# EXHIBIT B

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   In Re:                        )   Case No. LA13-15130-SK
                                  )
5   GGW BRANDS, LLC,              )   Los Angeles, California
                                  )   Wednesday, April 10, 2013
6            Debtor.              )   10:30 a.m.
    _____)
7                                 )
    In Re:                        )   Case No. LA13-15132-SK
8                                 )
    GGW DIRECT, LLC,              )
9                                 )
             Debtor.              )
10  _____)
                                  )
11  In Re:                        )   Case No. LA13-15134-SK
                                  )
12  GGW EVENTS, LLC,              )
                                  )
13           Debtor.              )
    _____)
14                                )
    In Re:                        )   Case No. LA13-15137-SK
15                                )
    GGW MAGAZINE, LLC,            )
16                                )
             Debtor.              )
17  _____)

18                                    HRG RE MOTION FOR ORDER
                                      DIRECTING THE APPOINTMENT OF A
19                                    CHAPTER 11 TRUSTEE

20

21                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE SANDRA KLEIN
22                UNITED STATES BANKRUPTCY JUDGE

23

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

```
 1  APPEARANCES:

 2  For the United States          DARE LAW, ESQ.
       Trustee:                    Office of the United States
 3                                   Trustee
                                   725 South Figueroa Street
 4                                 Suite 2600
                                   Los Angeles, California 90017
 5                                 (213) 894-4925

 6  For Wynn Las Vegas:            MALHAR S. PAGAY, ESQ.
                                   Pachulski, Stang, Ziehl &
 7                                   Jones, LLP
                                   10100 Santa Monica Boulevard
 8                                 13th Floor
                                   Los Angeles, California 90067
 9                                 (310) 277-6910

10                                 MITCHELL J. LANGBERG, ESQ.
                                   Brownstein, Hyatt, Farber
11                                   & Schreck, LLP
                                   2029 Century Park East
12                                 21st Floor
                                   Los Angeles, California 90067
13                                 (310) 500-4631

14  Proposed Counsel for           ROBERT M. YASPAN, ESQ.
       Debtor-in-Possession:       Law Offices of Robert M.
15                                   Yaspan
                                   21700 Oxnard Street
16                                 Suite 1750
                                   Woodland Hills, California
17                                   91367
                                   (818) 905-7711
18

19  Court Recorder:                Sandra Queen
                                   United States Bankruptcy Court
20                                 Edward R. Roybal Federal
                                     Building
21                                 255 East Temple Street
                                   Los Angeles, California 90012
22

23  Transcriber:                   Briggs Reporting Company, Inc.
                                   6336 Greenwich Drive, Suite B
24                                 San Diego, California 92122
                                   (310) 410-4151
25
```

*Briggs Reporting Company, Inc.*

1

1  LOS ANGELES, CALIFORNIA  WEDNESDAY, APRIL 10, 2013 10:30 AM

2                          --oOo--

3       (Call to order of the Court.)

4            THE COURT:  Matter number 37, GGW Brands.  It's

5  also matter numbers 38, 39 and 40.

6            MS. LAW:  Good morning, your Honor.  Dare Law on

7  behalf of the United States Trustee.

8            THE COURT:  Good morning, Ms. Law.

9            MR. PAGAY:  Good morning, your Honor.  Malhar

10 Pagay, Pachulski, Stang, Ziehl and Jones, together with

11 Mitchell Langberg of Brownstein, Hyatt, Farber and Schreck,

12 together for Wynn Las Vegas.

13           THE COURT:  Thank you.  How do you pronounce your

14 last name?

15           MR. PAGAY:  Pagay, P-A-G-A-Y.

16           THE COURT:  Pagay.  Thank you.

17           MR. PAGAY:  Thank you, your Honor.

18           MR. YASPAN:  Robert M. Yaspan, Y-A-S-P-A-N,

19 attorneys -- proposed counsel for the debtor in possession.

20           THE COURT:  Okay.  We're here on Wynn's motion for

21 order directing appointment of a Chapter 11 trustee.

22           I'd like to hear from Ms. Law first.  Even though

23 the U.S. Trustee filed a motion to dismiss yesterday, the

24 Court -- excuse me, a motion to appointment a trustee

25 yesterday, the Court did review that motion to appointment a

68

1          Wynn also filed an ex parte application for order

2     authorizing Wynn Las Vegas to file under seal Argyle Media

3     license agreement related to motion for order directing the

4     appointment of trustee.

5          On April 8th, the Court granted the ex parte

6     application.  A review of the email exchange highlighted by

7     Wynn as well as the document that was filed under seal

8     substantiates Wynn's contention that Francis attempted to

9     change the licensor with Direct TV from GGW Direct to Argyle

10    Media Sales, LLC.

11         Wynn asserts that Francis's intent was to transfer

12    these rights from GGW Direct, an entity subject to the alter

13    ego litigation to Argyle, an entity that was not.  Debtors

14    do not explain why Francis sought to transfer the rights

15    from GGW to Argyle.

16         Instead, debtors contend that courts will only

17    appoint trustees in cases where the debtor will continue

18    misconduct.  Debtors state that there is no evidence

19    presented of any misconduct pre-petition or post-petition

20    and even if there were pre-petition conduct, in the past,

21    debtors have a new management team since the time of the

22    alleged mismanagement.

23         For this proposition and for the fact that debtors

24    claim a trustee should not be appointed, they rely on In re

25    General Oil Distributors and In re Sundial Limited.

69

1          Here, the Court finds there is sufficient cause to

2   appoint a Chapter 11 trustee pursuant to 1104(a)(1).  This

3   finding is based on evidence of Francis's control over

4   debtors while he was the manager of Pablo Holdings which was

5   through late October, early November of 2012, as well as

6   what the Court perceives as Francis's continued control over

7   debtors since that time when Dale was purportedly promoted

8   to manager of Pablo Holdings.

9          The evidence is clear that despite debtors'

10  protestations to the contrary, that the trustee of the trust

11  controlled debtors, Francis was in complete control of

12  debtors through at least early November of 2012.

13          Pablo Holdings' operating agreement demonstrates

14  that the manager of Pablo -- who was Francis, not the member

15  as asserted repeatedly by debtors -- had absolute unfettered

16  discretion and complete control over Pablo Holdings, which

17  in turn controlled GGW Brands, the holding company of the

18  other GGW entities.

19          Further, although debtors seek to distance

20  themselves from Francis and claim that he often loudly

21  voices opinions or recommends to stamp on others regarding

22  whether someone should be hired or fired, the truth is that

23  at least through early November Francis had the ultimate say

24  in hiring and firing.

25          Francis alone determined how much he would be

*Briggs Reporting Company, Inc.*

70

1   paid, which was limited only by debtors' income.

2          From a review of his personal AmEx bills, it is

3   beyond dispute that GGW funds were used to pay Francis's

4   personal expenses.  He also used GGW assets to pay for

5   lawyers who represented him personally.

6          Although Kluger testified that when he was first

7   engaged by debtors, he researched whether Francis's personal

8   legal fees were properly deducted and he concluded that most

9   of the legal expenses incurred were legitimate business

10  expenses.  Because in most cases the assets of the companies

11  were being protected, that does not alter the analysis.

12         The implication is that some of the expenses might

13  not have been considered legitimate expenses or that Kluger

14  did not research all of the expenses.

15         Further, debtors' assertion that Francis did not

16  have any control over the GGW entities is belied by the fact

17  that he negotiated with and terminated vendors on behalf of

18  the GGW entities and that is evidence related to the Direct

19  TV emails and the Molten emails.

20         Further, the timing of Francis's attempt to change

21  the Direct TV licensor from GGW Direct to Argyle Media Sales

22  further supports the Court's belief that a trustee is

23  warranted.

24         On 7/20/2012, the Nevada state court issued a

25  preliminary injunction in the alter ego litigation which

71

1   continued to freeze 2,000,000 in funds claimed to belong to

2   GGW Brands and/or Direct which were held in David Houston's

3   client trust account.  Five days later, Francis attempted to

4   change the Direct TV licensor from GGW to Argyle Media

5   Sales, LLC.

6          Wynn also alleges that the attempted transfer to

7   Argyle should arouse suspicion about the nature and purpose

8   of any payments or transfers of assets from any of the

9   debtors to Argyle.

10          Wynn asserts that Argyle is a cancelled California

11   LLC that was registered with the Secretary of State under

12   Tim's name.  Wynn does not present any evidence supporting

13   this assertion and none is in the record.

14          Wynn also highlights that Aftergood signed the

15   agreement purportedly between Direct TV and the GGW Brands

16   where Mr. Francis was trying to change the licensor to

17   Argyle which Wynn asserts is reason to believe that Francis

18   controls everything and everyone related to debtors in an

19   attempt to manage the assets of his company.

20          Undercutting Wynn's arguments, only slightly

21   though, on this point, is Francis's seeming nonchalance in

22   response to Direct TV's reluctance to accept the amended

23   license agreement.

24          If Francis were determined to divert assets at

25   that time, it seems likely he would have made more of an

*Briggs Reporting Company, Inc.*

72

 1  effort to persuade Direct TV on this point.

 2          Although debtors argue that Dale is now the

 3  manager of the debtors and Francis purportedly has no actual

 4  power or control over the GGW entities, the Court finds that

 5  such an assertion is not credible.

 6          It is true that Dale now claims to be the manager

 7  of Pablo Holdings.  However, the timing of Dale's promotion

 8  and his independence are questionable.  The Court notes that

 9  Dale was purportedly promoted to manager of Pablo Holdings

10  in late October, early November, which was approximately the

11  same time as the Wynn -- as Wynn filed its motion for

12  appointment of a limited receiver in the California judgment

13  litigation.

14          Further, the Court has serious concerns regarding

15  Dale's ability to manage the GGW entities.  It's undisputed

16  that Dale was debtors' human resources manager at least

17  until August 29, 2012 and he concedes that at that time, his

18  knowledge of and authority over debtors was extremely

19  limited.

20          By late October, early November, Dale had been

21  elevated by Asia Trust Limited as trustee of the Ridgewood

22  Trust to purportedly manage Pablo Holdings and therefore

23  debtors.

24          He at that point was then responsible for what Mr.

25  Yaspan claims were 13 employees and at least 22 independent

73

1    contractors and a multimillion-dollar brand.

2           Debtors submitted Dale's declaration in support of

3    their opposition and they certainly could have provided

4    information regarding Dale's education, background and

5    experience that could have substantiated that he has the

6    knowledge, ability and background to manage debtors.

7           Debtors did not provide this information or about

8    the controller, the letter of whom debtors claim has years

9    of experience as a controller.  The lack of information

10   submitted by debtors on the important issue of the

11   experience of their management team is significant.

12          Additionally, as the Court noted during the 341(a)

13   meeting of creditors, Dale appeared and testified on behalf

14   of debtors.  Dale testified that he works approximately four

15   to five hours per week for the GGW entities and he is

16   currently working for an unrelated entity called Movie Clips

17   as an HR manager.

18          Although Dale testified he is the decision maker

19   for the GGW entities, he admitted relying on the department

20   heads to make day-to-day operating decisions.

21          Although Dale claims that Francis no longer has

22   any control over debtors, the Court does not believe this to

23   be true.  Debtors' explanation of GGW Direct's $65,000

24   payment to Kiki Entertainment that was made on 2/7/13, which

25   coincided with the date that the GGW entities filed for

74

1  bankruptcy, demonstrates that Francis still controls

2  debtors.

3        According to Tim, the $65,000 payment from GGW

4  Direct to Kiki Entertainment occurred because Perfect

5  Science Labs needed to wire funds from its account but did

6  not have the ability to do so; therefore, GGW Direct agreed

7  that Perfect Science Labs could transfer money from its

8  account and then GGW Direct would forward the money to Kiki

9  Entertainment.

10        What Tim did not state is that Francis is the

11  manager of Perfect Science Labs and that evidence is

12  contained in the Langberg declaration, Exhibit 6 and Exhibit

13  D, the second Langberg declaration.

14        And even though Mr. Tim claims that the payment to

15  Kiki Entertainment was on behalf of Perfect Science Labs,

16  the evidence submitted to support this contention

17  demonstrates that Argyle Online, rather than Perfect Science

18  Labs, transferred $65,000 into GGW Direct's account.

19        Additionally, the evidence related to the

20  $274,250.52 payments made to Argyle Online within a week of

21  the GGW cases being filed also raises significant concerns

22  with the Court.

23        On February 19, 2013, GGW Direct reported paying

24  Argyle a total of $214,250.52.  Approximately a week later,

25  on 2/25 Argyle Online as the, quote, U.S. representative of

75

1 Path Media was paid an additional $60,000 and then executed

2 a 95-day lease agreement for a total of 274,250.52 for the

3 use of the GGW trademarks.

4          The Tim 4/5 declaration and the 2/25 agreement

5 between Path Media and GGW Direct that purportedly

6 demonstrates the basis for the almost $275,000 payment

7 appears strange to the Court for a number of reasons.

8          First, the agreement just happened to be dated two

9 days before debtors filed for bankruptcy, and it was for a

10 90-day period.  There was no explanation why the agreement

11 is for such an odd number of days.

12          Second, even if it were a valid agreement, which

13 the Court is not convinced it is, the 274,250.52 amount of

14 the agreement is odd and it is exactly the same amount as

15 the total of the three payments that GGW Direct made within

16 a week of filing bankruptcy.

17          Finally, the agreement states explicitly that the

18 effective date was 2/25/13, which was the date of the last

19 $60,000 payment to Argyle.  GGW Direct, however, had paid

20 Argyle a total of more than $214,000 a week before, on

21 February 19, 2013.

22          Therefore, the payments made on February 19th

23 raise issues regarding whether debtors as fiduciaries should

24 pursue a possible fraudulent conveyance or preference action

25 against Path Media and/or Argyle Online to recover these

76

1   payments.

2       It is undisputed that Path Media is owned by

3   Ridgewood Trust, the sole member of Pablo Holdings and In re

4   Pitt Penn Holding Company, 484 B.R. 25, Bankruptcy, the

5   District of Delaware, 2012, stated that a close relationship

6   between the transferor and transferee is one of the badges

7   of fraud for purposes of determining whether a transfer is

8   fraudulent under section 540(a).

9       Finally, debtors' repeated assertions that the

10  trustee of the trust, and not Francis, controls debtors is

11  not true.  The Pablo operating agreement reveals that the

12  manager of Pablo Holdings, Francis and then Dale late

13  October, early November, and not its member Asia Trust

14  Limited, the trustee of Ridgewood Global Trust, is vested

15  with expansive control and power over Pablo and therefore

16  over debtors.

17      Section 9 of the Pablo operating agreement again

18  states that all management powers over Pablo are and shall

19  be exclusively vested in the manager and the member shall

20  not have any right to participate in any exercise, control

21  of management power or over the business and affairs of the

22  company.

23      As noted above, the Pablo agreement then lists

24  numerous functions of the manager demonstrating that the

25  manager, and definitely not the member, has unlimited

77

1    discretion regarding the management of Pablo.

2           In light of this unambiguous language in the Pablo

3    operating agreement, it's clear that the debtors continued

4    statement that the trustee of the trust, and not Francis,

5    has control over debtors is absolutely not true, despite

6    debtors' claim, Ridgewood Trust, as a member of Pablo has no

7    power over that entity.

8           As a result, Ridgewood Trust has no power over

9    debtors which are controlled by Pablo.  Control over Pablo,

10   and therefore control over debtors was vested exclusively in

11   the manager of Pablo.

12          According to Dale, he was elevated -- and that's a

13   direct quote from his declaration -- by Asia Trust Limited,

14   as trustee of the Ridgewood Global Trust, to be manager of

15   Pablo.  Again, Dale doesn't state exactly when that

16   occurred.

17          And, as I mentioned previously during the 341(a)

18   meeting, he had mentioned that he had not applied for the

19   manager position and that he learned about his appointment

20   during a telephone call from Robert Tim, who is representing

21   debtors and who has filed a number of declarations before

22   this Court.

23          On January 28, 2013, Dale signed a declaration in

24   which he stated that he was custodian of records of Pablo

25   Holdings and the GGW entities.  And that declaration was

*Briggs Reporting Company, Inc.*

78

1    Exhibit C to the second Langberg declaration that was filed

2    with the reply.

3          Attached to the declaration were copies of

4    operating agreements for the GGW entities as well as the

5    Pablo operating agreement.

6          Exhibit D-1 to Dale's January 28, 2013 declaration

7    is an amended and restated operating agreement of GGW

8    Brands, a Delaware limited liability company.

9          That operating agreement indicates that it was

10   amended and restated on February 19th and that the business

11   affairs of GGW Brands shall be managed by a board of

12   managers consisting of one manager appointed by the sole

13   member.  The initial manager shall be Christopher Dale and

14   the manager may be replaced at any time by the member, which

15   is defined as Pablo later in the agreement.

16         On the last page under the word "Member," which is

17   listed as Pablo Holdings, there is a stamp that states "ATP

18   Directors Limited by its duly authorized officer," and there

19   are signatures of Angela Pope and Lynette -- and her last

20   name is illegible.

21         The problem with the GGW amended operating

22   agreement is that pursuant to the Pablo operating agreement,

23   the manager of Pablo was in exclusive, complete control over

24   Pablo.  Therefore, it appears that the GGW operating

25   agreement might not be a valid effected document because it

1  was signed on behalf of Pablo Holdings by non-manager

2  parties.

3          The Court recognizes that even if Francis was

4  guilty of fraud, dishonesty, incompetence or gross

5  mismanagement, that does not necessarily mean that there is

6  cause and that a trustee must be appointed -- and that a

7  trustee doesn't have to be appointed if the Court is

8  satisfied that current management is free from the taint of

9  prior management.

10          As noted above, the evidence is not sufficient for

11  the Court to be satisfied that debtors' current management

12  is competent to be managing the debtors or that they are

13  acting independently.

14          Although the evidence is insufficient for this

15  Court to untangle the intricate web of interrelated

16  companies in this case, it's abundantly clear that all of

17  the interrelated companies are somehow related to Francis

18  and are controlled by him or someone acting on his behalf.

19          Therefore, the Court finds there is cause to

20  appoint a trustee under 1104(a).

21          Turning to -- that was 1104(a)(1).

22          Turning to 1104(a)(2), Wynn contends that

23  appointment of a trustee is warranted under (a)(2) because,

24  quote, "A trustee is essential to remedy the vacuum created

25  by debtors' abdication of control to Francis and the

80

1    resulting self-dealing."

2         The debtors do not exist independently from

3    Francis and cannot be trusted to do anything other than what

4    is in the best interest of Francis.

5         No rehabilitation is in prospect for which any

6    management expertise would be required, and in light of the

7    puppet managers installed by Francis, it appears that the

8    debtors' management would lack the knowledge and expertise

9    to lead to any such rehabilitation.

10        Wynn cites several cases to support its view that

11   under 1104(a)(2) the court employs a flexible standard and

12   courts consider several factors when determining whether to

13   appoint a trustee.

14        Debtors counter that appointment of a trustee

15   would be contrary to the interests of creditors because

16   debtors intend to pay all legitimate claims in full, debtors

17   are being professionally managed with an accounting staff

18   and experienced controller, and appointment of a trustee

19   would quickly cause the economic collapse of the GGW

20   entities since they will lose their right to use the Girls

21   Gone Wild brand.

22        And a trustee would not have the same motivation

23   as the debtors' management to reorganize the business and

24   preserve its enterprise value.

25        Debtors cite two cases for the proposition that

*Briggs Reporting Company, Inc.*

81

1    deciding whether to appoint a trustee pursuant to section

2    1104(a) is essentially a cost benefit analysis.  And debtors

3    assert that the factors listed above illustrate that the

4    cost of appointing a trustee outweigh the benefits.

5            Both Wynn and debtors frame the same legal

6    standard in slightly different terms.  As noted above, when

7    determining whether to appoint a trustee under 1104(a)(2),

8    the standard is flexible and courts examine the four factors

9    that I previously mentioned.

10           Further, as noted above, even if current

11   management is competent and honest, appointment of a trustee

12   may be warranted if management was recently appointed but

13   does not have the expertise that an exceptional trustee

14   would have in reorganizing the debtor.

15           In terms of trustworthiness of debtors.  The

16   essence of Wynn's argument is that debtors cannot be

17   trusted.  In Wynn's view, current management is merely a

18   puppet who is controlled by Francis and after Wynn took

19   steps to collect from the GGW entities, debtors' management

20   structure was changed to avoid impending court orders.

21           Wynn argues that debtors do not exist

22   independently from Francis and cannot be trusted to do

23   anything other than what is in the best interest of Francis.

24           Debtors acknowledge that Francis still has a role

25   with debtors as a consultant but maintain he has no actual

82

1  power or control over the GGW entities.  That assertion is

2  belied by Francis's relationship with Path Media.

3          Debtors assert that if a trustee were appointed,

4  the GGW entities would face, quote, economic death, end

5  quote, because Path Media, an allegedly unaffiliated

6  company, would purportedly not renew an intellectual

7  property license that exists between Path Media and debtors.

8          Contrary to debtors' assertion, the evidence

9  demonstrates that Path is owned by Ridgewood Trust which was

10  settled by Francis and therefore is not an unaffiliated

11  company.

12          Path Media obtained the IP rights which debtor

13  believes to be incredibly valuable because Path Media's

14  failure to renew those rights would result in debtors'

15  economic death for no consideration.  That was from Kluger's

16  deposition.

17          Through his control over Path Media and its

18  exceedingly valuable IP rights, Francis exercises complete

19  control over debtors.  Debtors' assertion that Francis

20  exercises no power or control over debtors therefore rests

21  on shaky ground, undermining debtors' credibility.

22          Further, the fact that debtors chose to

23  characterize Path Media as an unaffiliated company also

24  seriously undercuts debtors' trustworthiness.

25          Debtors' trustworthiness is also called into

83

1  question by their representations and filings before this
2  Court regarding who controls debtors.
3         The GGW entities' assertion that the trustee of
4  the trust and not Francis purportedly had ultimate say
5  regarding the management of the companies is not true, as
6  analyzed above.
7         Control over Pablo Holdings, and therefore control
8  over debtors, was and continues to be vested in the manager
9  of Pablo Holdings.
10        Although debtors claim that Dale is now in charge,
11 the Pablo operating agreement and the evidence related to
12 transfers, both into and out of the GGW entities' bank
13 accounts a few days before filing, support Wynn's contention
14 that Dale is a figurehead.
15        Further supporting that contention is the fact
16 that Dale only works four to five hours a week for debtors,
17 has outside employment and he leaves day-to-day management
18 decisions to managers who were not named and identified and
19 their credentials are not known to the Court.
20        Further, the fact that Dale is now purportedly
21 Pablo Holdings' manager does not engender an increase in the
22 debtors' trustworthiness.  It is difficult for the Court to
23 believe that Dale, who in August of 2012 was a human
24 resources manager and who knew little about debtors, is now
25 running a multimillion-dollar brand.

84

1        As mentioned Dale admitted working only four to

2  five hours a week and he leaves others to make the day-to-

3  day decisions.

4        Debtors' misrepresentation to this Court about

5  Pablo Holdings' true organizational structure as well as

6  significant questionable payments debtors made a few days

7  before filing for bankruptcy and the fact that debtors were

8  not able to produce a large, over 50,000 bill that was

9  purportedly for legal services, calls into question the

10  trustworthiness of debtors and weighs heavily in favor of

11  appointing a trustee.

12        In terms of debtors' past and present performance

13  and their prospects for rehabilitation, the Court has very

14  little information about debtors' past and present

15  performance.

16        The Court notes that even thought the cases were

17  filed and debtors claim that they have continued to operate

18  their business during the administrative period and have

19  even noticed an uptake in sales due to the publicity

20  surrounding the filing of the cases, the Court doesn't have

21  any information regarding the specifics of the debtors'

22  business.

23        I did review the initial status report that was

24  filed by debtors' counsel.  It does not provide any level of

25  detail regarding the debtors' business.

85

1          Further, the Court notes that debtors did not file

2    the typical, quote, first day, end quote, motions that are

3    filed in most corporate Chapter 11 cases.

4          For example, debtors did not seek authority to pay

5    pre-petition payroll even though they claim they employ --

6    now, they claim 13 employees.  I believe in one pleading it

7    said they had 17 employees and numerous independent

8    contractors.

9          Additionally, debtors did not file a motion

10   deeming the utilities to be adequately assured of future

11   performance pursuant to 11 U.S.C. section 366.  Therefore,

12   debtors' electricity, water or other utilities could be

13   terminated without warning at this point if debtors were

14   behind on their payments.

15         Debtors have also, as noted, not timely filed

16   monthly operating reports, although Mr. Yaspan mentioned

17   that there was a monthly operating report filed last

18   evening.

19         Therefore, the Court does not have any information

20   regarding the debtors' performance.  The fact that

21   $2,000,000 in funds belonging to GGW Brands and/or Direct

22   were frozen by court injunction sometime in 2012 is not

23   encouraging.

24         Although Dale, the person who claims to currently

25   be in charge of debtor, states that debtor is currently a

86

1  profitable business that is paying its bills and meeting its

2  obligations, it is difficult to believe this given that Dale

3  only works four to five hours a week.

4      Further, GGW Direct allowed Perfect Science Labs

5  and/or Argyle Online to use their account to transfer funds

6  the day that the bankruptcy was filed.

7      And little more than a month before debtors filed

8  for bankruptcy, GGW Direct paid Perfect Science Labs'

9  American Express bill that was issued in the name of Perfect

10 Science Labs and Joe Francis.  It is undisputed that Francis

11 is the manager of Perfect Science Labs.

12     As I mentioned, debtors were not able to provide a

13 copy of a 53,000 invoice or bill for a payment made to the

14 attorney who Mr. Tim claims is an attorney representing

15 debtors in a Mexico litigation.  Although the reason for

16 allowing these transfer of payments is unknown and maybe

17 questionable, it does demonstrate that debtors do not have

18 appropriate internal controls in place.

19     Therefore, this factor weighs in favor of

20 appointing a trustee.

21     In terms of the level of confidence of the

22 business community and creditors in current management, it

23 is clear that Wynn obviously does not have any confidence in

24 debtors' current management.  And also debtors dispute

25 Wynn's claim, Wynn is by far debtors' largest creditor.

87

1  Debtors allege the current management consists of

2 Dale as lead executive and that debtors are being

3 professionally managed with an accounting staff and

4 experienced controller.  Debtors acknowledge that Francis

5 still has a role as a consultant.

6  Regarding Dale, the Court, as mentioned, has no

7 information about his background, expertise or any other

8 information that would give the Court confidence that he

9 would be able to manage debtors.

10  Likewise, there's no evidence demonstrating how

11 the business community as a whole is likely to view Dale.

12 He was an HR manager until sometime at the end of October,

13 early November.  He is also now an HR manager for an

14 unrelated company.

15  Dale appears to have risen in the ranks quite

16 quickly and there's no evidence demonstrating his education,

17 business skills or acumen and/or managerial skills.  In

18 fact, Dale's testimony during the 341(a) meeting supports

19 Wynn's and the Court's lack of confidence in Dale to manage

20 debtors.

21  The Court also has no information about any other

22 managers of debtors other than Dale's conclusory statement

23 that the controller has years of experience as controller of

24 companies.

25  On balance, the Court finds that this factor

*Briggs Reporting Company, Inc.*

88

1   weighs in favor of appointing a trustee.

2           Finally, benefits of appointment balanced against

3   costs.

4           If the Court appoints a Chapter 11 trustee, many

5   of the concerns regarding transparency and Francis's level

6   of control would be alleviated.  A trustee would not have

7   any conflicts of interest that would prevent him or her from

8   pursuing possible claims for fraudulent transfers and/or

9   preferences.

10          Debtors' current management, on the other hand,

11  would be less likely to pursue such claims because of their

12  previous personal and professional relationships with

13  transferees.

14          A similar concern was before the court in In re

15  Microwave Products of America, Inc., 102 B.R. 666.  There,

16  the court found that appointment of a trustee would be in

17  the best interests of the creditors, in part because of the

18  existence of several transactions that the court saw as

19  questionable, including questionable accountings regarding a

20  $5,000,000 promissory note.

21          A director claimed to have sold the note at a

22  discounted price to a company owned by the director.

23  However, after the date of the supposed sale, the note was

24  still on debtor's books as a $5,000,000 asset.

25          The CFO sought direction from the board of

89

1  directors regarding this transaction, but the board did not

2  advise him on how to reflect the transaction on the debtor's

3  books.

4          The court noted that because the debtor is not in

5  a strong posture to pursue possible claims that may have

6  resulted from conflicts of interest and fraudulent

7  transfers, a trustee would likely be able to investigate

8  claims that could result in additional sums of money coming

9  into the estate.

10          The court also stated that because of the erosion

11  of confidence in the debtor, there is likely to be increased

12  litigation which will result in escalating legal costs to

13  the estate.

14          Many of the same concerns are present here.

15  Debtors have engaged in questionable transactions with

16  insiders, and current management would not have an incentive

17  to attempt to pursue possible fraudulent transfer or

18  preference claims.

19          Debtors here are also embroiled in litigation

20  which is likely to lead to more litigation costs to the

21  estate.

22          Debtors contend that if a trustee is appointed,

23  Path Media would not renew IP licenses with debtors that are

24  crucial to their business.  This assertion is questionable,

25  and even if it were true, there is no explanation why a

90

1  trustee would not be able to secure use of such rights.

2         Although a trustee will need time to familiarize

3  him or herself with the debtors' business, as noted Dale,

4  who is purportedly in charge of debtors, only assumed his

5  current position, at the latest, early November.

6         He has outside employment at an unrelated company

7  and he only works four to five hours per week for debtors.

8  He also leaves day-to-day operations to unnamed department

9  heads.

10         There was also no evidence demonstrating that

11 Dale, even if he worked full-time for debtors, would have

12 the knowledge, experience or expertise to manage debtors

13 successfully.

14         As analyzed above, on balance, the Court finds

15 that appointment of a Chapter 11 trustee would be in the

16 best interests of the creditors pursuant to 1104(a)(2).

17         So that concludes the hearing.

18         Ms. Law, in terms --

19         I guess it's -- Wynn needs to upload an order and

20 the order -- it's not going to be, oh, my goodness a two-

21 hour order.  It's going to be about three lines, which will

22 be for the reasons stated on the record.

23         And can you get that uploaded today?

24         MR. PAGAY:  Yes, your Honor, I can.  I was hoping

25 you'd say that I could just refer to the record.

94

1  be that they were all treated as one entity and the Court is

2  appointing a trustee in all four cases.

3          MR. YASPAN:  Thank you.

4          THE COURT:  Thank you.

5          Is there anything further?

6          Okay.  That concludes the hearing.  Off the

7  record.

8      (Proceedings concluded.)

9

10

11          I certify that the foregoing is a correct

12  transcript from the electronic sound recording of the

13  proceedings in the above-entitled matter.

14

15  /s/ Holly Martens                    4-15-13
    Transcriber                          Date

16

17

18

19

20

21

22

23

24

25