# EXHIBIT E

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           FOR THE COUNTY OF LOS ANGELES

3

4  WYNN LAS VEGAS, LLC d/b/a WYNN    )
    LAS VEGAS,                      )

5                               )
             Judgment Creditor,    )

6                             )
          vs.             ) No. BS123009

7                           )    BC296675
    JOSEPH FRANCIS,             )

8                           )
            Judgment Debtor.     )

9  _____)
                           )

10  IN RE GIRLS GONE WILD LITIGATION. )
    _____)

11

12

13

14          PMK OF MANTRA FILMS, INC.

15             DEPOSITION OF

16             JOSEPH FRANCIS

17         LOS ANGELES, CALIFORNIA

18           APRIL 18, 2012

19

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS

22  (800) 288-3376
    www.depo.com

23  REPORTED BY:    CANDACE A. NICHOLS, CSR NO. 12239
    FILE NO.:  A50A2FD

24

25

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3

4   WYNN LAS VEGAS, LLC d/b/a WYNN     )
    LAS VEGAS,                         )
5                                      )
                Judgment Creditor,     )
6                                      )
                vs.                    )  No. BS123009
7                                      )      BC296675
    JOSEPH FRANCIS,                    )
8                                      )
                Judgment Debtor.       )
9   _____)
                                       )
10  IN RE GIRLS GONE WILD LITIGATION.  )
    _____)
11

12

13

14          DEPOSITION OF PMK OF MANTRA FILMS, INC.,

15  JOSEPH FRANCIS, taken on behalf of Judgment Creditor, at

16  111 North Hill Street, Department 1-A, Los Angeles,

17  California, commencing at 9:38 a.m., Wednesday, April 18,

18  2012 before CANDACE A. NICHOLS, CSR No. 12239.

19

20

21

22

23

24

25

1              A P P E A R A N C E S:

2

3   FOR JUDGMENT CREDITOR:

4              BROWNSTEIN, HYATT, FARBER, SCHRECK
               BY:  CHAD SEBER, ESQ.
5              225 Broadway
               Suite 1670
6              San Diego, California 92101

7

8
    FOR JUDGMENT DEBTOR:
9
               THE AFTERGOOD LAW FIRM
10             BY:  AARON D. AFTERGOOD, ESQ.
               1875 Century Park East
11             Suite 2230
               Los Angeles, California 90067
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2   WITNESS:    JOSEPH FRANCIS

 3   EXAMINATION                                   PAGE

 4        By Mr. Seber                               5

 5

 6   EXHIBITS
                      JUDGMENT CREDITOR
 7   NUMBER              DESCRIPTION               PAGE

 8    1            Printout from Joe Francis's       44
                  website - 7 pages
 9

10    2            E-mail from Bob Klueger to        71
                  Leticia Kimble dated 3/21/12 -
11                1 page

12

13    3            Subpoena dated 4/11/12 - 11       75
                  pages
14

15    4            Certificate of Shares for Joe     85
                  Francis - 1 page
16

17    5            Civil Subpoena dated 1/18/12 -    88
                  8 pages
18

19

20

21

22

23

24

25
```

4

1    LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 18, 2012;

2                    9:38 A.M.

3

4                JOSEPH FRANCIS,

5           having been first duly sworn, was

6           examined and testified as follows:

7

8                  EXAMINATION

9    BY MR. SEBER:

10       Q.   Mr. Francis, is it okay if I call you Joe?

11       A.   It's okay if you call me Joe.

12       Q.   You've just been sworn in.  You were sworn in

13   downstairs, as well, too.  You have an understanding of

14   that oath?

15       A.   Do you mind if I just . . .

16       Q.   Just make yourself comfortable.  Yeah, make

17   yourself comfortable.  So, even though we are in a

18   cafeteria here, it's just like we're in a court of law,

19   testifying under oath with the full meaning, force, and

20   effect.  Do you have any questions about that?

21       A.   No, no questions about that.

22       Q.   The last time we went over a lot of the kind of

23   procedures and ground rules.  I think one of the biggest

24   things that I have a problem with is not talking over

25   each other, because we have a natural tendency, when we

1   are having a conversation, we want to just kind of help

2   each other along.  So, let's try to do that today, try

3   not to talk over each other.  If you have any

4   questioning about my questions, let me know.  I'm sure

5   Mr. Aftergood here will object.  Give him time to

6   object, and then we'll hash things out if we can.

7           The last time, the last examination that I took

8   of you, I think it was around August of this last year.

9   Do you recall that?

10      A.   Yes.

11      Q.   Around August 22nd.  I don't know the date for

12  certain, but it was here in this building.

13      A.   Correct, downstairs.

14      Q.   Right.  And then you were represented by Liner

15  and the I think the gentleman's name was Daniel . . .

16      A.   Gutenplan.

17      Q.   Correct.  There's a lot of talk -- it seemed

18  like you were on the eve of filing bankruptcy at that

19  time?

20      A.   Yeah.

21      Q.   Do you remember that?

22      A.   Yes.

23      Q.   What happened between now and then?  Are you

24  still considering bankruptcy right now?

25      A.   100 percent.

1      Q.   Is that on the doorstep, so to speak?

2      A.   Filed a complaint, if it was -- yeah, it's the

3   plan.

4      Q.   In your personal capacity?

5      A.   Personal and corporate, absolutely.

6      Q.   What corporations?

7      A.   Well, I don't -- I'd have to talk to my lawyers

8   about what corporations.

9      Q.   Which lawyers?

10     A.   Mr. Aftergood.

11     Q.   Is it accurate to say that Mr. Aftergood

12  handles the majority of your legal affairs?

13     A.   No.

14     Q.   Who are the other attorneys that you employ?

15     A.   I use Roy Black, I use Matt Dershowitz.  I

16  use --

17     Q.   Hold on.  Just slow down a second.

18     A.   Oh, I'm sorry.

19     Q.   I just want to make sure she gets it.  I'm

20  still processing names.

21     A.   Roy Black, Matt Dershowitz, Dave Houston,

22  Aaron Aftergood.

23          MR. AFTERGOOD:  And at this juncture, I want to

24  just remind the deponent or the witness to be careful

25  about venturing into anything --

1          THE WITNESS:  Well, I'm not going to talk about

2    any conversations.

3    BY MR. SEBER:

4       Q.   Yeah, I don't want to know about any specific

5    conversations.  You know that.  You've had your

6    deposition taken many times.

7       A.   Yeah.

8       Q.   I'm not going to try to trick you into

9    divulging any attorney-client privileges.  What type of

10   matters -- the subject matters, not the specific

11   matters -- does Mr. Black handle for you?

12      A.   I think that's attorney-client privilege.

13      Q.   As far as it's transactional or if it's -- I

14   mean, anything of public record I'm talking about, Joe.

15      A.   The things that they handle -- and this is what

16   I've been advised by counsel:  They are attorney-client

17   privilege and do not discuss -- by all counsel.

18      Q.   By all counsel?

19      A.   Because they are conversations that happened

20   between me and my attorney, and that's my privilege to

21   hold -- this is how it's been explained to me by

22   counsel.  So, if you ask me their names, I can tell you

23   their names.  Anything else beyond that, I'm going to

24   have to claim the attorney-client privilege.

25      Q.   Just so I understand your position, is your

1    position if a matter -- say, Mr. Black is handling a

2    matter for you that's a public record --

3        A.    Oh, it's if it's a public record --

4        Q.    A public record, yeah.

5        A.    -- the public record should speak for

6    themselves.

7        Q.    Yeah, that's what I'm asking about, and I think

8    I'll make it a little bit easier.

9        A.    He's handled some public things for me in the

10    past, but nothing's public right now.

11        Q.    Nothing's public.

12            In the matters that he's handled for you in the

13    past, the public matters -- were they transactional in

14    nature?  Were they litigation in nature?

15        A.    I think, you know, just you can Google it, and

16    it speaks for itself.  I don't want to waive that

17    privilege by discussing my communications or -- you

18    know, because I just don't want to waive that privilege.

19    And my attorney just warned me that the minute I go down

20    that road, it's -- you know . . .

21        Q.    Are those -- right now you currently -- you

22    currently employ, you personally, Mr. Joe Francis?

23        A.    I'm sorry?

24        Q.    Yeah, let me make sure I'm making it clear.  Do

25    you employ these attorneys, Mr. -- what was the first

1    gentleman's name besides Mr. Aftergood?

2        A.    No, the only attorney that I employ personally

3    is Mr. Aftergood.

4        Q.    So, the other gentlemen that you referenced are

5    employed by who?

6        A.    Well, you asked who's done work for me.

7        Q.    Right.  Now I'm just asking a different

8    question.

9        A.    Okay.

10       Q.    I'm not trying to mischaracterize your

11   testimony.

12           THE WITNESS:  Are you kind of confused?

13           MR. AFTERGOOD:  I am little confused.

14           THE WITNESS:  Just help me out.

15   BY MR. SEBER:

16       Q.    Yeah, let me help you out.  The first

17   gentleman's name was Mr. Blackwood?

18       A.    Roy Black.

19       Q.    And was he employed by you or was he employed

20   by someone else?

21       A.    I don't -- I don't know.  I haven't seen -- I

22   can't recall right now.  I don't know what the fee

23   agreement says.

24       Q.    And the same question for Mr. Houston.

25       A.    He wasn't employed by me personally.  I don't

1 think that -- no, I don't believe he was employed by me

2 personally, retained by me, but I don't know that -- I

3 don't want to discuss my attorneys' retainer agreements.

4 I believe that's privileged, isn't it?

5   MR. AFTERGOOD:  I don't know.

6 BY MR. SEBER:

7  Q.  Look, I'm not asking the specifics, Joe.  I'm

8 trying to make it easy.

9  A.  Yeah, yeah.  What do you want to know?

10  Q.  I just want to know if they were employed by

11 you or they were employed by someone else.

12  A.  And I don't know the answer to that question.

13 I mean, I'd have to review the retainer agreements, but

14 probably I couldn't discuss it.

15  Q.  I'll move on to a different topic.  It's a

16 little easier.  You know that I watched the Super Bowl

17 and that whole thing with Madonna.  Tell me what

18 happened with that, because I don't quite understand it.

19 There's a -- obviously there's some type of trademark

20 with Girls -- affiliated with Girls Gone Wild, right?

21  A.  It was just a publicity stunt.  It was merely a

22 publicity stunt.  There was -- I don't believe we ever

23 actually filed anything or did anything other than send

24 a letter to Madonna asking her not to -- sent a

25 letter -- I think it's all in the press.

1     Q.   I know.  That's how I know about it.  It's no

2  great detective work.  I just googled your name; and

3  it's, like, one of the top results in actually recent

4  controversy, Madonna --

5     A.   It's interesting.

6     Q.   It is.  I watched a little bit of the halftime

7  show.  I was a little disappointed --

8     A.   Kind of like they shouldn't have done that

9  song, don't you think?

10    Q.   I was waiting.

11    A.   I think the album would have done well.  The

12 album would have done well had they released that first.

13    Q.   What song is that?

14    A.   Girl Gone Wild -- or Girls Gone Wild.  She

15 changed it to Girl Gone Wild, right?

16    Q.   It's pretty cheesy.

17    A.   Pretty cheesy.

18    Q.   She was going to use Girls Gone Wild?

19    A.   Oh, yeah.

20    Q.   Then she changed it to Girl Gone Wild?

21    A.   Yeah.

22    Q.   And is Girl Gone Wild actually -- is that

23 actually a song on her album?

24    A.   Girls Gone Wild is.  Yeah, it's the No. 1 song

25 on her album, but she changed it now to Girl Gone Wild.

1    Q.   Did she have to go back and recut the lyrics

2    and everything?

3    A.   Yeah, they did the night before they released

4    it.  Yeah.  This is my understanding, and this is all,

5    like, what I understand from her people.

6    Q.   And that's all I'm asking for.  So, there is --

7    obviously there is a Girls -- Girls plural -- Gone Wild

8    trademark?  Is it a trademark, I take it?

9    A.   I would have to ask my attorneys.

10    Q.   Which attorney?

11    A.   Mr. Aftergood.

12    Q.   Do you have any understanding who has ownership

13    rights to that trademark?

14    A.   No, I don't, but I don't know who does.

15    Q.   You don't.  You mean you personally?

16    A.   Yeah -- nor do I know.

17    Q.   Was there any legal action taken against her

18    for possible infringements of that trademark?

19    A.   Nope.

20    Q.   Any --

21    A.   There was a threat of legal action.  I think it

22    was just --

23    Q.   Just that letter?

24    A.   Just a press play.  It's on the Internet.

25    Q.   Yeah, I'll look at it.  It's a bit interesting.

13

 1          The last time we talked, I asked you some

 2    questions about your -- just basic questions about

 3    income.  I'm going to ask the same questions now.

 4          A.    Go ahead.  That's fine.

 5          Q.    So, what is your current income right now?

 6          A.    I don't think I have an income.

 7          Q.    How about -- and I'll break it down.

 8          A.    Okay.  Go ahead.

 9          Q.    How about bonuses?  Do you receive any -- like,

10    a commission?  I know some people consider, like, an

11    income, like, a 9:00 to 5:00 job.

12          A.    No, an income would be anything probably

13    that -- economic benefit that I receive, and I just

14    don't right now and I haven't in quite some time.  The

15    same answer I gave you six months ago.

16          Q.    So, when was the last time you had any

17    income -- an income?

18          A.    2008, 2007.

19          Q.    Before the Mantra . . .

20          A.    Debacle?

21          Q.    Debacle, scandal that we talked about?

22          A.    Yep.  You have that all on the transcript, too.

23          Q.    Yeah, I know.  I've read it.

24          A.    Yeah.  I mean, like, so, what would you do?

25    You'd file for bankruptcy, too, you know what I'm

1  saying?  But you'd tee everything up and let everything

2  play out and then just file.  That's what I'm waiting

3  for.  I'm just waiting for some judgments to be

4  finalized.  That's why I'm waiting to file, just to let

5  everything get -- get rid of all of it at one time.

6      Q.   So, do you have any deferred compensation?

7      A.   No.

8      Q.   I asked these questions last time.  I'm going

9  to ask --

10      A.   Yeah, no, that's fine.  No, I understand it's

11  the same questions.  So, the answer is "no."

12      Q.   So, no deferred conversation, nothing in the

13  works as far as if you are working with people about

14  possible business plans where you may stand to gain some

15  income or other economic benefit?

16      A.   I mean, I filed a lawsuit against Mohamed Hadid

17  for a helicopter --

18      Q.   Yeah, I remember --

19      A.   -- that he sold --

20      Q.   -- we talked about Mr. Hadid last time.

21      A.   -- that he owes me money.  So, that would be

22  the only thing I think I stand to have any income or

23  benefit over.

24      Q.   And you personally don't have any ownership

25  rights, any trademarks, any -- let me break it down.

1    Any trademarks?

2         A.    Nope.

3         Q.    Copyrights?

4         A.    Nope, nope, own nothing.

5         Q.    Patents?

6         A.    Nope, no copyrights, trademarks or patents.  I

7    personally do not have any ownership.

8         Q.    Have you received anything of value in the last

9    year?

10        A.    All right.  Well, that's vague and ambiguous.

11   So, I'm going to object for my lawyer.

12        Q.    How can I make it -- how can I make it --

13        A.    He's asleep at the wheel, but --

14        Q.    How can I make it more clear, break it down?

15        A.    Yeah, just like, I mean, you know what I'm

16   saying --

17        Q.    Let's make it over $500, okay, and let's

18   make --

19        A.    Have I personally received any?  No.

20        Q.    Have you been given any gifts?

21        A.    No, I don't want any.

22        Q.    How about has anybody --

23        A.    Bought me dinner?  Yeah, probably.  I mean,

24   that's a value, right?

25             MR. AFTERGOOD:  Right.

1    BY MR. SEBER:

2        Q.    It is, and we'll get to that.  You know --

3        A.    You have to go a --

4        Q.    I'm not through with you.

5        A.    I know, I know, I know.

6        Q.    And it's a little bit curious to know how you

7    get by if you don't receive any income.  So, let's I

8    mean, let's break down, like, a day in the life of

9    Joe Francis, which must be -- you know, must have some

10   receipt of income or some receipt of money, I should

11   say, so you can pay your daily living expense.  So, you

12   wake up.  Where did you wake up today?  At the -- the

13   Bel Air Place?

14       A.    Uh-huh.

15       Q.    And you still live there obviously?

16       A.    Uh-huh, yes.

17       Q.    And for the record, the address is 111 or is

18   there another one?

19       A.    1111 Bel Air Place, yeah, but I don't own the

20   property.

21       Q.    So, you wake up there, and then you have --

22   you've got to eat something.

23       A.    No, I don't really eat in the morning.

24       Q.    When did you eat?

25       A.    I eat lunch.

1    Q.   So, how do you get that?  Who provides that

2    food?

3    A.   Well, do you want me just to go through

4    yesterday?

5    Q.   Please.

6    A.   My attorney bought me lunch at Lemonade.  We

7    went to Lemonade in, what, Brentwood?

8         MR. AFTERGOOD:  Right.

9         THE WITNESS:  And then I went home, did some

10   e-mails.

11   BY MR. SEBER:

12   Q.   So, when you are eating --

13   A.   Did a deposition, right?

14        MR. AFTERGOOD:  That's right.

15   BY MR. SEBER:

16   Q.   Warmed up, that's great.  So, when you are not

17   eating with your attorney and you are eating in your

18   house, there's food there, right?

19   A.   Sometimes.

20   Q.   How does the food get to the house?

21   A.   I'll have somebody go pick it up.

22   Q.   Is Heffe (phonetic) -- is it Miss Heffe, your

23   assistant?

24   A.   Yeah.

25   Q.   Does she pick it up?

1     A.    Uh-huh.

2     Q.    We talked about her a little bit last time.

3  So, she typically goes and picks up the food?

4     A.    Well, not typically.

5     Q.    Well, who typically picks up the food?

6     A.    Gosh, who picks up the food?  Me.

7     Q.    And when you are at the grocery store, how do

8  you pay for it?

9     A.    Cash.

10    Q.    Or the last time we talked about the American

11 Express card?

12    A.    Yeah.

13    Q.    Do you still have that American Express card?

14    A.    No, I think they took it away.

15    Q.    Who's "they"?

16    A.    American Express.

17    Q.    Do you have another credit card that you have

18 access to that you use?

19    A.    No.

20    Q.    No more credit cards?

21    A.    Well, I might, but nothing that I use

22 personally.

23    Q.    Well --

24    A.    This is to me personally, right?

25    Q.    Well, I'm just saying -- I'm not going to

1  differentiate between whether you're doing something for

2  a corporation and you have a credit card.  Right now I

3  just want to know --

4      A.   Me personally?  No, I don't have any.

5      Q.   You in any capacity, whether it's for -- you

6  know, whether it's for GGW Brands, Inc., or --

7      A.   No, you can't -- no, no, the thing is -- no,

8  there's a difference.

9      Q.   Yeah.

10      A.   Okay.  I'm sitting here as a judgment debtor

11  for what?  For me personally and then for Mantra Films.

12      Q.   Well, yeah, Joe, but it's also -- it's a

13  little -- when you don't have any income coming in

14  personally, you know, we are entitled to try to figure

15  out who's paying for your basic needs.

16      A.   And I told you, I ask my attorneys.  When I

17  need money, I ask my attorneys.

18      Q.   The last time we talked about Liner, right?

19      A.   Yeah.

20      Q.   Liner provided --

21      A.   Yeah, the bills.

22      Q.   Well, no, what I was referencing is that --

23           THE WITNESS:  Liner paid the bills?

24           MR. AFTERGOOD:  Right.

25  //

1    BY MR. SEBER:

2        Q.   They did.  What I was -- hold on.

3        A.   Yeah.

4        Q.   Hold on, Joe.  I just don't want to -- we are

5    both doing where we are talking over each other, and I'm

6    not trying to be rude and I know you are not either.  I

7    just want to make a good record.

8        A.   No, I'm not trying to be rude.

9        Q.   I know that.

10            So, I believe last time you testified when you

11    needed, like, a basic living stipend or some money, that

12    you would get it from Liner; is that correct?

13        A.   No, I just said my lawyers.

14        Q.   Okay.

15        A.   And you said, "Who are your lawyers?"

16            And I said, "Well, Liner is one of my lawyers."

17        Q.   So, if you do need to get just day-to-day money

18    or any money, where do you get that from?

19        A.   I ask Mr. Aftergood.

20        Q.   Mr. Aftergood.  Is there anybody else besides

21    Mr. Aftergood that you asked?

22        A.   No.

23        Q.   So I want to be clear.  If you need that -- we

24    talked a little bit about when you went to the grocery

25    store and you had some cash on you, if you needed that

21

1    cash, that would come from Mr. Aftergood?

2        A.    Well, I'd borrow it, yeah, as a loan.

3        Q.    Do you have an agreement in place with

4    Mr. Aftergood?

5        A.    Yes, I have an oral agreement in place, but

6    I'll pay him back one day when I can afford to pay him

7    back.

8        Q.    It's very kind of him.

9        A.    Well, don't you think that, you know?  I'll

10   have a clean slate, bankrupt and all.  And then you are

11   done, and then you get a fresh start.

12       Q.    Okay.  So, rather than finishing out your whole

13   day, then it's safe to say that anything you need,

14   moneywise --

15       A.    I can borrow money from friends with the idea

16   that I'm borrowing it, and then I have to pay it back.

17       Q.    So, do you get a utility bill at the Bel Air

18   Place?

19       A.    I don't.

20       Q.    Who does?

21       A.    I don't know.

22       Q.    Who would know?

23       A.    Mr. Aftergood maybe, but I don't know.  I don't

24   want to speculate.

25       Q.    So, you are completely in the dark about how

1    basic items --

2         A.    Oh, yeah --

3         Q.    Hold on a second.

4         A.    Okay, sorry.

5         Q.    I just want to make sure we are clear.

6         A.    I know, you want to be clear.  Go ahead, go

7    ahead, go ahead.

8         Q.    Thanks.  So, besides utility bills; so,

9    anything associated with the Bel Air house, you have no

10   idea how you would spend it?

11        A.    As I testified earlier or at least as I

12   testified in the last judgment debtor exam that we did

13   downstairs, like, six months ago, I believe that's

14   intentional, and I like it that way.  So, I'm not going

15   to ask any questions.  I mean, I searched for documents.

16   I didn't have any of the documents pursuant to -- I went

17   through everything, and I didn't have any of that stuff.

18   And the only conversations I've had about the stuff are

19   with my attorneys; and I think I have been intentionally

20   left in the dark, even if I ask a question.

21        Q.    And why is that?  Why is it a good idea that

22   you are intentionally left in the dark?

23             MR. AFTERGOOD:  I'll object to that, calls for

24   speculation.

25             But if you know, you can answer.

23

1      THE WITNESS:  Well, it involves conversations

2  with my attorneys; so, I don't want to say any -- I

3  don't.

4  BY MR. SEBER:

5      Q.  Well, do you have an independent opinion,

6  outside of what an attorney has told you or a

7  conversation that you've had with him, about why you

8  believe it's a good idea that you're intentionally in

9  the dark about your finances?

10      A.  No, I don't have an opinion.

11      Q.  Who would be the best person specifically to

12  talk to about your finances?

13      A.  My attorney, Aaron Aftergood.

14      Q.  It's Mr. Aftergood?

15      A.  Yes.

16      Q.  And how long has that been the case, that

17  Mr. Aftergood has represented you?

18      A.  Eight months now, at least, a year.  Has it

19  been a year?

20      MR. AFTERGOOD:  I don't think it's been a year.

21  BY MR. SEBER:

22      Q.  Time flies when you are having fun.  Well, he

23  wasn't representing you at the last hearing, the last

24  examination we had.

25      A.  Yeah, which was probably August -- August

1    somewhere.

2        Q.   August?

3        A.   August, yeah.  So, you want to know how long

4    he's represented me?

5        Q.   No, don't worry about it.  Strike that

6    question.

7        A.   I mean --

8        Q.   I can figure it out.

9        A.   Yeah.

10       Q.   Joe, is anything being held for you of value

11   for you by a third person?

12       A.   No, not from me.

13       Q.   How about -- I said, "third person."  I should

14   have clarified.  Third party, company -- nobody's

15   holding anything for you; there's no pot of money out

16   there being held by you?

17       A.   No -- go ahead.  I'm sorry, go ahead.  I'll let

18   you finish.

19       Q.   I took too long with my question.  There's

20   no --

21       A.   Well, you compounded it.  It's not like you

22   take -- you added another question on top of it, but go

23   ahead.

24       Q.   So, nobody is holding any money for your use,

25   any third parties?

1    A.    Other than the $5 billion being held in the

2    account -- I'm kidding.  No.  I was joking, by the way.

3    Q.    And I mean anywhere, too, even overseas.

4    A.    Yeah.  No.

5    Q.    Are you still a beneficiary on any trusts?

6    A.    Not to the best of my knowledge.

7    Q.    Is the Francis trust that we discussed last

8    time -- is that still in existence?

9    A.    I don't know.

10   Q.    Who would know?

11   A.    Aaron Aftergood, my attorney.  I'd have to

12   discuss it with my attorney.

13   Q.    No more Mr. Raymond (phonetic)?

14   A.    No more Mr. Raymond.

15   Q.    I take it you and Mr. Raymond aren't on good

16   terms anymore.

17   A.    Um, no, we are not on good terms.

18   Q.    There's been a lawsuit filed -- I can't

19   remember who originally filed the original lawsuit.

20   A.    We filed against him originally.

21   Q.    And has he counter sued?

22   A.    I -- I haven't been served with anything, but

23   I'm aware that there is maybe something out there, but

24   I've not been served with anything.  So, I can't tell.

25   We were talking about me today.  Sorry about that.

1    Q.    Of course.  Do you have access to any bank

2    accounts?

3    A.    Nope.

4    Q.    Do you have access to any corporate bank

5    accounts, bank accounts not in your name?

6    A.    No.

7    Q.    Are you --

8    A.    Not to the best of my knowledge.

9    Q.    Are you signatory on any company checks?  Can

10   you sign for a company for their checks?

11   A.    I think I can, yeah.

12   Q.    Do you know which ones?

13   A.    No, not offhand.

14   Q.    If I read you a list -- I'll go down and I'll

15   ask you just so we have a complete record, so to cover

16   that later.  Have you signed a check that's been on the

17   company check in the last two years?

18   A.    I don't know.  I'd have to -- I'd have to

19   check.  I assume so, but I'd have to check.

20   Q.    Who would you check with?

21   A.    My attorney, Aaron Aftergood.

22   Q.    Is that for all the companies that you do

23   business with?

24   A.    Uh-huh.

25   Q.    You don't have any money on you right now, do

1   you?

2      A.   20 bucks, parking.

3      Q.   Did you get that from Mr. Aftergood?

4      A.   Uh-huh, he loaned it to me, with the intention

5   of receiving it back, I'm sure.

6      Q.   With interest?

7      A.   Ask him.

8      Q.   That was in the oral contract, if there's

9   interest in it?

10     A.   Ask Mr. Aftergood.

11     Q.   I'm going to jump back, Joe, to the topic of

12   bankruptcy.

13     A.   Okay.

14     Q.   Has there been any change in --

15     A.   The attorney?

16     Q.   No, almost.  Almost got it.

17     A.   We've done this so many times, I got you.

18     Q.   It's a good dance.

19     A.   I got you.

20     Q.   Has there been any change in any creditors that

21   you owe money to since the last time?  The last time you

22   listed some of your creditors.

23     A.   Yeah, preference payments?  No, everyone is

24   getting nailed at the same time.

25     Q.   Zero?

1      A.    Yeah, but I want to wait until these judgments

2   come to fruition, then boom, everything's set perfectly.

3   It's all teed up for bankruptcy.  I've told you that.

4   There are no assets.  It's at zero assets, bankruptcy.

5      Q.    Besides Wynn Las Vegas, who are some of the

6   other creditors?

7      A.    I don't even know.  I know -- yeah, I don't

8   know offhand.

9      Q.    Who would know?  Would Mr. Aftergood?

10      A.    Yeah, Mr. Aftergood.  I mean, I'm intentionally

11   left out of this.  I told you that last time.

12      Q.    I understand.

13      A.    I know.  You have to --

14      Q.    You know I have to go through and be thorough

15   with all of these.  I'm not trying to --

16      A.    I'm happy, because it makes it easy.

17      Q.    What's your current employment, if you have

18   any?

19      A.    Creative consultant for GGW.

20      Q.    Which GGW?  There's several GGWs.  All of them?

21      A.    Brands.

22      Q.    So, as a creative -- if someone asked you,

23   "Hey, Joe, what you are you doing nowadays?" that's what

24   you'd tell them -- I mean, creative?

25      A.    Absolutely.  Somebody asked me yesterday.

```
 1    That's what I said.

 2        Q.    It sounds good.  That's a good title.  What

 3    does a creative consultant do?

 4        A.    I don't know.  It doesn't pay me.  Maybe I

 5    should be a lawyer.  What do you think?  Where did you

 6    go to law school?

 7        Q.    University of San Diego.

 8        A.    USD?  My sister went there.  Undergrad there,

 9    too?

10        Q.    A little bit.

11        A.    My sister went down there -- you're about 40,

12    right?

13        Q.    About that.

14        A.    You know Babette Francis?

15        Q.    You know, that sounds familiar.  It's a small

16    world.

17        A.    It's a small world.  She's an alpha

18    (unintelligible).  ADPi?  ADPi was the good one down

19    there at USD at the time, wasn't it?

20        Q.    I wasn't big into the sorority system.  I

21    played rugby.

22        A.    There's the whole problem.

23        Q.    I played rugby.  That was kind of my thing.

24            But anyway, back on topic.  So, as a creative

25    consultant, you are not provided -- you don't expect to
```

1    be provided any salary or anything like that?

2        A.    No, nor defer compensation.

3        Q.    Right.

4        A.    None.

5        Q.    Is it accurate to say that you are doing the

6    work that you are doing now in expectations of getting

7    something after the bankruptcy is complete?

8        A.    No, no, not at all.  I'm actually like -- I

9    spend most of my time like this.  We were in court on --

10   yesterday -- I mean, we were in depositions all day

11   yesterday.  We were in court on Monday, correct, of this

12   week?

13           MR. AFTERGOOD:  I think it was Friday.

14           THE WITNESS:  Friday, and Monday we had another

15   depo.  So, this is pretty much what I do.  So, I do this

16   up until these -- hopefully I'll get a final judgment

17   and then 7 out, baby.  Done.

18   BY MR. SEBER:

19       Q.    7 out?

20       A.    7 out.  Chapter 7, out, done.  There will be no

21   restructuring.  It's zero assets.

22       Q.    So, as the creative consultant, you don't

23   have -- if you had to tell me, "Hey, what are your exact

24   duties?" you couldn't tell me what those are?

25       A.    Creative consultant.

```
 1        Q.    Is it just a title only?

 2        A.    I don't really have any responsibilities or

 3   duties.

 4        Q.    How about --

 5        A.    Or ownership.

 6        Q.    Ownership of what?

 7        A.    Anything.

 8        Q.    So, you have zero ownership of any companies

 9   right now?

10        A.    Zero ownership.

11        Q.    And how long has that been the case?

12        A.    A long time.

13        Q.    Since --

14        A.    I don't know.  I wouldn't want to guess.  I'd

15   have to talk to my attorneys.

16        Q.    Could it be since -- is it more than five years

17   ago?

18        A.    No, probably less than five years.

19        Q.    More than two?

20        A.    Yeah, way more than two.

21        Q.    So, more than two years ago, you have not had

22   any ownership in any companies?

23        A.    Well, I would have to discuss that with my

24   attorney, but I don't know for 100 percent sure.

25        Q.    But you believe so?
```

1    A.   Well, what I believe and what -- I don't want

2    to speculate.

3    Q.   Well, I'm just trying to follow up on what you

4    said, Joe.  I'm not trying to put words in your mouth.

5    A.   Yeah, no, I know.  But I don't want to

6    speculate; so, I'd have to discuss that with my

7    attorney, and I wouldn't want to speculate.  But I

8    did -- do agree to the parameters that it would be less

9    than 5- and more than 2-, somewhere in there.

10   Q.   What, though?  That's what I don't understand.

11   What's --

12   A.   What is your question?

13   Q.   I got lost in your answer.  I don't know if you

14   know now or you don't.  My question -- do you have to

15   talk to your attorney?  Is that -- I just don't know.

16   So, the question is:  Do you have any ownership interest

17   in any companies?

18   A.   No.

19   Q.   And the thing that you --

20   A.   Not to the best of my knowledge.

21   Q.   To the best of your knowledge, and the thing

22   that you were unsure about is how long that's been the

23   case?

24   A.   Yes.

25   Q.   Right?

1    A.    Yes.

2    Q.    And, so, that's where you were responding, "I'd

3    have to talk to my attorneys about," would be the time

4    when you no longer had any interest in companies, right?

5    A.    The time, yeah, and I said --

6    Q.    You just don't know?

7    A.    I'm not going to speculate.

8    Q.    So, as of right now, you have no -- this date

9    you can say, today's date, you have no interest in any

10    companies?

11    A.    To the best of my knowledge, correct.

12    Q.    And "companies" I mean -- you know, I'm not

13    trying to be super technical.  I'm not talking like

14    LLCs, limited liability companies --

15    A.    Anything?

16    Q.    Anything.  Incorporated.

17    A.    To the best of my knowledge, nothing.

18    Q.    And if anybody -- if I needed to confirm --

19    A.    Go online.

20    Q.    Well, besides going online, would I talk to

21    Mr. Aftergood?

22    A.    Yeah.

23    Q.    Is that the best person?

24    A.    Well, how would he be the best person to

25    confirm that I personally don't own any part?  Go to the

1    companies themselves.  Ask them if I own anything.

2         Q.   But who --

3         A.   Corporate records, right, search would probably

4    be the best way.  But to confirm whether, I don't know.

5    Probably.  I'm the best person, and I'm confirming to

6    you, I don't own any companies.

7         Q.   Or have any ownership interest in the

8    companies?

9         A.   Asked and answered, yeah.  I mean, really.

10        Q.   Are you currently still unmarried?

11        A.   Yes.

12        Q.   The last time --

13        A.   Or divorced.  I don't know what you want to

14   call it.  Civil unionized.  So, I never got married.

15        Q.   You never got married to Christina McLarty?

16        A.   Yes, that's correct.

17        Q.   And now you are still single, not married to

18   anybody right now?

19        A.   (Witness nodding head.)

20        Q.   Yes?

21        A.   Yes.  I mean . . .

22        Q.   It's good when I cross things off.

23             Joe, you testified earlier about checking

24   e-mails like you are doing right now --

25        A.   Oh, no, I was waiting for your question.

1    Q.   No, that's fine.

2    A.   I'm sorry.  No, no, no, I'm not checking

3 e-mails.

4    Q.   No, I'm talking about when you testified about

5 checking e-mails, you said you used a computer at your

6 house.

7        MR. AFTERGOOD:  Objection.  I don't know if

8 that was stated.  He said he went home and --

9        THE WITNESS:  Yeah.

10        MR. AFTERGOOD:  -- checked e-mail, I think.

11        THE WITNESS:  Yeah.

12 BY MR. SEBER:

13    Q.   How do you check for e-mail?

14    A.   On my phone.

15    Q.   Your phone.  Do you have a computer at home?

16    A.   No, not currently.

17    Q.   Do you have access to a computer anywhere else?

18    A.   Yeah.

19    Q.   Where would that be?

20    A.   My attorney's office.

21    Q.   So --

22    A.   Century City.

23    Q.   And that's the only other place you have access

24 to a computer?

25    A.   Well, I probably could access that computer

1   (indicating), I could use computers everywhere.  I

2   probably have access to a lot of computers.

3       Q.   Fair enough.  You know -- I mean, a computer

4   that -- a computer that's yours to use?

5       A.   Yeah, I've got a computer on my phone.  Why do

6   I need a computer for?  You are still a BlackBerry guy,

7   huh?  That's your problem.

8       Q.   Yeah.

9       A.   Chad, come on, grow up.

10      Q.   Old school.

11      A.   Come on, buddy, old school.

12      Q.   Right.  So, I just want to make sure.  I got it

13  that your only computer that you have that's personally

14  yours is that phone?

15      A.   Well, you know, I use other computers.

16      Q.   But they are not yours?

17      A.   No, they are not mine personally.  No.

18      Q.   And they are not -- do they belong to a company

19  that you have any relationship to, like a GGW?

20      A.   I have no ownership interest in any company

21  that I have access to a computer or anything else.

22      Q.   Do you have access to -- I think there's an

23  office at Cloverfield?

24      A.   Uh-huh.

25      Q.   Is that office -- is that still in operation?

1      A.    I don't believe so, but, you know.

2      Q.    When's the last time you were there?  That

3  probably will make it a little easier to answer a

4  question.

5      A.    Six months ago.

6      Q.    And when you do --

7      A.    Five months ago, probably.  I don't know?  How

8  long ago?  What do you think?

9      Q.    What do you remember?

10     A.    Six months ago --

11     Q.    Six months?

12     A.    -- probably.

13     Q.    So, when you go to do --

14     A.    A few months ago.

15     Q.    -- your creative consulting, do you do that

16  from home?

17     A.    Uh-huh.

18     Q.    Does GGW Brands have an office?

19     A.    Nope.

20     Q.    Any of the GGW entities -- do they have an

21  office?

22     A.    Ask them.

23     Q.    I was told that -- well, strike that.  I'll

24  come back to that.

25          Do you have access to the, like, use of a car

1 or motor vehicle?

2  A. Uh-huh, yes.

3  Q. How many?

4  A. One.

5  Q. What is it?  Make, model?

6  A. Do I have access to it?

7  Q. Yeah, can you drive it?  Do you have the keys?

8  A. No -- yeah, sometimes.

9  Q. What kind of car is it?

10  A. I have a Prius, a white Prius.

11  Q. Toyota?

12  A. Toyota Prius, yeah.

13  Q. Going green?

14  A. (Witness nodding head.)

15  Q. Smart man.  Good gas mileage.

16  So, who provides that car for your use?

17  A. One of the GGW companies.

18  Q. And why do they provide it to you?  Is it

19 because of your role as a creative consultant?

20  MR. AFTERGOOD:  Objection, that calls for

21 speculation and vague.

22  But you can answer.

23  THE WITNESS:  Ask them.

24 BY MR. SEBER:

25  Q. How long have you had access to the Toyota

1    Prius?

2        A.   Two years.

3        Q.   And can you use it on a daily basis?

4        A.   I don't know.  I'd have to ask them.

5        Q.   Has anyone told you, "Joe, you can't use this

6    Toyota Prius"?

7        A.   Yeah.

8        Q.   Who?

9        A.   Eric Deutsch one time.

10       Q.   When did Eric Deutsch tell you that?

11       A.   I don't remember.

12       Q.   A couple of years ago?

13       A.   Yeah, somebody told somebody that.  They did.

14       Q.   Is Eric Deutsch currently affiliated with any

15   of the GGWs?

16       A.   No.

17       Q.   Is Eric Deutsch --

18       A.   I'm sorry.  Is this -- if you are going to ask

19   anything associated with GGW entities, you are going to

20   have to depose them or ask them.

21       Q.   Okay.

22       A.   If you are talking about me personally today,

23   Mantra Films; so, I'm happy to answer any questions

24   about me personally, Mantra Films.

25       Q.   That's fine.  But I am going to ask questions

1   about assets or --

2       A.   You've already asked them.

3       Q.   -- vehicles that are potentially -- that are

4   provided to you by the GGWs.

5       A.   They are not provided to my ownership.

6       Q.   Provided for use?

7       A.   This table is being provided to use by the City

8   right now, you know, right?

9       Q.   Is there any other vehicle that you have access

10  to besides the Toyota right now?

11      A.   Yeah, Mr. Aftergood's car, you know, and if I

12  ask friends, they'll let me use their cars.

13      Q.   A car that you use without having to ask him.

14      A.   No, there's no car that I use -- I have to ask

15  that -- people to use all my cars.

16      Q.   And the Toyota Prius, who do you have to ask

17  currently today if you want to use that?

18      A.   The GGW entities.

19      Q.   But who, Joe, do you ask personally?  Is there

20  a person you call?  Who do you ask?

21      A.   My attorney.

22      Q.   Which attorney?

23      A.   Bob Klueger.

24      Q.   And, so, if there's an asset that you are

25  using, is Mr. Klueger -- that's how you pronounce his

1    last name?

2        A.    There's an asset, but it's their asset, though.

3        Q.    But if you want to use it, you have to ask

4    Mr. Klueger?

5        A.    Yes.  So, I have to ask somebody.

6        Q.    Are there other assets --

7        A.    Who, in turn, asks somebody else that I don't

8    know.

9        Q.    Are there other assets that you use besides the

10   Toyota, other cars that you use, that you have to ask

11   Mr. Klueger?

12       A.    Not regularly.

13       Q.    I'm just trying to figure out, Joe, is there

14   any other car that you use regularly beside the Toyota

15   Prius?  Do you drive another car?  Is there any other

16   car besides that?

17       A.    Sometimes.

18       Q.    And what would that be?

19       A.    Mr. Aftergood's car, various other cars, rental

20   cars.

21       Q.    Beside the Toyota Prius, is there any car that

22   you use on a weekly basis?

23       A.    Sometimes, but not really.

24       Q.    Well, what would that be besides the Toyota

25   Prius?

1   A.   Sometimes I drive a Bentley.

2   Q.   Is that Mr. Aftergood's subsequently or does

3   that belong to someone else?

4   A.   It doesn't belong to me.

5   Q.   And how do you get access to the Bentley?

6   A.   I ask my attorney, Mr. Aftergood.

7   Q.   Mr. Aftergood?

8   A.   Uh-huh.

9   Q.   Is there any other vehicle you ask any of your

10  attorneys to use for any reason whatsoever?

11  A.   Nope.

12  Q.   Just the Bentley and the Toyota?

13  A.   Yep.

14  Q.   I'm not trying to beat a dead horse, Joe.  I'm

15  really --

16  A.   No, I --

17  Q.   I'm just trying to figure out what cars you use

18  on a frequent basis.

19  A.   It doesn't matter.  I don't own the car.  I

20  don't have ownership interest, nor do I use them on a

21  consistent basis, nor does -- it doesn't matter.  So,

22  I'm happy to answer your questions.

23  Q.   Okay.

24  A.   I don't care.  I don't own the cars, I don't

25  have control or authority over the cars, I don't retain

1   the cars, I don't even put gas in the cars.  I have no

2   ownership interest in the cars; and any cash I use to

3   buy things, I borrow and I get . . .

4       Q.   You know, this will probably save a lot of

5   time:  Is that true with everything you use of value?

6   So, if it's -- you know, if you are needing to travel --

7       A.   I borrow.

8       Q.   Borrow or is -- I want to distinguish between

9   the two.  Besides --

10      A.   Yeah, borrow with taking a debt with the

11  intention to pay back hopefully one day when I can

12  afford it.  It hasn't been the easiest economic times.

13      Q.   I understand.  Are you still working -- and I'm

14  using that term loosely, because I don't know how you

15  define it.  Do you still have some involvement with the

16  show that's on HDNet?  We talked about it last time,

17  America's Hottest Next --

18      A.   Yeah, it's finished.  Yeah, it's over now.

19      Q.   So, what's the name of the show?

20      A.   The Hottest Girl in America.

21           MR. SEBER:  I'm going to mark a document, and

22  I'll mark this as an exhibit.

23           (Exhibit 1 was marked.)

24  BY MR. SEBER:

25      Q.   So, do you recognize what we are calling

1   Exhibit 1?

2       A.   Absolutely.

3       Q.   And what is this?

4       A.   A website.  My website.

5       Q.   And how long has this website been up?

6       A.   I don't know.  Years.

7       Q.   What's the purpose of the website?

8       A.   Just for fans.  I don't derive any revenue from

9   it.

10      Q.   It seems pretty PR-related; is that true --

11  public-relations-related?

12      A.   Well, I mean, yeah, it's for fans.  PR, yes.

13      Q.   That's just my take.  I could --

14      A.   Yeah.

15      Q.   -- be completely wrong.

16      A.   Well, it just explains a lot of misconceptions

17  out there, too, you know.

18      Q.   That was my take.

19      A.   I don't --

20      Q.   It's pretty interesting.

21      A.   Pretty interesting legal story from a lawyer's

22  perspective, huh?

23      Q.   The first -- the latest blog and I think this

24  one talks about what we were talking about earlier, that

25  Girls Gone Wild trademark battle.  And I first glanced

1   at that, and that's not Madonna.  It kind of looked a

2   little bit like her, I think.

3       A.   It is Madonna.

4       Q.   Is it really?

5       A.   Yeah.

6       Q.   Seriously?

7       A.   Uh-huh.

8       Q.   No joke?

9       A.   No joke.  It's Madonna.  She's 53.

10      Q.   Wow.

11      A.   Well, I'm not saying anything.

12      Q.   I had a debate with a colleague whether that

13  was.

14      A.   It is Madonna.

15      Q.   So, I have to tell him he's right.  Well, it

16  talks about "Over His 'Girls Gone Wild' Trademark," and

17  it's referring to you?

18      A.   Yeah.

19      Q.   And --

20      A.   "His" meaning, and you want me to define that?

21      Q.   Please.

22      A.   "His" meaning, I originally came up with it.  I

23  don't own it, but I originally came up with it.  That's

24  what "his" means.

25      Q.   You've got to understand when I read this, it

1   makes it seem like, "Okay, that's his trademark."  But

2   your --

3       A.   Yeah, but then you can search records and

4   understand that I don't own it.

5       Q.   Well, that's what I'm here asking you, Joe.

6   I'm just trying to figure it out.

7       A.   Yes, and "his" is in the terms -- "his" meaning

8   the one that he -- originally.  Like, I came up with

9   that.  And then they argue -- you know, I don't own it,

10  but I came up with it.

11      Q.   And does that trademark have value?

12          MR. AFTERGOOD:  Objection, calls for

13  speculation.

14          THE WITNESS:  Yeah, I can't speculate.

15  BY MR. SEBER:

16      Q.   Do you know if it has value?  I'm asking you if

17  you know.

18      A.   I'm not going to speculate.

19      Q.   But you obviously would care if someone was

20  infringing upon that trademark's rights.

21      A.   No.

22      Q.   Do you?

23      A.   If I had the right to sue her, I probably would

24  have, but I don't have the ownership right to sue her.

25      Q.   So, your position is that you individually

47

1   don't have the right to sue on this trademark, the Girls

2   Gone Wild trademark?

3       A.   Yeah, I don't have the right to sue personally,

4   no.

5       Q.   And you don't know who does?

6       A.   I could look it up just as easy as you could.

7       Q.   I'm just asking you, Joe.

8       A.   No.  As I sit here today, no.

9       Q.   Flip to Page 2 of Exhibit 1, and this is

10  talking about "Season 3 of the Hottest Reality Show on

11  TV."  It's a couple of months old, it looks like, the

12  Hottest Girl in America.  So, is that still in shooting

13  or -- that's the last season, is this year?

14      A.   It's done.

15      Q.   Done.  So, the shooting process, it's all done.

16  There's no further -- there's not going to be a

17  Season 4?

18      A.   That's correct.

19      Q.   And what was your position?  What was your

20  position in regards to that --

21      A.   Talent.

22      Q.   -- show?

23           I'm sorry.  I didn't hear.

24      A.   The host.

25      Q.   The host.  Did you receive any income for your

1    hosting abilities?

2         A.   Nope, didn't even take a paycheck, not once.

3         Q.   Why did you do the job?

4         A.   Publicity.

5         Q.   Publicity.  Who was the main person, the point

6    of contact for the show that you worked with?

7         A.   Eric Deutsch.

8         Q.   Eric Deutsch?  He worked -- I'm talking about

9    he worked for the Hottest Girl in America show?

10        A.   Uh-huh.

11        Q.   What was his position?

12        A.   Executive producer.

13        Q.   Do you still work with Mr. Deutsch?

14        A.   No.

15        Q.   Do you want more coffee?

16        A.   No, I'm fine.

17        Q.   When you need a break, you can tell me.

18        A.   I don't think we'll be much longer.

19        Q.   Turn to the page where it has Hate R Love.

20        A.   Wait, I'm sorry.  Just give me a number.  Just

21   tell me what's at the top.

22        Q.   The top is the Hate R Love, the one with the

23   picture of you and Mario Lopez.

24        A.   Got it.

25        Q.   And did you receive any payment for your

1    appearance on that show?

2        A.    No.

3        Q.    Anything of value?

4        A.    No.  Publicity.

5        Q.    Publicity.  And it references your Bel Air

6    mansion in there.  Is that loose use of the term "your"?

7        A.    Yeah, "your" and "his" and "her," it's just

8    bullshit.  You know that.  You are a lawyer.  Nothing is

9    to imply ownership of any -- no mention of those words

10   is to infer or imply ownership in any way, shape, or

11   form.

12       Q.    Your last page with the Beach Girls, with the

13   Kardashians --

14       A.    Which page?

15       Q.    The last page, it says:  "Beach Girls."

16       A.    Uh-huh.

17       Q.    The same question there.  It talks about Joe's

18   luxurious beachfront estate in Mexico.

19       A.    It's all bullshit.

20       Q.    You don't have any ownership right in the

21   house?

22       A.    No, not one smidgen.

23       Q.    And do you know who does?

24       A.    Nope.  That's great, because in the press you

25   can say all you want.

1     Q.   Do you have an access or the use of a bank

2   account?

3     A.   No.

4     Q.   Do you have access or use of a bank account

5   for -- in the name of a third party?

6     A.   No.

7     Q.   Even overseas?

8     A.   Nope.

9     Q.   Do you have access to the use of a savings --

10   excuse me, a safe-deposit box?

11     A.   No.  Do people still even use safety-deposit

12   boxes?

13     Q.   Old school people do.

14     A.   Do they really?

15     Q.   People who use BlackBerries.

16     A.   It's a little self-deprecating humor, Chad.

17   That's good.

18     Q.   Right, of course.  From 2008 to the present,

19   have you been involved with the transfer of money over

20   $5,000?

21     A.   Have I personally?  No.

22     Q.   In a corporate capacity?

23     A.   No -- well, involved.  I mean, I don't know.  I

24   mean, like, paying -- having a corporation pay a lawyer

25   is a transaction over $5,000, right?

1    Q.   Right.  I don't know.  You tell me.

2    A.   Well, in my personal capacity, no.  Unless you

3  are asking for Mantra Films, and then the answer is

4  "no," as well.  In those two capacities.

5    Q.   So, you have the access to use or the ability

6  to use the Bel Air home; you still have access to the

7  house in Mexico, right, or do you?  That's not fair for

8  me to assume.  Do you have access to the house in

9  Mexico?

10    A.   Not whenever I want, no.

11    Q.   Well, last time -- correct me if I'm mistaken,

12  but last time I thought you testified that you could use

13  that house pretty much for anything.

14    A.   Then I testified incorrectly.

15    Q.   Maybe I don't recall your testimony correctly.

16  Right now, let's just make it clear --

17    A.   If I wanted to go to Mexico right now?

18    Q.   Yes, if you wanted to go to Mexico.

19    A.   I couldn't.

20    Q.   Say it again.  I'm sorry.

21    A.   I couldn't.

22    Q.   Why not?

23    A.   Well, I'd have to contact my attorney, and

24  they'd have to contact appropriate people and I don't

25  know who they contact.

1      Q.   We are talking about -- to clear it up for the

2    record, we are talking about the house of Casa de

3    Aramara, I believe?  Is that what it's called?

4      A.   It's your depo.

5      Q.   How many places in Mexico do you have access

6    to?

7      A.   Probably anywhere in the country.

8      Q.   How about the house that was referenced in

9    Exhibit 1 with the Kardashians where they had their

10   beach party?

11     A.   I don't own it.

12     Q.   What's the name of that house?

13     A.   Huh?

14     Q.   What's that house referred to as?

15     A.   Girls Gone Wild Island.

16     Q.   So, when you want to go to that --

17     A.   Girls Gone Wild Island.

18     Q.   -- Girls Gone Wild Island, where is that

19   located?

20     A.   In Mexico.

21     Q.   In what city?

22     A.   In Punta Mita, Mexico.

23     Q.   I'm sorry, what?

24     A.   In Puerto Vallarta, Mexico.

25     Q.   So, when you want to go to that house, it's the

1    one that -- the same house that we talked about last

2    time, the one that was on Million Dollar Decorators?

3        A.   Uh-huh.  And you deposed, them, as well.

4        Q.   And talked to them?

5        A.   And they told you that they didn't pay me and I

6    didn't own it and . . .

7        Q.   Well, when you want to go to that house in

8    Mexico, who is it you have to contact?

9        A.   Bob Klueger, my attorney, and then he has to

10   contact somebody else, and I don't know who that person

11   is.

12       Q.   Has there ever been a time where you've wanted

13   to go to that house in Mexico and you've contacted

14   Mr. Klueger, and he said, "No"?

15       A.   That's attorney-client privilege.

16       Q.   Has there ever been a time where you haven't

17   been able to use the house in Mexico for any reason

18   whatsoever --

19       A.   Yes.

20       Q.   -- when you wanted to?

21            And why was that?

22            MR. AFTERGOOD:  Objection, calls for

23   speculation, lacks foundation.

24            THE WITNESS:  I don't remember.  Why was it?

25   //

1    BY MR. SEBER:

2        Q.   Yeah.  Was there someone else using it or was

3    it booked?

4        A.   I was told "no," but that's also

5    attorney-client privilege, by my attorney.

6        Q.   So, your attorney told you "no"?

7        A.   I don't want to disclose conversations --

8        Q.   I don't want to know --

9        A.   -- between me and my attorney.

10       Q.   -- what he told you.

11       A.   Then don't ask me.  So, it's even now.

12       Q.   He's the person that -- look, I just want to

13   know if there's -- the only time that you can't use it

14   is because there's someone else using it?  What's the

15   reason why you can't use it?

16       A.   It's attorney-client privilege.  Ask my

17   attorney, Bob Klueger, and he -- I --

18       Q.   Let me try to do it this way, without getting

19   into what he told you.

20       A.   Okay.

21       Q.   So, Mr. Klueger would be the only person that

22   would tell you you could not use that house in Mexico?

23           MR. AFTERGOOD:  Assumes facts not in evidence,

24   objection.

25   //

1    BY MR. SEBER:

2        Q.    Is there anybody else that would tell you that

3    you couldn't use the house in Mexico?

4        A.    I go through my attorney.

5        Q.    So, he's the only person?

6        A.    I go -- yes, I go through my attorney.

7        Q.    That's all I was trying to figure out.

8        A.    Okay.

9        Q.    Do you spend most of your time at the Bel Air

10   house, Joe?

11       A.    Most of my time?  Now?

12       Q.    Is there another place besides the Bel Air

13   house that you reside?  Is that your primary residence?

14       A.    I stay at friends' houses sometimes.

15       Q.    I mean, the only reason why I'm asking, to be

16   quite candid with you, is sometimes it's been very

17   difficult to serve you there, and our guy tells me that

18   you are not there.  So, I'm just trying to figure out if

19   that's your primary residence or not.  Is it?

20       A.    Maybe.

21       Q.    I mean, do you have a primary residence?

22       A.    I mean, not really.

23       Q.    Well, besides the Bel Air house, where else do

24   you stay?

25       A.    The Bel Air house.

 1      Q.   So, that's it?

 2      A.   Well, I didn't say that was it.  You asked me

 3  what my primary residence was, and I told you.  That's

 4  fair, right?  That's a fair question.

 5      Q.   That's fair, I'm trying to figure out what your

 6  primary residence is; and you are saying it's the Bel

 7  Air house, that's correct?

 8      A.   That's correct.

 9      Q.   And who are a couple of people that could

10  verify that?

11      A.   Verify what?

12      Q.   That you spend most of your time there.

13      A.   I don't spend most of my time there.  That

14  wasn't my testimony.  You are misstating my testimony.

15      Q.   Okay.  Who --

16      A.   Wait.  Is there a question pending?

17      Q.   If you want to take a break, you can take a

18  break.

19      A.   No, that's fine.  How much longer do you think

20  you have?

21      Q.   I've got quite a few pages.

22      A.   Like, so . . .

23      Q.   It's going to be a couple of hours.  I'm got to

24  ask you questions about Mantra.  We can go off the

25  record.

1    A.   I don't know anything about Mantra, so . . .

2    Q.   Okay.

3    A.   I'm not the person that you would want to talk.

4    Q.   But I need to ask you questions.

5    A.   Go ahead.

6    Q.   So, if you want to take a break, we can take a

7  break.

8    A.   All right.  Let's take a break.

9         (A recess was taken.)

10  BY MR. SEBER:

11   Q.   Joe, do you have any interest in any stock?

12   A.   Nope.

13   Q.   Bonds?

14   A.   Nope.

15   Q.   Securities?

16   A.   Nope.

17   Q.   Do you stand to gain any benefit whatsoever

18  from any trust?

19   A.   Not to the best of my knowledge.

20   Q.   Even overseas trusts?

21   A.   I believe that's asked and answered.

22   Q.   So, that question would be the same.

23   A.   Well, you've already asked me that question in

24  the beginning.

25   Q.   Do you stay in a house that's owned by a trust?

1      A.    Not to the best of my knowledge.

2      Q.    Do you stay in a house that a trust pays for

3  mortgage payments?

4      A.    I don't know the answer to that question.

5      Q.    Trust pays for rent?

6      A.    A trust pays for what?

7      Q.    Do you stay in a house that a trust pays for

8  rent?

9      A.    I don't know.

10     Q.    Does the trust make any payments for your

11  living expenses?

12     A.    I'm not aware of any.

13     Q.    Besides Mr. Hadid, does anybody else owe you

14  money?

15     A.    Mantra Films.

16     Q.    The same testimony as last time on that?

17     A.    Exactly the same testimony.

18     Q.    Are there any other lawsuits that you are

19  currently involved in?  And by "involved," I mean

20  something that's been filed; so, it's public record --

21     A.    Yeah.

22     Q.    -- besides Mr. Hadid.

23     A.    Yeah.  Well, I think Steve Wynn owes me money,

24  probably about 50 million, $60 million in damages he's

25  done to me.

1      Q.   Besides the lawsuit you are involved in with

2 Mr. Wynn and Mr. Hadid and Mr. Raymond, is there anybody

3 else that you are involved in with a lawsuit?

4      A.   Not that I can think of right now, but I'd have

5 to . . .

6      Q.   Do you have a publicist?

7      A.   Nope.

8      Q.   An accountant?

9      A.   Nope.

10      Q.   CPA?

11      A.   Nope.

12      Q.   Do you --

13      A.   I have a lawyer, Bob Klueger.  I think he's a

14 CPA.

15      Q.   So, Mr. Klueger is a CPA, an accountant?

16      A.   I don't know what his formal title is, but he

17 acts as my attorney and my accountant.

18      Q.   Does he do your taxes for you?

19      A.   Uh-huh.

20      Q.   Do you have an agent?

21        MR. AFTERGOOD:  Objection, that's vague.

22        THE WITNESS:  No.

23 BY MR. SEBER:

24      Q.   Personal driver, Joe?

25      A.   No.

1     Q.   Cook?

2     A.   No.

3     Q.   The Bel Air house, was it once owned by you and

4  transferred to Blue Horse, LLC?

5     A.   No, it was never owned by me.

6     Q.   Does Blue Horse, LLC, own the property now in

7  Bel Air?

8     A.   I don't know.

9     Q.   You don't know who owns?

10    A.   That's what I just answered.  Yeah, I don't

11 know.

12    Q.   Are you aware of any previous refinance on the

13 Bel Air house?

14    A.   Not as I sit here today.

15    Q.   Have you assigned any checks for payments of

16 the mortgage on the Bel Air house?

17    A.   I don't believe so.  I'm not sure.  I may have,

18 but not personally.

19    Q.   You would have been signing those checks for a

20 corporation?

21    A.   If I did, I would have, yes.

22    Q.   Do you remember which company?

23    A.   No.

24    Q.   Do you still sign those checks today?  That's a

25 bad question.  Let me rephrase it.  If you have a --

1    there's a mortgage payment coming up next month.  Are

2    you going to sign a check for a company for that

3    payment?

4        A.   Not necessarily, no.

5        Q.   Are you familiar with Boulevard Management?

6        A.   Uh-huh.

7        Q.   Do they have any connection to the Bel Air

8    house?

9        A.   Nope.

10       Q.   Who are they?

11       A.   They were an accounting firm that I was going

12   to use, but I never ended up using them.  They turned

13   down my business.

14       Q.   Who's Regina Jones?  Do you know who she is?

15       A.   She was an accountant.  I've never met her.

16       Q.   Did you ever use her as a bookkeeper?

17       A.   No, not personally.

18       Q.   Was she a bookkeeper for one of the companies

19   that you worked with?

20       A.   I don't know specifically.  I know she was

21   employed by Boulevard Management.  That's all I know.

22       Q.   Have you ever received a letter from Chase in

23   regards to the Bel Air home?

24       A.   I don't remember anything specifically.

25       Q.   Do you have any understanding why you would?

1    Let me rephrase.  Is there any reason why you personally

2    would be receiving a letter from Chase in regards to

3    that Bel Air home?

4        A.   I don't know how to answer that question.

5        Q.   Do you know if there's any liens on the Bel Air

6    home?

7        A.   Yes.

8        Q.   And who would be the lienholders?

9        A.   Chase.

10       Q.   Anyone else?

11       A.   Yeah, there's several other liens.

12       Q.   Do you know them?  Do you know who they are?

13       A.   No, but they are -- they are UCC filed; so, you

14   should be able to look it up, but I can't tell you

15   specifically.  But, yeah, I think there's like

16   $5 million in additional liens on the house, in addition

17   to the mortgage.

18       Q.   Is it your understanding the property is worth

19   less than it's owed on?

20       A.   Yes.  Yes, that's my understanding.

21       Q.   Does Blue Horse Trading own any trademarks?

22            MR. AFTERGOOD:  Objection, calls for

23   speculation.

24            THE WITNESS:  Ask them.

25   //

1    BY MR. SEBER:

2        Q.   Do you have any work with any trademarks that

3    are used for work owned by Blue Horse Trading?

4        A.   Ask them.

5        Q.   Were you involved with the Kardashians in a

6    trademark -- I think the name of it is Perfect Skin?

7        A.   No.

8        Q.   Are you involved in any work with the

9    Kardashians involving any type of trademarks?

10       A.   Me?  No.

11       Q.   Mantra?

12       A.   I'm sorry, is Mantra?

13       Q.   Yeah.

14           MR. AFTERGOOD:  Lacks foundation, objection.

15   BY MR. SEBER:

16       Q.   Well, I'm asking just to save time, because you

17   are the PMK for Mantra.

18       A.   Yeah, yeah.

19       Q.   I'm trying to save time.

20       A.   Mantra, yeah, I appreciate that, too.  No, I'm

21   not involved in any trademarks with Mantra.  I'm not

22   involved in -- I have no ownership, no position, I have

23   nothing to do with it whatsoever.

24       Q.   So, you individually have no involvement in any

25   trademarks whatsoever?

1       A.   Whatsoever.

2       Q.   Are you involved with any of your -- any

3   companies that --

4       A.   You are saying -- but -- but -- but here's how

5   I'm interpreting "involved," as ownership.  Like, do I

6   own any trademarks?

7       Q.   Well, let me --

8       A.   Because how you define "involved"?

9       Q.   Yeah, let me define what "involved" --

10      A.   Am I involved with any trademarks?

11      Q.   So, you don't own any trademarks?

12           THE WITNESS:  So it's stipulated just for the

13   record, we are going to try to define this now, but we

14   may have to go back on my questions and reanswer based

15   on what his definition of "involved" is.

16           Chad, what's your definition of involved?

17   BY MR. SEBER:

18      Q.   Well, first let's say you don't have any

19   ownership in any trademarks that have anything to do

20   with the Kardashians?

21      A.   No, I don't, personally.

22      Q.   Do you do any work on any project that has a

23   trademark that the Kardashians are involved in?

24      A.   No.

25      Q.   Are you aware of any trademark that the

1    Kardashians are related to in any way?

2        A.    No.

3        Q.    Have you ever heard of a name, Perfect Nails?

4        A.    Vaguely.

5        Q.    How is that?

6        A.    I've heard the name.

7        Q.    Have you had any involvement with any work with

8    a company or an entity named Perfect Nails?

9        A.    Nope.

10       Q.    Same question for Perfect Hair?

11       A.    No.

12       Q.    PerfectSkin?

13       A.    Nope.

14       Q.    University of Dermatology?

15       A.    Nope.

16       Q.    Rebirth?

17       A.    Nope.

18       Q.    Cell Wipes (phonetic)?

19       A.    No -- me personally?  No, on any of them.

20       Q.    Perfect Science Labs?

21       A.    No.

22       Q.    Perfect Science?

23       A.    No ownership.

24       Q.    In any of the work that you do with -- in any

25   corporate capacity, have you had any involvement, work

1    or otherwise, with that list of companies that I just

2    read?

3        A.    Wait.  I didn't understand that question.  I'm

4    sorry.

5        Q.    I'm trying to avoid going --

6        A.    No, no, I appreciate that, too.  I appreciate

7    that.

8        Q.    So, not in your individual capacity but as a

9    corporate capacity --

10       A.    But what corporate?

11       Q.    I don't know.  That's why I'm asking you.

12       A.    But, you can't, because I have no ownership in

13   any of these companies.  You can ask them.

14       Q.    Well, I'm just asking if you've done any work

15   for any company that had anything to do with any of

16   these names that I just read?

17       A.    No.

18       Q.    Do you need me to read the list again?  I don't

19   want to if I don't have to.

20       A.    No, you don't have to.  I don't have any

21   ownership.

22       Q.    I'm not asking ownership.  I'm just saying any

23   work -- so, if you are working for a GGW, if you are

24   working for Mantra, any other corporation, have you

25   worked within -- has any of your work involved working

1    with that list of names I just read?

2        A.    No.  You'd have to ask them.  I don't work for

3    them, other than I mentioned creative consultant.

4        Q.    So, you may have been a creative consultant

5    involved with some of these names?

6        A.    Uh-huh, yeah, but I said that in the beginning.

7        Q.    Generally, I'm just trying to figure out what

8    the scope of that creative consultant role would take.

9    So, if you are a creative consultant on any of these

10   names, I just want to know "yes" or "no."  And I can

11   read the list again, if you want.

12       A.    Yeah, go ahead and read the list.

13       Q.    Yeah, let me do it.  So, were you a creative

14   consultant at any point in time on -- and stop me if

15   it's "yes" or "no" -- Perfect Science?

16       A.    No.

17       Q.    Perfect Science Labs?

18       A.    No.

19       Q.    Cell Wipes?

20       A.    No.  These aren't even -- these aren't even

21   companies.  These are just trademarks -- they were just

22   marks, right?

23       Q.    I don't know, Joe.  I'm trying to figure out.

24   I'm trying to put the pieces of the puzzle together.

25       A.    I don't know.  Yeah, I can't tell you --

1     Q.   I just want to know --

2     A.   I just don't know, because I just don't know.

3  I think you are asking me just stuff that I just don't

4  know about.  You know, it's just -- it's kind of

5  strange.

6     Q.   I don't know what you know and what you don't

7  know, Joe.

8     A.   Then ask me questions.

9     Q.   Yeah.  Rebirth?

10    A.   Don't know.

11    Q.   University of Dermatology?

12    A.   Don't know anything about it.

13    Q.   Perfect?

14    A.   Don't know.

15    Q.   PerfectSkin, Perfect Hair?

16    A.   Don't know.

17    Q.   Perfect Nails?

18    A.   Don't know.

19    Q.   Are you familiar with GGW Interactive, LLC?

20    A.   Nope.

21    Q.   GGW Direct, LLC?

22    A.   Have I heard of it?  Yeah, I've heard of it.

23  Am I familiar with it?  I don't know.

24    Q.   Are you a creative consultant for them?

25    A.   Huh-uh.

1      Q.   Do you have any type of role whatsoever with

2    GGW Direct, LLC?

3      A.   Creative consultant.

4      Q.   It's creative consultant?

5      A.   Uh-huh.

6      Q.   Are you a creative consultant for GGW Brands,

7    LLC?

8      A.   I don't think so.

9      Q.   Do you do any work for GGW Brands, LLC?

10     A.   Not really.

11     Q.   How about GGW Magazines, LLC?

12     A.   Sometimes, I guess.

13     Q.   Creative consultant or is there a different

14   role?

15     A.   Creative consultant.

16     Q.   GGW Events, LLC?

17     A.   Sometimes I consult.

18     Q.   Same deal, creative consultant?

19     A.   Yeah.

20     Q.   GGW Marketing, LLC?

21     A.   Never heard of -- no, I don't do any work.

22     Q.   For the ones that you were a creative

23   consultant on, to make it easier, Joe, I'm just going to

24   refer to those as the GGW companies.  If there's any

25   confusion about what I'm asking, just let me know.  Did

1  any of the GGW companies have a relationship to Pablo, I

2  believe it's pronounced, P-a-b-l-o, Holdings, LLC?  Have

3  you heard of that company, Joe?

4      A.   I don't know.  Ask them.

5           MR. SEBER:  Mark this as Exhibit 2.

6           (Exhibit 2 was marked.)

7  BY MR. SEBER:

8      Q.   It's an e-mail from Mr. Klueger to an associate

9  at my office.

10     A.   (Reviewing document) Okay.  And?

11     Q.   Do you have any understanding why Mr. Klueger

12  is referring to you as the PMK of operations?

13          MR. AFTERGOOD:  Objection, lacks foundation and

14  calls for speculation.

15          THE WITNESS:  No.

16 BY MR. SEBER:

17     Q.   Do you consider yourself a PMK of operations of

18 any company?

19     A.   I . . .

20     Q.   I'm just asking you, not what Mr. Klueger

21 believes.

22     A.   I would say Mr. Klueger is the person most

23 knowledgeable, because I couldn't tell you anything

24 about these companies.

25     Q.   So, Mr. Klueger is the person most

1    knowledgeable of the GGW companies?

2         A.   Yes.

3         Q.   And it's not you?

4         A.   That's correct.

5         Q.   Of any type of topic, just to be thorough?

6         A.   Well, I'm a creative consultant, you know, when

7    anyone asks me.

8         Q.   So, if the topic fell underneath the creative

9    consultant role, then you would know about that?

10        A.   If the topic fell under the creative consultant

11   role . . .

12        Q.   Right.  I'm just trying to figure out, Joe,

13   Mr. Klueger references and he says that you are the

14   person most knowledgeable of --

15        A.   Sure, but --

16        Q.   Hold on.  I want to make sure -- of operations,

17   and I believe you are telling me something different.

18   If that's not the case, then let me know.

19        A.   Ask me a question, and I'll answer it.

20        Q.   Are you the person most knowledgeable of any of

21   the GGW companies for any subject matter?

22        A.   Yeah, but I don't really know anything.  I'm

23   the person most knowledgeable, but I don't know

24   anything.  Just make me the person most knowledgeable

25   for everything.  I'm not that knowledgeable.  I'd have

1    to go ask Bob Klueger any information.

2         Q.    So, Mr. Klueger would be more knowledgeable

3    on --

4         A.    100 percent.

5         Q.    Okay.  Thank you.

6         A.    He's the person most knowledgeable.

7         Q.    Do you know where the GGW companies' offices

8    are operated?

9         A.    No, I don't know the address.

10        Q.    Do you know of the GGW companies -- how their

11   ownership interest is structured?

12        A.    No.

13        Q.    Do you have any influence over how these

14   companies are governed?

15        A.    No.

16        Q.    Who makes the day-to-day decisions?

17        A.    Ask them.

18        Q.    Have you negotiated business deals for any of

19   the GGW companies?

20        A.    Not to the best of my knowledge.

21        Q.    Do you have any idea or understanding how

22   GGW -- the GGW companies financially operate?

23        A.    No.  Ask Bob Klueger.

24        Q.    Do you have any understanding of GGW companies'

25   assets?

1     A.    Nope.

2     Q.    Liabilities?

3     A.    Nope.

4          MR. SEBER:  Let's go off the record.

5          (Discussion off the record.)

6   BY MR. SEBER:

7     Q.    Perfect Science Labs, LLC -- have you heard of

8   them?

9     A.    I've heard of it.

10    Q.    How so?

11    A.    Just heard of it.

12    Q.    Do you do any work with them?

13    A.    Nope.

14    Q.    In an individual or corporate capacity?

15    A.    Nope.

16    Q.    Do you know if Perfect Science Labs, LLC, has

17  any involvement with Pure Skin?  That's what I was

18  looking for.  Pure Skin?

19    A.    Huh-uh.

20    Q.    PerfectSkin?

21    A.    Nope.

22    Q.    Do they have any involvement with the

23  Kardashians?

24    A.    I don't know.  You'd have to ask them.  I mean,

25  like --

1    Q.   All these questions --

2    A.   I'm not the person -- like, I can't -- you are

3  asking me, like, frigging questions like now I'm just

4  getting in the habit of just like "I don't know."  So,

5  I'll just say, "I don't know."  I just don't know.

6    Q.   Well, you may know one of these.

7    A.   Okay.  All right.  So, keep going.

8    Q.   Fair enough.  Have you ever -- strike that.

9        MR. SEBER:  Off the record for a second.

10       (Discussion off the record.)

11       (Exhibit 3 was marked.)

12  BY MR. SEBER:

13   Q.   I've handed you Exhibit No. 3.  It's a copy of

14  a Subpoena for a production of documents in this matter.

15  Have you seen this before, Joe?

16   A.   Yes, I have, and I've read it.

17   Q.   Then flip to -- there's a Request for

18  Production of Documents, and we are not going to read

19  them all --

20   A.   I know.

21   Q.   -- because they are all in the document.  But

22  it's 1 through 33.

23   A.   Got it, okay.

24   Q.   And I take it when you received this, you read

25  over these Requests for Production of Documents?

1      A.    Yes, and I did a diligent search, and I don't

2   have any of those documents in my possession.

3      Q.    Where did you search?

4      A.    I searched my house, I searched my files and

5   searched my computer.  I don't have any of those

6   documents.

7      Q.    Did you talk to any of your agents that might

8   have your documents, such as an attorney?  I'm not

9   trying to figure out what you told them.  I just want to

10   know if you asked them, "Guys, do you have any of these

11   documents so I can comply with the Subpoena?"

12      A.    Oh, yes.

13      Q.    You did?

14      A.    My attorneys do not have any of these -- or

15   it's been represented to me.  I mean, I'm not going to

16   say that they are -- you know, it's been represented to

17   me that these documents were not.

18      Q.    I'm sorry.  Can you finish that last sentence,

19   Joe?

20      A.    I thought I did.  I'm sorry.

21      Q.    Maybe I missed it.

22      A.    Okay.

23      Q.    My last question was --

24      A.    My attorneys have represented to me they didn't

25   have any of the documents, as well.

1    Q.   About how many hours did you spend looking for

2    these documents?

3    A.   I made a reasonable effort.

4    Q.   Give me a ballpark.  I mean, was this, like,

5    12 hours, 24, three days?  What are we talking about?

6    A.   Three hours, two hours.

7    Q.   Do you have an understanding if you once had

8    these documents in your possession -- any of these?  I

9    don't want to go one by one.

10   A.   No, no, no, I've read through these.  I mean,

11   you know, like, when I was involved in Mantra, I would

12   have had something to do with that way back when.  You

13   know what I'm saying?  But it calls for since

14   January 2007.  So, it's, like, it's -- no, I don't, and

15   I did read them and I did search for them, because it

16   wouldn't be relevant anyways.  I would be happy to

17   furnish them if I had them in my possession.

18   Q.   Let's switch hats here and go over to Mantra.

19   A.   Okay, cool.

20   Q.   As the person most knowledgeable from Mantra,

21   how much does Mantra owe Joe Francis, you?

22   A.   Well, it's, I mean, I think a significant

23   amount.

24   Q.   Over 2 million?

25   A.   Oh, yeah, for sure.

1    Q.   Over 10?

2    A.   I think so, in damages.

3    Q.   And who was the person that most benefited from

4  that scandal that occurred at Mantra that we talked

5  about last time?

6    A.   The CFO.

7    Q.   Who was that again?

8    A.   Michael Barrett.

9    Q.   Where is Michael Barrett now?

10   A.   I don't know.

11   Q.   Is he the rogue that's gone off the net, so to

12  speak?

13   A.   Off the grid.

14   Q.   Off the grid.

15        MR. AFTERGOOD:  Girls Gone Wild Island.

16        THE WITNESS:  Girls Gone Wild Island.

17  BY MR. SEBER:

18   Q.   Maybe that's why you can't use it.  Maybe he's

19  there.

20   A.   It's a fictitious place.  Like, you rent sets.

21  Like, you call up the girls who want a studio.  You rent

22  a fucking place.  You put a sign out that says:  "Girl

23  Gone Wild Studios."  That doesn't mean you own it.  It's

24  Hollywood, baby.

25   Q.   Where do the books go for Mantra?

1    A.    I -- I have no idea.

2    Q.    Mantra -- is it currently operating?

3    A.    Ask them.

4    Q.    Well, you are the PMK right now, so . . .

5    A.    I'm the PMK, but I have no knowledge.  I don't

6    know who owns it, I don't know where anything is, I

7    don't know anything about it and . . .

8    Q.    Do you believe you should be the PMK for

9    Mantra?

10   A.    I know the most about it, but I don't know

11   anything.

12   Q.    You know the most --

13   A.    So, I believe I am the right proper PMK.

14   Q.    You know the most, which is zero or -- right?

15   A.    It doesn't exist.

16   Q.    But --

17   A.    I mean, it doesn't -- as far as, like, I'm

18   concerned, I don't own any part of it.  I don't have any

19   ownership interest.  I mean, you wanted a PMK.  I'm

20   here.

21   Q.    When's the last time it existed?

22   A.    I don't know.  I told you that last time.

23   Q.    Correct --

24   A.    But I could -- Bob Klueger would be the other

25   closest person.

1    Q.   Does Bob Klueger know more about Montra's

2    operations than you?

3    A.   Probably, but I would say equally.

4    Q.   But if it's zero, then it's zero?

5    A.   I mean, and that's really my point, too --

6    Q.   But I'm trying to figure out --

7    A.   I'll say it doesn't exist.  Like, I don't own

8    any part of it.  I'm not trying to divert your question.

9    I'm just trying to make it easier to give you more

10   information.

11   Q.   But obviously it was in existence --

12   A.   At some point, yeah.

13   Q.   -- at some point, right.

14   A.   Yeah.

15   Q.   So, I just want to know --

16   A.   How did it cease to be in existence?  I don't

17   know.

18   Q.   -- when the date was that it ceased.

19   A.   I don't know.  So, that's what I don't know, as

20   we sit here today.

21   Q.   Well, there's one point in time where it had an

22   office, right?

23   A.   Yeah, we talked about that earlier.  Yeah.

24   Q.   Right.  So, I'm trying to figure out when did

25   that -- is there a time where you could say, "You know

1   what?  That's the last point in time when Mantra had an

2   office"?

3      A.   Yeah.  Well, we talked about this in the

4   beginning of the deposition, and I think you said it

5   was -- you asked me if it was greater than five years

6   ago; and I said, "No, it was less than five years."

7          And you asked me if it was greater than two

8   years, and I said, "Probably between two and five

9   years."

10     Q.   We are talking about something a little bit

11  different, but I remember talking about it.  So, it's

12  the same thing.

13     A.   That was my answer, yeah, and that's still my

14  answer.  Yeah, I am the person most knowledgeable, but

15  there's nothing to know.  It doesn't operate, as far as

16  I know.

17     Q.   Was there --

18     A.   Anything else -- I'm sorry.  Anything else I'd

19  need to talk to Bob Klueger about.

20     Q.   So, do you have any understanding, as you sit

21  here today, of Mantra -- when Mantra did have assets,

22  the amount of assets it had?

23     A.   No, I have no idea.  No, I don't, because it

24  was an accounting fraud, too.  You know, you know that

25  whole story.  You've read that whole story.

1   Q.   The same question for liabilities.  Do you have

2   any understanding --

3   A.   No.

4   Q.   Do you have any understanding how the four --

5   while Mantra was in operation, how it paid its bills?

6   A.   Yeah, by check probably.  Yeah, by checks.

7   Q.   Well, who was the head of the accounting?  Was

8   that still Eric Deutsch?

9   A.   No, it was Michael Barrett.

10  Q.   Michael Barrett.

11  A.   The guy who embezzled the money.  And we made a

12  good route.  We went over this whole entire -- we went

13  over this all last time.  I explained the whole thing.

14  Q.   I understand, Joe.  Now, I'm just kind of

15  asking -- I am asking:  Now you sit here not as Joe

16  Francis, but you are wearing the --

17  A.   The Mantra hat.

18  Q.   -- Mantra --

19  A.   I got you.

20  Q.   -- speaking for Mantra.

21       From Montra's perspective, is there a company

22  that took over its operations?

23  A.   No.

24  Q.   Was that because it's just so depleted of any

25  assets whatsoever, there's nothing to take over?

1    A.   There was nothing.  It was riddled with fraud.

2   I mean, the CFO -- the three top guys stole the money.

3   Yeah, I mean --

4    Q.   Did Mantra ever have any ownership right in the

5   house in Mexico?

6    A.   Never.

7    Q.   Did they have the ability to sign contracts for

8   the use of the house in Mexico?

9    A.   Never.

10    Q.   So, Mantra would never sign a contract?

11    A.   Ever.  It couldn't.  I can't even see the

12   relationship.

13    Q.   So, it had nothing to do with as far as who got

14   Mantra, I'm talking --

15    A.   I'd have to talk to Bob Klueger about it, but,

16   yeah, there's -- I mean, that would be pretty -- I

17   wouldn't see how that could possibly work.

18    Q.   Why is that?  I just don't understand the

19   structure.

20    A.   Either do I.  I don't understand the structure

21   either, but I'm just --

22    Q.   But you know it well enough that Mantra would

23   not be in the position to grant --

24    A.   To the best of my knowledge, yeah.  I mean, to

25   the best of my knowledge.

1    Q.    To the best of your knowledge, Mantra would not

2    be in a position to grant somebody the use of the house

3    in Mexico?

4    A.    No, I don't see how that could happen.

5    Q.    The house in -- that was featured in --

6    A.    But you would have to ask that -- like, I don't

7    know.

8    Q.    But you are them right now; so, that's right

9    why I'm trying --

10    A.    But I don't own it, and I have no position, I

11    have no authority, but I've designated myself just so

12    you have somebody to talk to.  You can talk to me or

13    Bob.  Bob Klueger would be the person most knowledgeable

14    for Mantra.

15    Q.    Would Bob Klueger be in a better position to

16    answer questions about Mantra having any right or access

17    or the ability to control the house in Mexico?

18    A.    Well, I've already answered that there's -- and

19    to the best of my ability, there's no way.  Like, I

20    couldn't see that, but I don't know the structure and I

21    think intentionally.

22    Q.    Have you ever owned stock in Mantra?

23    A.    Yes.

24    Q.    So, Mantra issued Joe Francis stock?

25    A.    I mean, I don't know, but I -- I -- at one time

1    I was a shareholder for Mantra.  If somebody issued, I

2    don't know what that means.

3        Q.   Did they ever give you a certificate that said,

4    "Stock"?

5        A.   I've never seen one.  I don't know if they did.

6             MR. SEBER:  Mark this next one.

7             (Exhibit 4 was marked.)

8    BY MR. SEBER:

9        Q.   Have you ever seen what's Exhibit 4 before?

10       A.   No, but that doesn't mean anything.  My

11   signature is on it, but I don't remember seeing it.

12       Q.   Do you have any idea where -- it's a stock

13   certificate, and it --

14       A.   This is November 1988.

15       Q.   It's old school?

16       A.   Yeah, it's old school.

17       Q.    It's got your name on it.  It says 900 -- I

18   mean, it says 900 shares of stock of Mantra Films, Inc.

19   Do you have any idea what happened to that stock?

20       A.   I have no idea.

21       Q.   Do you know who would?

22       A.   Bob Klueger probably.

23       Q.    I don't have any more questions about that,

24   Joe.  Do you have any understanding if there's any

25   outstanding stock today of Mantra?

1      A.   I don't know.  You'd have to ask them.

2      Q.   Mr. Klueger?

3      A.   (Witness nodding head.)

4      Q.   Yes?

5      A.   Correct.  I would -- yes.  I have no ownership

6   interest in the company, I have no position in the

7   company, I don't think the company operates.  That's

8   my -- you know.

9      Q.   Does Mr. Klueger have an understanding of the

10  asset structure of Mantra?

11     A.   I can't speak for his knowledge.

12     Q.   Joe, were you the sole shareholder of Mantra?

13     A.   No.

14     Q.   The company wasn't public, was it?

15     A.   No, it was private.

16     Q.   Was Joe Francis ever an employee of Mantra?

17     A.   Yes.

18     Q.   And what was your role?

19     A.   As -- I was the president of Mantra for a

20  period of time.

21     Q.   Did Mantra ever provide you, Joe, with anything

22  of value to use, like a car?

23     A.   Huh?

24     Q.   Yes?  I'm sorry, yes or no?

25     A.   Yeah, they used to pay me -- I used to get paid

1   by Mantra, but that was many years ago.

2       Q.   When did that stop?  Is there a defining line?

3   Two years ago?  Is that still safe --

4       A.   Mantra hasn't paid me in years.  Mantra owes me

5   money.  Years.  I would say four or five years.

6       Q.   Let's say four years, to be conservative,

7   Mantra hasn't provided anything of value to you?

8       A.   Except a lot of fucking lawsuits.

9       Q.   Which may or may not be of value?

10      A.   I don't think they are of value.  I think they

11  are liabilities.  Mantra has got a lot of liabilities is

12  what I understand from my attorneys, but that's all.

13      Q.   Have you ever heard of the name Ashley Bosh?

14      A.   Yes.

15      Q.   Who is -- is it she or he?

16      A.   She.

17      Q.   Who is she?

18      A.   She was a paralegal.

19      Q.   For?

20      A.   I don't know.  For my attorney.

21      Q.   She wasn't a paralegal for Mantra?

22      A.   No, she worked -- she worked for the

23  attorney -- whoever the attorney was at the time.

24          MR. SEBER:  Let's go off the record.

25          (Discussion off the record.)

1        MR. SEBER:  There's a stipulation I'm going to

2   put on the record with Mr. Aftergood we agreed with.  If

3   Wynn is going to file a motion to compel on the

4   documents -- I'm not saying we are or not -- but we both

5   understand that there's no need to seek an intervention

6   with the Court on that point; that we can simply file a

7   motion to compel.  And Mr. Aftergood has agreed that if

8   we are, that he's not going to raise that for us failing

9   to go down and seek an intervention on that ground.

10       MR. AFTERGOOD:  I'm fine with that.

11       THE WITNESS:  That's fine.

12       (Exhibit 5 was marked.)

13   BY MR. SEBER:

14   Q.   The last document that I have for you is

15   Exhibit No. 5.  Exhibit No. 5, this is a Subpoena to

16   Mantra for production of documents.  Have you seen this

17   document before?

18   A.   Yes.

19   Q.   And direct your attention to -- it starts

20   several pages in.  It says:  "Documents to be Produced,"

21   and it has Requests for Production of Documents No. 1

22   through 23"?

23   A.   Yep.

24   Q.   You specifically looked for these document?

25   A.   Yes.

1    Q.   And where did you look?

2    A.   Computer, files, home, but, you know, I'm not

3    involved with Mantra, so . . .

4    Q.   Did you talk to anybody about if they had any

5    of these documents in their possession?

6    A.   I talked to my attorneys.

7    Q.   And they represented to you that they did not

8    have any of these documents in their possession?

9    A.   Yes, that's correct.

10   Q.   About how many hours did you spend --

11   A.   Or they said whatever documents they had,

12   meaning that we -- meaning the attorneys, they said that

13   they produced pursuant to the last -- pursuant to the

14   Subpoena.  It was our last -- I guess, in another --

15   what?

16   Q.   Whatever they said, they said.

17   A.   Yeah, but then also, I'm getting into

18   attorney-client privilege stuff, but that's -- yes.

19   Q.   I mean, the fact that they produced documents

20   wouldn't be privileged if they produced them?

21   A.   Yeah.

22   Q.   I'm just trying to figure out if they -- it

23   sounds like you spoke to your counsel about the

24   documents request --

25   A.   I made a reasonable diligent search for these

1   documents --

2       Q.    Hold on.  Let me finish.  You spoke to your

3   counsel about the documents requested in Exhibit No. 5,

4   and your attorney said that they either already produced

5   them or that there were no documents to produce?

6       A.    Correct.

7       Q.    And you spent about how many hours looking for

8   the documents in Exhibit No. 5?

9       A.    Well, I didn't -- I looked at the same time;

10  so, the same three-hour period of time, I spent any

11  other -- just looking for this at the same time.

12      Q.    And the same locations that you looked for --

13  and the other exhibit being Exhibit No. 3, I believe,

14  which is the Subpoena to Joe Francis as an individual

15  for production of documents?

16      A.    Correct.

17      Q.    And your testimony is that you have no

18  documents responsive to any of these in your --

19      A.    That haven't been produced previously.

20      Q.    That have not been produced?

21      A.    Previously.

22      Q.    Previously?

23      A.    Yeah, or that are, like, public record that you

24  could obtain yourself.

25          MR. SEBER:  That's it.  We can go off.  We are

1    done.

2          THE WITNESS:  Can we stipulate that this

3    concludes the . . .

4          MR. SEBER:  Well, we'll stipulate that this

5    concludes the examination; but, Joe, you should still go

6    down and let them know.

7          THE WITNESS:  Okay, yeah.  So, let's go down.

8          MR. SEBER:  Go ahead, and I will be --

9          THE WITNESS:  Let's stipulate that it's the end

10   of the judgment debtor exam for Joseph Francis and

11   Mantra Films.

12          (Ending time:  11:46 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   STATE OF _____)
                                         ) SS.
2   COUNTY OF _____)

3

4

5

6

7     I, the undersigned, declare under penalty

8   of perjury that I have read the foregoing

9   transcript, and I have made any corrections,

10  additions or deletions that I was desirous of

11  making; that the foregoing is a true and correct

12  transcript of my testimony contained therein.

13       EXECUTED this _____ day of _____,

14  20__, at _____, _____.
                    [City]                [State]
15

16

17

18

19

20

21

22             _____
                  JOSEPH FRANCIS
23

24

25
```

1                          REPORTER'S CERTIFICATE

2

3          I, CANDACE A. NICHOLS, CSR No. 12239, Certified

4     Shorthand Reporter, certify:

5          That the foregoing proceedings were taken before me

6     at the time and place therein set forth, at which time the

7     witness was put under oath by me;

8          That the testimony of the witness, the questions

9     propounded, and all objections and statements made at the

10    time of the examination were recorded stenographically by

11    me and were thereafter transcribed;

12         That the foregoing is a true and correct transcript

13    of my shorthand notes so taken.

14         I further certify that I am not a relative or

15    employee of any attorney of the parties, nor financially

16    interested in the action.

17         I declare under penalty of perjury under the laws of

18    California that the foregoing is true and correct.

19         Dated this *23* day of *April*          , 2012.

20

21    *Candace A. Nichols*
      CANDACE A. NICHOLS C.S.R. No. 12239

22

23

24

25