# EXHIBIT J

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   LOS ANGELES DIVISION

 4

 5   In re:

 6   GGW BRANDS, LLC,
     GGW DIRECT, LLC,
 7   GGW EVENTS, LLC,
     and GGW MAGAZINE, LLC,
 8
                    Debtors.
 9
                          Case No. 2:13-bk-15130-SK
10
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11

12

13

14
                       DEPOSITION OF
15
                    ROBERT F. KLUEGER
16

17                      May 24, 2013

18                       1:00 p.m.

19

20
                   1999 Avenue of the Stars
21                        39th Floor
                   Los Angeles, California
22

23

24             Karen Aligo, CSR No. 13418

25
```



```
 1                 DEPOSITION OF ROBERT F. KLUEGER
 2                          May 24, 2013
 3                            --oOo--
 4                    ROBERT F. KLUEGER,
 5   sworn as a witness by the Certified Shorthand
 6   reporter, testified as follows:
 7                          EXAMINATION
 8   BY MR. PFISTER:
 9        Q.   Good afternoon, Mr. Klueger.
10        A.   Good afternoon.
11        Q.   We met off the record.  I'm Rob Pfister.
12   With me is my colleague, Jonathan Weiss.  We are here
13   as counsel to the bankruptcy trustee in the bankruptcy
14   cases of GGW Brands, GGW Events, GGW Magazine, and
15   GGW Direct, LLC.
16             This is a Rule 2004 examination, and we would
17   like to ask you some questions about your prepetition
18   representation of the debtors, the GGW entities that I
19   mentioned.
20             When did you first begin representing the
21   debtors?
22        A.   Probably in October of 2011.
23        Q.   How is it that you came to represent these
24   companies?
25        A.   Mr. Francis's CPA, Tim Devine, referred
```



ROBERT F. KLUEGER  
In re GGW BRANDS  
May 24, 2013  
6

1  Mr. Francis to me.
2      Q.   When was that?
3      A.   Well, it would have been shortly before
4  October 4, 2011.
5      Q.   And you represented all four of the
6  GGW entities that I mentioned; is that correct?  I can
7  list them again.
8      A.   No, you don't have to.  To a greater or
9  lesser extent, yes.
10     Q.   Help me understand the --
11     A.   Well, you mentioned GGW Magazine.  I don't
12 think that I really did any work that I can recall for
13 GGW Magazine.
14     Q.   What about GGW Events?
15     A.   Yes, mostly GGW Direct and GGW Brands.
16     Q.   What work did you do -- well, the distinction
17 between the work that you did for GGW Direct and
18 GGW Brands, is there one, or did you just work on
19 behalf of both of them?
20     A.   It would be more of the latter.
21     Q.   So if I just refer to those two
22 GGW entities --
23     A.   You can refer to the GGW entities, that will
24 work.
25     Q.   So I will refer to GGW Direct, LLC, and



800.211.DEPO (3376)  
EsquireSolutions.com

ROBERT F. KLUEGER
In re GGW BRANDS

May 24, 2013
7

```
 1   GGW Brands, LLC, as the GGW entities.
 2       A.   Correct.
 3       Q.   What work were you hired to do for the
 4   GGW entities?
 5       A.   The October 4th engagement letter pretty much
 6   summarizes the work that we were going to do.  The
 7   principal work that we did we were engaged to do was
 8   to separate the ownership of the intellectual property
 9   from the operating companies that were operating.  You
10   know what I mean?  To put the ownership of the
11   intellectual property in entities that were separate
12   from the operating companies.
13       Q.   And why was that being done?
14       A.   Well, it's just basic prudence that if an
15   operating company is sued for whatever reason, you
16   don't want to have a creditor of the operating company
17   be able to seize the intellectual property, which is
18   an asset of the operating company.
19            The intellectual property itself may have
20   nothing whatever to do with the creditor's claim, may
21   be a tort claim of some sort, but you don't want to
22   have the creditor be able to access the intellectual
23   property itself.  So it's normal prudence to separate
24   them into separate entities.
25            Sometimes this is done -- the separation is
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER　　　　　　　　　　　　　　　May 24, 2013
In re GGW BRANDS　　　　　　　　　　　　　　　　　　　　8

1　done for tax purposes -- very often it's done for tax
2　purposes.  It wasn't done for tax purposes in this
3　case because there was no tax advantage in doing so
4　because all of these were pass-through entities that
5　ultimately flowed through to Joe Francis.
6　　　Q.　So the reason for doing it, then, had nothing
7　to do with taxes but was a matter, as you described
8　it, as basic prudence?
9　　　A.　Correct, nothing to do with taxes.
10　　　Q.　Of the two GGW entities, Direct and Brands,
11　is it your understanding that one of the them is a
12　holding company and one is an operating company?
13　　　A.　That is my understanding.  My understanding
14　is that GGW Brands, LLC, was the owner of the
15　operating companies GGW Direct, GGW Events and so
16　forth.
17　　　Q.　So Brands was the holding company?
18　　　A.　It's my understanding, yes.
19　　　Q.　And Direct then was the operating company?
20　　　A.　Yes.
21　　　Q.　Do you recall which of the two entities owned
22　the intellectual property?
23　　　A.　You have to understand there were hundreds of
24　trademarks and copyrights spread over all sorts of
25　different entities.  I couldn't tell you.



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER　　　　　　　　　　　　　　　　　　　　　　May 24, 2013
In re GGW BRANDS　　　　　　　　　　　　　　　　　　　　　　　　　　9

1　　　Q.　Why wouldn't it be sufficient for the
2　prudence matter that you identified for the
3　intellectual property to be held by the holding
4　company and then to have the separate legal entity,
5　the operating company do the actual business?  Why
6　wouldn't that --
7　　　A.　Your question is could it simply have been
8　sufficient to just transfer all of the intellectual
9　property to GGW Brands?  Perhaps.  Perhaps.  I don't
10　really think that necessarily works as well as having
11　the intellectual property owned by an offshore entity
12　as we did in this case.  This is part science and part
13　art.  And, no, I think the better practice is to have
14　the intellectual property owned by an offshore entity.
15　　　Q.　Why is that?  What makes an offshore entity
16　as opposed to a United States entity?
17　　　A.　Just more difficult for a creditor to be able
18　to access the assets.
19　　　Q.　So one of the entities we're going to be
20　talking about a little bit later this afternoon is
21　it's called Path Media Holdings; does that name sound
22　familiar?
23　　　A.　I believe I created Path Media Holdings.
24　　　Q.　So Path Media Holdings is the offshore entity
25　that this intellectual property was transferred to, to



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER  May 24, 2013
In re GGW BRANDS  10

```
 1  the best of your recollection?
 2      A.   To the best of recollection, yes.
 3      Q.   So tell me about how you created Path Media
 4  Holdings.
 5      A.   We formed a limited liability company in
 6  Nevis.
 7      Q.   Where is Nevis?
 8      A.   It's in the Caribbean.
 9      Q.   Have you been there?
10      A.   No, not personally.
11      Q.   Why Nevis?
12      A.   Nevis is a good jurisdiction in which to form
13  limited liability companies for a number of reasons --
14  a lot of reasons.  It's quick.  It's cheap.  They
15  don't hassle you, which is a function of being quick
16  and cheap.  We have a good relationship with an agent
17  that we use in Nevis.  There are other jurisdictions
18  that you can use, but I don't know any that are
19  better.
20      Q.   So it's not, again, that the specific
21  operations of GGW Direct or GGW Brands or any of these
22  other entities had any connection to Nevis?
23      A.   Other than the fact that the intellectual
24  property was transferred to an entity chartered in
25  Nevis.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        Q.   Okay.
 2        A.   They certainly had no operations in Nevis,
 3   that's for sure.
 4        Q.   That's all I'm trying to understand.  I --
 5        A.   No, they were not operating -- they were not
 6   operating companies in Nevis.
 7        Q.   Wasn't because Joe Francis had a niece in
 8   Nevis or --
 9        A.   No, no, that's for sure.
10        Q.   So you were telling me how Path Media
11   Holdings -- how you formed it, and you said it
12   was --
13        A.   Formed it in Nevis.  It was chartered in
14   Nevis.  We drafted an operating agreement for a Nevis
15   company.  We filed a form with the IRS, Form 8832,
16   electing that the Nevis company be a disregarded
17   entity for tax purposes.
18        Q.   What does that mean?
19        A.   It means that the IRS allows you to elect in
20   certain cases not to have the earnings of an offshore
21   corporation be subject to U.S. taxes.  There was no
22   thought in this case of deferring any taxes by forming
23   an offshore entity.  All of the taxes of the operating
24   entities were taxable directly to Joe Francis before
25   we did what we did, and they were taxable to
```



ROBERT F. KLUEGER  May 24, 2013
In re GGW BRANDS  12

```
 1  Joe Francis after we did what we did.
 2          So that's what we did.  We formed the entity,
 3  we drafted an operating agreement, we elected that it
 4  be a nontaxable entity, and then of course we
 5  physically transferred all of the intellectual
 6  property to the entity.
 7      Q.  When you say "physically transferred," what
 8  do you mean?
 9      A.  We assigned the trademarks to the offshore
10  entity and registered the assignments with U.S. Patent
11  Trademark Office.
12      Q.  Did you do that personally?
13      A.  Yes.
14      Q.  So that was the trademarks.  Any other
15  intellectual property that was transferred?
16      A.  Well, now, I'm trying to think if there were
17  copyrights that were transferred as well.  I don't
18  recall.
19      Q.  But the goal when you were retained was to
20  move all of the intellectual property owned by the
21  GGW entities to Path Media Holdings?
22      A.  Right.  If you look at the engagement letter
23  is one of the offshore entities -- for the purpose of
24  acting as the holder of your IP, correct.
25      Q.  You in fact did complete that process?
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER                                           May 24, 2013
In re GGW BRANDS                                                      60

1  the website to reflect as to who now owned the
2  intellectual property, right.
3            MR. PFISTER:  I'm going to mark as
4  Exhibit 170 and 171, two unanimous written consents --
5  I'm sorry.  Pardon me, 171 and 172.
6            (Deposition Exhibits No. 171 and 172 were
7  marked for identification.)
8  BY MR. PFISTER:
9      Q.   I believe that the two of them, Exhibits 171
10 and 172, are identical, except one is GGW Brands, LLc,
11 and the other one is GGW Events, LLC.
12     A.   Well, they differ more than that.  172 is the
13 consent of the member of GGW Events, and it is adopted
14 by GGW Brands, the member of GGW Events.  171, which
15 is the consent of GGW Brands, it is the consent of its
16 member, Pablo Holdings.
17     Q.   Did you prepare both of these documents?
18     A.   Yes.
19     Q.   Is your signature on the second page of each?
20     A.   Yes.
21     Q.   What's the purpose of this unanimous written
22 consent?
23     A.   This was dated October 12th.  I was working
24 right out of the box, I'll tell you.  I believe this
25 was for the purpose of enabling these two entities to



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER                                              May 24, 2013
In re GGW BRANDS                                                         61

1   open bank accounts at Wells Fargo.
2       Q.   Do you know where they had their bank
3   accounts before?
4       A.   I would be guessing.  I don't know.
5       Q.   Is there any reason -- I mean, both of these
6   entities existed obviously before you engaged them.
7       A.   Yes.
8       Q.   Any reason in connection with what you were
9   doing to change the bank accounts?
10      A.   You mean, why did they want to open up bank
11  accounts?
12      Q.   Right.
13      A.   I don't recall.  You know, I can speculate
14  that they may have obviously had a falling out with
15  their bank or they just didn't like the service that
16  they were getting at their bank.
17      Q.   To your knowledge, it has nothing to do with
18  the asset protection or --
19      A.   No, it didn't.
20      Q.   Now, the "Further resolved" right under
21  "Resolved," it reads, "Joseph R. Francis is a key
22  executive of the company.  As such he is hereby
23  authorized to act as signatory for the company fully
24  empowered and authorized to make deposits,
25  withdrawals, execute instruments, signature cards



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER                                       May 24, 2013
In re GGW BRANDS                                                  62

```
 1  indentures and contracts of whatever nature related to
 2  the company's bank account with Wells Fargo, N.A., and
 3  bind the company thereby."  What's the purpose of
 4  that?
 5      A.   I do recall that.  This language in this
 6  "Further resolved," this was drafted to satisfy
 7  somebody at the bank, who was not familiar with
 8  limited liability companies.  You still have these
 9  people.  And, you know, somebody at the bank was
10  asking, well, is he the president of the company?  No,
11  he's not the president of the company.  He doesn't
12  have a president.  And this person was saying, well,
13  you know, he's got to be some sort of an executive in
14  the company in order to be a signatory.
15           So I said to the person at the bank, well, if
16  I just draft these to reflect the fact that he is a
17  key executive of the company, will that work?  And the
18  banker said yes.  So I said done.
19           Experience is a great teacher.  You don't
20  learn that stuff in law school.
21      Q.   One of the things we talked about a little
22  bit earlier was the cleanup of some of the old
23  entities.
24      A.   Yes.
25           MR. PFISTER:  I'm going to mark as
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT F. KLUEGER  May 24, 2013
In re GGW BRANDS  78

1  I mean, they've got essentially one creditor
2  that I know of.  I don't get it.
3  Q.  Do you know Bob Yaspan, Y-a-s-p-a-n?  He's in
4  Woodland Hills.  He was their bankruptcy lawyer who
5  filed the case.
6  A.  No, I don't believe I do.
7  MR. PFISTER:  I think I'm almost done.  Why
8  don't we just take a quick five-minute break and let
9  me just confer with Jonathan here and make sure I
10 didn't miss anything.
11 THE WITNESS:  Okay.
12 MR. PFISTER:  Off the record.
13 (Recess.)
14 MR. PFISTER:  I have no more questions.
15 Thank you so much for your time.
16 (Discussion held off the record.)
17 MR. PFISTER:  Back on the record.  We've
18 reached a stipulation:  The witness is going to waive
19 the right to read and sign the transcript; is that
20 correct?
21 THE WITNESS:  That is correct.
22 MR. PFISTER:  Thank you.  Off the record.
23 (Signature waived.)
24 (Deposition concluded at 3:38 p.m.)
25



800.211.DEPO (3376)
EsquireSolutions.com

**ROBERT F. KLUEGER**  May 24, 2013
In re GGW BRANDS  79

```
 1  STATE OF CALIFORNIA    )
 2                         )  ss.
 3  COUNTY OF LOS ANGELES  )
 4
 5          I, KAREN ALIGO, CSR NO. 13418, do hereby
 6  certify:
 7          That prior to being examined, the witness
 8  named in the foregoing deposition, ROBERT F. KLUEGER,
 9  was by me administered an oath to testify the truth,
10  the whole truth, and nothing but the truth;
11          That said deposition was taken before me at
12  the time and place therein set forth and was taken
13  down by me in shorthand and transcribed into
14  computer-generated text under my direction and
15  supervision; and I hereby certify the foregoing
16  transcript of my shorthand notes so taken.
17          I further certify that I am neither counsel
18  for nor related to any party to said action nor in any
19  way interested in the outcome thereof.
20          IN WITNESS WHEREOF, I have hereunto
21  subscribed my name this  27th  day of  May 2013.
22  
23  
24  KAREN ALIGO, CSR No. 13418
25  
```



**ESQUIRE**  800.211.DEPO (3376)
EsquireSolutions.com