# EXHIBIT M

JS - 6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Rothwell, Ltd., <br>     Plaintiff(s), <br> v. <br> United States of America, <br>     Defendant(s). | CASE No. SA CV 10-00479-RGK(FFMx) <br> Order RE: <br> Court Trial |

**I.    INTRODUCTION**

On April 19, 2010, Plaintiff Rothwell, Ltd. ("Rothwell") filed a complaint against Defendant United States of America ("U.S.") for wrongful levy pursuant to 26 U.S.C. § 7426. The dispute concerns a levy executed by the Internal Revenue Service ("IRS") on assets held by Rothwell to satisfy tax obligations of non-party Joseph Francis ("Francis").

A bench trial was held on June 14, 2011, concluding on June 16. The Court has reviewed the record and considered all the arguments and evidence presented. Based on the credible evidence and the reasonable inferences drawn from that evidence, the Court finds that the levy of Rothwell's assets was not wrongful. Rothwell's claim therefore fails.

**II. FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This opinion serves as the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact that actually constitutes a conclusion of law is adopted as such, and the converse is true as well.

**A. Findings of Fact**

1. Francis is the founder of Girls Gone Wild entertainment business and the sole owner of two U.S. corporations, Sands Media, Inc. ("Sands") and Mantra Films, Inc., ("Mantra") which are engaged in producing, promoting, marketing and distributing DVDs, infomercials, magazines, apparel and other items.

2. Both Mantra and Sands are "S Corporations," and as such, the profits from these companies must be reported by Francis on his individual income tax returns.

3. On May 24, 1999, Francis settled The Francis Trust ("Trust"), naming Hallmark Trust Ltd. ("Hallmark") as Trustee.

4. Hallmark was wholly owned and directed by Colin Chaffe ("Chaffe") and Nicola Jordan ("Jordan") from the time the Trust was settled until 2005, when Hallmark was purchased by Brian Trowbridge ("Trowbridge"). Eventually, in 2010, Hallmark resigned as Trustee, and Chaffe, in his individual capacity, took on the role.

5. The terms of the Trust also included an additional role of the "Protector," whose approval would be necessary to ratify certain actions of the Trustee. An entity, Pittsford, Ltd., was named as the initial Protector for the trust. In 2005, Brian Rayment ("Rayment") was named as an additional Protector.

6. Rayment has served as counsel for the Trust, Rothwell and other entities owned by the trust since at least 2002. Rayment has also served as Francis' counsel since 1992 continuing through the date the property was levied, and served as counsel for Sands and Mantra.

7. As Francis' counsel, Rayment owed Francis fiduciary duties and acted as his agent.

8. The terms of the Trust provide that all power and discretion, including decisions concerning investments and or disbursements, is determined at the sole discretion of the Trustee, with the exception of specified powers noted within the Schedules of the Trust which need the permission of the Protector.

9. The Francis Trust beneficiaries are Joseph Francis, his parents, his children, and Oklahoma Film Holding Corporation, an entity owned by Francis.

10. On June 9, 2000, Chaffe incorporated Rothwell in the Cayman Islands. Rothwell's shares are owned by The Francis Trust.

11. In 2001, Chaffe and Jordan opened a investment account with Morgan Stanley in Irvine, California managed by the broker John Welker ("Morgan Stanley Account"). They also opened a bank account at the Bermuda Commercial Bank in Hamilton, Bermuda for Rothwell ("Bermuda Account").

12. A record submitted to the Bermuda Account, signed by Chaffe and printed on Hallmark letterhead identified Francis as the sole "beneficial owner" of Rothwell.

13. From June 9, 2000, to November 29, 2005, Chaffe and Jordan, individually or through corporate entities they owned, controlled, directed and managed the operations, finances, assets and investment decisions of Rothwell.

14. Even after Trowbridge acquired Hallmark, and thus assumed duties through the entity as Trustee, Chaffe and Jordan continued to exercise control over Rothwell.

15. Chaffe and Jordan's continued role in managing Rothwell was provided for in an agreement appointing them "mandators" of the Trust, designed to provide them with authority to act for the Trust and continue directing Rothwell's affairs, though no longer Trustees of the Trust. This agreement included provisions indemnifying Hallmark for any actions taken by Chaffe and Jordan as mandators.

16. Trowbridge had reservations about the role Chaffe and Jordan played in the Trust's affairs as mandators, specifically their continued control over Rothwell, but acquiesced to the arrangement because Rayment had informed him it was what Francis desired.

17. Additionally, Trowbridge testified that he was not totally in control of the assets of the Trust, but rather that Rothwell, directed by Chaffe and Jordan controlled Rothwell's assets, even after he became the sole Trustee. (Ex. 157-B, 24:24-25:7)

18. On March 13, 2002, a $1.03 million payment was made from Rothwell's Bermuda Commercial Bank account to fund the purchase of real property located in the "Ranchos Punta Mita development" in the Municipality of Bahia de Banderas, State of Nayarit, Mexico. This property was identified as Lot 14 (collectively with Lot 13(b), "Mexico Property").

19. Chaffe authorized Rothwell to make the payment at the request of Francis. Both Rayment and Francis communicated Francis' desire that Rothwell make the payment.

20. Rayment, at Francis' direction negotiated the terms of the Lot 14 purchase with Crescent Capital, Ltd. ("Crescent Capital"), a property

4

development company and Cantiles de Mita, S.A. de C.V, the owner of the land. Mohammed Hadid ("Hadid") is the owner of Crescent Capital.

21. Before he or Rayment, at his direction, communicated with Rothwell concerning the property, Francis provided a $100,000 payment by personal check to Crescent Capital as a security deposit on Lot 14.

22. Additionally Francis, through Mantra, paid Hadid $495,000 toward the purchase of Lot 14. The $1,030,000 purchase price of Lot 14 represented a price available to Hadid as a developer of the Ranchos Punta Mita development. Hadid allowed Rothwell to acquire the lot for this reduced price in return for the additional payment for his interest. After this payment was made, Francis' $100,000 security deposit was refunded to him.

23. Rothwell never took title to Lot 14. Instead, another corporate entity owned by the Trust, Casa Blanca de Punta Mita S.A. de C.V. ("Casa Blanca"), is the formal owner and deed holder of the lot.

24. Francis, through payments made by Sands and Mantra, provided the funds to develop and improve Lot 14. During 2002 and 2003, the entities paid over $5 million to Crescent Capital for constructing a residence on the lot.

25. Francis directed and controlled the design and construction of the premises and improvements made on Lot 14.

26. In September 2005, a $1.023 million payment was made from Rothwell's Morgan Stanley account to fund the purchase of Lot 13(b), a lot adjoining Lot 14.

27. At the request of Francis, Chaffe authorized Rothwell to purchase Lot 13(b) to protect the view from the residence situated on Lot 14.

28. Rothwell never took title to Lot 13(b). Instead, Casa Blanca is the formal owner and deed holder of the lot.

29. Francis has had use of the Mexico Property and its residence. Neither Rothwell, Casa Blanca, the Trust, nor its Trustee has ever controlled or denied Francis' ability to use the property.

30. Francis, through his corporate entities Sands and Mantra, was the ultimate source of over $14 million in transfers to Rothwell. The majority of transfers to Rothwell were incorrectly recorded as deductible business expenses on Sands and Mantra's 2002 and 2003 tax returns, but Rothwell did not provide any goods or services to Sands or Mantra in return for the funds.

31. The only major disbursements made from Rothwell's Morgan Stanley Account since its creation were the payments to purchase the Mexico Property.

32. From its creation until the date the IRS levied its assets, Rothwell or its directors acted according to Francis' direction as expressed by Francis and Rayment as his agent.

33. On April 11, 2007, Francis was indicted on two counts of tax evasion for 2002 and 2003 tax years. (Case No. 2:08-cr-00494-SJO).

34. On September 23, 2009, Francis agreed to plead guilty to two misdemeanor counts of filing a personal income tax return and an amended personal income tax return for 2003 that were false as to a material matter.

35. On November 6, 2009, the IRS served a Notice of Levy on Morgan Stanley for Francis' tax liabilities, on the grounds that Rothwell is Francis' "nominee."

36. Initially, neither Hallmark, Rothwell, nor Trowbridge was advised that a levy had been served on Rothwell's Morgan Stanley account. Trowbridge says he learned about the levy in early 2010.

37. On December 31, 2009, in compliance with the IRS nominee levy on Rothwell's account, Morgan Stanley liquidated Rothwell's Morgan Stanley investment account and surrendered the funds to the U.S.

**B.    Conclusions of Law**

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(e) as a civil action brought against the United States under 28 U.S.C. § 7426. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1402(b), as the subject property is located within this Central District of California.

2. Where a taxpayer neglects to pay an assessed tax liability after it has been demanded, a lien for the unpaid tax arises in favor of the U.S. on all property or property rights belonging to the taxpayer. 26 U.S.C. § 6321. Property held by a third party is nonetheless subject to this lien where the taxpayer holds an interest in the property, such as where the third party is taxpayer's alter ego, or holds the property as a nominee. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977); *Scoville v. United States*, 250 F.3d 1198, 1202-03 (8th Cir. 2001).

3. Federal statute allows a party other than the delinquent taxpayer to challenge a levy pursuant to a tax lien as wrongful. 26 U.S.C. § 7426. A levy upon property in which the taxpayer does not have an interest is wrongful. *Sessler v. United States*, 7 F.3d 1449, 1451 (9th Cir. 1993).

4. In a "wrongful levy" action under 26 U.S.C. § 7426, state law is applied to determine whether the taxpayer holds an interest in the property in question. *See Scoville*, 250 F.3d at 1202; *cf. United States v. Overman*, 424 F.2d 1142, 1144 (9th Cir. 1970).

5. A plaintiff claiming wrongful levy bears the initial burden of proving title to the property. *LiButti v. United States*, 107 F.3d 110, 118 (2d Cir. 1997).

6. Here, there is no dispute that Rothwell had at least bare legal title to the assets levied from the Morgan Stanley Account, so this burden is satisfied.

7. Once Plaintiff establishes title to the property, the burden shifts; the government must carry a burden of persuasion to show a nexus between the taxpayer and the levied property. *Tri-State Equip. v. United States*, 79 A.F.T.R.2d 97-2502 (E.D. Cal. 1997) (citing *Flores v. United States*, 551 F.2d 1169, 1174-76, n.8 (9th Cir. 1977).

8. Such a nexus is established where the third party held the property as a nominee or alter ego for the taxpayer. *See G.M. Leasing Corp*, 429 U.S. at 350-51; *Tri-State Equip.*, 79 A.F.T.R. 2d 97-2502 (citing *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C. Cir. 1980), *cert. denied*, 451 U.S. 1018 (1981)). A nominee holds legal title to property while another retains the benefits of the property. *Scoville,* 250 U.S. at 1202 (citing *Black's Law Dictionary* (7th ed. 1999)).

9. California law recognizes that when property is held by a nominee, the beneficial owner retains interest in the property. *Lewis v. Hankins*, 214 Cal. App. 3d 195, 201-02 (1989); *Baldassari v. United States*, 79 Cal. App. 3d 267, 272 (1978).

10. A third party will be considered a nominee to the extent that the taxpayer exercises control over the party and its assets. *U.S. v. Bell*, 27 F.Supp. 2d 1191, 1195 (E.D. Cal. 1998) (citing *LiButti*, 107 F.3d at 119). Some factors held by other courts as relevant to determine control in the nominee analysis include a lack of

8

consideration paid by the nominee for the property, a close relationship between the taxpayer and the nominee, and continued enjoyment of the benefits of the property by the taxpayer. *See Bell*, 27 F. Supp. 2d at 1195; *Towe Antique Ford Found. v. I.R.S.*, 791 F. Supp. 1450, 1454 (D. Mont. 1992).

11. For the reasons set out below, the Court finds the government has carried its burden to demonstrate a nexus between the assets of Rothwell, Ltd. and Francis. The Court is persuaded that Rothwell held the levied assets as a nominee for Francis, who retained control over the assets.

12. The government has demonstrated Francis' control over Rothwell's assets by showing how the management of Rothwell was intertwined with Francis, and how expenditure of Rothwell's funds by the company was directed by and for the benefit of Francis.

13. Rothwell's director, Chaffe, testified that it is owned by the Trust, not owned or controlled by Francis. While Francis is not the record owner of Rothwell, the government has presented evidence that Rothwell's operations are intertwined with Francis. Some of these points of contact are relatively innocuous when taken in isolation, but when considered together, they raise significant questions on the independence of Rothwell from Francis.

14. Chaffe identified Francis as the beneficial owner of Rothwell on a document filed with the Bermuda Commercial Bank. The fact that Francis alone was listed, rather than the Trust itself or even a list of the Trust's beneficiaries, provides some indication that Rothwell was operated for his benefit.

15. Francis held his own investment account at same branch of Morgan Stanley and used the same broker as the levied Rothwell account. While

9

not improper, this is evidence of how closely Rothwell's operations were connected with Francis' own.

16. Additionally, according to his own testimony, Rayment served as counsel for Francis during the relevant time period, while also serving as counsel for Rothwell, the Trust, and all other entities owned by the Trust, and eventually, Protector of the Trust. Thus, while he held important roles for Rothwell and its record owner, the Trust, Rayment owed fiduciary duties to Francis. It appears that while he held these duties, Rayment acted as Francis' agent, communicating directives to Chaffe and Trowbridge. This not only calls into question Rayment's independence when performing roles for Rothwell or the Trust, but also indicates a possible locus of control employed by Francis, allowing Francis to communicate his directions indirectly to Rothwell and Chaffe.

17. The deposition testimony of Trowbridge suggests Francis exerted control over who managed Rothwell. After Trowbridge succeeded Chaffe and Jordan as Trustees, Chaffe and Jordan nonetheless continued to direct the operations of Rothwell. Trowbridge admits that he was uncomfortable with Chaffe and Jordan's continued role, but agreed to the arrangement at Francis' direction. This arrangement appears to have reduced Trowbridge's oversight regarding Rothwell's assets, undermining his effectiveness as an independent trustee.

18. Finally, the government produced evidence that, through entities owned by Francis, Francis effected the transfer of over $14 million to Rothwell. Rothwell never provided any consideration to Francis or the entities for these funds. Other than income or capital gains derived from investment of the funds contributed through Francis, Rothwell has provided no evidence of other sources of funding or operations

1  contributing to its assets. This initial source of Rothwell's assets
2  increases the likelihood that it held assets for Francis' benefit,
3  especially in light of the use of some of these assets detailed below.
4  19.  Francis' control over Rothwell and its assets is evidenced by the
5  events surrounding the acquisition and improvement of the Mexico
6  Property. The only major disbursements made from the levied account
7  were payments toward the purchase of this property. These payments are
8  only comprehensible in the context of Francis' efforts to acquire and
9  improve Lot 14. In the first place, Rothwell made payment for Lot 14
10 at the request of Francis. Before Francis had even communicated to
11 Rothwell his desire that the lot be purchased, he had provided a
12 $100,000 deposit on the land to Crescent Capital. This suggests little
13 doubt on his part that Rothwell would make the payment he desired.
14 Rothwell's characterization that it alone paid the purchase price for
15 the lots is belied by the Hadid's testimony, detailing the $495,000
16 payment Francis made to him for the right to purchase Lot 14. It is
17 also notable that Rothwell did not take title to the land it
18 purchased, or receive any other benefit for the funds it expended. Nor
19 did Rothwell or Casa Blanca exercise control over the improvement of
20 the property. Instead, Francis directed the construction of the
21 residence to his specifications, and paid for it through Sands and
22 Mantra. The subsequent purchase of Lot 13(b) followed the same
23 pattern. If was purchased with Rothwell's funds, at Francis' request,
24 for Francis' benefit and deeded to Casa Blanca.
25 20.  The sequence of events related above strongly indicates that
26 despite Francis' lack of formal ownership over Rothwell, he exercised
27 control over the entity and use of its assets. He not only directed
28 its expenditures on the Mexico property, but necessarily coordinated

11

those expenditures with his own to purchase and improve the property. The court is persuaded that the property was purchased at his direction, in conjunction with his own expenditures, and for his use.

21. Due to Francis' apparent influence over Rothwell and its assets, the Court finds Rothwell held its assets as a nominee for Francis. Rothwell initially received its assets from Francis, made expenditures at Francis' direction, and the benefits of these expenditures incurred to Francis. In the face of these indica of control, the Court is persuaded that a nexus existed between Francis and Rothwell's assets.

22. In a wrongful levy action, after the government has established a nexus between the taxpayer and the property, the burden once again shifts to the plaintiff. *Arth v. United States*, 735 F.2d 1190, 1193 (9th Cir. 1984). At this point the plaintiff must prove that the taxpayer holds no ownership over the property. *Id.*

23. As discussed above, the Court finds that Rothwell held its assets as a nominee for Francis, subject to Francis' control. Evidence of Francis' lack of formal ownership or rights to control Rothwell's assets fails to rebut this conclusion. Likewise, the Court finds Chaffe and Rayment's testimony that Francis lacked control over Rothwell unconvincing in light of the facts established above.

### III. CONCLUSION

For the foregoing reasons, the Court grants judgment in favor of Defendant and against Plaintiff on Plaintiff's claim for wrongful levy pursuant to 26 U.S.C. § 7426. Counsel for Defendant is directed to submit a proposed judgment consistent with these Findings of Fact and Conclusions of Law, not later than Friday, July 8, 2011.

**IT IS SO ORDERED.**

**JUNE 30, 2011**
Dated

R. Gary Klausner
U.S. District Court Judge