# EXHIBIT N

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF LOS ANGELES

3                       - - -    CERTIFIED COPY

4    WYNN LAS VEGAS, LLC,            )
                                     )
5              Judgement Creditor,   )
                                     )
6          vs.                       )   No. BS 123009
                                     )
7    JOSEPH FRANCIS,                 )
                                     )
8              Judgement Debtor.     )
     _____)

9

10

11

12

13

14

15          JUDGMENT DEBTOR'S EXAMINATION OF

16                  JOSEPH R. FRANCIS

17               Los Angeles, California

18                   August 22, 2011

19

20

21

     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   www.depo.com

24   Reported by:  MARIANNA DONNER, CSR No. 7504

25   FILE No. A5079BE

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   COUNTY OF LOS ANGELES

 3                        - - -

 4   WYNN LAS VEGAS, LLC,          )
                                   )
 5            Judgement Creditor,) 
                                   )
 6       vs.                       )   No. BS 123009
                                   )
 7   JOSEPH FRANCIS,               )
                                   )
 8            Judgement Debtor.)
     _____)
 9

10

11

12

13

14

15       Judgment Debtor's Examination of JOSEPH R.

16   FRANCIS, taken on behalf of Judgement Creditor, at 111 North

17   Hill Street, Department 1A, Los Angeles, California,

18   commencing at 9:52 a.m., Monday, August 22, 2011,

19   before MARIANNA DONNER, CSR No. 7504.

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S:

 2


 3       For Judgement Creditor:

 4           BROWNSTEIN HYATT FARBER SCHRECK
             Attorneys at Law
 5           BY:  CHAD SEBER, ESQ.
             225 Broadway
 6           Suite 1670
             San Diego, California  92101
 7           (619) 702-6100
             (619) 239-4333 (facsimile)
 8           cseber@bhfs.com

 9       For Judgement Debtor:

10           LINER GRODE STEIN YANKELEVITZ SUNSHINE
             REGENSTREIF & TAYLOR
11           Attorneys at Law
             BY:  DANIEL R. GUTENPLAN, ESQ.
12           1100 Glendon Avenue
             14th Floor
13           Los Angeles, California  90024
             (310) 500-3500
14           (310) 500-3501 (facsimile)
             dgutenplan@linerlaw.com

15       Also Present:

16           ROBBINS GELLER RUDMAN & DOWD LLP
             Attorneys at Law
17           BY:  CHRISTOPHER COLLINS, ESQ.
             655 West Broadway
18           Suite 1900
             San Diego, California  92101
19           (619) 231-1058
             (619) 231-7423 (facsimile)
20           ccollins@rgrdlaw.com

21

22

23

24

25
```

3

```
1                      I N D E X

2

3   WITNESS:  JOSEPH R. FRANCIS

4   EXAMINATION                                    PAGE

5       BY MR. SEBER                                  5

6

7

8

9                      EXHIBITS

10                      (None)

11

12          WITNESS INSTRUCTED NOT TO ANSWER

13               PAGE        LINE

14                8          22
                 71          18
15

16

17             TRANSCRIPT MARKED

18               PAGE        LINE

19                26          6

20

21

22

23

24

25
```

```
1                    JOSEPH R. FRANCIS,

2              having been first duly sworn,

3           was examined and testified as follows:

4

5                        EXAMINATION

6  BY MR. SEBER:

7      Q.   Can you state your full name for the court

8  reporter?

9      A.   Joseph R. Francis, F-r-a-n-c-i-s.

10     Q.   And have you used any other names before?

11     A.   Joe.

12     Q.   Just Joe?  Do you prefer if I called you

13 Mr. Francis today or --

14     A.   Just Joe.  Call me Joe.

15     Q.   That's fine?

16     A.   Yeah.

17     Q.   And you understand they sworn you in

18 downstairs?

19     A.   Yes.

20     Q.   You understand what that oath entails?

21     A.   Yes.

22     Q.   Penalty of perjury for willful misstatement of

23 fact?

24     A.   That's correct.

25     Q.   And you understand I'm taking your debtor's
```

1    exam here today for the -- in relation to the Nevada

2    judgment?

3        A.    The one that's currently on appeal in the

4    Nevada Supreme Court?  Is that the correct one?

5        Q.    We're on the same page.

6        A.    Okay.  Good.  So that's the --

7              Can he do that?

8        MR. GUTENPLAN:  Yes.  Evidently.

9        THE WITNESS:  But this is the second one, so --

10   BY MR. SEBER:

11       Q.    I think it might be the third.

12       A.    The third.

13       Q.    But I could be wrong.  Typically it's

14   Mitch Langberg that is sitting in my spot --

15       A.    Okay.  Cool.

16       Q.    -- so it's nice to meet you.

17       A.    Nice to meet you.

18       Q.    Have you taken any medications or drugs that

19   may impact your ability to testify this morning?

20       A.    Nope.

21       Q.    And your personal residence, is it still

22   1111 Bel Air Place in Los Angeles, California?

23       A.    That's correct.

24       Q.    I'm going to refer to that as the Bel Air

25   house or your personal residence so I don't have to

```
 1   keep on repeating the address, if that's okay with you.
 2        A.   Okay.
 3        Q.   If you don't --
 4             If I misstate something or you are getting
 5   confused what house I'm referring to, please let me
 6   know.
 7        A.   Okay.
 8        Q.   And do you currently own your Bel Air house?
 9        A.   No.
10        Q.   Do you pay rent for that house?
11        A.   No.
12        Q.   Do you know who owns the house?
13        A.   I believe it's Blue Horse Trading, LLC.
14        Q.   Do you have any affiliation with Blue Horse
15   Trading, LLC?
16        A.   I don't know what the structure is.
17        Q.   Are you a member of that LLC?
18        A.   I'm not sure of the structure.
19        Q.   I understand you are not sure of the
20   structure, but do you know if you have any connection
21   with that LLC?
22        A.   I don't know.  I just -- I would have to ask
23   my attorney about that.
24        Q.   Which attorney would be the best person to
25   ask?
```

1     A.   Probably Liner.  Probably somebody at Liner.

2     Q.   Is that the full firm name?

3     A.   Liner Grode.

4     MR. GUTENPLAN:  He's referencing my firm.

5     MR. SEBER:  Is that your firm?

6     MR. GUTENPLAN:  Yes.

7     MR. SEBER:  Thank you.

8     Q.  And does Mantra Films, Inc., do they lease

9  that house from Blue Horse Trading, LLC?

10    MR. GUTENPLAN:  Objection; lacks foundation,

11  assumes facts not in evidence, relevance.

12    THE WITNESS:  Yeah, I don't understand the

13  structure of it.

14  BY MR. SEBER:

15    Q.  Do you know who -- do you know if Mantra Films

16  has a leasehold on that house?

17    A.  I know Mantra Films is not in existence is my

18  understanding and hasn't been for quite some time.

19  That's my understanding.

20    Q.  Okay.  Do you pay rent to anybody for the use

21  of that residence at Bel Air?

22    MR. GUTENPLAN:  Asked and answered.

23      You don't need to answer it.  You already

24  answered it.

25  BY MR. SEBER:

8

1    Q.   Was there a period of time when you ever

2    personally owned the Bel Air house?

3    A.   I don't think so, but I'm not sure.

4    Q.   Have you provided any money to Blue Horse

5    Trading, LLC for the use of that Bel Air home?

6    A.   I don't know.

7    MR. GUTENPLAN:  I'll object just to being asked

8    and answered, but you can -- to the extent providing

9    money would be paying rent.

10        But you can answer that to the extent you

11   understand what he means.

12   BY MR. SEBER:

13   Q.   I can clarify.

14   A.   Yeah.  What does it mean?

15   Q.   It was similar to the rent question.

16        Besides rent, which my understanding that you

17   are unsure if you pay rent, but my other question is --

18   MR. GUTENPLAN:  If we can read it back.  I thought

19   you said you do not pay rent.

20   THE WITNESS:  Yeah.  I think -- but whatever, it's

21   on the record.  But I don't think I did pay rent.

22   MR. GUTENPLAN:  That's fine.  I just didn't want

23   to misstate your testimony.  Making sure we stay on the

24   same page.

25   THE WITNESS:  Yeah, that's good.

1  BY MR. SEBER:

2      Q.   Besides rent, have you provided any money to

3  Blue Horse, LLC to live in the Bel Air home?

4      A.   I don't know.  I just don't know.  I mean, I

5  just don't know.

6      Q.   Do you provide anything of value to live in

7  the Bel Air home?

8      MR. GUTENPLAN:  Not an objection so much, but do

9  we want to specify a time frame?  Because that Bel Air

10 home has been in existence for ten years --

11     THE WITNESS:  Yeah.

12     MR. GUTENPLAN:  -- eight to ten years.

13     MR. SEBER:  If that helps to clarify.

14     MR. GUTENPLAN:  I just want to know, do you mean

15 on an ongoing basis in the last two years?  At any

16 point in the last two years?

17     THE WITNESS:  Because I really don't know as to

18 what whole period of time so you might as well just

19 give him the answer.  Because if I do know during the

20 period of time, I will give you that answer, too.  If I

21 can say "yes" to it, I will, but I just don't know.  I

22 just don't know if -- you know, I just don't know

23 because our attorneys handle my affairs.

24 BY MR. SEBER:

25     Q.   So I mean for any period of time you don't

1  know if you've provided any money to anybody to live at

2  the Bel Air home?

3      A.   Correct.

4      Q.   Have you personally ever taken a loan out from

5  the Bel Air home?

6      A.   Have I personally taken a loan?  I don't know

7  whether -- there's a loan, but I don't know whether

8  it's personal.  I don't know whether it's part -- I

9  don't know the structure of the loan, but there is a

10 loan.  So I'm not a lawyer also, so I don't know

11 whether it's personal or not so I'm not sure of that.

12 But there's a loan.

13     Q.   I want to focus this question on a period of

14 time in the last year.  Have you had any guest that has

15 stayed over at the Bel Air house for more than, let's

16 say, seven days?

17     A.   Last year, yes.

18     Q.   You don't have to give me their names at this

19 point in time.

20     A.   All right.

21     Q.   Have they provided you, you, anything of value

22 to be able to stay at the residence?

23     A.   No.

24     Q.   Do you know if they provided anything of value

25 to anybody to stay at the residence?

1     A.    I don't know.

2     Q.    What were their names?

3     A.    Just one person would be Christina McLarty.

4  C-h-r-i-s-t-i-n-a, M-c-L-a-r-t-y.

5     Q.    Can you pronounce her last name again?  It's

6  McLarty?

7     MR. GUTENPLAN:  Google it.

8     THE WITNESS:  What?

9     MR. GUTENPLAN:  Google it.

10    MR. SEBER:  I know who she is, I just don't want

11 to mispronounce her name.

12    THE WITNESS:  M-c- --

13 BY MR. SEBER:

14    Q.    No, no.  I don't need the spelling.

15    A.    I'm sorry.

16          For you, McLarty.  I was trying to help you

17 get the spelling, M-c-l-a-r-t-y.

18    Q.    And my question was just how you pronounce the

19 last name.  I don't want to --

20    A.    I was just helping her.

21    MR. GUTENPLAN:  McLarty.

22    THE WITNESS:  Normally it works the other way.

23 BY MR. SEBER:

24    Q.    So it's McLarty?

25    MR. GUTENPLAN:  McLarty, yeah.

1      MR. SEBER:  I thought I mispronounced it.

2      THE WITNESS:  She's a real gem.  You will have fun

3  with her.

4      MR. GUTENPLAN:  That's fine.

5  BY MR. SEBER:

6      Q.   What is your average expenses a month?

7      MR. GUTENPLAN:  Just object as to "you."  You just

8  mean Joe individually?

9      MR. SEBER:  Yes, I will make it simple.  Whenever

10  I refer to "you," I do mean Mr. Francis.

11      Q.   I mean you individually.  If I say something

12  else, I will specify.

13      A.   Yeah, no.

14      Q.   I understand the structure, the entities.

15      MR. GUTENPLAN:  You were asking about Mantra.

16      MR. SEBER:  No.  Right now I'm just asking about

17  Mr. Francis individually.

18      THE WITNESS:  I don't know.  I just don't know.

19  For food and stuff, I don't know.  I just don't know.

20  BY MR. SEBER:

21      Q.   Have any idea like how much you have to pay

22  for groceries a month, anything like that?

23      A.   I don't buy them myself, so.

24      Q.   Who does?

25      A.   Other -- various other people.

13

1    Q.    Do you have a personal assistant?

2    A.    I do.

3    Q.    And what is his or her name?

4    A.    Her name is Megan.

5    Q.    And what is her last name?

6    A.    Hafey.

7    Q.    Hafey, like H-a- --

8    A.    -- -f-e-y, correct.  You got it.

9    Q.    Thanks.

10         Is there one person that does the majority of

11   purchasing your monthly personal items that you need

12   such as groceries?

13   A.    Pretty much, yeah.

14   Q.    And that would be Ms. Hafey?

15   A.    Uh-huh.

16   Q.    How does she get the money to purchase these

17   items?

18   A.    I don't know.

19   Q.    Do you know who --

20   A.    No.  I'm trying to think, though.

21   MR. GUTENPLAN:  Calls for speculation.

22   THE WITNESS:  Yeah.

23   MR. GUTENPLAN:  You don't need to speculate.

24   MR. SEBER:  I'm just asking if he has any idea.

25   MR. GUTENPLAN:  Right.

1    MR. SEBER:  I didn't ask the person.  I'm asking

2  if he knows.  If he knows, he knows.  It's not

3  speculating.

4    THE WITNESS:  I think -- you know, I'm insulated

5  from all of this stuff, so I don't know exactly how it

6  all works.

7  BY MR. SEBER:

8    Q.  You don't know how she gets paid, Ms. Hafey?

9    MR. GUTENPLAN:  Objection; that's a different

10  question.

11    THE WITNESS:  Different question.

12  BY MR. SEBER:

13    Q.  Do you know -- it was two different questions.

14    A.  How does Ms. Hafey get paid?

15    Q.  No.  Let's finish up my first one, which was

16  do you know how she gets the money to buy items that

17  you may need?

18    A.  I don't think she gets any cash or anything

19  like that to do it, but I'm just trying to think of the

20  mechanism.  As I sit here today, I just don't have

21  firsthand knowledge.

22    Q.  Now, I'll go to my second question, which I

23  jumped to, which is do you know -- have any

24  understanding how she gets paid?

25    A.  Yes; through ADP, payroll service.

1    Q.   And do you know who provides the money to ADP?

2    A.   I don't know how it works.

3    Q.   What is the last five things that you

4  purchased, "you" being yourself?  A cup of coffee,

5  something minor, anything like that.

6    A.   Well, he bought me a cup of coffee.  It's very

7  nice of him.

8    Q.   That is nice.

9    A.   Dan's, not, you know --

10   Q.   Nice guy.

11   A.   Nice guy, really is.

12   MR. GUTENPLAN:  Thank you.

13   THE WITNESS:  The last five things that I bought.

14  Personally, I had a sandwich at Subway yesterday.

15       That's a very good question.  I just can't

16  remember.

17  BY MR. SEBER:

18   Q.   You remember --

19   A.   I remember what I had for dinner last night

20  and I'm backing up from there.

21   Q.   The sandwich at Subway, how did you purchase

22  that?

23   A.   I had cash.  I had -- I paid cash.

24   Q.   Where did you get the cash from?

25   A.   My pocket.

16

1      Q.   How did it get to your pocket?

2      A.   Probably my hand.

3      Q.   Well, how did it get to your hand?

4      A.   How did it get to my hand?

5      Q.   Yes.  What source provided you the cash?  I

6   mean, that's where I'm going with that.

7      A.   Geez, I'm trying to think who provided it to

8   me, but I do not remember.

9           Maybe Megan, one of my assistants.

10     Q.   And do you have any understanding how she gets

11  the cash?

12     A.   I'm probably intentionally left out of that

13  loop.

14     Q.   Do you have any understanding as to why you

15  are intentionally left out of the loop?

16     A.   I haven't asked.

17     Q.   Who would know if you do?

18     A.   My attorneys.

19     Q.   In the debtor's exam that Mitch Langberg took,

20  you spoke about a credit card, an American Express

21  card.

22     A.   Uh-huh.

23     Q.   Do you still have that American Express card?

24     A.   Yes.

25     Q.   Do you know what the account number is on it?

1    A.    Nope.

2    Q.    Do you know what name it has on the front?

3    A.    Nope.  I mean, I don't have it with me either.

4  I don't have it.  I don't use it very often, so --

5    Q.    Do you know where the bills go?

6    A.    That's a good question.  Actually I don't.

7    Q.    How about the --

8          Is there a limit on it?

9    A.    I don't know.

10   Q.    Is that your primary credit card that you use?

11   A.    I don't know, you know, because I really don't

12  use it myself.  I really don't make my own purchases,

13  so -- but I would say I have one -- American Express

14  would be one credit card.

15   Q.    That's one.  Do you have other credit cards?

16   A.    I have other credit cards but not that I use.

17   Q.    So --

18   A.    Me personally, though, too.  So I probably

19  have one credit card, me personally.

20   Q.    You personally?

21   A.    Yeah.  One American Express card.

22   Q.    Do you have a checkbook?

23   A.    Unh-unh.  Nope.

24   Q.    When is the last time that you filled out a

25  financial statement or a loan application?

1    A.    That's also a very good question.    Five years

2  or six years ago probably.    Maybe more.

3    Q.    Do you know what that was in connection for?

4    A.    I just do not remember.    But I mean, I would

5  never personally even fill out an application, so --

6  but I'm trying to think.    That's my best recollection.

7    Q.    And do you recall what it was for?

8    A.    No.    You asked me that.    I don't recall.

9    Q.    Do you recall who it was with, like what

10  institution?

11    A.    You know -- and I don't even think I filled it

12  out.    I just signed it.    But I don't remember and I'm

13  trying to remember right now.    Yeah, I just don't.    I'm

14  not a big form guy.

15        Would financial statements include tax

16  returns?

17    MR. GUTENPLAN:    It's vague and ambiguous.    I'm not

18  sure.

19    THE WITNESS:    I just don't want to mis- --

20  BY MR. SEBER:

21    Q.    I will narrow it down for you.    I'm talking

22  about a loan application.

23    A.    No, definitely.    Nope.

24        Oh.    No, I don't remember.    You know, because

25  I could have signed something or, you know, whatever

1    but -- if it was something that was put in front of me

2    that I didn't know it was an application for the sale.

3    I just want to preface that, to the best of my

4    recollection.

5         Q.   Does that happen often where you sign things

6    that your counsel or somebody puts in front of you that

7    you don't barely read?

8         A.   All of the time.  Absolutely.

9         Q.   How many times on a given month an average, if

10   you know?

11        A.   I could never read the amount of stuff that's

12   put in front of me to sign, ever.  Like that would just

13   be -- that's all I would do and then I still wouldn't

14   get it done.  So a lot.

15        Q.   In the last three years, have you ever been a

16   guarantee on any loan?

17        A.   No, not in the last three years.

18        Q.   How about like a cosigner on any loan in the

19   last three years?

20        A.   No.  I mean, I just -- you are going back to

21   that thing like -- and this is why I remember that

22   because the last time I think I signed something I was

23   rejected because of the tax liens on my credit report

24   which has been in existence since 2007 so that would be

25   four years, so that was the last time.  So that's why

 1  I'm figuring so I never applied for anything else after

 2  that because I would get rejected.

 3      Q.   And does the IRS still have some assets of

 4  yours personally frozen?

 5      A.   Yes, I believe but I don't want to misspeak.

 6  But I believe that, yes.

 7      Q.   And which ones of those assets do you believe

 8  that the IRS still has frozen?

 9      A.   You know, I don't want to misspeak here.  This

10  is obviously a very --

11           You know, I have to talk to my counsel about

12  it to understand the situation, because I still don't

13  fully understand the entire situation with the IRS.

14      Q.   Besides my client, has there been any other

15  judgment creditors that have taken steps to enforce a

16  judgment against you?

17      A.   Mr. Collins to your left, who is sitting in on

18  this judgment debtor exam -- to your right, but that is

19  it.

20      Q.   Earlier you said that Mantra Films, Inc.,

21  that's no longer in existence?

22      A.   Yes, I believe that.

23      Q.   When was --

24           You used to be the chief executive officer of

25  Mantra?

                                                        21

1     A.   I don't remember the exact title, but I was a

2  principal, correct.

3     Q.   And when was the last time you were the

4  principal of Mantra?  And I'm going to refer to it as

5  "Mantra," if that's okay.

6     A.   That's fine.

7     Q.   If that's confusing --

8     A.   No.

9     Q.   -- then I will --

10         I'm trying to avoid saying the whole title.

11    A.   A few years ago.

12    Q.   And what was the nature of the business of

13 Mantra?

14    A.   DVD, video production.  DVD, video production,

15 distribution.

16    Q.   And why are they no longer in existence?

17    A.   There was a massive accounting fraud that came

18 to light in 2008 orchestrated by a gentleman named

19 Michael Barrett who was the C- -- this is where the

20 assets are if you go after this guy.  Michael Barrett,

21 Roman Pelikh and Will L'Heureux, who siphoned off money

22 over a period of -- I mean, a huge amount of money over

23 a period of time and a decision was made to -- and then

24 they signed a confession, sorry, with the Federal

25 government, Federal prosecutors that they had actually

1 | stolen all of this money and orchestrated this whole

2 | accounting fraud over -- this actual theft over that

3 | period of time and the decision was made to close

4 | Mantra.

5 |     Q.   Did it have any --

6 |     A.   I'm sorry.  I'm just trying to give you the

7 | whole thing.  But go ahead.

8 |     Q.   You gave me a lot, so -- is that pretty much

9 | the --

10 |         No, I guarantee I'm not going to remember it

11 | all, but that's why we have the court reporter here.

12 |     A.   Yeah.

13 |     Q.   And there was --

14 |         The first name was Michael Barrett, was it?

15 |     A.   Correct.

16 |     Q.   And so in 2008, before --

17 |     A.   It was discovered in 2008.  It had been going

18 | on probably from 2000 to 2007 or '8, you know.

19 |     Q.   Let's just pick the end of 2007, say

20 | December of 2007.

21 |     A.   All right.

22 |     Q.   Did Mantra at that point in time, December of

23 | 2007, did it have any assets that it held title to?

24 |     A.   You know, I don't know.  I just don't know

25 | what the whole picture was.  And attorneys took it over

1   about that time, so I --

2       Q.   Michael Barrett, is it, is he an attorney or

3   is he --

4       A.   He's a CPA.

5       Q.   He's a CPA?

6       A.   Uh-huh.  He's a CPA and he was the controller

7   and CFO of the company.  And then Roman Pelikh was the

8   CTO and then Will L'Heureux was the COO.

9       Q.   What was the nature of their massive -- and if

10  I use the wrong word, I apologize, but fleecing of

11  Mantra, what was the nature --

12      MR. GUTENPLAN:  I'll object to relevance.

13      THE WITNESS:  But also the protective order or can

14  I say this?  Because this is a hearing, right?

15      MR. GUTENPLAN:  Yeah, but it's not --

16      THE WITNESS:  I want you to tell me whether or not

17  I can do it.

18      MR. GUTENPLAN:  I don't think it's even relevant.

19  I don't think it's necessary.

20      THE WITNESS:  I'm happy to give this if my

21  attorney says it's okay.

22      MR. GUTENPLAN:  I don't think you should.  That's

23  all right.

24      THE WITNESS:  There's a protective order in place

25  that the judge -- Federal judge has prevented me from

 1  discussing their confession because it was at the end

 2  of a very high-profile case.

 3          If you will let me say whatever, I'm happy to

 4  get you this information.

 5  BY MR. SEBER:

 6      Q.   Well, I want to understand your counsel's

 7  objections.

 8          Daniel, is the objection --

 9      MR. GUTENPLAN:  I'll object on privacy grounds.

10  I'll object on relevance.  I'll object on the

11  protective order grounds.

12          I haven't read the protective order.  I don't

13  have it sitting in front of me.

14      THE WITNESS:  That's my only concern really.

15      MR. GUTENPLAN:  If it's like every protective

16  order I've ever read, that unless there's some court

17  order mandating the information be disclosed, I don't

18  think it should be disclosed, particularly given the

19  tangential connection here.

20      MR. SEBER:  I can make the connection.  I just

21  want to make sure it just wasn't a relevancy ground.

22      MR. GUTENPLAN:  No, it's not.

23      MR. SEBER:  If you are objecting on the actual MPO

24  production order applying --

25      MR. GUTENPLAN:  Yes, I'm objecting on that

1  grounds.

2      THE WITNESS:  That's the only things that

3  concerns --

4      MR. GUTENPLAN:  Otherwise, I would be happy to let

5  him answer.

6      MR. SEBER:  Can you mark that portion?

7      Q.   Now, you held stock in Mantra at one point in

8  time?

9      A.   Yes, I believe so.

10      Q.   When was the last time that you held stock?

11      A.   I don't know.  I just don't know.

12      Q.   Do you know how much stock you held?

13      A.   As far as value?  I don't know either value or

14  number of shares or any detail.

15      Q.   I was referring to the quantity.  So if you

16  were -- for example, if you were the sole shareholder

17  or if there was -- if you were the majority

18  shareholder.

19      A.   I don't believe I was the sole shareholder,

20  but then again I don't know the entire structure and

21  what it was.  My attorneys really handled all of my

22  affairs and continue to.

23      Q.   But since Mantra is no lodger in existence,

24  then their stock is --

25      A.   There is no stock.

1    Q.   There is no stock?

2    A.   Yeah.

3    Q.   Did you receive value for that stock when

4 Mantra ceased to exist?

5    A.   If the value is determined in liability, yes,

6 a negative value.

7    Q.   Do you know the last custodian of the stock

8 from Mantra?

9    A.   I don't know what that means.

10    Q.   Is there a person that held your stock when

11 you had Mantra stock, I mean, or did you hold it

12 personally?

13    A.   You mean like physically like hold a

14 certificate or something?

15    Q.   Was it at your house?

16    MR. GUTENPLAN:  Physical stock certificates?

17 BY MR. SEBER:

18    Q.   Were there physical stock certificates?

19    A.   I don't think so.  I never saw one.  But I

20 don't know if that's held by the state or whatever.  I

21 just don't know.  Attorneys.  I don't know who does

22 that.

23    Q.   So you never --

24    A.   Saw any stock.

25    Q.   I've talked over you, and I --

1    A.   I'm sorry.

2    Q.   I know it's not intentional.

3    A.   I'm just trying to help you out.

4    Q.   I know.  It's the natural conversational ebb

5  and flow.

6    A.   So you ask me a --

7    Q.   I just want to make sure to clarify for the

8  record, and I've been guilty of it as well, of talking

9  over you.

10       But you never saw an actual physical piece of

11  paper that would represent Mantra stock when you --

12    A.   That said "stock"?  No.  But I don't know

13  where that would be either, like you asked me also

14  that.

15       By the way, I will sell it to you.  You can

16  have it if you will take all of the liability.  Let's

17  find that.  Will you settle for that?

18    Q.   I don't have that authority.

19    A.   That would be great.

20       And I also have this bridge that's awesome.

21  It's in New York.

22    Q.   When is the last time that Mantra filed a tax

23  return?

24    A.   That's a very good question.  I don't know,

25  but it had to be around -- I just don't know.

1    Q.   Do you know if there was --

2    A.   I'm sure it files --

3         I mean, I'm sure, what, two years ago or

4    whatever, like whenever it closed.

5    MR. GUTENPLAN:  Don't ask me.

6    THE WITNESS:  I don't know.

7    BY MR. SEBER:

8    Q.   Do you know if there was -- if you recall, if

9    there was a tax liability or refund?

10    A.   Oh, there was a liability.  There is a

11    liability, I think, that's still in existence, yes.

12    Q.   Does Mantra owe you any money?

13    A.   I believe so, yes.  I believe so.  But there

14    aren't any assets, that's the fucking problem.  And

15    there's all of these liabilities, and that's the other

16    problem.  And I believe there's -- you know, but it

17    doesn't exist, so how do you go --

18    Q.   You have to ask your attorney.

19    A.   I know.  If you can help me out with that, I'd

20    appreciate that.  These guys can't figure it out.

21    Q.   Might be a conflict there.

22         Do you have an idea approximately how much

23    money that Mantra owed you?

24    A.   I would be speculating.  I'm not going to

25    speculate, but I definitely think there's a duty to

1  defend and I think there's a duty to indemnify.  But I

2  definitely think there's money, yes.  I definitely

3  believe I'm a creditor and probably the largest

4  creditor.

5     Q.   Who would be some of the other creditors?

6     A.   I don't know.

7     Q.   The last time that you had an examination with

8  Mr. Langberg --

9     A.   Well, other than the IRS.  I'm sorry.  I

10 stated that before.

11    Q.   The last exam you had with Mr. Langberg,

12 Mitch, you two gentlemen were talking about Mantra

13 getting their financials in order.

14         And did that happen after the last

15 examination?

16    A.   No.  Here's why.  Because you just can't.  At

17 a point when there's been a fraud and there's like

18 forensic accountants that go and look, it's just like

19 screw it.  It's too deep.  It's all over the place.

20 It's hidden here and it's hidden there, and the

21 decision was made to close it because it's --

22         You know, these guys were stealing from it for

23 so many years and hiding their things and how could you

24 ever sign a tax return and represent that that document

25 was true and correct ever again for that entity that

1  these guys admitted stealing from for that many years

2  and hiding all of these things.

3          So there's nothing you could do except go

4  after these guys, which I've sued these guys, you know,

5  personally.

6      Q.   I think I lost my question.

7      A.   Sorry.

8      Q.   No, that was helpful information.

9          So my question --

10     A.   I'm trying to help.

11     Q.   I think you answered the question.  You

12  answered the question with a "no," but I don't want to

13  misstate your testimony.  I was just -- I asked if the

14  financials had been put together.  You told me the

15  reason why.

16     A.   No.  I don't believe any financials --

17          I believe to the best that they could have

18  prior to closure, I believe that they were put

19  together.  But I don't believe that they were ever tied

20  out, or whatever, or made any sense because of the

21  fraud.

22     Q.   Do you know who's in possession of those

23  financials?

24     A.   I don't know.  I don't know.

25     Q.   I'm going to talk about Sands Media, Inc.  I

1    will just refer to it as Sands, if that's okay.

2        A.   Got it.  Sure.

3        Q.   Is that an ongoing business?

4        A.   No.

5        Q.   When did that go -- cease to be?

6        A.   Same time as Mantra because -- same issues.

7    Same exact issues I discussed before; same people, same

8    players, same fraud.

9        Q.   Was there a business that took over Mantra's

10   business after it ceased to exist?

11       MR. GUTENPLAN:  Objection as to vague and

12   ambiguous, "took over Mantra's business."

13            Do you mean assumed its assets and

14   liabilities?

15            You don't have to answer it unless you

16   understand it.  I don't know what take over business

17   means.

18   BY MR. SEBER:

19       Q.   Do you understand?

20       A.   Can you clarify it?  It would be great.

21       Q.   Yes, I will try.

22       A.   Okay.  Good.

23       Q.   Well, Mantra ran a certain portion of business

24   that you were associated with.

25       A.   Uh-huh, yes.

1    Q.   Does anybody run that portion of business now?

2    A.   Well, you said assumes assets and liabilities.

3         No.

4    Q.   That's what I'm trying to clarify.

5    A.   No one assumed Mantra's business.

6    Q.   No one assumed Mantra's business?

7    A.   No.   No.

8    Q.   How about Sands?

9    A.   No.

10   Q.   We talked -- I asked you about what did Mantra

11   do.

12   A.   That would be great if somebody would.   That

13   would be great.

14   Q.   Besides the liability, though, as far as

15   conducting the business, the day-to-day business, of

16   Mantra?

17   A.   No.   Nope.

18   Q.   What about Sands, we talked -- we discussed

19   about what Mantra did as a business.   What did Sands

20   do?   Is it basically the same thing or is it a little

21   different?

22   A.   I think Sands really was the media buying arm

23   of, you know, Mantra.   It was the media buying arm of

24   Mantra.

25   Q.   So you have Girls Gone Wild and you have the

33

1  DVDs that are produced in that line of production,

2  right?

3      A.   Well, I don't.

4      Q.   Okay.  There is a Girls Gone Wild entity,

5  correct?

6      A.   An entity?  No.

7      MR. GUTENPLAN:  I don't know what that means.

8      THE WITNESS:  No.

9  BY MR. SEBER:

10     Q.   There's a Girls Gone Wild Brands, Inc.?

11     A.   There is a company Girls Gone --

12     Q.   Correct.

13     A.   Okay.  Yes.

14     Q.   You are familiar with the videos Girls Gone

15  Wild?

16     A.   Yes, yes.  I'm trying to help you out.

17     MR. GUTENPLAN:  He didn't know if you meant

18  business entity, because he gets -- because the

19  business gets sued as Girls Gone Wild, an unknown

20  business entity, all of the time, which isn't a

21  business entity.  It doesn't exist.  So I don't know if

22  that's what you were referencing.

23  BY MR. SEBER:

24     Q.   Let me pull out my Joe Francis or corporate

25  chart.

1    A.    Okay.

2    Q.    There is a Girls Gone Wild Brands, Inc.,

3 correct?

4    A.    Correct.

5    Q.    And there's the Girls Gone Wild Marketing,

6 Inc.?

7    A.    Correct.

8    Q.    Okay.  So if I wanted to go buy a Girls Gone

9 Wild DVD, who would I send my money to?

10    A.    You know, I don't know the exact entity that

11 you would.  I just don't know.  And --

12    Q.    Go ahead, please.

13    A.    No.  I've been asking, but I don't know.  I

14 don't know the answer.  I have no firsthand knowledge.

15    Q.    Has anybody told you?

16    A.    Nope.

17    Q.    I asked you if I wanted to buy a DVD Girls

18 Gone Wild, I asked you where I would send my money.  Do

19 you know who would send me the DVD if I purchased a

20 Girls Gone Wild DVD, what entity?

21    A.    No, I don't.

22    Q.    Did --

23    A.    I mean, as I sit here today, I don't.  I've

24 been trying to figure that out, though.  I'm serious,

25 too.  I'm totally serious.  I just don't know.

```
 1        Q.    If -- well, who -- do you know what entity --

 2        A.    Like who would know, is that what you want to

 3   ask me?

 4        Q.    I'll get to that.

 5        A.    All right.

 6        MR. GUTENPLAN:   Let him ask the questions.

 7   BY MR. SEBER:

 8        Q.    What entity would set up the actual

 9   infomercials that we would see on TV?

10        A.    Don't know.   I do want to know, but I don't

11   know.

12        Q.    What entity owns the Girls Gone Wild tour bus?

13        A.    Not sure, because I don't -- as I said, I'm

14   not being evasive at all.   I just don't know the

15   structure.   Like, I don't know.   And whether that's

16   intentional or not, whether it's speculation, but I

17   don't know.   And I've asked.

18        Q.    Is it your testimony that your attorneys have

19   intentionally kept you out of that loop?

20        A.    No.   I don't believe there's any deliberate

21   action on their part.   I believe that there's just

22   structure stuff that's complicated that I don't

23   understand and I haven't been briefed on it.

24        Q.    Well, what was Mantra's connection with the

25   distribution of the DVDs?
```

1      A.    Well, I think there was another distribution

2  arm.  I'm not sure about the distribution.  I know

3  Mantra was involved in the production at some point of

4  Girls Gone Wild DVDs.  I don't know about the

5  distribution, though.

6      Q.    And by "production" I take it you mean the

7  filming or --

8      A.    Yes.

9      Q.    Okay.  That's where I was getting at with, you

10 know, my 20 questions.

11     A.    Okay.  That's all you need to figure out.

12     MR. GUTENPLAN:  Just to clarify, the question you

13 just asked was Mantra, which obviously would have been

14 in the past since Mantra is no longer in business, you

15 are asking why in that question about all the GGW

16 Brands, Marketing, etc., entities, so --

17     MR. SEBER:  I appreciate the clarification, but I

18 was trying to get the clarification so I could ask the

19 question about Mantra.  But thank you.

20     MR. GUTENPLAN:  That's fine.

21 BY MR. SEBER:

22     Q.    The same question for Sands, then Media, how

23 did that fit in with the distribution of Girls Gone

24 Wild?

25     A.    As I explained before, this is my

1  understanding, it's only my understanding, but my

2  understanding it was the media arm or the media buying

3  arm of Mantra.

4       Q.    That's Sands?

5       A.    Yes.  That's what you just asked, right?

6       Q.    Yeah.

7       A.    Okay.  Yeah.

8       Q.    And what does that mean, the "media buying

9  arm"?

10      A.    And I'm answering that two, maybe the third

11  time here, because I've already answered that.

12      Q.    I'm just trying to understand what "media

13  buying arm" means.

14      A.    Oh, I'm sorry.  Like television time,

15  television air time.

16      Q.    Thank you.

17            So did you once hold stock in Sands as well,

18  too?

19      A.    Physically.  Okay.  All right.

20      Q.    No, not physically.

21      A.    Well, I'm just like --

22      Q.    Did you have the right to sell --

23      A.    Let me just -- I'll get ahead of you.

24            I know at some point I had an interest.

25  Whether it was a majority interest, I don't know and

1  what the structure of that was, I don't know.  But yes,

2  I did at some point.

3      Q.   And did you eventually sell that?

4      A.   No.  It was closed down and now being pursued

5  for liabilities.

6      Q.   Same situation with Mantra?

7      A.   Exactly, yeah.

8      Q.   That it has more liabilities than the value

9  associated with the company?

10     A.   Yes.  Lots.  I'm sorry.

11     Q.   Go ahead, please.

12     A.   Lots.

13     Q.   And that happened --

14     A.   But there would be just liabilities, a lot of

15  them I believe are, so --

16     Q.   That happened at the same time as it did with

17  Mantra?

18     A.   Around.  I don't want to, like, say something

19  that I don't have direct knowledge of.

20     Q.   Within the same year?

21     A.   I personally believe that, but I'm also

22  speculating at the same time.

23     Q.   I don't want you to speculate, of course.

24     A.   So --

25     Q.   So you don't know?

```
 1       A.    I don't know.

 2       Q.    Do you know the last time that Sands filed a

 3  tax return?

 4       A.    Unh-unh, no.

 5       Q.    When -- jumping around a little bit.

 6       A.    I'm saying like I don't remember, not like --

 7       Q.    I understand.

 8             When was the last time that you got paid by

 9  Mantra?

10       A.    I don't remember.

11       Q.    When is the last --

12             Have you ever received a bonus from Mantra?

13       A.    I've been paid by Mantra before.

14       Q.    Right.

15       A.    Yeah, yeah.  I've been paid by Mantra.  I just

16  don't remember the last time I received a payment from

17  Mantra.  I mean, just like I don't remember.

18       Q.    By "payment" -- I probably should have

19  narrowed it down a little bit more for you.  By

20  "payment" I mean --

21       A.    Anything.

22       Q.    -- any income.

23       A.    Yeah.

24       Q.    Let's break it down.

25             Did you at one time get a salary from Mantra?
```

1    A.   Yes.

2    Q.   And --

3    A.   I don't remember what that was because I got

4  paid mostly in bonus or when I did well.

5    Q.   When was the last time that you received a

6  salary from Mantra?

7    A.   Probably sometime prior to its closure.

8    Q.   Prior to 2008?

9    A.   Well, just prior to its closure, let's say

10  that.  Just because that's all -- I'm 100 percent sure.

11    Q.   Okay.  The bonus that you referenced, when was

12  the last time you received a bonus from Mantra?

13    A.   I don't remember.

14         But early on when things were well, I received

15  it.  And then after 2003, things went south, after this

16  whole thing happened in Florida with the cameraman and

17  this whole legal battle.  You know, they were far and

18  few between after that.

19    Q.   And the last bonus that you remember, can you

20  remember how much it was?

21    A.   Not specifically.

22    Q.   Was it over a million?

23    A.   It wasn't that much, but I don't remember

24  exactly what it was.

25    Q.   That would have been prior to -- let's just be

1  conservative, let's just say 2004?

2      A.   No, because there was definitely payments

3  prior to the closure, but I don't remember what they

4  were and I don't remember when they were.  But so

5  sometime between -- you know, so there was definitely

6  something between '04 and '08 as well, but I don't

7  remember what it was.

8      Q.   When you gave me the 2003 period of time, you

9  were referring to that was the time when the company

10 was last doing good.  Is that --

11     A.   Yes.

12     Q.   I want to make sure I understood your

13 testimony.

14     A.   Okay.  Yes.

15     Q.   So you did receive a bonus after the 2003

16 period of time?

17     A.   Correct.

18     Q.   You just cannot recall?

19     A.   Yeah.  That's correct.

20     Q.   I'm going to ask the same question about

21 Sands.  When was the last -- strike that.  Back up.

22          When you got a salary from Mantra, do you

23 remember who wrote the check, whose name was on the

24 check?

25     A.   ADP.

1    Q.   Do you have any idea how ADP got the money for

2 your salary?

3    A.   Yeah.   They were funded by the company, I'm

4 sure, Mantra.   Yeah, absolutely.

5    Q.   Was that the same for the bonus as well, too?

6    A.   Yes, I believe so.

7    Q.   Okay.   Now I'll jump to the Sands.

8         When was the last time that you received a

9 salary from Sands?

10    A.   That, I don't remember at all.

11    Q.   Do you remember the bonus, last time you got a

12 bonus from Sands?

13    A.   I don't remember at all, like I just don't

14 remember.

15    Q.   Any type of compensation from Sands?

16    A.   I would be speculating.   That's -- I would be

17 speculating, so I don't know.

18    Q.   Did Mantra -- and I'll narrow this down in a

19 time period.

20         From 2007 forward, did Mantra provide you the

21 use of anything as far as value, like use of a house,

22 use of automobiles?

23    A.   Yeah.   They did provide me, yeah.   For the

24 terms of those leases or whatever they did, yeah,

25 absolutely.   But it was just -- yes.

1      Q.    And did Sands also provide you use of items of

2   value, such as cars, or was it Mantra that provided

3   that?

4      A.    Mantra.  But not to keep.  To use, you know.

5      Q.    Right.  They weren't transferring ownership to

6   you?

7      A.    No.  They were leases and stuff that hadn't

8   run out, or whatever.

9      Q.    Can you give me a for example?

10     A.    For example, Mantra had a lease for a Ferrari

11  that I drove -- when I was shooting the infomercials, I

12  would drive it in the infomercials and stuff like that;

13  and, therefore, I got to drive it, you know.

14     Q.    Are you familiar with Pepe Bus LLC?

15     A.    Am I familiar?  Ever heard the name?  Yes.

16     Q.    Let's start there.

17     A.    Yes.

18     Q.    Are you an officer of that LLC?

19     A.    I have no idea.

20     Q.    Do you know what they do?

21     A.    Not really.  I know it's one of the entities

22  that is in the business, but I'm not sure of the

23  structure or what exactly it does or holds or whatever.

24     Q.    But they are affiliated with Girls Gone Wild

25  Brand, Inc.?

1     A.   I believe so, but I'm not sure of the

2  affiliation exactly.

3     Q.   And I will try to be exact with the names I'm

4  using because I understand there's some similarities in

5  the names.

6     A.   Yeah.  And I will try to clarify.

7     Q.   So when people ask you, Joe, what do you do

8  today, when they ask you what is your professional

9  occupation, what do you tell them?

10    A.   I defend lawsuits with lawyers for the past

11 liabilities.  That's my full-time job.  I really do, as

12 funny as that sounds.

13    Q.   You're employed by no one today?

14    A.   I would say self-employed.

15    Q.   And besides the defending lawsuits portion of

16 your self-employment, is there another portion that you

17 are working on?

18    A.   That would be my primary business, I would

19 say, right now.  My primary -- where I spend most of my

20 time.

21    Q.   Consumes you with the majority of your time?

22    A.   I would say so.

23    Q.   So there's nobody today currently that's

24 providing you a salary?

25    A.   No, I don't believe so.

```
 1      Q.   And no one today that's providing you a bonus?

 2      A.   No.

 3      Q.   Any income whatsoever?

 4      A.   Not really new income, no.  I don't believe

 5 so.

 6      Q.   How about old income, deferred compensation?

 7      A.   There's no deferred compensation because

 8 things don't exist anymore.  That's the problem.

 9      Q.   I didn't know if --

10      A.   Deferred liabilities.

11      Q.   Deferred liabilities?

12      A.   Yeah.  Every day.

13      Q.   So there's no one holding anything of value

14 for you?

15      A.   No.  No.  I wish, but no.

16      Q.   Have you engaged in any discussions with a

17 working group to try to develop a new product line?

18      A.   What?

19      Q.   Are you engaged in any discussions to try to

20 develop a new product line?

21      A.   No.  But I will be as soon as I get past all

22 of this part of my life.

23      Q.   Do you have any ideas of what that will be?

24      A.   Not yet, but I will.

25      Q.   I'm just asking, because it sounds to me --
```

1      A.   Well, we're looking at a bankruptcy, like

2  personal bankruptcy, to be perfectly honest, like the

3  next few weeks or whatever.  So that wipes this clean

4  and then I will do whatever I want to do after that and

5  so then we'll be fine.  So that's the truth and that's

6  the -- you know.

7      Q.   I'll be candid with you.  You are obviously a

8  pretty entrepreneurial guy.

9      A.   Yeah.  But I need to do this bankruptcy and

10 wipe this slate clean because, you know, I didn't

11 create this mess and I'm certainly not going to spend

12 the rest of my life in litigation.  So it's pretty set

13 and file the BK and be done.  And then after that, I'm

14 sure I will have some new ideas.

15     Q.   Have you filed any official documents or

16 paperwork for the bankruptcy?

17     A.   Nope.

18     Q.   When do you anticipate filing?

19     A.   Well, that's up to my lawyers to really

20 decide, but as soon as everything's 100 percent ready,

21 and I'm pushing for probably the next few weeks.

22     Q.   Who is your current accountant?

23     A.   Bankruptcy attorney?

24     Q.   Who is your current accountant if you have a

25 CPA?

```
 1        A.   I'm currently looking for one.  The old

 2   accountant was Michael Barrett, and he was the one who

 3   was stealing from the company, so he's the one that was

 4   stealing from me.

 5        Q.   I don't think you would still be employing

 6   him.

 7        A.   No.  I did for a while, though, because I

 8   didn't know.

 9        Q.   Do you have a publicist?

10        A.   No.

11        Q.   Secretary?

12        A.   Yes.  Megan, who I said before.

13        Q.   I didn't know she was a secretary.  I thought

14   she was a personal assistant.

15        A.   I assume semantics, so I understand that to be

16   like the same thing.  PA, like U.K., whatever,

17   secretary.  I think they are just -- I mean, I think

18   they are the same thing, so if you ask me that.

19        Q.   A lot of people do.  I do, too.  I just wanted

20   to clarify we are on the same page.

21        A.   See, you even think that and you are asking

22   me?  Such a lawyer.

23             Can I go to the bathroom and come back?

24        MR. SEBER:  Take a break.

25        MR. GUTENPLAN:  Go off the record.
```

```
 1            (Off the record.)

 2   BY MR. SEBER:

 3       Q.   I got to ask these questions.

 4       A.   I understand.

 5       Q.   You don't have a wallet on you today, do you?

 6       A.   Nope.

 7       Q.   Any cash on you today?

 8       A.   20 bucks.  $10.

 9       Q.   And your counsel bought you coffee this

10   morning?

11       A.   That was nice of him, don't you think?

12       MR. GUTENPLAN:  Of course you told me you didn't

13   have any money.

14       THE WITNESS:  I had ten bucks.

15   BY MR. SEBER:

16       Q.   He'll probably expense it to you.

17       A.   Spoken like a true lawyer, huh?

18       Q.   Have you bought any gifts for anybody in the

19   last three years?

20       A.   Well, I did.  I bought an engagement ring

21   for -- I mean, I have bought like -- but three years

22   would be like going back to 2007, right?  2007 to now.

23       Q.   You could say 2007, if that makes -- yeah, say

24   2007 January.

25       A.   Yes.
```

1      Q.    The engagement ring?

2      A.    Yeah, that's probably about it.

3      Q.    Well, let me narrow it down.  Maybe it will

4 make it easier.

5            Let's just say anything over $1,000 for a

6 gift.

7      A.    Probably the engagement ring is about it.

8      Q.    Besides the gifts, have you made any other

9 purchases over $1,000 in the last three years?

10     A.    Not that I can recall.

11     Q.    Obviously you are not married right now?

12     A.    Obviously.  I love the word.  Yes.

13     Q.    You were --

14     A.    Well --

15     Q.    You weren't married.  You were in a civil

16 union, correct?

17     A.    Correct.

18     Q.    You were in a civil union --

19     A.    Uh-huh.

20     Q.    -- with Ms. McLarty?

21     A.    McLarty.  I have trouble saying it, too.

22     Q.    I said I was going to mispronounce it.

23     A.    I don't care.  It's not my name you are

24 mispronouncing.  You are not going to offend me.

25     Q.    And when did that the ceremony with

1   Ms. McLarty occur?

2       A.    Last November.

3       Q.    November of 2010?

4       A.    Correct.

5       Q.    And was that at the house down in Mexico?

6       A.    That was in Mexico, correct.

7       Q.    What is the location of the house in Mexico?

8       A.    Like where is it?

9       Q.    Yes.  What is the closest city?

10      A.    Puerto Vallarta.

11      Q.    Puerto Vallarta?

12      A.    Uh-huh.  Puerto Vallarta

13      Q.    I will mispronounce that, too, trust me.

14      A.    That's Spanish.  I will give you a by on that.

15      MR. GUTENPLAN:  Cut him some slack.

16      THE WITNESS:  I will cut you some slack.

17  BY MR. SEBER:

18      Q.    And how long did the civil union last?

19      A.    After the ceremony?

20      Q.    Right.

21      A.    Like three weeks.  Yeah, not very long at all.

22      Q.    It's officially terminated?

23      A.    Yes.

24      Q.    Over with?

25      A.    Uh-huh, yes.

1    Q.    And how much did the actual ceremony cost?

2    A.    I don't know.  I didn't pay for it.

3    Q.    Who did?

4    A.    Her.  I don't know.

5    Q.    "Her" being?

6    A.    I don't know who actually paid for the

7    whole --

8    Q.    The wedding ring that we referenced earlier,

9    you purchased that?

10   A.    I'm trying to think, though, if I purchased it

11   personally or it was gifted.  I'm trying to remember

12   the exact circumstances of the thing.

13         But I think you should go after her for it, so

14   I'm going to be willing to help you as much as possible

15   recover that for yourself.

16   Q.    Is she currently in possession of it right

17   now?

18   A.    Yes, I believe so.

19   Q.    What is the value of it?  If you had to sell

20   it on the street, what would you ask for it?

21   A.    I mean that's the problem with that stuff.

22   You sell it on the street, what is the value?  Ten

23   grand, you know?

24   Q.    You tell me, what do you think?

25   A.    Probably 25,000, maybe.

1     Q.   How many carats is it?

2     A.   I don't know.  She picked it out and did it.

3     Q.   This big?

4     A.   You know what I'm saying?  It's like worth

5 nothing when you try to sell it.  That's one of those

6 things.

7        But I would be more than happy and -- can we

8 go off the record for a second?

9        I would be more than happy to participate in

10 any way in that recovery.

11    MR. GUTENPLAN:  I think we're good.

12    THE WITNESS:  So if we talk off line, we're more

13 than happy to discuss the recovery of that and deed it

14 to you.

15 BY MR. SEBER:

16     Q.   Well, do you have --

17     A.   Because that's really like the only asset that

18 like -- you know, that we can get, and I would love for

19 you to have it.

20     Q.   Do you have any understanding if -- well,

21 strike that.

22        Is it your position that the ring belongs to

23 you?

24    MR. GUTENPLAN:  Do you have a position?  If you

25 have a position.

53

1    THE WITNESS:  I don't think I can take a position

2  on that.  I don't know.  I would certainly like to put

3  it in your hands.  How about that?  Is that -- if I

4  could.

5  BY MR. SEBER:

6    Q.   They are two different questions.  I

7  appreciate you trying to answer.

8    A.   I'm just saying he could, you know, whatever,

9  figure it out.

10    Q.   Do you know, was there a prenuptial agreement?

11    MR. GUTENPLAN:  I will let him answer that

12  question, but I will object on attorney/client

13  privilege.

14    MR. SEBER:  I'm not going to ask --

15    MR. GUTENPLAN:  I figured you won't, but --

16    THE WITNESS:  No.  There was a cohabitation,

17  whatever, agreement.

18  BY MR. SEBER:

19    Q.   Is that an agreement that would divide up

20  assets between the two of you?

21    A.   Yeah.  And I'm just trying to think whether or

22  not that says it, but -- you know, if it was a gift or

23  not, whatever, but --

24    You know, I would have to check.  I just don't

25  know as I sit here right now what that says, because

1  you just kind of triggered the idea.

2       Q.   And you're uncertain if you paid for it or it

3  was --

4       A.   I'm uncertain of the transaction.

5       Q.   You don't recall -- go ahead.

6       A.   I believe that I did, but the whole -- I'm not

7  certain of the entire transaction.

8       Q.   Do you recall going to a store to purchase it?

9       A.   No.  I never did any of that.  No, I never

10  saw, talked to the person.  Never did that, no.

11       Q.   Who purchased it?

12       A.   She did.

13       Q.   Oh, so you told her to go out and purchase her

14  own ring?

15       A.   Yeah.  It's retarded.  That's what he said.

16  Yeah, retarded.  Dude.  Oh, God, let's -- oh, God.

17  Yeah.  Yeah, I had a bad experience --

18       Q.   I understand.

19       A.   -- with women.  Am I the first guy?  Yeah.

20       Q.   Did you give her a credit card to go out and

21  purchase it?

22       A.   No.  No, no.  See, there's nothing like that.

23  That's why the whole transaction, I'm just not sure of

24  it.

25            But if there's any way to get it in your

1  hands, I would be happy to do it.

2      Q.   Do you have any understanding how she was able

3  to walk into the store and purchase the ring from a

4  money standpoint?  Because that's what I'm trying to

5  determine.  That would be helpful.

6      A.   You know, I'm not sure exactly how it was paid

7  for.  I'm just not sure as I sit here right now.  I

8  mean, it's probably something I can look into, but I'm

9  not sure.  That's why I don't want to say, oh, well,

10 this was happening because I don't have a checkbook.  I

11 don't have a checkbook, I don't have a checking

12 account, I don't have a bank account.  I don't

13 operate -- you know, until my bankruptcy, I'm

14 operating, you know, frickin' hand to mouth, so --

15     Q.   Did it have any connection with the Francis

16 Trust?

17     A.   None whatsoever.  Absolutely not.

18     Q.   You keep that separate from --

19     A.   Like I don't even know where that's at.

20 Like -- you know, that's another can of worms.

21     Q.   How about the dress at the wedding, her dress?

22     A.   Borrowed.  Like it was on a loan -- I know

23 that for a fact, because that was a loan deal with a

24 stylist and it was done for free.

25     Q.   It's an impressive dress.  I saw the pictures.

1    A.   But it was done like a trade for the name in

2  the press, or something like that.  So, you know, it

3  was like I was at the Kardashian wedding this weekend,

4  but a lot of that was trade-out.

5    Q.   Did you provide Ms. McLarty anything of value

6  in the last three years besides the ring?  Let's say

7  over $1,000.

8    A.   No, nothing over $1,000.  But like dinners for

9  certain, you know, clothing, stuff like that, but

10  nothing over $1,000 per --

11    Q.   And the dinners, clothing?

12    A.   Would it total more than $1,000?  Probably.  I

13  shouldn't answer that.

14    MR. GUTENPLAN:  I don't want you talking over him.

15  Let him ask his questions.

16    THE WITNESS:  I would love to help in any way I

17  can.

18  BY MR. SEBER:

19    Q.   Now --

20    A.   There's nothing like a common enemy to bring

21  two people closer together.

22    Q.   The dinners that you purchased for her, do you

23  recall where you got the source of that money?

24    A.   Yeah, you know, everything's -- I get, you

25  know, some money from lawyers and it gets provided to

1  me and I don't know how or how it's structured and how

2  I do.  But until the bankruptcy, I'm not allowed to

3  have any, and I don't.

4      Q.  Explain that, until the bankruptcy you are not

5  allowed to have any.

6      A.  Like you asked me earlier, like what's my next

7  thing.

8      MR. GUTENPLAN:  I will just put an objection on

9  the record as to attorney/client privilege.  I don't

10  really think you need to dig into that.

11  BY MR. SEBER:

12     Q.  Besides talking -- discussions with your

13  attorneys.

14     A.  All of those are discussions with my

15  attorneys.

16     Q.  Let me finish.

17     A.  Okay.  Sorry.

18     Q.  See if I can frame a question without a

19  discussion.  Maybe I can't.

20     A.  Okay.

21     Q.  So if you needed to get $50, do you know how

22  you would get it?

23     A.  Call my lawyer.

24     Q.  And there would be a meeting someplace and he

25  would give you the $50?

1      A.   I'm not going to discuss privileged

2  information.

3      Q.   Not a discussion with him but a meeting.

4      A.   But it would require discussion with him or --

5      Q.   I'm not asking about the discussion.  I don't

6  want to know about your discussions you are having with

7  your attorneys.  I'm just asking would you meet your

8  attorney to get the money or is there some --

9      A.   Yes.  Yes.

10      Q.   There's nobody else in between that they would

11  give the money to?

12      A.   Well, I am not going to go farther than that.

13           But yes, there's nobody.  My attorneys are in

14  control.

15      Q.   Do you currently have access to a safe deposit

16  box?

17      A.   Nope.

18      Q.   Do you have -- "you" I mean personally.

19           Do you have access on behalf of any other

20  entity to access a safe deposit box?

21      A.   Nope.

22      Q.   You don't currently have a checking account, I

23  take it, because you don't have a checkbook?

24      A.   Nope.

25      Q.   When was the last time you had a checking

1  account?

2      A.    A couple years ago.

3      Q.    Was it the Wells Fargo one?

4      A.    No.  I had one after that, too.  I had one at

5  Morgan Stanley, and so I believe that would probably be

6  like the last one.

7      Q.    It's no longer -- Morgan Stanley is in longer

8  in existence?

9      A.    They closed it.

10      Q.    So is that the one that is associated with the

11  Rothwell Trust?

12      A.    Yeah.  But there's also a couple accounts

13  there.  I'm talking me personally and those were

14  seized.

15      Q.    Because there were personal accounts in the

16  Morgan Stanley that were involved in the seizure.

17      A.    Yeah.  But Wells Fargo, Morgan Stanley and

18  there's the UBS one.  So there were all of those ones

19  and they are all gone.

20      Q.    So if you total up the personal accounts --

21      A.    All of those personal accounts?

22      Q.    Yes.

23            -- how much money did the IRS seize of you

24  personally?

25      A.    I mean I don't know exactly but $33 million,

1   something like that.  I mean, like wiped them off the

2   face of the earth, you know, everything.

3       Q.   And that's also including accounts under

4   Rothwell Limited as well?

5       A.   I can't -- I mean, that stuff, I don't know

6   how that's even structured or what that even -- that's

7   another can of worms, so --

8       Q.   Now, you said --

9       A.   I had a bad year last year.  Bad year.

10      Q.   So you said you don't have a checking account

11  personally.  I asked you a similar question for safe

12  deposit box.

13          Do you have access to a checking account of

14  anybody else?

15      A.   No, no.  Because that would mean I would have

16  access.  I would have answered that question.

17      Q.   Like a power of attorney.  Did anybody give

18  you a power of attorney to access any accounts for

19  them?

20      A.   No.  Nothing like that, no.

21      Q.   When is the last time you used an ATM machine?

22      A.   That, probably five years ago, six years ago

23  maybe.

24      Q.   Have you ever asked anybody to use an ATM

25  machine for you?

1          A.    No.

2          Q.    Go to a bank and withdraw cash for you?

3          A.    No.  Oh, well, other than conversations with

4  my attorneys.

5          Q.    In the calendar year 2010, did you instruct

6  anybody to transfer --

7          A.    Wait, wait.  Sorry.  Give me the time again.

8          MR. GUTENPLAN:  2010.

9  BY MR. SEBER:

10         Q.    2010.

11         A.    Okay.  Got it.

12         Q.    Did you instruct anybody to transfer money

13  from one financial institution to another?

14         A.    No.  I instructed -- asked the IRS to return

15  my money.  Is that an instruction?  I guess it's a

16  request.

17         Q.    You answered my question.

18         A.    I know what you are saying.

19         Q.    Who is Collin Chaffey?

20         A.    Collin Chaffey -- and this is my

21  understanding, but he is apparently -- but he's rogue,

22  but he is the -- was an unlicensed trustee put in

23  charge of the Francis Trust.  But I have no

24  relationship with him.  I've never met him.  I don't

25  know how he got there.  I don't know anything about

```
 1   him.  And he's never returned a call or E-mail of mine
 2   ever.
 3        Q.   Do you know where --
 4             You've called him?
 5        A.   I have.
 6        Q.   Do you --
 7        A.   I've tried to call him.
 8        Q.   Do you know where he's physically located?
 9        A.   That's another thing.  I don't know.  I've
10   heard Panama, like Panama meaning, you know, Central
11   America Panama or actually it's probably North America,
12   isn't it.  And then Florida.  I've heard both.
13        Q.   What was the area code?
14        A.   The cell phone, it was a Florida cell phone.
15        Q.   Florida cell phone?
16        A.   Yeah, it was a Florida cell phone number.
17        Q.   Who is Nicole Jordan?
18        A.   Another one, same one.  No return E-mail, but
19   she is the partner with Collin Chaffey, both unlicensed
20   trustees who are somehow involved in this -- who are
21   somehow involved in the trust.
22        Q.   The Francis Trust?
23        A.   Correct.
24        Q.   Do you know how they got appointed to the
25   Francis Trust?
```

     1        A.   No, I don't.

     2        Q.   Do they have an affiliation with the Rothwell

     3   Trust as well?

     4        A.   I don't know.  I don't know that stuff.  I

     5   would like to know that stuff, but I don't know.

     6             But he's -- well, without -- he's adverse to

     7   me, I would say.

     8        Q.   Because Chaffey identified you as --

     9        A.   Trust me, if I could get funds, you know, I

    10   would settle with you.  Trust me.  If -- I'm not

    11   playing games.  I'm sorry.  But if you could get these

    12   guys, we can nail these guys down, too, you know.

    13             But this guy is rogue, and I've never met him

    14   or his partner, and I don't know how the hell he got

    15   there.  But that's the God's honest truth and we will

    16   send you a vCard for those guys, I mean what I have, if

    17   you can track them down.  It would be worth it, I

    18   think.

    19        Q.   How about Brian, is it Trowbridge, same story?

    20        A.   Same friggin' story, yes, exactly.  But he is

    21   a licensed trustee.  This is just what I know.

    22             So he is a licensed trustee, and he was the

    23   original trustee and somehow his old partner and --

    24   these two people used to work for him, and somehow they

    25   just separated out, took everything with them and took

```
 1   off kind of thing.  And he seems to have no knowledge.

 2          And him I did talk to him on the phone.

 3     Q.   Go ahead.

 4     A.   Once, one conversation.

 5     Q.   Where is he out of?

 6     A.   He's in the Turks and Caicos Islands.  His

 7   company is called TCI Trust, or something like that.

 8   Trust -- or something like TCI Trust.

 9     Q.   He's not an attorney?

10     A.   I don't know who he is.  I've had one

11   conversation that he picked up.

12     Q.   What was the nature of the call?

13     A.   Oh, it was --

14     Q.   You were upset with him?

15     A.   Yes.  What's going on, like what -- you know,

16   where is all of this?

17     Q.   So I take it there was money missing that you

18   felt shouldn't be missing?

19     A.   Exactly.

20     Q.   And you felt that these individuals had a hand

21   in it?

22     A.   Yes.  Currently I feel like that's the case,

23   yes.

24     Q.   And I take it you don't know how

25   Mr. Trowbridge got in the position where he got?
```

1       A.   No.  No.  It's ridiculous.

2       Q.   How much money was in this trust that --

3       A.   They don't want to give me the accounting.  I

4   can't get anything.  It's absurd.  It's absurd.

5       Q.   How much do you think it should have been?

6   Over 20 million?

7       A.   I don't know.  I don't know personally.  I

8   just don't know.  And I don't want to speculate and I

9   don't want to speculate on the record.

10          And, you know, it's really it's -- you know,

11  from the attorneys here, it's like not yours, nothing

12  you can do.  And I'm like it's just -- it's a

13  ridiculous situation.  It's a den of thieves is what it

14  is.

15      Q.   But this money was -- the trust was partially

16  funded with assets associated with Girls Gone Wild?

17      A.   No, I wouldn't say that at all.  No.

18      Q.   No?

19      A.   No, I wouldn't say that at all.  No.

20          But -- yeah.

21      Q.   What was the money that was in the trust,

22  where was the original source?  The Francis Trust, I'm

23  talking about.

24      A.   You know, I don't know the intricacies of the

25  whole thing.  I just don't know.  And I've been trying

1  diligently to gather information and pursue legal

2  action to get an accounting, to get this information.

3  But because of the fact that this guy Trowbridge is

4  licensed and the other guys aren't and they are rogue

5  and apparently Trowbridge is like, oh, well, I have

6  nothing to do with it, I resigned, and his ex two

7  partners are the ones that apparently have taken off

8  with these assets, it's -- it's a situation; so --

9      Q.   If I asked this question, I don't think I

10 specifically did, but do you know how much they took

11 off with as far as from the assets?

12     A.   No.  Because I don't have an accounting; and

13 if I had one, and it's been requested and --

14     Q.   Are they in any way involved with a gentleman

15 involved by the name of Brian Rayment?

16     A.   I believe so.  I believe he's controlling it,

17 absolutely.  And he is the protector.

18     Q.   Did I pronounce his --

19     A.   Yeah, R-a-y-m-e-n-t.

20     Q.   You have a lawsuit against him?

21     A.   Correct.  Yes.  Oh, yes.  And I'm pursuing all

22 of these people.

23     Q.   And his law firm, I believe.

24     A.   Correct.  I'm pursuing all of these people.

25     Q.   There's a Joe Francis at that law firm.  Is

1  there any relation?

2      A.   No.   Yeah, but no relation to me whatsoever.

3  It's odd.

4      Q.   It's odd.

5      A.   But no relation.

6      Q.   I didn't think there was another Joe Francis,

7  especially in Oklahoma.

8      A.   There can't be.  Kidding.

9      Q.   There's probably only one, right?

10     A.   What?

11     Q.   There's probably only one, right?

12     A.   There can only be one, right.

13     Q.   I like to think the same thing about myself,

14  but --

15     A.   Yeah.  The Brian Rayment thing because he was

16  a family attorney and I thought he was trusted.  And

17  yeah, I believe that he may have some assets as well,

18  too.

19     Q.   How did you meet Mr. Rayment?

20     A.   He was my father's attorney when I was a kid,

21  and that's how I met him so I just trusted him.

22     Q.   And you feel he violated your trust?

23     A.   Yes.  And I believe he is in control of a lot

24  of assets that we would all like to get to

25  collectively.  And I believe he has like at his

1  fingertips control of those assets.

2     Q.   What was his official title?

3     A.   Protector of the Francis Trust.

4     Q.   Have you taken steps to try to get him removed

5  as the protector?

6     A.   Yeah.  You read the lawsuit, right?

7          Oh, you mean, yeah, and steps over there, too,

8  absolutely.  Currently, yes.  Actively.  But the way

9  it's structured or written, or something like that, I

10 can't.  I mean --

11    Q.   Who has -- go ahead.

12    A.   I mean, there's just some legal hurdles to

13 overcome.

14    Q.   Do you know who has the power to remove him as

15 protector of the trust?

16    A.   Collin Chaffey and his partners, his cohorts.

17 His co-conspirators, I will call them.  But that's my

18 own characterization of what I believe to be the

19 situation without making a legal conclusion, right.

20         Yeah, I got double screwed, triple screwed.

21    Q.   You currently don't own a car, do you?

22    A.   No.

23    Q.   Do you have access to one?

24    A.   Uh-huh.

25    Q.   What kind?

1    A.    I drive a leased company -- a leased car.

2    Q.    Is it the Ferrari still, the one that we
3  talked about earlier?

4    A.    Uh-huh, yep.

5    Q.    You have access to -- the last examination you
6  referenced a Bentley.  Do you still have access to that
7  Bentley?

8    A.    It was sold.

9    Q.    Who leases the automobiles?

10    A.    Who?

11    Q.    Who is the lessee and lessor on the
12  automobiles, if you know?

13    A.    Oh, Girls Gone Wild, GGW.

14    Q.    Which one, Brands or Inc.?  I mean, excuse
15  me --

16    A.    Brands.

17    Q.    Is it Brands?  And there's also the Marketing?

18    A.    Brands.

19    Q.    Is there any other, that you are aware of, any
20  other Girls Gone Wild corporations besides Girls Gone
21  Wild Brands, Inc. and then Girls Gone Wild Marketing,
22  Inc.?

23    A.    Those are the ones.  But there are other ones,
24  but I don't have like -- you know, they all do
25  different things and they are all different ownership

```
 1   structures, so I don't know all of them.  I don't have
 2   them at any fingertips.
 3       Q.   I think there's one more.
 4       A.   There's plenty more.
 5       Q.   There's plenty more.  There's a culinary
 6   concepts one, too.
 7       A.   Yeah.  But I don't know what are in existence,
 8   what aren't, you know.  They were created over the
 9   years by a lot of, like, in-house counsel and stuff and
10   sometimes new ones pop up all of the time that you are
11   like, oh, really?
12       Q.   So I'm sorry, I jumped around.  This question
13   popped in my head.
14           The bankruptcy that you referenced, is that
15   going to be for you personally?
16       A.   Yes, uh-huh.
17       Q.   Do you know what chapter?
18       MR. GUTENPLAN:  Object; attorney/client privilege.
19           You don't have to answer questions about the
20   bankruptcy.
21       THE WITNESS:  Okay.  You have to ask my lawyers.
22           But there's no point.  You can understand,
23   there's no point in fighting something you don't have
24   and get a fresh start and you are done, you know.
25   BY MR. SEBER:
```

1     Q.   Do you still have access to a private plane?

2     A.   Nope.

3     Q.   Are you familiar with --

4     A.   Aero Falcon.

5     Q.   -- Aero Falcon?

6     A.   That was the company, yeah.

7     Q.   Did they at one point lease a plane or have

8 title or registration to a plane?

9     A.   I don't know title, registration, lease,

10 whatever.  But Aero Falcon was the entity that --

11    Q.   You could get on a plane and fly it and Aero

12 Falcon, LLC, was the company that was affiliated with

13 that plane?

14    A.   That's correct.  That's true and correct.

15    Q.   That is no longer the case?

16    A.   That's true and correct.

17    Q.   Is Aero Falcon, LLC, are they in existence

18 anymore?

19    A.   I don't know.  I don't know the answer to that

20 question.  No assets, though.  But I don't know what

21 the exact -- yeah, no.  I went through some tough

22 years, so --

23       I'm going to get a fresh start in a couple

24 weeks and be done with it.  I won't have to answer

25 these stupid questions anymore, not to say -- I'm

```
 1   not -- I'm not trying to be personal.
 2        Q.   I understand.
 3        A.   I'm just sick of this stuff.  I didn't create
 4   this mess and I'm certainly not going to spend any more
 5   time dealing with it.
 6        Q.   Well, I have to be thorough.
 7        A.   No, no.  I'm sorry.  I'm not taking it
 8   personally with you.
 9        Q.   Not insulted by any means.
10             In the last three years, have you licensed
11   anybody to use your commercial -- use your name for
12   commercial purposes?
13        A.   I don't know the answer.  My personal name?
14        Q.   Yes.
15        A.   No.  No.  All my endorsement deals ended on my
16   arrest in 2007.  They were all canceled.
17        Q.   Was that the arrest in Florida?
18        A.   Yep.  The contempt of court and then led to
19   everything else, so they canceled all of my
20   endorsements.
21        Q.   Do you have any interest in real estate at
22   all?
23        A.   Not personally.
24        Q.   The house down in Mexico we talked about.  And
25   I recently saw the episode on I think it was Million
```

1  Dollar Decorators.

2      A.    Uh-huh, correct.

3      Q.    That's the house in Mexico we're talking

4  about?

5      A.    That's correct.

6      Q.    Same one?

7      A.    Yes.

8      Q.    And that's where the civil union took place?

9      A.    That's correct.

10     Q.    How is it that you have access to that house?

11     A.    That's attorney/client privilege because it's

12 been explained to me by my attorneys, but I don't own

13 the house.

14     Q.    Who does?

15     A.    I don't know, and that's the truth.  I just

16 don't.

17     Q.    Do you give anything of value to have access

18 to that house?

19     A.    I would have to talk to my attorneys to get

20 that answer.  So to the best of my knowledge, I can't

21 answer that question.  I mean, to the best of my

22 knowledge sitting here today, I just don't know, and

23 I've asked the same question.  So I've asked the same

24 question.

25     Q.    You don't know if -- let me make it more

1    specific.

2            My understanding that's a 40,000 square foot

3    house.  It's a big house.  It's an impressive house.

4        A.   That's correct.

5        Q.   I don't know if you were involved in the

6    design of it, but --

7        A.   I was, yeah.

8        Q.   But candidly I got to say, I'm impressed with

9    the house.  It's a gorgeous place.  It really is.

10       A.   Thank you.

11       Q.   And what I've heard is it's worth somewhere

12   around 30 million.  Is that accurate?

13       A.   I don't think so.  Not in Mexico, that's for

14   sure.  But bottom line is, like, I don't own it.

15       Q.   You don't have any idea of the value of how

16   much it is?

17       A.   No.

18       Q.   Have you -- and this is where I'm coming back

19   to you about five questions ago when I asked you if you

20   gave anything of value to use that house.  And I

21   understand that's a broad term.

22           Have you given any money to use that house?

23       A.   Personally?

24       Q.   Yes.

25       A.   I don't believe so.

1    Q.   Do you know any other entities that have?

2    A.   I would have to ask my lawyers to get that

3  information, but I don't know it firsthand.  I don't

4  know it right off here.

5         And I know that sounds like weird.  I don't

6  mean to sound evasive, but that's true.  There's a lot

7  of stuff that I don't know that I will know eventually,

8  hopefully.

9    Q.   Is there a certain name you refer to the

10  house.  Casa --

11    A.   Case Aramara.

12    Q.   Casa Aramara?

13    A.   Correct.

14    Q.   Do you know who pays the utilities for the

15  Mexico house?

16    A.   No.  But it's a good question.

17    Q.   They get paid, though?  They are on?

18    A.   They do, yes, absolutely.

19    Q.   When was the last time you were down there?

20    A.   A few weeks ago.

21    Q.   And no restrictions on your ability to use it?

22  You don't have to call in to anybody and say, "I'm

23  going to use the house in Mexico"?

24    A.   No.

25    Q.   It's not like a timeshare?  I wouldn't think

1   so.

2       A.   No, no.

3       Q.   Yeah, that's what I'm getting at.

4       A.   No, not like a timeshare.

5       Q.   Where you've got to check in with somebody,

6   say "Hey, make sure you guys aren't using it this

7   weekend," nothing like that?

8       A.   No.

9       Q.   I wouldn't think so.

10      A.   Other than shoot.  We shoot some of the show

11  there.  We shot some of the show there, like Million

12  Dollar Decorator.

13      Q.   So the purpose is a business purpose?

14      A.   100, absolutely.

15      Q.   And what business entity is affiliated with it

16  for the business purpose?

17      A.   I guess the business of being Joe Francis.  I

18  mean, like in -- you know, as funny -- as stupid as

19  that sounds, but, you know, what that brings us, I

20  guess, Girls Gone Wild and other things and other

21  projects and like Million Dollar Decorator, and that's

22  the business of Joe Francis, really, to market the

23  character and the persona of Joe Francis.

24           Does that answer your question?

25      Q.   Kind of.  Let me see if I can do it this way.

1   I'm cognizant of the clock, too.

2       A.   I know, just --

3       Q.   Does Girls Gone Wild Brand, Inc. --

4       A.   Correct.  Brands.

5       Q.   Brands plural, thank you.

6            Does that have any affiliation with the house

7   in Mexico?

8       MR. GUTENPLAN:  Objection as to "affiliation."

9            You've asked if he knows who owns the house.

10  He said he doesn't so do you mean other than owning the

11  house?

12  BY MR. SEBER:

13      Q.   Does Girls Gone Wild Brands, Inc., do you know

14  if they get a benefit from the filming that takes place

15  at the house in Mexico?

16      A.   I don't -- you know, I don't know how to

17  answer that question.  I would believe, absolutely,

18  because --

19           Like you said, like you saw it on television

20  and the people buying Girls Gone Wild products.  So

21  absolutely.  There you go.

22      Q.   I don't know if I'm going to, but I know what

23  you mean.

24      A.   Come on.

25      Q.   It's used for marketing?

1       A.   Yes.  Exactly.  Yes.  Correct.

2       Q.   And it's also --

3       A.   As well as multiple other locations are, too,

4   you know, absolutely.  Like sound stages and stages and

5   that.

6       Q.   Are there any houses, besides the Bel Air

7   house that we talked about and the Mexico house, that

8   you have access to and the right of use?

9       A.   No.  Other than those two.

10      MR. GUTENPLAN:  You can come to my place any time.

11      THE WITNESS:  Dan's place is nice.

12  BY MR. SEBER:

13      Q.   Martin Bullard, is it?

14      A.   Bullard.

15      Q.   He's a designer of the stars, famous

16  gentleman?

17      A.   Yeah.  But a lot of that is television, you

18  know.  A lot of that is set up.

19      Q.   Seems like he does a good job.

20      A.   He does.  He does.  Absolutely.

21      Q.   I don't have quite the pallet but enough to

22  recognize his good work.

23           Who --

24      A.   You seem like a stylish guy.

25      Q.   I appreciate it.

```
 1          You wouldn't tell from the haircut, but --
 2     A.    The monochromatic tie with the -- well, you
 3 know Dan Gutenplan.  Sorry, my attorney has a huge ego
 4 here.
 5     MR. GUTENPLAN:  Please.
 6 BY MR. SEBER:
 7     Q.    Who pays for his -- compensates him to go down
 8 to the Mexico house?
 9     A.    I mean, actually, in all truth, it's kind of
10 really like television.  It's kind of a trade for
11 publicity, but, you know, that's the truth of it.
12     Q.    So you are not aware of him receiving any
13 compensation?
14     A.    Not recently.  Not recently.
15     Q.    In the past?
16     A.    Yeah, in the way past.  Like in the way past I
17 used to pay him, absolutely.  But we did so much work
18 together in the past, that kind of like now I've fallen
19 on kind of a different time in my life, a harder time,
20 and kind of keeping up with the persona, it's just a
21 trade of, yeah, I will do this TV show and scream and
22 yell and do whatever you want, you know, whatever, as a
23 favor.
24     Q.    When was the last time --
25     A.    Because it's publicity for him and business
```

1  for him, you know; so he will trade it out for

2  providing services.

3      Q.   When was the last time you paid Martin Bullard

4  anything for his services?

5      A.   Four years ago, probably.

6      Q.   But has he done work on the Bel Air house?

7      A.   A long time ago.  Like in 2001 or 2002, yeah.

8      Q.   Besides the Bel Air house and the house in

9  Mexico, has he done work on any other houses that

10  you've stayed in?

11      A.   No.  He did work in the office, though, in

12  probably 2002 or 2001.

13      Q.   Where is the office?

14      A.   In -- my old office in the Water Garden, like

15  in --

16      Q.   I'm unfamiliar.

17      A.   In Santa Monica.

18      Q.   Cloverfield, is that the address?

19      A.   Yeah.

20      Q.   You no longer have access to that office?

21      A.   I have access to it, but it's done.  The lease

22  is done.

23      Q.   How is it --

24      A.   Closing it up, moving out.  It's over so it's

25  boxed up and we're out.

1    Q.    Do you have any plans on where you are going

2  to work next, location?

3    A.    I mean I'm not sure.  I don't know what -- as

4  soon as the bankruptcy is over, then --

5         I'm not going to decide anything until then,

6  and my lawyers have said don't decide anything until

7  then because anything you do is subject to a tax

8  credit; so I'm not going to make any decisions on that.

9    Q.    Did Sands ever provide any money towards the

10  purchase or the development of the Mexico property?

11    A.    I don't know.  I don't remember.

12    Q.    How about Mantra, do you remember?

13    A.    I don't remember.  I don't remember how it was

14  structured.

15    Q.    Did you personally provide any money?

16    A.    Oh, can you phrase your whole question?

17    Q.    Let me rephrase because I've been building on

18  the last several questions.

19    A.    Then you get in a rapid-fire session.

20    Q.    Did you personally ever provide any money to

21  purchase the house in Mexico?

22    A.    I don't remember.

23    Q.    Security deposit?

24    A.    I don't remember.

25    Q.    Are you familiar with an entity that has --

1  its Casa Blanca?

2      MR. GUTENPLAN:  For the court reporter, answer the

3  question.

4      THE WITNESS:  Oh, I'm sorry.  Don't remember that

5  entity.

6  BY MR. SEBER:

7      Q.   How about Island Films, Incorporated?

8      A.   That was part of the trust.  Island Films is

9  part of the trust.  But I don't know what the frick it

10 does, you know what I'm saying?

11     Q.   When you say "trust," the Francis Trust?

12     A.   The Francis mess, let's call it, for sake of a

13 conversation, yeah.

14     Q.   What about Summerlands Holding?

15     A.   I have no idea what that is, and I have been

16 asked that before.  I don't know what these things are,

17 and people keep asking me the same damn questions over

18 and over again.

19     Q.   I asked you if you knew who owned the property

20 now, the Mexico property.  Was there a period of time

21 when you ever knew who owned the property?

22     A.   I was intentionally not told anything about

23 the structure, because I don't know the structure.

24     Q.   And the house was built -- in Mexico was 2002

25 approximately?

1    A.   Yes.

2    Q.   Do you know who Mohammed Hadid is?

3    A.   Yes.

4    Q.   Who is he?

5    A.   A thief, a scumbag.  Yeah, all of the -- yeah,

6  he was -- yeah.

7    Q.   How so?

8    A.   I don't know.

9    MR. GUTENPLAN:  Just give him the facts.

10   THE WITNESS:  Yeah.

11  BY MR. SEBER:

12   Q.   Does he have any affiliation with the house?

13   A.   Give me the context, because I could go on

14  forever.

15   Q.   Let's talk about his connection with the

16  Mexico house.

17   A.   He was the original -- he was the original

18  contractor, but -- he was the original contractor on

19  the Mexico house.

20   Q.   "Contractor" meaning the actual guy?

21   A.   Consultant, or whatever, construction

22  consultant, contractor, I don't know what it was.  It

23  just was ugly.

24   Q.   And your opinion, he didn't do a good job on

25  the house?

1    A.    He didn't do anything with the house, like he

2    took money and didn't do anything for like a year.

3    Q.    How much money?

4    A.    I don't remember the exact number, but then I

5    ended up suing him so it all probably is pled in that.

6    Q.    Did you sue him in Mexico or in the

7    United States?

8    A.    In the United States, here.

9    Q.    What jurisdiction, if you remember?

10   California?

11   A.    Here, right?  In California, in L.A.

12   Q.    What was the date of the lawsuit?

13   A.    I just don't remember.  I'm sure you can find

14   it.

15   Q.    Five years --

16         I'm sure I could find it.  It's you

17   personally?

18   A.    Yes, it's me personally.

19   Q.    Were you successful?

20   A.    I was successful in --

21   Q.    Let me rephrase.  That's a bad question.

22   A.    Yeah.

23   Q.    Did you get a judgment in your favor?

24   THE WITNESS:  Can I ask a question?  Can you

25   discuss a confidential settlement agreement in this

1  proceeding?  "Yes" or "no"?

2      MR. GUTENPLAN:  You can discuss -- you can say.

3      THE WITNESS:  There's the existence of a

4  confidential settlement agreement, but I did not

5  receive any money from that.

6  BY MR. SEBER:

7      Q.   So you sued Mr. Hadid and there's a settlement

8  -- there's a confidential settlement entered?

9      A.   Settlement agreement.

10     Q.   Settlement agreement.

11     A.   But it was more like --

12          I think it was almost like more -- what do you

13  call that?  Yes, there was a confidential settlement

14  agreement.

15     Q.   And -- strike that.

16     A.   I mean he knows more than I do.

17     Q.   That resolved the case?

18     A.   No.  See, it didn't.  That's the thing, like I

19  don't feel it effectively resolved the issues of the

20  case.

21     MR. GUTENPLAN:  By "resolved the case," I don't

22  want to put words in his mouth --

23     THE WITNESS:  See, I'm not a lawyer, too.

24     MR. GUTENPLAN:  -- do you mean resulted in the

25  dismissal of the action that Mr. Francis had initiated?

1  BY MR. SEBER:

2      Q.   Has the case been dismissed?

3      A.   Yes.  But I think the settlement agreement

4  almost provided for like a deferral of -- there were

5  still issues that weren't resolved, I guess, so --

6           What do you call that?

7      MR. GUTENPLAN:  Tolling agreement?

8      THE WITNESS:  Something like that.  Or without

9  prejudice or something like that.

10     MR. GUTENPLAN:  Yeah, dismissal without prejudice.

11     THE WITNESS:  Yeah.  Or with -- no, without

12 prejudice, meaning you can go and relitigate the issues

13 or something.  That's just my recollection of the

14 agreement.

15 BY MR. SEBER:

16     Q.   Did you provide Mr. Hadid $100,000 personally?

17     A.   I don't remember.  But I provided --

18          It's all in that lawsuit.  You should just

19 pull the -- he'll even get you the site.

20     Q.   You provided some money to him, you just don't

21 remember the amounts?

22     A.   Yes.  100 percent, yes.

23          But I believe there's still issues that, you

24 know, if we could even team up on that and go after him

25 because he just sold a house for $75 million.

1          Well, I'm just telling you, if I get some help

2  going after these people, right?  It's not my problem,

3  you know.  Or maybe even -- I'm just thinking out loud

4  here.

5      MR. GUTENPLAN:  Why don't we think out loud after

6  the examination.

7      THE WITNESS:  Can't you assign a liability to

8  somebody that they can collect on, right?

9  BY MR. SEBER:

10     Q.  I can't answer that question for you.

11     A.  I'm just saying for the purposes of trying to

12  settle this out.

13     Q.  If we wanted to talk settlement, we can set up

14  something and talk.

15     A.  I'm open to that.

16     Q.  I will convey it to my client.

17     A.  Okay.  Because this guy's got money.  You

18  know, he's got pockets is what I hear.

19     Q.  Mr. Hadid has pockets?

20     A.  Yeah.  He just sold a house for $75 million.

21  This guy's got to have money, you know.

22     MR. COLLINS:  Are you going to settle with us,

23  too?

24     THE WITNESS:  No, because you don't have a real

25  claim.

```
 1      MR. GUTENPLAN:  Let's remember we're still on the
 2  record.
 3      THE WITNESS:  I'm kidding.  That was a joke.
 4      MR. GUTENPLAN:  I just mean Mr. Collins is not the
 5  examiner here, so --
 6  BY MR. SEBER:
 7      Q.   Other than the stocks that we talked about
 8  with Mantra and Sands, do you have any right to any
 9  stocks whatsoever?
10      A.   Nope.
11      Q.   Bonds?
12      A.   Nope.
13      Q.   Any rights to any -- any right to any other
14  securities whatsoever?
15      A.   It was all wiped out.  I mean, you know all of
16  that stuff.  You know everything that happened.  IRS
17  went and took everything.
18      Q.   You don't have access to any type of
19  retirement accounts?
20      A.   No.
21      Q.   Nothing?
22      A.   Nothing.
23      Q.   Nothing of value?
24      A.   Nothing of value.
25      Q.   Only access to liabilities?
```

1       A.   Yes.   But some of those liabilities you've

2   actually got me thinking might be worth something,

3   might be real assets that if -- for the right person to

4   go after them, so --

5       Q.   Well, besides the ring that we discussed and

6   Mr. Hadid, do you have any other of those type of

7   situations that we --

8       A.   We talked about the trust issue, too.

9       Q.   The trust issue.

10      A.   The trust issue and the Hadid issue.  I think

11  those are the ones that --

12          I mean, I don't know.  I don't -- I would

13  certainly like somebody to pursue these people because

14  I -- the bankruptcy makes them all go away.  I can't

15  pursue them and they can't pursue me.  But if you

16  assign it prior to that --

17          Can he do that?

18      MR. GUTENPLAN:  We'll look into it.

19      THE WITNESS:  Maybe that's a way to make, you

20  know, your client happy.

21  BY MR. SEBER:

22      Q.   Besides the Francis Trust, is there any other

23  trust that you know of that you have any type of

24  interest in whatsoever?

25      A.   Absolutely not.

1    Q.   What about the Hallmark Trust?

2    A.   It's the same thing.  The Hallmark is --

3         Remember we talked about Collin Chaffey --

4    Q.   Right.

5    A.   -- and all of those people and this

6 Brian Trowbridge, that's his company TCI Hallmark

7 Trust.  That was his company.

8    Q.   So it was affiliated with the Francis Trust?

9    A.   That's the name of the trust company.  There

10 was originally --

11        This is my understanding, too, and I may be

12 screwing up some things a little bit.  But generally,

13 you get what I'm saying.

14        That's like -- Brian Trowbridge's company.

15   Q.   Besides what we discussed, is there anybody

16 else that owes you money?

17   A.   Yeah.  I mean, I believe so.  What about the

18 three guys that stole all of the money out of the

19 friggin' company for seven years --

20   Q.   Besides those folks.

21   A.   -- and have admitted.

22   Q.   I just want to make sure I haven't missed

23 anybody.  That's what I'm looking for.

24   A.   Those are the people -- those are the ones.

25 Those are all of the big ones that I believe.

1      Q.    Who has the best understanding of your

2  finances?  Is that your attorneys or is it a CPA?

3      A.    My attorneys.

4      Q.    And which law firm?

5      A.    I use Liner.  Mr. Gutenplan's firm.

6      Q.    I'll go down the list of companies, and have

7  you ever received --

8            When was the last year you received a tax

9  reporting form for Mantra?

10     A.    I don't remember.

11     Q.    How about for Sands?

12     A.    I don't remember.

13     Q.    Island Films, have you received any reporting

14  form --

15     A.    No, nothing ever.

16     Q.    How about MRA Holdings, LLC, have you

17  received --

18     A.    I don't think MRA Holdings has ever filed a

19  tax return, but I'm not sure.  And I get asked about

20  that one, too, and it's like I don't really know a lot.

21     Q.    These are companies that are associated with

22  your name --

23     A.    Okay.  Got it.

24     Q.    -- so I just want to run through them.

25            Rothwell Limited.

1    A.   Part of the -- I believe part of the

2  Francis Trust but never received any compensation.

3    MR. GUTENPLAN:   Compensation is not the question.

4  The question is tax returns or --

5    THE WITNESS:   No.

6  BY MR. SEBER:

7    Q.   So you haven't received any --

8       You haven't received any compensation from

9  Rothwell Limited?

10    A.   My only understanding of the tax on the

11  Rothwell was that interest was paid on the account at

12  the conclusion of my tax trial -- at the conclusion of

13  the tax settlement.  So I agreed to pay interest on the

14  Rothwell account in claiming it, and then the next day

15  the IRS swooped in and took the whole thing anyway, so

16  it doesn't matter, seized control of all of that stuff.

17    Q.   So you had a plea agreement with the

18  United States?

19    A.   Yes.

20    Q.   And the plea agreement was with -- involved

21  the criminal side, let's say.

22    A.   That's correct.

23    Q.   And then after that was signed, closely after

24  that was signed, within a matter of what, days?

25    A.   Hours.

1   Q.   Hours --

2   A.   The government swooped in and did what is

3   called a jeopardy assessment and took everything.

4   Q.   And that was not covered underneath the plea

5   agreement.  I've read your plea agreement.  I'm just

6   asking you.

7   A.   Yeah.  No, it wasn't.

8        Look, do I think it was?

9   Q.   Yes.

10  A.   Absolutely.

11  Q.   You think your plea --

12  A.   I thought --

13       Yeah, of course.  I thought my lawyers told me

14  this whole thing was resolved, so there may be

15  malpractice but -- as another asset.

16       But yes -- don't worry, it wasn't his firm.

17  Q.   Who was representing you, Joe, for --

18  A.   Brad Brian of Munger Tolles.

19  Q.   I'm sorry.  Let me finish.  I want to make

20  sure I get it on the record.

21       Who was representing you, Joe, for the plea

22  agreement that was entered into between you and the

23  United States?

24  A.   Brad Brian of Munger Tolles & Olson, MTO.

25  Q.   And your understanding is that covered any --

1  or should have precluded the United States from seizing

2  your assets?

3      A.   Well, I'm not going to make a legal conclusion

4  here.  You are asking my personal opinion?

5      Q.   I'm just asking what you believed.

6      A.   Well, my opinion?

7      Q.   Yes, what you believed.

8      A.   Yes.

9      Q.   When you signed it --

10     A.   I believed everything was resolved and this

11  was all over and this whole nightmare was over other

12  than being able to -- I was going to be able to pursue

13  the people that had stolen.  I didn't think that the

14  IRS was going to come in hours later, like literally

15  hours later and wipe out every single asset that has

16  ever been even associated with me.  Not even owned by

17  me, even associated with me.

18     Q.   That's a good question, and that may help to

19  wrap things up, or speed things up.

20          So your position is that the IRS, when they

21  came in and levied your property in 2000 --

22     A.   Let's not say my property.  Just anything that

23  they even believed was --

24     Q.   Associated.

25     A.   -- could even remotely be associated with me

1  was wiped out, yes.  And then made -- the agent made

2  the comment "We got everything you had or you thought

3  you had."  So that was his --

4      Q.   Do you remember the agent's name?

5      A.   No.

6      Q.   It was one of the agents who is in the

7  paperwork that filed the declaration --

8      A.   Yeah.  And then they walked out of the office.

9  Well, they said that in their own paperwork, too.

10     Q.   But they weren't able to touch the house in

11 Mexico, that you know of.  Obviously you still get to

12 use it.

13     A.   Yeah.

14     Q.   You could go there this weekend if you wanted

15 to?

16     A.   It's true, yes.

17     Q.   I got off track there.  Back to the question

18 of going down the laundry list of entities.

19     A.   And then what is the question for each one?

20     Q.   The question is do you have -- have you

21 received tax reporting forms?

22     A.   Meaning like tax returns?

23     Q.   No.  I mean reporting forms, something that

24 tells you you need to file tax associated with this --

25     A.   Oh.  Okay.

1   Q.   -- like interest income.

2   A.   Yeah.  And the Rothwell one was -- the answer

3 was yes, during the thing, that was the last time.

4 Okay.

5   Q.   That you had interest that you -- some

6 interest that you accumulated.

7   A.   That I claimed, to get it resolved and just to

8 get it over with.  I didn't quite believe or agree with

9 everything, but -- it was a misdemeanor, so --

10   Q.   How about Asian Pacific Insurance Company?

11   A.   Asian Pacific Insurance Company, I haven't

12 received any tax form.

13   Q.   Have you ever received any compensation from

14 them?

15   A.   Nope.

16   Q.   Aero Falcon, LLC?

17   A.   This is all to the best of my knowledge as I

18 sit here today without talking or reviewing anything.

19   Q.   Of course.

20   A.   But no, I do not believe so.

21   Q.   No, not -- you haven't received a tax

22 income -- excuse me, strike that -- tax reporting form?

23   A.   I did receive a tax lien on Aero Falcon, on

24 Mantra and on Sands.  Those are currently in -- there's

25 liens on all of those.  There's liens on most of

1  these --

2          There's still liens on most of these

3  corporations, by the way.  So reporting, if that

4  includes a lien, yes, on everything that you've

5  mentioned.

6          Does that make sense?

7      Q.   It does.

8      A.   Okay.

9      Q.   I'm thankful that you made the distinction

10 about the lien, but what I'm referencing is

11 basically --

12     A.   It's time to file taxes from like -- like

13 these "Para Psych" or "Corp Co.," that come in the mail

14 all of the time.

15     Q.   "You made X amount of money with us," "you

16 made X amount of interest with us," whatever it may be,

17 that tells you the taxpayer --

18     A.   Yeah, and really the last time I got all of

19 that was right -- was I would get them from the

20 financial institutions where I had money prior to the

21 IRS taking it all.  So I would get those all of the

22 time from like, you know, Morgan Stanley and UBS and

23 Wells Fargo, but those are --

24     Q.   You've never gotten a tax reporting form on

25 Girls Gone Wild Interactive, LLC?

1    A.    No.  I don't think we've ever used it.  Like

2    these are some of the ones that have come up in

3    litigation, but they are just, I guess, created but

4    never used.

5    Q.    How about Girls Gone Wild Brands, Inc., have

6    you ever received a tax reporting form associated with

7    them?

8    A.    Not personally, no.

9    Q.    Do you know --

10    You say "not personally."  Do you know if

11    another entity has that you know of?

12    A.    Not -- I don't know.

13    Q.    How about Pepe Bus, LLC?

14    A.    I haven't received anything on Pepe Bus, LLC.

15    Q.    I don't know if we covered Blue Horse Trading,

16    LLC.

17    A.    But I haven't received anything.  I received a

18    lien notice on Blue Horse.  That's the only thing I've

19    received.

20    Q.    Was that an intent to lien the house in

21    Bel Air?

22    A.    Uh-huh.  It is liened.

23    Q.    It is liened?

24    A.    Uh-huh.

25    Q.    By the IRS?

```
1       A.    Yes.
2       Q.    And is the property worth less than the
3  encumbrance on the property?
4       A.    Yeah.
5       Q.    So it's upside down basically, as most
6  properties are?
7       A.    Yeah.  Do you have to rub it in?
8       Q.    I don't think you are the only one.
9       THE WITNESS:  What a dick.  I'm kidding.
10      MR. SEBER:  Let's take a short break, and I think
11  I can conclude.
12            (Off the record.)
13      MR. SEBER:  Back on the record.
14      Q.    The lawsuit against Mr. Rayment, his law firm,
15  it's also -- this is -- I read the complaint, scanned
16  it, and it has yourself personally and it has Girls
17  Gone Wild Brands, Inc. and Mantra, Inc. and Sands
18  Media, Inc. as well.
19      A.    That was the original -- I'm sorry.
20      MR. GUTENPLAN:  No, it's fine.
21      THE WITNESS:  Yeah, but you can answer.
22      MR. GUTENPLAN:  That's not entirely accurate
23  actually.
24      MR. SEBER:  Well, then he can answer.
25      MR. GUTENPLAN:  I don't know if he even knows the
```

1   specifics, so I will object.

2       THE WITNESS:  I don't know, but he can answer.

3       MR. SEBER:  Let him answer.

4       MR. GUTENPLAN:  Okay.  I'll object it misstates

5   facts or assumes facts not in evidence.

6       THE WITNESS:  I don't believe that's true and

7   correct, but he can answer.

8   BY MR. SEBER:

9       Q.   Who is involved in the lawsuit along with you

10  on the plaintiff side?

11      A.   I don't know because it's been -- it was

12  re- -- I think it's been --

13      MR. GUTENPLAN:  If you don't know, you don't know.

14      THE WITNESS:  I don't know.

15  BY MR. SEBER:

16      Q.   Was it at one time Girls Gone Wild Brands,

17  Inc., were they involved in the lawsuit on the

18  plaintiff side?

19      A.   I don't know specifically.

20          But he's happy to answer.  He's happy to talk

21  to you about that.

22      Q.   No, that's okay.  I want to talk to you.

23          Do you have the authority to bring a lawsuit

24  on behalf of Girls Gone Wild Brands, Inc.?

25      A.   I don't know.

1      MR. GUTENPLAN:  Objection; vague and ambiguous as

2  to "authority on behalf of."  I don't know what any of

3  that means.

4  BY MR. SEBER:

5      Q.   Do you?

6      A.   I'm not sure.  Don't know.

7      Q.   Have you -- go ahead.

8      A.   I just don't know.

9      Q.   Have you ever been in a lawsuit with -- the

10 same side, if you were plaintiffs, with Girls Gone Wild

11 Brands, Inc.?

12     A.   If this was the site, I mean that could have

13 been the original site, but I know things have changed

14 rapidly.

15     Q.   You don't know, or no?

16     A.   I don't know is the answer to the question.

17 It could have been at one time, but I don't believe

18 that's still the case.

19     Q.   I understand.

20          Who is Mark Cuban?

21     A.   He's the owner of the Dallas Mavericks and he

22 owns HDNet.

23     Q.   Do you do any business with him on HG Net?

24          Is it "HG Net," I'm sorry?

25     MR. COLLINS:  "HD," as in dog.

1  BY MR. SEBER:

2      Q.   I'm sorry.  Is it "HG" or "HD"?

3      A.   "HD."

4      Q.   Like "D" as in Delta?

5      A.   Yeah, like high definition.

6      Q.   Do you do any business with him on HDNet?

7      A.   Not personally, but I do host -- I mean, I do

8  appear on a show called "Search for the Hottest Girl in

9  America" on HDNet.  But I'm not compensated for it.

10     Q.   Are you given any title or affiliation like a

11 producer --

12     A.   I get a producer title.

13     Q.   So you are on --

14          Is it "Search for the Next Hottest Girl," is

15 that the name of it?

16     A.   Yeah.

17     Q.   In America, or is it just "Search for the Next

18 Hottest Girl"?

19     A.   "Search for the Hottest Girl in America."

20     Q.   Hottest girl?

21     A.   Correct.

22     Q.   And you are the producer of that show.  That's

23 what I didn't hear.  I'm sorry.

24     A.   You asked me if I had a title.

25     Q.   Right.

1    A.    And I mean, I don't know how familiar -- you

2  live here, so you must be very familiar.  Some people

3  are sometimes given titles because of what they created

4  in the past.  Like, you know, I created Girls Gone Wild

5  so I'm executive producer, but there's no -- I'm not

6  the actual, like, physical producer of the show.

7    Q.    You are just given that in name only

8  basically?

9    A.    Correct.

10    Q.    You don't receive any compensation for that?

11    A.    No compensation.

12    Q.    Nothing exchanged in kind like --

13    A.    Publicity.

14    Q.    Publicity is the only --

15    A.    Yeah.  So that's -- there's a value to that.

16  I think we talked about the Martin thing earlier.

17    Q.    Same concept?

18    A.    Same concept.

19    Q.    And along those lines --

20    A.    Try to collect on publicity.

21        Well, you have how many -- but, you know, you

22  can leverage that later to something new.

23    Q.    And along those lines, so your appearance that

24  you did on Million Dollar --

25    A.    Did not get paid.

1    Q.   And who was the entity that contacted you

2    about appearing on that?  Was it Bravo?

3    A.   No.  Martin just called me and asked me.  I

4    was not contacted by Million Dollar.

5    Q.   Nothing of value?

6    A.   Publicity.  And that, you know, can be

7    leveraged later on.  After I clean the slate here and

8    do the BK, then I'm free to do whatever I want.

9    Q.   I asked you earlier about if you needed $50,

10   how would you get it.  And I don't want to

11   mischaracterize --

12   THE WITNESS:  Dan, can I have $50?

13   BY MR. SEBER:

14   Q.   You are going to ask your attorneys?

15   A.   Yeah.  I'm going to give you a scenario, yes.

16   Q.   Which law firm?

17   A.   Liner.

18   Q.   Is that the only law firm that you would

19   ask --

20   A.   That I use.

21   Q.   That you use?

22   A.   Correct.

23   Q.   Are there any other entities that you work

24   with that use a different law firm if they need money?

25   A.   Any other entities I work with?  I mean, I

```
 1   don't know.  I went to Starbucks a few minutes ago and,

 2   like, did I have a relationship with them?  Yeah, he

 3   bought me a coffee from them.

 4       Q.   I'm trying to avoid having to go through the

 5   list.

 6       A.   But like primarily, I mean the real answer is

 7   no, but I don't want to mess up and say like -- and

 8   have you twist anything I'm saying, but you don't seem

 9   like that kind of guy.  But Liner is my primary law

10   firm.

11       Q.   And do you know of any other law firm that you

12   could -- you or on behalf of someone else go to and get

13   money?

14       A.   Oh, no.  No.

15       Q.   That's what I'm asking.

16       A.   No, I don't.

17       Q.   I'm not asking if someone gave you a refund at

18   Starbucks or something.

19       A.   No, no, no.  Yeah.  No.

20       Q.   Primary place is Liner?

21       A.   Yes.

22       MR. SEBER:  Give me a minute.  I will go through

23   my notes.

24       MR. GUTENPLAN:  No problem.

25       MR. SEBER:  I'm finished with my examination
```

1    today.   Thank you for your time.

2         THE WITNESS:   Thank you.

3  /

4  /

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4          I, the undersigned, a Certified Shorthand

5     Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7     before me at the time and place herein set forth; that

8     any witnesses in the foregoing proceedings, prior to

9     testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14         I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20    Dated:    *Sept. 6, 2011*

21

22

23    MARIANNA DONNER, CSR, RPR, CLR
      CSR No. 7504

24

25

# A5079BE

## JOSEPH R. FRANCIS AUGUST 22, 2011

**A**

ability 6:19 76:21
able 11:22 56:2 95:12,12 96:10
about 7:23 13:15,16 17:20 18:7 19:22 20:18 21:11 24:1 30:12 31:25 33:8,10,18,19 37:2,4,15 37:19 42:20 46:6 50:2,7 54:3 56:21 59:5,6 62:25 64:19 66:23 68:13 70:3 71:19 73:24 74:4 75:19 79:7 82:12 83:7,14,22 84:15 89:7 90:8 91:1,3 91:17 92:11,16,19 97:10 98:10 99:5,13 101:21 104:16 105:2,9
absolutely 20:8 43:4,25 56:17 67:17 69:8 76:18 77:14 78:17,21 79:4,20 80:17 90:25 94:10
absurd 66:4,4
access 59:15,19,20 61:13 61:16,18 69:23 70:5,6 72:1 74:10,17 79:8 81:20,21 89:18,25
account 17:25 56:12,12 59:22 60:1 61:10,13 93:11,14
accountant 47:22,24 48:2
accountants 30:18
accounting 22:17 23:2 66:3 67:2,12
accounts 60:12,15,20,21 61:3,18 89:19
accumulated 97:6
accurate 75:12 100:22 108:12
action 36:21 67:2 86:25 108:15
Actively 69:8
actual 23:2 25:23 28:10 36:8 52:1 84:20 104:6
actually 18:6 22:25 52:6 63:11 80:9 90:2 100:23
address 7:1 81:18
admitted 31:1 91:21
ADP 15:25 16:1 42:25 43:1
adverse 64:6
Aero 72:4,5,10,11,17 97:16,23
affairs 10:23 26:22
affiliated 44:24 72:12 77:15 91:8
affiliation 7:14 45:2 64:2 78:6,8 84:12 103:10
after 21:1 22:20 30:14 31:4 32:10 41:15,15,18 42:15 47:4,13 51:19 52:13 60:4 87:24 88:2,5 90:4 93:23,23 105:7
again 12:5 26:20 30:25 62:7 83:18
against 21:16 67:20 100:14

**B**

agent 96:1
agents 96:6
agent's 96:4
ago 19:2 22:11 29:3 60:2 61:22,22 75:19 76:20 81:5,7 106:1
agree 97:8
agreed 93:13
agreement 54:10,17,19 85:25 86:4,9,10,14 87:3 87:7,14 93:17,20 94:5,5 94:22
ahead 23:7 35:12 38:23 39:11 55:5 65:3 69:11 102:7
air 6:22,24 7:8 8:21 9:2,5 10:3,7,9 11:2,5,15 38:15 79:6 81:6,8 99:21
allowed 58:2,5
almost 86:12 87:4
along 101:9 104:19,23
already 8:23 38:11
ambiguous 19:17 32:12 102:1
America 63:11,11 103:9 103:17,19
American 17:20,23 18:13 18:21
amount 20:11 22:22 98:15,16
amounts 87:21
Angeles 1:2,17 2:2,17 3:13 6:22
another 37:1 45:16 56:20 61:7 62:13 63:9,18 68:6 94:15 99:11
answer 4:12 8:23 9:10 10:19,20 26:5 32:15 35:14 54:7,11 57:13 71:19 72:19,24 73:13 74:20,21 77:24 78:17 83:2 88:10 97:2 100:21 100:24 101:2,3,7,20 102:16 106:6
answered 8:22,24 9:8 31:11,12 38:11 61:16 62:17
answering 38:10
anticipate 47:18
anybody 8:20 11:1,25 33:1 35:15 49:18 61:14 61:17,24 62:6,12 73:11 76:22 91:15,23
anymore 46:8 72:18,25
anything 10:6 11:21,24 13:22 15:18 16:5 21:1 40:21 43:21 46:13 50:5 57:5 62:25 66:4 74:17 75:20 81:4 82:5,6,7 83:22 85:1,2 95:22 97:18 99:14,17 106:8
anyway 93:15
apologize 24:10
apparently 62:21 67:5,7
appeal 6:3
appear 103:8
appearance 104:23

appearing 105:2
application 18:25 19:5,22 20:2
applied 21:1
applying 25:24
appointed 63:24
appreciate 29:20 37:17 54:7 79:25
approximately 29:22 83:25
Aramara 76:11,12
area 63:13
arm 33:22,23 37:2 38:2,3 38:9,13
around 28:25 39:18 40:5 71:12 75:12
arrest 73:16,17
Asian 97:10,11
asked 8:22 9:7 17:16 19:8 28:13 31:13 33:10 35:17,18 36:17 37:13 38:5 58:6 61:11,24 62:14 67:9 74:23,23 75:19 78:9 83:16,19 92:19 103:24 105:3,9
asking 13:15,16 14:24 15:1 35:13 37:15 46:25 48:21 59:5,7 83:17 94:6 95:4,5 106:15,17
assessment 94:3
asset 53:17 94:15 95:15
assets 21:3,7 22:20 23:23 29:14 32:13 33:2 54:20 66:16 67:8,11 68:17,24 68:23 90:3 95:2
assign 88:7 90:16
assistant 14:1 48:14
assistants 17:9
associated 32:24 39:9 60:10 66:16 92:21 95:16,17,24,25 96:24 99:6
assume 48:15
assumed 32:13 33:5,6
assumes 8:11 33:2 101:5
ATKINSON-BAKER 1:21
ATM 61:21,24
attorney 7:23,24 24:2,21 29:18 47:23 59:8 61:17 61:18 65:9 68:16,20 80:3 108:16
attorneys 3:4,11,17 10:23 17:18 23:25 26:21 27:21 36:18 58:13,15 59:7,13 62:4 66:11 74:12,19 92:2,3 105:14
attorney/client 54:12 58:9 71:18 74:11
August 1:18 2:18
authority 28:18 101:23 102:2
automobiles 43:22 70:9 70:12
Avenue 3:12
average 13:6 20:9
avoid 22:10 106:4

aware 70:19 80:12
away 90:14
awesome 28:20
a.m 2:18
A5079BE 1:25

**B**

back 9:18 20:20 42:21 48:23 49:22 75:18 96:17 100:13
backing 16:20
bad 55:17 61:9,9 85:21
bank 58:12 62:2
bankruptcy 47:1,2,9,16 47:23 56:13 58:2,4 71:14,20 82:4 90:14
barely 20:7
Barrett 22:19,20 23:14 24:2 48:2
basically 33:20 98:11 100:5 104:8
basis 10:15
bathroom 48:23
battle 41:17
before 7:13 21:5,6,7,22 26:9,19 29:13,13,16 30:3 31:16,17,18,19 36:20,21 39:15,21 43:6 45:1,25 46:4 52:18 55:6 60:5 67:16,16,23 68:17 68:23,25 69:18 75:25 78:17 87:23 91:17,25 93:1 97:8,20 101:6 102:17
behalf 2:16 59:19 101:24 102:2 106:12
being 9:7 16:4 36:14 39:4 52:5 77:17 95:12
Bel 6:22,24 7:8 8:21 9:2,5 10:3,7,9 11:2,5,15 79:6 81:6,8 99:21
believe 7:13 21:5,6,7,22 26:9,19 29:13,13,16 30:3 31:16,17,18,19 36:20,21 39:15,21 43:6 45:1,25 46:4 52:18 55:6 60:5 67:16,16,23 68:17 68:23,25 69:18 75:25 78:17 87:23 91:17,25 93:1 97:8,20 101:6 102:17
believed 95:5,7,10,23
belongs 53:22
benefit 78:14
Bentley 70:6,7
besides 9:16 10:2 21:14 33:14 45:15 50:8 57:6 58:12 70:20 79:6 81:8 90:5,22 91:15,20
best 7:24 19:6 20:3,11 17 74:20,21 92:1 97:17
between 41:18 42:5,6 54:20 59:10 94:22
big 19:14 53:3 75:3 91:25
bills 18:5
bit 40:5,19 91:12
BK 47:13 105:8
Blanca 83:1
Blue 7:13,14 8:9 9:4 10:3 99:15,18
Bonds 89:11
bonus 40:12 41:4,11,12 41:19 42:15 43:5,11,12 46:1

**Borrowed** 56:22
both 63:12,19
bottom 75:14
bought 16:6,13 49:9,18 49:20,21 106:23
box 59:16,20 61:12
boxed 81:25
Brad 94:18,24
Brand 44:25 78:3
Brands 34:10 35:2 37:16 70:14,16,17,18,21 78:4 78:5,13 99:5 100:17 101:16,24 102:11
Bravo 105:2
break 40:24 48:24 100:10
Brian 64:19 67:15 68:15 91:6,14 94:18,24
bridge 28:20
briefed 36:23
bring 57:20 101:23
brings 77:19
broad 75:21
Broadway 3:5,18
BROWNSTEIN 3:4
BS 1:6 2:6
bucks 49:8,14
building 82:17
built 83:24
Bullard 79:13,14 81:3
bus 36:12 44:14 99:13,14
business 22:12 32:3,9,10 32:12,16,23 33:1,5,6,15 33:15,19 34:18,19,20 34:21 37:14 44:22 45:18 77:1,5,16,16,17 77:22 80:25 102:23 103:6
buy 13:23 15:16 35:8,17
buying 33:22,23 38:2,8 38:13 78:20

**C**

C 3:1 22:19
Caicos 65:6
calendar 62:5
California 1:1,17 2:1,17 3:6,13,19 6:22 85:10,11 108:5
call 5:14 58:23 63:1,7 65:12 69:17 76:22 83:12 86:13 87:6
called 5:12 63:4 65:7 94:3 103:8 105:3
Calls 14:21
came 22:17 95:21
cameraman 41:16
canceled 73:16,19
candid 47:7
candidly 75:8
car 69:21 70:1
carats 53:1
card 17:20,21,23 18:10 18:14,19,21 55:20
cards 18:15,16
care 50:23
cars 44:2
Casa 76:10,12 83:1

**A5079BE**

**JOSEPH R. FRANCIS AUGUST 22, 2011**

Page 2

case 25:2 65:22 72:15 76:11 86:17,20,21 87:2 102:18
cash 15:18 16:23,23,24 17:5,11 49:7 62:2
ccollins@rgrdlaw.com 3:20
cease 32:5
ceased 27:4 32:10
cell 63:14,14,15,16
Central 63:10
ceremony 50:25 51:19 52:1
certain 32:23 55:7 57:9 76:9
certainly 47:11 54:2 73:4 90:13
certificate 27:14
certificates 27:16,18
Certified 108:4
certify 108:5,14
CFO 24:7
CHAD 3:5
Chaffey 62:19,20 63:19 64:8 69:16 91:3
changed 102:13
chapter 71:17
character 77:23
characterization 69:18
charge 62:23
chart 34:25
check 42:23,24 54:24 77:5
checkbook 18:22 56:10 56:11 59:23
checking 56:11 59:22,25 61:10,13
chief 21:24
Christina 12:3
CHRISTOPHER 3:17
circumstances 52:12
city 51:9
civil 50:15,18 51:18 74:8
claim 88:25
claimed 97:7
claiming 93:14
clarification 37:17,18
clarify 9:13 10:13 28:7 32:20 33:4 37:12 45:6 48:20
clean 47:3,10 105:7
client 21:14 88:16 90:20
clock 78:1
close 23:3 30:21
closed 29:4 39:4 60:9
closely 93:23
closer 57:21
closest 51:9
Closing 81:24
closure 31:18 41:7,9 42:3
clothing 57:9,11
Cloverfield 81:18
CLR 108:23
Co 98:13
code 63:13
coffee 16:4,6 49:9 106:3
cognizant 78:1

cohabitation 54:16
cohorts 69:16
collect 88:8 104:20
collectively 68:25
Collin 62:19,20 63:19 69:16 91:3
Collins 3:17 21:17 88:22 89:4 102:25
come 48:23 78:24 79:10 95:14 98:13 99:2
coming 75:18
commencing 2:18
comment 96:2
commercial 73:11,12
common 57:20
companies 92:6,21
company 24:7 34:11 39:9 42:9 43:3 48:3 65:7 70:1 72:6,12 91:6,7,9 91:14,19 97:10,11
compensated 103:9
compensates 80:7
compensation 43:15 46:6,7 80:13 93:2,3,8 97:13 104:10,11
complaint 100:15
complicated 36:22
concept 104:17,18
concepts 71:6
concern 25:14
concerns 26:3
conclude 100:11
conclusion 69:19 93:12 93:12 95:3
conducting 33:15
confession 22:24 25:1
confidential 85:25 86:4,8 86:13
conflict 29:21
confused 7:5
confusing 22:7
connection 7:20 19:3 25:19,20 36:24 56:15 84:15
conservative 42:1
construction 84:21
consultant 84:21,22
Consumes 45:21
contacted 105:1,4
contempt 73:18
context 84:13
continue 26:22
contractor 84:18,18,20 84:22
control 59:14 68:23 69:1 93:16
controller 24:6
controlling 67:16
conversation 65:4,11 83:13
conversational 28:4
conversations 62:3
convey 88:16
COO 24:8
Cool 6:15
Corp 98:13
corporate 34:24

corporations 70:20 98:3
correct 5:24 6:4,23 11:3 14:8 22:2 23:15 30:25 34:5,12 35:3,4,7 42:17 42:19 50:16,17 51:4,6 63:23 67:21,24 72:14 72:14,16 74:2,5,9 75:4 76:13 78:4 79:1 93:22 101:7 103:21 104:9 105:22
cosigner 20:18
cost 52:1
counsel 20:6 21:11 49:9 71:9
counsel's 25:6
COUNTY 1:2 2:2
couple 60:2,12 72:23
course 39:23 49:12 94:13 97:19
court 1:1,22 2:1 5:7 6:4 23:11 25:16 73:18 83:2
covered 94:4,25 99:15
co-conspirators 69:17
CPA 24:4,5,6 47:25 92:2
create 47:11 73:3
created 71:8 99:3 104:3,4
credit 17:20 18:10,14,15 18:16,19 20:23 55:20 82:8
creditor 1:5 2:5,16 3:3 30:3,4
creditors 21:15 30:5
criminal 93:21
cseber@bhfs.com 3:8
CSR 1:24 2:19 108:23,23
CTO 24:8
Cuban 102:20
culinary 71:5
cup 16:4,6
current 47:22,24
currently 6:3 7:8 45:23 48:1 52:16 59:15,22 65:22 69:8,21 97:24
custodian 27:7
cut 51:15,16
C-h-r-i-s-t-i-n-a 12:4

**D**

D 4:1 103:4
Dallas 102:21
damn 83:17
Dan 80:3 105:12
Daniel 3:11 25:8
Dan's 16:9 79:11
date 85:12 108:17
Dated 108:20
day 46:12 93:14
days 11:16 93:24
day-to-day 33:15
deal 56:23
dealing 73:5
deals 73:15
debtor 1:8 2:8 3:9 21:18
debtor's 1:15 2:15 5:25 17:19
December 23:20,22
decide 47:20 82:5,6

decision 22:23 23:3 30:21
decisions 82:8
declaration 96:7
Decorator 77:12,21
Decorators 74:1
deed 53:13
deep 30:19
defend 30:1 45:10
defending 45:15
deferral 87:4
deferred 46:6,7,10,11
definitely 19:23 29:25 30:2,2 42:2,5
definition 103:5
deliberate 36:20
Delta 103:4
den 66:13
Department 2:17
deposit 59:15,20 61:12 82:23
design 75:6
designer 79:15
detail 26:14
determine 56:5
determined 27:5
develop 46:17,20
development 82:10
dgutenplan@linerlaw.com 3:14
dick 100:9
Diego 3:6,19
different 15:9,11,13 33:21 54:6 70:25,25 80:19 105:24
dig 58:10
diligently 67:1
dinner 16:19
dinners 57:8,11,22
direct 39:19
direction 108:12
disclosed 25:17,18
discovered 23:17
discuss 53:13 59:1 85:25 86:2
discussed 32:7 33:18 90:5 91:15
discussing 25:1
discussion 58:19 59:3,4 59:5
discussions 46:16,19 58:12,14 59:6
dismissal 86:25 87:10
dismissed 87:2
distinction 98:9
distribution 22:15 36:25 37:1,2,5,23
divide 54:19
document 30:24
documents 47:15
dog 102:25
doing 42:10
Dollar 74:1 77:12,21 104:24 105:4
done 20:14 47:13 56:24 57:1 71:24 72:24 81:6,9 81:21,22

DONNER 1:24 2:19 108:23
double 69:20
DOWD 3:16
down 19:21 39:4 40:19 40:24 43:18 50:3 51:5 64:12,17 73:24 76:19 80:7 92:6 96:18 100:5
downstairs 5:18
dress 56:21,21,25
drive 44:12,13 70:1
drove 44:11
drugs 6:18
Dude 55:16
duly 5:2
during 10:19 97:3
duty 29:25 30:1
DVD 22:14,14 35:9,17,19 35:20
DVDs 34:1 36:25 37:4

**E**

E 3:1,1 4:1
each 96:19
earlier 21:20 52:8 58:6 70:3 104:16 105:9
early 41:14
earth 61:2
easier 50:4
ebb 28:4
effectively 86:19
ego 80:3
eight 10:12
either 18:3 26:13 28:13
employed 45:13
employee 108:16
employing 48:5
encumbrance 100:3
end 23:19 25:1
ended 73:15 85:5
endorsement 73:15
endorsements 73:20
enemy 57:20
enforce 21:15
engaged 46:16,19
engagement 49:20 50:1 50:7
enough 79:21
entails 5:20
entered 86:8 94:22
entire 21:13 26:20 55:7
entirely 100:22
entities 13:14 37:16 44:21 76:1 96:18 105:23,25
entity 30:25 34:4,6,18,20 34:21 35:10,20 36:1,8 36:12 59:20 72:10 77:15 82:25 83:5 99:11 105:1
entrepreneurial 47:8
episode 73:25
especially 68:7
ESQ 3:5,11,17
estate 73:21
etc 37:16
evasive 36:14 76:6

# A5079BE
## JOSEPH R. FRANCIS AUGUST 22, 2011

Page 3

even 19:5,11 24:18 48:21
56:19 61:6,6 87:19,24
88:3 95:16,16,17,23,25
100:25
eventually 39:3 76:7
ever 9:1 11:4 20:12,15
25:16 30:24,25 31:19
40:12 44:15 61:24 63:2
82:9,20 83:21 92:7,15
92:18 95:16 97:13 99:1
99:6 102:9
every 25:15 46:12 95:15
everything 61:2 64:25
73:19 89:16,17 94:3
95:10 96:2 97:9 98:4
everything's 47:20 57:24
evidence 8:11 101:5
Evidently 6:8
ex 67:6
exact 22:1 32:7 35:10
45:3 52:12 72:21 85:4
exactly 15:5 39:7 41:24
44:23 45:2 56:6 60:25
64:20 65:19 79:1
exam 6:1 17:19 21:18
30:11
examination 1:15 2:15
4:4 5:5 30:7,15 70:5
88:6 106:25
examined 5:3
examiner 89:5
example 26:16 44:9,10
except 31:3
exchanged 104:12
excuse 70:14 97:22
executive 21:24 104:5
EXHIBITS 4:9
exist 27:4 29:17 32:10
34:21 46:8
existence 8:17 10:10
20:24 21:21 22:16
26:23 29:11 60:8 71:7
72:17 86:3
expense 49:16
expenses 13:6
experience 55:17
Explain 58:4
explained 37:25 74:12
Express 17:20,23 18:13
18:21
extent 9:8,10
E-mail 63:1,18

**F**

face 61:2
facsimile 3:7,14,20
fact 5:23 56:23 67:3
facts 8:11 84:9 101:5,5
Falcon 72:4,5,10,12,17
97:16,23
fallen 80:18
familiar 34:14 44:14,15
72:3 82:25 104:1,2
family 68:16
famous 79:15
far 26:13 33:14 41:17
43:21 67:11

FARBER 3:4
Fargo 60:3,17 98:23
farther 59:12
father's 68:20
favor 80:23 85:23
Federal 22:24,25 24:25
felt 65:22 68:22 86:19
felt 65:18,20
Ferrari 44:10 70:2
few 22:11 41:18 47:3,21
76:20 106:1
fighting 71:23
figure 29:20 35:24 37:11
54:9
figured 54:15
figuring 21:1
file 1:25 47:13 96:24
98:12
filed 28:22 40:2 47:15
92:18 96:7
files 29:2
filing 47:18
fill 19:5
filled 18:24 19:11
filming 37:7 78:14
Films 8:8,15,17 21:20
83:7,8 92:13
finances 92:2
financial 18:25 19:15
62:13 98:20
financially 105:15
financials 30:13 31:14,16
31:23
find 28:17 85:13,16
fine 5:15 9:22 13:4 22:6
37:20 47:5 100:20
fingertips 69:1 71:2
finish 15:15 58:16 94:19
finished 106:25
firm 8:2,4,5 67:23,25 92:4
92:5 94:16 100:14
105:16,18,24 106:10,11
first 5:2 15:15 23:14
55:19
firsthand 15:21 35:14
76:3
fit 37:23
five 16:3,13 19:1 61:22
75:19 85:15
fleecing 24:10
Floor 3:12
Florida 41:16 63:12,14,15
63:16 73:17
flow 28:5
fly 72:11
focus 11:13
folks 91:20
follows 5:3
food 13:19
foot 75:2
foregoing 108:6,8,12
forensic 30:18
forever 84:14
form 19:14 92:9,14 97:12
97:22 98:24 99:6
forms 96:21,23
forth 108:7

forward 43:20
foundation 8:10
four 20:25 81:5
frame 10:9 58:18
Francis 1:7,16 2:7,16 4:3
5:1,9,13 13:10,17 34:24
56:15 62:23 63:22,25
66:22 67:25 68:6 69:3
77:17,22,23 83:11,12
86:25 90:22 91:8 93:2
fraud 22:17 23:2 30:17
31:21 32:8
free 56:24 105:8
fresh 71:24 72:23
frick 83:9
frickin 56:14
friggin 64:20 91:19
from 8:9 11:4 15:5 16:20
16:24 23:18 24:25 27:8
30:22 31:1 40:12,16,25
41:6,12 42:23 43:9,12
43:15,20 48:3,4 56:3,18
57:25 62:11 66:15
67:11 78:14 80:1 86:5
93:8 95:1 97:13 98:12
98:19,22 106:3
front 18:2 20:1,6,12
25:13
frozen 21:4,8
fucking 29:14
full 5:7 8:2
fully 21:13
full-time 45:11
fun 13:2
funded 43:3 66:16
funds 64:9
funny 45:12 77:18
further 108:12,14
f-e-y 14:8
F-r-a-n-c-i-s 5:9

**G**

games 64:11
Garden 81:14
gather 67:1
gave 23:8 42:8 75:20
106:17
Geez 17:7
GELLER 3:16
gem 13:2
generally 91:12
gentleman 22:18 67:14
79:16
gentlemen 30:12
gets 15:8,16,18,24 17:10
34:18,19 57:25
getting 7:4 30:13 37:9
77:3
GGW 37:15 70:13
gift 50:6 54:22
gifted 52:11
gifts 49:18 50:8
girl 103:8,14,18,19,20
Girls 33:25 34:4,10,11,14
34:19 35:2,5,8,17,20
36:12 37:4,23 44:24
66:16 70:13,20,20,21

77:20 78:3,13,20 98:25
99:5 100:16 101:16,24
102:10 104:4
give 10:19,20 11:18 23:6
24:20 44:9 51:14 55:20
58:25 59:11 61:17 62:7
66:3 74:17 84:9,13
105:15 106:22
given 20:9 25:18 75:22
103:10 104:3,7
Glendon 3:12
go 15:22 18:5 22:20 23:7
29:17 30:18 31:3 32:5
35:8,12 39:11 48:23,25
52:13 53:8 55:5,13,20
59:12 62:2 65:3 69:11
78:21 80:7 84:13 87:12
87:24 90:4,14 92:6
96:14 102:7 106:4,12
106:22
God 55:16,16
God's 64:15
going 6:24 17:6 20:20
22:4 23:10,17 29:24
31:25 42:20 47:11
49:22 50:22,24 52:14
54:14 55:8 59:1,12
65:15 71:15 72:23 73:4
76:23 78:22 82:1,5,8
88:2,22 95:3,12,14
96:18 105:14,15
gone 33:25 34:4,10,11,14
34:19 35:2,5,8,18,20
36:12 37:4,23 44:24
60:19 66:16 70:13,20
70:20,21 77:20 78:3,13
78:20 98:25 99:5
100:17 101:16,24
102:10 104:4
good 6:6 9:25 16:15 18:6
19:1 28:24 32:22 42:10
53:11 76:16 79:19,22
84:24 95:18
Google 12:7,9
gorgeous 75:9
gotten 98:24
government 22:25 94:2
grand 52:23
great 28:19 32:20 33:12
33:13
groceries 13:22 14:12
Grode 3:10 8:3
ground 25:21
grounds 25:9,11 26:1
group 46:17
guarantee 20:16 23:10
guess 62:15 77:17,20
87:5 99:3
guest 11:14
guilty 28:8
Gutenplan 3:11 6:8 8:4,6
8:10,22 9:7,18,22 10:8
10:12,14 12:7,9,21,25
13:4,7,15 14:21,23,25
15:9 16:12 19:17 24:12
24:15,18,22 25:9,15,22
25:25 26:4 27:16 29:5

32:11 34:7,17 36:6
37:12,20 48:25 49:12
51:15 53:11,14 54:11
54:15 57:14 58:8 62:8
71:18 78:8 79:10 80:3,5
83:2 84:9 86:2,21,24
87:7,10 88:5 89:1,4
90:18 93:3 100:20,22
100:25 101:4,13 102:1
106:24
Gutenplan's 92:5
guy 16:10,11 19:14 22:20
47:8 55:19 64:13 67:3
79:24 84:20 106:9
guys 29:20 30:22 31:1,4
31:4 64:12,12,16 67:4
77:6 91:18
guy's 88:17,21

**H**

Hadid 84:2 86:7 87:16
88:19 90:6,10
Hafey 14:6,7,14 15:8,14
haircut 80:1
Hallmark 91:1,2,6
hand 17:2,3,4 56:14
65:20
handle 10:23
handled 26:21
hands 54:3 56:1
happen 20:5 50:14
happened 39:13,16 41:16
89:16
happening 56:10
happy 24:20 25:3 36:4
53:7,9,13 56:1 90:20
101:20,20
harder 80:19
having 5:2 59:6 106:4
HD 102:25 103:2,3
HDNet 102:22 103:6,9
head 71:13
hear 88:18 103:23
heard 44:15 63:10,12
75:11
hearing 24:14
held 23:23 26:7,10,12
27:10,20
hell 64:14
help 12:16 28:3 29:19
31:10 34:16 52:14
57:16 88:1 95:18
helpful 31:8 56:5
helping 12:20
helps 10:13
her 12:5,11,20 13:3 14:3
14:4,5 52:4,5,13 55:13
55:13,20 56:21 57:22
Hey 77:6
he'll 49:16 87:19
HG 102:23,24 103:2
hidden 30:20,20
hiding 30:23 31:2
high 103:5
high-profile 25:2
Hill 2:17
him 10:19 16:7 26:5 36:6

# A5079BE
## JOSEPH R. FRANCIS AUGUST 22, 2011

Page 4

48:6 49:11 51:15 54:11 57:14,15 59:3,4 62:24 62:24 63:1,4,7 64:13,24 65:2,2,14 67:20 68:21 68:21 69:4,14 80:7,12 80:17,25 81:1 84:9 85:5 85:6 87:20,24 101:3 102:23 103:6
**hold** 27:11,13 38:17
**holding** 46:13 83:14
**Holdings** 92:16,18
**holds** 44:23
**home** 9:5 10:3,7,10 11:2 11:5
**honest** 47:2 64:15
**hopefully** 76:8
**Horse** 7:13,14 8:9 9:4 10:3 99:15,18
**host** 103:7
**Hottest** 103:8,14,18,19 103:20
**hours** 93:25 94:1 95:14 95:15
**house** 6:25 7:5,8,10,12 8:9,16 9:2 11:15 27:15 43:21 51:5,7 73:24 74:3 74:10,13,18 75:3,3,3,9 75:20,22 76:10,15,23 78:6,9,11,15 79:7,7 80:8 81:6,8,8 82:21 83:24 84:12,16,19,25 85:1 87:25 88:20 96:10 99:20
**houses** 79:6 81:9
**huge** 22:22 80:3
**huh** 49:17
**hurdles** 69:12
**HYATT** 3:4
**H-a** 14:7

### I
**idea** 13:21 14:24 29:22 43:1 44:19 55:1 75:15 83:15
**ideas** 46:23 47:14
**identified** 64:8
**impact** 6:19
**impressed** 75:8
**impressive** 56:25 75:3
**Inc** 1:21 8:8 21:20 31:25 34:10 35:2,6 44:25 70:14,21,22 78:3,13 99:5 100:17,17,18 101:17,24 102:11
**include** 19:15
**includes** 98:4
**including** 61:3
**income** 40:22 46:3,4,6 97:1,22
**Incorporated** 83:7
**indemnify** 30:1
**individually** 13:8,11,17
**individuals** 65:20
**infomercials** 36:9 44:11 44:12
**information** 25:4,17 31:8 59:2 67:1,2 76:3

**initiated** 86:25
**institution** 19:10 62:13
**institutions** 98:20
**instruct** 62:5,12
**instructed** 4:12 62:14
**instruction** 62:15
**insulated** 15:4
**insulted** 73:9
**Insurance** 97:10,11
**intent** 99:20
**intentional** 28:2 36:16
**intentionally** 17:12,15 36:19 83:22
**Interactive** 98:25
**interest** 38:24,25 73:21 90:24 93:11,13 97:1,5,6 98:16
**interested** 108:15
**intricacies** 66:24
**involved** 37:3 60:16 63:20,21 67:14,15 75:5 93:20 101:9,17
**in-house** 71:9
**IRS** 21:3,8,13 30:9 60:23 62:14 89:16 93:15 95:14,20 98:21 99:25
**Island** 83:7,8 92:13
**Islands** 65:6
**issue** 90:8,9,10,10
**issues** 32:6,7 86:19 87:5 87:12,23
**items** 14:11,17 15:16 44:1

### J
**January** 49:24
**jeopardy** 94:3
**job** 45:11 79:19 84:24
**Joe** 5:11,12,14,14 13:8 34:24 45:7 67:25 68:6 77:17,22,23 94:17,21
**joke** 89:3
**Jordan** 63:17
**Joseph** 1:7,16 2:7,15 4:3 5:1,9
**judge** 24:25,25
**Judgement** 1:5,8 2:5,8 2:16 3:3,9
**judgment** 1:15 2:15 6:2 21:15,16,18 85:23
**jump** 43:7
**jumped** 15:23 71:12
**jumping** 40:5
**jurisdiction** 85:9
**just** 5:12,14 7:22 9:7,22 10:4,5,14,18,21,22,22 12:3,10,18,20 13:7,7,16 13:18,19 14:24 15:19 15:20 16:15 19:4,12,13 19:19 20:3,12,20 23:6 23:19,24 25:20,21 26:11 27:21 28:3,7,25 30:16,18 31:13 32:1 35:11,25 36:14,21 37:12,13 38:5,12,21,23 39:14 40:15,17 41:9,10 41:25 42:1,18 43:13,25

46:25 48:17,19 50:5 54:8,21,24 55:1,23 56:7 58:8 59:7 64:21,25 66:8 66:12,25 68:21 69:12 73:3 74:15,22 78:2 80:20 84:9,23 85:13 87:13,18,20,25 88:1,3 88:11,20 89:4 91:22 92:24 94:5 95:5,22 97:7 99:3 102:8 103:17 104:7 105:3

### K
**Kardashian** 57:3
**keep** 7:1 44:4 56:18 83:17
**keeping** 80:20
**kept** 36:19
**kid** 68:20
**kidding** 68:8 89:3 100:9
**kind** 55:1 65:1 69:25 77:25 80:9,10,18,19,20 104:12 106:9
**knew** 83:19,21
**know** 7:6,12,16,20,22 8:15,15,17 9:6 10:4,4,5 10:14,17,19,21,22,22 10:22 11:1,6,7,8,9,10 11:24 12:1,10 13:18,18 13:19,19 14:18,19 15:4 15:5,8,13,16,23 16:1,2 16:9 17:17,25 18:2,5,9 18:11,11 19:3,11,24,25 20:2,10 21:9,11 23:18 23:24,24,24 26:11,11 26:12,13,20 27:7,9,20 27:21,21 28:2,4,12,24 28:25 29:1,6,8,16,19 30:6,22 31:4,22,24,24 32:16 33:23 34:7,17,21 35:10,10,11,13,14,19 35:25 36:1,2,10,10,11 36:14,15,17 37:2,4,10 38:24,25 39:1,25 40:1,2 41:17 42:5 43:17 44:4 44:13,20,21 46:9 47:6 47:10 48:8,13 52:2,4,6 52:23 53:2,4,18 54:2,8 54:10,22,24,25 56:6,13 56:14,19,20,22 57:2,9 57:24,25 58:1,21 59:6 60:25 61:2,5 62:18,25 62:25 63:3,8,9,10,24 64:4,4,5,5,9,12,14,21 65:10,15,24 66:7,7,8,10 66:10,24,24,25 67:10 69:14 70:12,24 71:1,7,8 71:17,24 72:9,19,19,20 73:13 74:15,22,25 75:5 76:1,3,4,5,7,14 77:18 77:19 78:2,13,16,16,22 78:22 79:4,18 80:3,11 80:22 81:1 82:3,11 83:9 83:10,16,23 84:2,8,22 87:24 88:3,18,21 89:15 89:16 90:12,20,23 92:20 96:11 98:22 99:9 99:10,11,12,15 100:25

101:2,11,13,13,14,19 101:25 102:2,6,8,13,15 102:16 104:1,4,21 105:6 106:1,11
**knowledge** 15:21 35:14 39:19 65:1 74:20,22 97:17
**knows** 15:2,2,2 78:9 86:16 100:25

### L
**lacks** 8:10
**Langberg** 6:14 17:19 30:8,11
**largest** 30:3
**LAS** 1:4 2:4
**last** 10:15,16 11:14,17 12:5,19 14:5 16:3,13,19 18:24 20:15,17,19,22 20:25 22:3 26:10 27:7 28:22 30:7,11,14 40:2,8 40:11,16 41:5,12,19 42:10,21 43:8,11 49:19 50:9 51:2,18 57:6 59:25 60:6 61:9,21 70:5 73:10 76:19 80:24 81:3 82:18 92:7 93:7 98:18
**later** 95:14,15 104:22 105:7
**laundry** 96:18
**law** 34:1,11,17 67:23,25 92:4 100:14 105:16,18 105:24 106:9,11
**lawsuit** 67:20 69:6 85:12 87:18 100:14 101:9,17 101:23 102:9
**lawsuits** 45:10,15
**lawyer** 11:10 48:22 49:17 57:25 71:21 76:2 82:6 94:13
**lawyers** 45:10 47:19
**lease** 8:8 44:10 72:7,9 81:21
**leased** 70:1,1
**leasehold** 8:16
**leases** 43:24 44:7 70:9
**led** 73:18
**left** 17:12,15 21:17
**legal** 41:17 67:1 69:12,19 95:3
**less** 100:2
**lesser** 70:11
**lessor** 70:11
**let** 7:5 25:3 26:4 34:24 36:6 38:23 50:3 54:11 57:15 58:16 74:25 77:25 82:17 85:21 94:19 101:3
**let's** 11:15 15:15 23:19 28:16 40:24 41:9,25 42:1 44:16 50:5 55:16 57:6 83:12 84:15 89:1 93:21 95:22 100:10
**leverage** 104:22
**leveraged** 105:7
**levied** 95:21

**liabilities** 29:15 32:14 33:2 39:5,8,14 45:11 46:10,11 89:25 90:1
**liability** 27:5 28:16 29:9 29:10,11 33:14 88:7 73:10
**licensed** 64:21,22 67:4 73:10
**lien** 97:23 98:4,10 99:18 99:20
**liened** 99:22,23
**liens** 20:23 97:25,25 98:2
**life** 46:22 47:12 80:19
**light** 22:18
**like** 13:21,22 14:7 15:19 16:5 19:20 20:12,18,21 25:15 27:13,13 28:13 29:4 30:17,18 36:2,15 38:14,21 39:18 40:6,6 40:17 43:13,21 44:12 47:1,2 48:16,16 49:17 49:21,22 51:8,21 53:4 53:17,18 54:2 55:22 56:19,20,22 57:1,2,3,8 57:9,20 58:6,6 60:6 61:1,1,17,20 63:10 64:5 65:7,8,15,22 66:11,12 67:5 68:13,24,25 69:9 70:24 71:9,11 75:14 76:5,25 77:4,7,11,18,21 78:19,19 79:4,19,24 80:10,16,18 81:7,14 85:1,2 86:11,12,18 87:4 87:8,9 90:13 91:14 92:20 95:14 96:22 97:1 98:12,12,22 99:1 103:4 103:5,10 104:4,6,12 106:2,6,7,9
**limit** 18:8
**Limited** 61:4 92:25 93:9
**line** 4:13,18 34:1 46:17,20 53:12 75:14
**Liner** 3:10 8:1,1,3 92:5 105:17 106:9,20
**lines** 104:19,23
**list** 92:6 96:18 106:5
**literally** 95:14
**litigation** 47:12 99:3
**little** 33:20 40:5,19 91:12
**live** 10:3,6 11:1 104:2
**LLC** 1:4 2:4 7:13,15,17,21 8:9 9:5 10:3 44:14,18 72:12,17 92:16 97:16 98:25 99:13,14,16
**LLP** 3:16
**loan** 11:4,6,7,9,10,12 18:25 19:22 20:16,18 56:22,23
**located** 64:8
**location** 51:7 82:2
**locations** 79:3
**lodger** 26:23
**long** 51:18,21 81:7
**longer** 21:21 22:16 37:14 60:7,7 72:15 81:20
**look** 30:18 56:8 90:18 94:8
**looking** 47:1 48:1 91:23

**A5079BE**

**JOSEPH R. FRANCIS AUGUST 22, 2011**

Page 5

**loop** 17:13,15 36:19
**Los** 1:2,17 2:2,17 3:13 6:22
**lost** 31:6
**lot** 20:14 23:8 39:14 48:19 57:4 68:23 71:9 76:6 79:17,18 92:20
**Lots** 39:10,12
**loud** 88:3,5
**love** 50:12 63:18 57:16
**L'Heureux** 22:21 24:8
**L.A** 85:11

**M**

**machine** 61:21,25 108:10
**made** 22:23 23:3 30:21 31:20 50:8 96:1,1 98:9 98:15,16 108:10
**mail** 98:13
**majority** 14:10 26:17 38:25 46:21
**make** 13:9 18:12 25:20,21 28:7 42:12 50:4 74:25 77:6 82:8 90:19 91:22 94:19 95:3 98:6
**makes** 49:23 90:14
**making** 9:23 69:19
**malpractice** 94:15
**mandating** 25:17
**Mantra** 8:8,15,17 13:15 21:20,25 22:4,5,13 23:4 23:22 24:11 26:7,23 27:4,8,11 28:11,22 29:12,23 30:12 32:6,23 33:10,16,19,23,24 37:3 37:13,14,19 38:3 39:6 39:17 40:9,12,13,15,17 40:25 41:6,12 42:22 43:4,18,20 44:2,4,10 82:12 89:8 92:9 97:24 100:17
**Mantra's** 32:9,12 33:5,6 36:24
**many** 20:9 30:23 31:1 53:1 104:21
**MARIANNA** 1:24 2:19 108:23
**mark** 26:6 102:20
**MARKED** 4:17
**market** 77:22
**marketing** 35:5 37:16 70:17,21 78:25
**married** 50:11,15
**Martin** 79:13 81:3 104:16 105:3
**massive** 22:17 24:9
**matter** 93:16,24
**Mavericks** 102:21
**may** 6:19 15:17 68:17 91:11 94:14 95:18 98:16
**maybe** 17:9 19:2 38:10 50:3 52:25 58:19 61:23 88:3 90:19
**McLarty** 12:3,6,16,21,24 12:25 50:20,21 51:1 57:5

**mean** 9:14 10:4,14,25 13:8,10,11 17:6 18:3 19:4 20:20 22:22 27:11 27:13 29:3 32:13 35:23 37:6 38:8 40:17,20 48:17 49:21 52:21 56:8 59:18 60:25 61:1,5,15 64:16 69:7,10,12 70:14 74:21 76:6 77:18 78:10 78:23 80:9 82:3 86:16 86:24 89:4,15 90:12 91:17 96:23 102:12 103:7 104:1 105:25 106:6
**meaning** 63:10 84:20 87:12 96:22
**means** 9:11 27:9 32:17 34:7 38:13 73:9 102:3
**meant** 34:17
**mechanism** 15:20
**media** 31:25 33:22,23 37:22 38:2,2,8,12 100:18
**medications** 6:18
**meet** 6:16,17 59:7 68:19
**meeting** 58:24 59:3
**Megan** 14:4 17:9 48:12
**member** 7:17
**mentioned** 24:18
**mess** 47:11 73:4 83:12 106:7
**met** 62:24 64:13 68:21
**Mexico** 51:5,6,7 73:24 74:3 75:13 76:15,23 78:7,15 79:7 80:8 81:9 82:10,21 83:20,24 84:16,19 85:6 96:11
**Michael** 22:19,20 23:14 24:2 48:2
**might** 6:11 10:18 29:21 90:2,3
**million** 41:22 60:25 66:6 73:25 75:12 77:11,21 87:25 88:20 104:24 105:4
**mine** 63:1
**minor** 16:5
**minute** 106:22
**minutes** 106:1
**mis** 19:19
**mischaracterize** 105:11
**misdemeanor** 97:9
**mispronounce** 12:11 50:22 51:13
**mispronounced** 13:1
**mispronouncing** 50:24
**missed** 91:22
**missing** 65:17,18
**misspeak** 21:5,9
**misstate** 7:4 9:23 31:13
**misstatement** 5:22
**misstates** 101:4
**Mitch** 6:14 17:19 30:12
**Mohammed** 84:2
**Monday** 2:18
**money** 9:4,9 10:2 11:1 14:16 15:16 16:1 22:21

**22:22** 23:1 29:12,23 30:2 35:9,18 43:1 49:13 56:4 57:23,25 59:8,11 60:23 62:12,15 65:17 66:2,15,21 75:22 82:9 82:15,20 85:2,3 86:5 87:20 88:17,21 91:16 91:18 98:15,20 105:24 106:13
**Monica** 81:17
**monochromatic** 80:2
**month** 13:6,22 20:9
**monthly** 14:11
**more** 11:15 19:2 39:8 40:19 53:7,9,12 57:12 71:3,4,5 73:4 74:25 86:11,12,16
**Morgan** 60:5,7,16,17 98:22
**morning** 6:19 49:10
**most** 45:19 97:25 98:2 100:5
**mostly** 41:4
**mouth** 56:14 86:22
**moving** 81:24
**MPO** 25:23
**MRA** 92:16,18
**MTO** 94:24
**much** 10:8 13:21 14:13 23:8 26:12 29:22 41:20 41:23 52:1,14 60:23 66:2,5 67:10 75:16 80:17 85:3
**multiple** 79:3
**Munger** 94:18,24
**must** 104:2
**myself** 13:23 18:12 68:13
**M-c** 12:12
**M-c-L-a-r-t-y** 12:4,17

**N**

**N** 3:1 4:1
**nail** 64:12
**name** 5:7 8:2 12:5,11,19 14:3,4,5 18:2 23:14 42:23 44:15 50:23 57:1 67:15 73:11,13 76:9 91:9 92:22 96:4 103:15 104:7 108:18
**named** 22:18
**names** 5:10 11:18 12:2 45:3,5
**narrow** 19:21 43:18 50:3
**narrowed** 40:19
**natural** 28:4
**nature** 22:12 24:9,11 65:12
**necessary** 24:19
**need** 8:23 12:14 14:11,23 15:17 37:11 47:9 58:10 96:24 105:24
**needed** 58:21 105:9
**negative** 27:6
**neither** 108:14
**Net** 102:23,24
**Nevada** 6:1,4
**never** 19:5 20:11 21:1

**27:19,23** 28:10 55:9,9 55:10 62:24 63:1 64:13 93:2 98:24 99:4
**new** 28:21 46:4,17,20 47:14 71:10 104:22
**next** 47:3,21 58:6 82:2 93:14 103:14,17
**nice** 6:16,17 16:7,8,10,11 49:11 79:11
**Nicole** 63:17
**night** 16:19
**nightmare** 95:11
**nobody** 45:23 59:10,13
**None** 4:10 56:17
**Nope** 6:20 18:1,3,23 19:23 33:17 35:16 47:17 49:6 59:17,21,24 72:2 89:10,12 97:15
**Normally** 12:22
**North** 2:16 63:11
**notes** 106:23
**nothing** 31:3 53:5 55:22 57:8,10,20 61:20 66:11 67:6 77:7 89:21,22,23 89:24 92:15 104:12 105:5
**notice** 99:18
**November** 51:2,3
**number** 17:25 26:14 63:16 85:4

**O**

**oath** 5:20 108:9
**object** 9:7 13:7 24:12 25:9,10,10 54:12 71:18 101:1,4
**objecting** 25:23,25
**objection** 8:10 10:8 15:9 25:8 32:11 58:8 78:8 102:1
**objections** 25:7
**obviously** 21:10 37:13 47:7 50:11,12 96:11
**occupation** 45:9
**occur** 51:1
**odd** 68:3,4
**off** 22:21 48:25 49:1 53:8 53:12 61:1 65:1 67:7,11 76:4 96:17 100:12
**offend** 50:24
**office** 81:11,13,14,20 96:8
**officer** 21:24 44:18
**official** 47:15 69:2
**officially** 51:22
**often** 18:4 20:5
**oh** 19:24 29:10 38:14 55:13,16,16 56:9 62:3 65:13 67:5,21 69:7 70:13 71:11 82:16 83:4 96:25 106:14
**okay** 6:6,15 7:1,2,7 8:20 22:5 24:21 48:25 49:1 53:8 34:13 35:1,8 37:9,11 38:7,19 41:11 42:14 43:7 58:17,20 62:11 71:21 88:17 92:23

**96:25** 97:4 98:8 101:4 101:22
**Oklahoma** 68:7
**old** 48:6 48:1 64:23 81:14
**Olson** 94:24
**once** 38:17 65:4
**one** 6:3,4,9 12:3 14:10 15:15 17:9 18:13,14,15 18:19,21 26:7 27:19 33:5,6 40:25 44:21 45:13 46:1,13 48:1,2,3 53:5 60:3,4,4,6,10,18 62:13 63:18,18 65:4,10 67:13 68:9,11,12 69:23 70:2,14 71:3,6 72:7 74:6 92:20 96:6,19 97:2 100:8 101:16 102:17
**ones** 21:7 60:18 67:7 70:23,23 71:10 90:11 91:24,25 99:2
**ongoing** 10:15 32:3
**only** 25:14 26:2 38:1 53:17 68:9,11,12 89:25 93:10 99:18 100:8 104:7,14 105:18
**open** 88:15
**operate** 56:13
**operating** 56:14
**opinion** 84:24 95:4,6
**orchestrated** 22:18 23:1
**order** 24:13,24 25:11,12 25:16,17,24 30:13
**original** 64:23 66:22 84:17,17,18 100:19 102:13
**originally** 91:10
**other** 5:10 9:17 12:22 13:25,25 18:15,16 21:14 29:15 30:5,9 50:8 59:19 62:3 67:4 70:19 70:20,23 76:1 77:10,20 77:20 78:10 79:3,9 81:9 89:7,13 90:6,22 95:11 105:23,25 106:11
**Otherwise** 26:4
**out** 11:4 17:12,15 18:24 19:5,12 28:3 29:19,20 31:20 34:16,24 35:24 36:19 37:11 44:8 53:2 54:9 55:13,20 64:25 65:5 81:1,24,25 88:3,5 88:12 89:15 91:18 95:15 96:1,8
**over** 11:15 22:22,22 23:2 23:2,25 27:25 28:9 30:19 32:9,12,16 41:22 50:5,9 51:24 57:7,8,10 57:14 66:6 69:7 71:8 81:24 82:4 83:17,18 95:11,11 97:8
**overcome** 69:13
**owe** 29:12
**owed** 29:23
**owes** 91:16
**own** 7:18 14:12 55:14 69:18,21 74:12 75:14 96:9

A5079BE

## JOSEPH R. FRANCIS AUGUST 22, 2011

Page 6

owned 9:2 83:19,21 95:16
owner 102:21
ownership 44:5 70:25
owning 78:10
owns 7:12 36:12 78:9 102:22

**P**

P 3:1,1
PA 48:16
Pacific 97:10,11
page 4:4,13,18 6:5 9:24 48:20
paid 15:8,14,24 16:23 40:8,13,15 41:4 52:6 55:2 56:6 76:17 81:3 93:11 104:25
pallet 79:21
Panama 63:10,10,11
paper 28:11
paperwork 47:16 96:7,9
Para 98:13
part 11:8 36:21 46:22 83:8,9 93:1,1
partially 66:15
participate 53:9
particularly 25:18
parties 108:16
partner 63:19 64:14,23
partners 67:7 69:16
past 37:14 45:10 46:21 80:15,16,16,18 104:4
pay 7:10 8:20 9:17,19,21 13:21 52:2 80:17 93:13
paying 9:9
payment 40:16,18,20
payments 42:2
payroll 15:25
pays 76:14 80:7
Pelikh 22:21 24:7
Penalty 5:22
people 13:25 32:7 45:7 48:19 57:21 64:24 67:22,24 78:20 83:17 88:2 90:13 91:5,24 95:13 104:2
Pepe 44:14 99:13,14
per 57:10
percent 41:10 47:20 87:22
perfectly 47:2
period 9:1 10:18,20,25 ,11:13 22:22,23 23:3 42:8,16 43:19 83:20
perjury 5:22
person 7:24 12:3 14:10 15:1 27:10 55:10 90:3
persona 77:23 80:20
personal 6:21,25 11:8,11 14:1,11 47:2 48:14 60:15,20,21 73:1,13 95:4
personally 9:2 11:4,6 16:14 18:18,19,20 19:5 21:4 27:12 31:5 39:21 52:11 59:18 60:13,24

61:11 66:7 71:15 73:8 73:23 75:23 82:15,20 85:17,18 87:16 99:8,10 100:16 103:7
phone 63:14,14,15,16 65:2
phrase 82:16
physical 27:16,18 28:10 104:6
physically 27:13 38:19 38:20 63:8
pick 23:19
picked 53:2 65:11
picture 23:25
pictures 56:25
piece 28:10
place 6:22 24:24 30:19 74:8 75:9 78:14 79:10 79:11 106:20 108:7
placed 108:9
plaintiff 101:10,18
plaintiffs 102:10
plane 72:1,7,8,11,13
plans 82:1
players 32:8
playing 64:11
plea 93:17,20 94:4,5,11 94:21
please 7:5 35:12 39:11 80:5
pled 85:5
plenty 71:4,5
plural 78:5
pocket 16:25 17:1
pockets 88:18,19
point 10:16 11:19 23:22 26:7 30:17 37:3 38:24 39:2 71:22,23 72:7
pop 71:10
popped 71:13
portion 26:6 32:23 33:1 45:15,16
position 53:22,24,25 54:1 65:25 95:20
possession 31:22 52:16
possible 52:14
power 61:17,18 69:14
precluded 95:1
preface 20:3
prefer 5:12
prejudice 87:9,10,12
prenuptial 54:10
Present 3:15
press 57:2
pretty 14:13 23:8 47:8,12
prevented 24:25
primarily 106:6
primary 18:10 45:18,19 106:9,20
principal 22:2,4
prior 31:18 41:7,8,9,25 42:3 90:16 98:20 108:8
privacy 25:9
private 72:1
privilege 54:13 58:9 71:18 74:11
privileged 59:1

probably 8:1,1 17:2,12 18:18 19:2 23:18 30:3 40:18 41:7 47:21 49:16 50:2,7 52:25 56:8 57:12 60:5 61:22 63:11 68:9 68:11 81:5,12 85:5
problem 29:14,16 46:8 52:21 88:2 106:24
proceeding 86:1
proceedings 108:6,8,10
produced 34:1
producer 103:11,12,22 104:5,6
product 46:17,20
production 22:14,14 25:24 34:1 37:3,6
products 78:20
professional 45:8
projects 77:21
pronounce 12:5,18 67:18
properties 100:6
property 82:10 83:19,20 83:21 95:21,22 100:2,3
prosecutors 22:25
protective 24:13,24 25:11,12,15
protector 67:17 69:3,5,15
provide 10:6 43:20,23 44:1 57:5 82:9,15,20 87:16
provided 9:4 10:2 11:1 11:21,24 17:5,7 44:2 57:25 87:4,17,20
provides 16:1
providing 9:8 45:24 46:1 81:2
Psych 98:13
publicist 48:9
publicity 80:11,25 104:13 104:14,20 105:6
Puerto 51:10,11,12
pull 34:24 87:19
purchase 14:16 16:21 55:8,13,21 56:3 82:10 82:21
purchased 16:4 35:19 52:9,10 55:11 57:22
purchases 18:12 50:9
purchasing 14:11
purpose 77:13,13,16
purposes 73:12 88:11
pursue 67:1 90:13,15,15 95:12
pursued 39:4
pursuing 67:21,24
pushing 47:21
put 20:1,12 31:14,18 54:2 58:8 62:22 86:22
puts 20:6

**Q**

quantity 26:15
question 9:15,17 11:13 12:18 15:10,11,22 16:15 18:6 19:1 28:24 31:6,9,11,12 37:12,15 37:19,22 42:20 54:12

58:18 61:11,16 62:17 67:9 71:12 72:20 74:21 74:23,24 76:16 77:24 78:17 82:16 83:3 85:21 85:24 88:10 93:3,4 95:18 96:17,19,20 102:16
questions 15:13 36:6 37:10 49:3 54:6 57:15 71:19 72:25 75:19 82:18 83:17
quite 8:18 79:21 97:8

**R**

R 1:16 2:15 3:1,11 4:3 5:1 5:9
ran 32:23
rapidly 102:14
rapid-fire 82:19
Rayment 67:15 68:15,19 100:14
re 101:12
read 9:18 20:7,11 25:12 25:16 69:6 94:5 100:15
ready 47:20
real 13:2 73:21 88:24 90:3 106:6
really 10:17 16:11 18:11 18:12 25:14 26:21 33:22 44:21 45:11 46:4 47:19 53:17 58:10 66:10 71:11 75:9 77:22 80:10 92:20 98:18
reason 31:15
recall 19:7,8,9 29:8 42:18 50:10 55:5,8 57:23 receive 27:3 42:15 86:5 97:23 104:10
received 40:12,16 41:5 41:12,14 43:8 92:7,8,13 92:17 93:2,7,8 96:21 97:12,13,21 99:6,14,17 99:17,19
receiving 80:12
recently 73:25 80:14,14
recognize 79:22
recollection 19:6 20:4 87:13
record 9:21 28:8 48:25 46:1 53:8 58:9 66:9 89:2 94:20 100:12,13 108:10
recover 52:15
recovery 53:10,13
refer 6:24 13:10 22:4 32:1 76:9
referenced 41:11 52:8 70:6 71:14
referencing 8:4 34:22 81:10
referring 7:5 26:15 42:9
refund 29:9 106:17
REGENSTREIF 3:10
registration 72:8,9
rejected 20:23 21:2
relation 6:1 68:1,2,5
relationship 62:24 106:2

relative 108:15
relevance 8:11 24:12 25:10
relevancy 25:21
relevant 24:18
relitigate 87:12
remember 16:16,18,19 17:8 19:4,12,13,24 20:21 22:1 23:10 40:6 40:10,16,17 41:3,13,19 41:20,23 42:3,4,7,23 43:10,11,13,14 52:11 82:11,12,13,13,22,24 83:4 85:4,9,13 87:17,21 89:1 91:3 92:10,12 96:4
remotely 95:25
remove 69:14
removed 69:4
rent 71:10 8:20 9:9,15,16 9:17,19,21 10:2
repeating 7:1
rephrase 82:17 85:21
report 20:23
Reported 1:24
reporter 5:8 23:11 83:2 108:5
REPORTERS 1:22
reporting 92:9,13 96:21 96:23 97:22 98:3,24 99:6
represent 28:11 30:24
representing 94:17,21
request 62:16
requested 67:13
require 59:4
residence 6:21,25 8:21 11:22,25
resigned 67:6
resolved 86:17,19,21 87:5 94:14 95:10 97:7
rest 47:12
restrictions 76:21
resulted 86:24
retarded 55:15,16
retirement 89:19
return 28:23 30:24 40:3 62:14 63:18 92:19
returned 63:1
returns 19:16 93:4 96:22
reviewing 97:18
ridiculous 66:1,13
right 11:20 13:16 14:25 19:13 21:18 23:21 24:14,23 34:2 36:5 38:5 38:19,22 40:14 44:5 45:19 49:22 50:11 51:20 52:16 54:25 56:7 68:9,11,12 69:6,19 76:4 79:8 85:11 88:2,8 89:8 89:13 90:3 91:4 98:19 103:25
rights 89:13
ring 49:20 50:1,7 52:8 53:22 55:14 56:3 57:6 90:5
ROBBINS 3:16
rogue 62:21 64:13 67:4

**A5079BE**

## JOSEPH R. FRANCIS AUGUST 22, 2011

Page 7

**Roman** 22:21 24:7
**Rothwell** 60:11 61:4 64:2
  92:25 93:9,11,14 97:2
**RPR** 108:23
**rub** 100:7
**RUDMAN** 3:16
**run** 33:1 44:8 92:24
**R-a-y-m-e-n-t** 67:19

**S**

**S** 3:1
**safe** 59:15,20 61:11
**sake** 83:12
**salary** 40:25 41:6 42:22
  43:2,9 45:24
**sale** 20:2
**same** 6:5 9:24 32:6,6,7,7
  32:7,8 33:20 37:22 39:6
  39:16,20,22 42:20 43:5
  48:16,18,20 63:18
  64:19,20 68:13 74:6,23
  74:23 83:17 91:2
  102:10 104:17,18
**San** 3:6,19
**Sands** 31:25 32:1 33:8,18
  33:19,22 37:22 38:4,17
  40:2 42:21 43:7,9,12,15
  44:1 82:9 89:8 92:11
  97:24 100:17
**sandwich** 16:14,21
**Santa** 81:17
**saw** 27:19,24 28:10 55:10
  56:25 73:25 78:19
**saying** 22:10 40:6 50:21
  53:4 54:8 62:18 83:10
  88:11 91:13 106:8
**says** 24:21 54:22,25
**scanned** 100:15
**scenario** 105:15
**SCHRECK** 3:4
**scream** 80:21
**screw** 30:19
**screwed** 69:20,20
**screwing** 91:12
**scumbag** 84:5
**Search** 103:8,14,17,19
**SEBER** 3:5 4:5 5:6 6:10
  8:5,7,14,25 9:12 10:1
  10:13,24 12:10,13,23
  13:1,5,9,16,20 14:24
  15:1,7,12 16:17 19:20
  25:5,20,23 26:6 27:17
  29:7 32:18 34:9,23 36:7
  37:17,21 48:24 49:2,15
  51:17 53:15 54:5,14,18
  57:18 58:11 62:9 71:25
  78:12 79:12 80:6 83:6
  84:11 86:6 87:1,15 88:9
  89:6 90:21 93:6 100:10
  100:13,24 101:3,8,15
  102:4 103:1 105:13
  106:22,25
**second** 6:9 15:22 53:8
**secretary** 48:11,13,17
**securities** 89:14
**Security** 82:23
**see** 36:9 48:21 55:22

58:18 77:25 86:18,23
**seem** 79:24 106:8
**seems** 65:1 79:19
**seize** 60:23
**seized** 60:14 93:16
**seizing** 95:1
**seizure** 60:16
**self-employed** 45:14
**self-employment** 45:15
**sell** 28:15 38:22 39:3
  52:19,22 53:5
**semantics** 48:15
**send** 35:9,18,19 64:16
**sense** 31:20 98:6
**separate** 56:18
**separated** 64:25
**serious** 35:24,25
**service** 15:25
**services** 81:2,4
**session** 82:19
**set** 36:8 47:12 79:18
  88:13 108:7
**settle** 28:17 64:10 88:12
  88:22
**settlement** 85:25 86:4,7,8
  86:9,10,13 87:3 88:13
  93:13
**seven** 11:16 91:19
**several** 26:14
**shareholder** 26:16,18,19
**shares** 26:14
**shoot** 77:10,10
**shooting** 44:11
**short** 100:10
**shorthand** 108:4,11
**shot** 77:11
**show** 77:10,11 80:21
  103:8,22 104:6
**sick** 73:3
**side** 93:21 101:10,18
  102:10
**sign** 20:5,12 30:24
**signed** 19:12,25 20:22
  22:24 93:23,24 95:9
**similar** 9:15 61:11
**similarities** 45:4
**simple** 13:9
**since** 20:24 26:23 37:14
**single** 95:15
**siphoned** 22:21
**sit** 15:20 35:23 54:25 56:7
  97:18
**site** 87:19 102:12,13
**sitting** 6:14 21:17 25:13
  74:22
**situation** 21:12,13 39:6
  66:13 67:8 69:19
**situations** 90:7
**six** 19:2 61:22
**slack** 51:15,16
**slate** 47:10 105:7
**sold** 70:8 87:25 88:20
**sole** 26:16,19
**some** 8:18 21:3 25:16
  30:5 37:3 38:24 39:2
  45:4 47:14 51:15,16
  57:25 59:8 68:17 69:12

72:21 77:10,11 87:20
  88:1 90:1 91:12 97:5
  99:2 104:2
**somebody** 8:1 20:6 33:12
  77:5 88:8 90:13
**somehow** 63:20,21 64:23
  64:24
**someone** 106:12,17
**someplace** 58:24
**something** 7:4 13:11
  16:5 19:25 20:1,22
  27:14 39:18 42:6 56:8
  57:2 61:1 65:7,8 69:9
  71:23 87:8,9,13 88:14
  90:2 96:23 104:22
  106:18
**sometime** 41:7 42:5
**sometimes** 71:10 104:3
**somewhere** 75:11
**soon** 46:21 47:20 82:4
**sorry** 12:15 22:24 23:6
  28:1 30:9 31:7 38:14
  39:10 58:17 62:7 64:11
  71:12 73:7 80:3 83:4
  94:19 100:19 102:24
  103:2,23
**sound** 76:6 79:4
**sounds** 45:12 46:25 76:5
  77:19
**source** 17:5 57:23 66:22
**south** 41:15
**Spanish** 51:14
**specific** 75:1
**specifically** 41:21 67:10
  101:19
**specifics** 101:1
**specify** 10:9 13:12
**speculate** 14:23 29:25
  39:23 66:8,9
**speculating** 15:3 29:24
  39:22 43:16,17
**speculation** 14:21 36:16
**speed** 95:19
**spelling** 12:14,17
**spend** 45:19 47:11 73:4
**spoke** 17:20
**Spoken** 49:17
**spot** 6:14
**square** 75:2
**stages** 79:4,4
**standpoint** 56:4
**Stanley** 60:5,7,16,17
  98:22
**Starbucks** 106:1,18
**stars** 79:15
**start** 44:16 71:24 72:23
**state** 1:1 2:1 5:7 27:20
  108:5
**stated** 30:10
**statement** 18:25
**statements** 19:15
**States** 55:7,8 93:18 94:23
  95:1
**stay** 9:23 11:22,25
**stayed** 11:15 81:10
**stealing** 30:22 31:1 48:3
  48:4

**STEIN** 3:10
**steps** 21:15 69:4,7
**still** 6:21 17:23 20:13 21:3
  21:8,12 29:11 48:5 70:2
  70:6 72:1 87:5,23 89:1
  96:11 98:2 102:18
**stock** 26:7,10,12,24,25
  27:1,3,7,10,11,16,18,24
  28:11,12 38:17
**stocks** 89:7,9
**stole** 91:18
**stolen** 23:1 95:13
**store** 55:8 56:3
**story** 64:19,20
**street** 2:17 52:20,22
**strike** 42:21 53:21 86:15
  97:22
**structure** 7:16,18,20 8:13
  11:9 13:14 26:20 36:15
  36:22 39:1 44:23 83:23
  83:23
**structured** 58:1 61:6 69:9
  82:14
**structures** 71:1
**stuff** 13:19 15:5 20:11
  36:22 44:7,12 52:21
  57:9 61:5 64:4,5 71:9
  73:3 76:7 89:16 93:16
**stupid** 72:25 77:18
**stylish** 79:24
**stylist** 56:24
**subject** 82:7
**subscribed** 108:18
**Subway** 16:14,21
**successful** 85:19,20
**sue** 85:6
**sued** 31:4 34:19 86:7
**suing** 85:5
**Suite** 3:6,18
**Summerlands** 83:14
**SUNSHINE** 3:10
**SUPERIOR** 1:1 2:1
**Supreme** 6:4
**sure** 7:18,19 9:3,23 11:11
  19:18 25:21 28:7 29:2,3
  32:2 36:13 37:2 41:10
  42:12 43:4 44:22 45:1
  47:14 55:23 56:6,7,9
  75:14 77:6 82:3 85:13
  85:16 91:22 92:19
  94:20 102:6
**swooped** 93:15 94:2
**sworn** 5:2,17

**T**

**take** 28:16 32:16 37:6
  48:24 54:1 59:23 65:17
  65:24 100:10
**taken** 2:16 6:18 11:4,6
  21:15 67:7 69:4 108:6
**takes** 78:14
**taking** 5:25 73:7 98:21
**talk** 21:11 31:25 53:12
  65:2 74:19 84:15 88:13
  88:14 101:20,22
**talked** 27:25 33:10,18
  55:10 70:3 73:24 79:7

89:7 90:8 91:3 104:16
**talking** 19:21 28:8 30:12
  57:14 58:12 60:13
  66:23 74:3 97:18
**tangential** 25:19
**tax** 19:15 20:23 28:22
  29:9 30:24 40:3 82:7
  92:8,19 93:4,10,12,13
  96:21,22,24 97:12,21
  97:22,23 98:24 99:6
**taxes** 98:12
**taxpayer** 98:17
**TAYLOR** 3:10
**TCI** 65:7,8 91:6
**team** 87:24
**television** 38:14,15 78:19
  79:17 80:10
**tell** 24:16 45:9 52:24 80:1
**telling** 88:1
**tells** 96:24 98:17
**ten** 10:10,12 49:14 52:22
**term** 75:21
**terminated** 51:22
**terms** 43:24
**testified** 5:3
**testify** 6:19
**testifying** 108:9
**testimony** 9:23 31:13
  36:18 42:13
**thank** 8:7 16:12 37:19
  38:16 75:10 78:5 107:1
  107:2
**thankful** 98:9
**Thanks** 14:9
**theft** 23:2
**their** 11:18 12:2 24:9 25:1
  26:24 30:13,23 36:21
  96:9
**thereof** 108:13
**thief** 84:5
**thieves** 66:13
**thing** 20:21 23:7 33:20
  41:16 48:16,18 52:12
  58:7 63:9 65:1 66:25
  68:13,15 86:18 91:2
  93:15 94:14 97:3 99:18
  104:16
**things** 16:3,13 20:5 26:2
  30:23 31:2 41:14,15
  46:8 53:6 70:25 77:20
  83:16 91:12 95:19,19
  102:13
**think** 6:11 9:3,20,21
  14:20 15:4,18,19 17:7
  19:6,11 20:22 24:18,19
  24:22 25:18 27:19
  29:11,25 30:1,2 31:6,11
  33:22 37:1 48:5,17,17
  48:21 49:11 52:10,13
  52:24 53:11 54:1,21
  58:10 64:18 66:5 67:9
  68:6,13 71:3 73:25
  75:13 76:25 77:9 86:12
  87:3 88:5 90:10 92:18
  94:8,11 95:13 99:1
  100:8,10 101:12 104:16
**thinking** 88:3 90:2

A5079BE

## JOSEPH R. FRANCIS AUGUST 22, 2011

Page 8

third 6:11,12 38:10
thorough 73:6
though 14:20 18:18
  33:14 35:24 37:5 48:7
  52:10 72:20 76:17
  81:11
thought 9:18 13:1 48:13
  68:16 94:12,13 96:2
three 20:15,17,19 49:19
  49:21 50:9 51:21 57:6
  73:10 91:18
through 15:25 72:21
  92:24 106:4,22
tie 80:2
tied 31:19
time 8:18 9:1 10:9,18,20
  10:25 11:14,19 18:24
  20:8,22,25 22:3,23 23:3
  23:22 24:1 26:8,10
  28:22 30:7 32:6 34:20
  38:11,14,15 39:16,22
  40:2,8,16,25 41:5,12
  42:8,9,16 43:8,11,19
  45:20,21 59:25 61:21
  62:7 71:10 73:5 76:19
  79:10 80:19,19,24 81:3
  81:7 83:20 97:3 98:12
  98:14,18,22 101:16
  102:17 107:1 108:7
times 20:9
timeshare 76:25 77:4
title 22:1,10 23:23 69:2
  72:8,9 103:10,12,24
titles 104:3
today 5:13 6:1 15:20
  35:23 45:8,13,23 46:1
  49:5,7 74:22 97:18
  107:1
together 31:14,19 57:21
  80:18
told 31:14 35:15 49:12
  55:13 83:22 94:13
Tolles 94:18,24
Tolling 87:7
total 57:12 60:20
totally 35:25
touch 96:10
tough 72:21
tour 36:12
towards 82:9
track 64:17 96:17
trade 57:1 80:10,21 81:1
trade-out 57:4
Trading 7:13,15 8:9 9:5
  99:15
transaction 55:4,7,23
transcribed 108:11
TRANSCRIPT 4:17
transcription 108:13
transfer 62:6,12
transferring 44:5
trial 93:12
tried 63:7
triggered 55:1
triple 69:20
trouble 50:21
Trowbridge 64:19 65:25

67:3,5 91:6
Trowbridge's 91:14
true 30:25 49:17 72:14,16
  76:6 96:16 101:6
trust 51:13 56:16 60:11
  62:23 63:21,22,25 64:3
  64:9,10 65:7,8,8 66:2
  66:15,21,22 68:22 69:3
  69:15 83:8,9,11,11 90:8
  90:9,10,22,23 91:1,7,8
  91:9 93:2
trusted 68:16,21
trustee 62:22 64:21,22,23
trustees 63:20
truth 47:5 64:15 74:15
  80:9,11
try 32:21 45:3,6 46:17,19
  53:5 69:4 104:20
trying 12:16 14:20 15:19
  17:7 19:6,13 22:10 23:6
  28:3 31:10 33:4 34:16
  35:24 37:18 38:12
  52:10,11 54:7,21 56:4
  66:25 73:1 88:11 106:4
Turks 65:6
TV 36:9 80:21
twist 106:8
two 10:15,16 15:13 29:3
  30:12 38:10 54:6,20
  57:21 64:24 67:6 79:9
type 43:15 89:18 90:6,23
Typically 6:13

### U

UBS 60:18 98:22
ugly 84:23
uh-huh 14:15 17:22 24:6
  32:25 50:19 51:12,25
  69:24 70:4 71:16 74:2
  99:22,24
uncertain 55:2,4
under 61:3 108:9,11
underneath 94:4
undersigned 108:4
understand 5:17,20,25
  7:19 8:12 9:11 13:14
  21:12,13 25:6 32:16,19
  36:23 38:12 40:7 45:4
  48:15 49:4 55:18 71:22
  73:2 75:21 102:19
understanding 8:18,19
  9:16 16:24 17:10,14
  38:1,1,2 53:20 66:2
  62:21 75:2 91:11 92:1
  93:10 94:25
understood 42:12
unfamiliar 81:16
Unh-unh 18:23 40:4
union 50:16,18 51:18
  74:8
United 85:7,8 93:18 94:23
  95:1
unknown 34:19
unless 25:16 32:15
unlicensed 62:22 63:19
unsure 9:17
until 56:13 58:2,4 82:5,6

upset 65:14
upside 100:5
use 8:20 9:5 18:4,10,12
  18:16 24:10 43:21,21
  43:22 44:1,4 61:24
  73:11,11 75:20,22
  76:21,23 79:8 92:5
  96:12 105:20,21,24
used 5:10 21:24 61:21
  64:24 78:25 80:17 99:1
  99:4
using 45:4 77:6 108:10
utilities 76:14
U.K 48:16

### V

vague 19:17 32:11 102:1
Vallarta 51:10,11,12
value 10:6 11:21,24
  26:13,13 27:3,5,6 39:8
  43:21 44:2 46:13 52:19
  52:22 57:5 74:17 75:15
  75:20 89:23,24 104:15
  105:5
various 13:25
vCard 64:16
VEGAS 1:4 2:4
verbatim 108:9
very 16:6,15 18:4 19:1
  21:10 25:2 28:24 51:21
  104:2
video 22:14,14
videos 34:14
violated 68:22
vs 1:6 2:6

### W

wait 62:7,7
walk 56:3
walked 96:8
wallet 49:5
want 9:22 10:9,14 11:13
  12:10,19 19:19 20:3
  21:5,9 24:16 25:6,21
  28:7 31:12 36:2,10
  39:18,23 42:12 47:4
  56:9 57:14 59:6 66:3,8
  66:9 80:22 86:22 91:22
  92:24 94:19 101:22
  105:8,10 106:7
wanted 35:8,17 48:19
  88:13 96:14
wasn't 25:21 41:23 94:7
  94:16
Water 81:14
way 12:22 28:15 53:10
  55:25 57:16 67:14 69:8
  77:25 80:16,16 90:19
  98:3
wedding 52:8 56:21 57:3
weekend 57:3 77:7 96:14
weeks 47:3,21 51:21
  72:24 76:20
weird 76:5
well 10:18 16:6 17:3 25:6
  28:8 30:9 32:23 33:2
  34:3 36:1,24 37:1 38:17

38:21 41:4,9,14 42:6
  43:5 47:1,19 49:20 50:3
  50:14 53:16,20 56:9
  59:12 61:4 62:3 64:3,6
  67:5 68:17 73:6 79:3
  80:2 88:1 90:5 95:3,6
  96:9 100:18,24 104:21
Wells 60:3,17 98:23
went 41:15 72:21 89:17
  106:1
were 12:2 13:15 22:3
  26:16,16,17 27:18
  30:12,22 31:18,19
  32:24 34:22 41:14,17
  42:4,4,9 43:3 44:7
  50:13,15,18 60:13,15
  60:16,18 65:14 71:8
  73:16 75:5 76:19 85:19
  87:4 101:17 102:10
  108:6,9
weren't 44:5 50:15 87:5
  96:10
West 3:18
we'll 47:5 90:18
we're 6:5 47:1 53:11,12
  74:3 81:25 89:1
we've 99:1
whatsoever 46:3 56:17
  68:2 89:9,14 90:24
WHEREOF 108:17
while 48:7
whole 10:18 22:10 23:1,7
  23:25 41:16,17 52:7
  55:6,23 66:25 82:16
  93:15 94:14 95:11
Wild 33:25 34:4,10,15,19
  35:2,5,9,18,20 36:12
  37:4,24 44:24 66:16
  70:13,20,21,21 77:20
  78:3,13,20 98:25 99:5
  100:17 101:16,24
  102:10 104:4
wilful 5:22
willing 52:14
wipe 47:10 95:15
wiped 61:1 89:15 96:1
wipes 47:3
wish 46:15
withdraw 62:2
WITNESS 4:3,12 6:9 8:12
  9:20,25 10:11,17 12:8
  12:12,22 13:2,18 14:22
  15:4,11 16:13 19:19
  24:13,16,20,24 25:14
  26:2 29:6 34:8 49:14
  51:16 53:12 54:1,16
  57:16 71:21 79:1 83:4
  84:10 85:24 86:3,23
  87:8,11 88:7,24 89:3
  90:19 93:5 100:9,21
  101:2,6,14 105:12
  107:2 108:17
witnesses 108:8
women 55:19
word 24:10 50:12
words 86:22
work 64:24 79:22 80:17

81:6,9,11 82:2 105:23
  105:25
working 45:17 46:17
works 12:22 15:6 16:2
worms 56:20 61:7
worry 94:16
worth 53:4 64:17 75:11
  90:2 100:2
wouldn't 20:13 66:17,19
  76:25 77:9 80:1
wrap 95:19
written 69:9
wrong 6:13 24:10
wrote 42:23
www.depo.com 1:23
WYNN 1:4 2:4

### X

X 4:1 98:15,16

### Y

YANKELEVITZ 3:10
yeah 5:16 8:12 9:14,20
  9:25 10:11 12:25 13:13
  14:13,22 18:21 19:13
  23:12 24:15 27:2 38:6,7
  39:7 40:15,15,23 42:19
  43:3,4,23,23,24 45:6
  46:12 47:9 49:23 50:2
  51:21 54:21 55:15,16
  55:17,17,19 57:24
  60:12,17 63:16 66:20
  67:19 68:2,15,17 69:6,7
  69:20 71:7 72:6,21 75:7
  77:3 79:17 80:6,12,21
  81:7,19 83:13 84:5,5,6
  84:10 85:22 87:10,11
  88:20 91:17 94:7,13
  96:8,13 97:2 98:18
  100:4,7,21 103:5,16
  104:15 105:15 106:2,19
year 11:14,17 39:20 61:9
  61:9,9 62:5 85:2 92:8
years 10:10,12,15,16
  19:1,2 20:15,17,19,25
  22:11 29:3 30:23 31:1
  49:19,21 50:9 57:6 60:2
  61:22,22 71:9 72:22
  73:10 81:5 85:15 91:19
yell 80:22
yep 70:4 73:18
yesterday 16:14
York 28:21

### $

$1,000 50:5,9 57:7,8,10
  57:12
$10 49:8
$100,000 87:16
$33 60:25
$50 58:21,25 105:9,12
$75 87:25 88:20

### 0

04 42:6
08 42:6

A5079BE

**JOSEPH R. FRANCIS AUGUST 22, 2011**

**1**

**1A** 2:17
**100** 41:10 47:20 77:14
  87:22
**1100** 3:12
**111** 2:16
**1111** 6:22
**123009** 1:6 2:6
**14th** 3:12
**1670** 3:6
**18** 4:14
**1900** 3:18

**2**

**20** 37:10 49:8 66:6
**2000** 23:18 95:21
**2001** 81:7,12
**2002** 81:7,12 83:24
**2003** 41:15 42:8,15
**2004** 42:1
**2007** 20:24 23:18,19,20
  23:23 43:20 49:22,22
  49:23,24 73:16
**2008** 22:18 23:16,17 41:8
**2010** 51:3 62:5,8,10
**2011** 1:18 2:18
**22** 1:18 2:18 4:14
**225** 3:5
**231-1058** 3:19
**231-7423** 3:20
**239-4333** 3:7
**25,000** 52:25
**26** 4:19
**288-3376** 1:22

**3**

**30** 75:12
**310** 3:13,14

**4**

**40,000** 75:2

**5**

**5** 4:5
**500-3500** 3:13
**500-3501** 3:14

**6**

**6** 4:19
**619** 3:7,7,19,20
**655** 3:18

**7**

**702-6100** 3:7
**71** 4:14
**7504** 1:24 2:19 108:23

**8**

**8** 4:14 23:18
**800** 1:22

**9**

**9:52** 2:18
**90024** 3:13
**92101** 3:6,19