1   Mitchell J. Langberg, Esq., Nev. Bar. No. 10118
    Laura F. Bielinski, Esq., Nevada Bar No. 10516
2   BROWNSTEIN HYATT FARBER SCHRECK, LLP
    100 North City Parkway, Suite 1600
3   Las Vegas, Nevada 89106
    mlangberg@bhfs.com
4   lbielinski@bhfs.com
    Telephone:  (702) 382-2101
5   Facsimile (702) 383-8135

6       and

7   MALHAR S. PAGAY, ESQ. (CA BAR NO. 189289)
    (*pro hac vice* pending)
8   PACHULSKI STANG ZIEHL & JONES LLP
    10100 Santa Monica Blvd., 13th Floor
9   Los Angeles, California  90067
    mpagay@pszjlaw.com
10  Telephone:    (310) 277-6910
    Facsimile:    (310) 201-0760

11

12  Attorneys for Wynn Las Vegas, LLC d/b/a Wynn Las Vegas

13          **UNITED STATES BANKRUPTCY COURT**

14            **DISTRICT OF NEVADA**

15  In re:                                  Adversary Case No.: 13-01050-MMN

16  WYNN LAS VEGAS LLC d/b/a/ WYNN LAS       Chapter 11
    VEGAS, a Nevada limited liability company,
17                                           **DECLARATION OF MALHAR S. PAGAY**
                    Plaintiff,               **REGARDING REPLY RE: MOTION FOR**
18                                           **ORDER APPROVING STIPULATION**
            vs.                              **REGARDING RESOLUTION OF**
19                                           **REMOVED ACTION**
    GGW DIRECT, LLC, a Delaware limited
20  liability company; GGW BRANDS, LLC, a
    Delaware limited liability company; GGW
21  EVENTS, LLC, a Delaware limited liability    **Hearing**
    company; MANTRA FILMS, INC., a
22  suspended Oklahoma corporation; BLUE     Date:   August 28, 2013
    HORSE TRADING, LLC, a California limited Time:    9:30 a.m.
23  liability company; PEPE BUS, LLC, an inactive Place: Courtroom 2
    Montana limited liability company; SANDS        U.S. Bankruptcy Court
24  MEDIA, INC., a revoked Nevada domestic         District of Nevada
    corporation; JOSEPH R. FRANCIS, an             Foley Federal Building
25  individual; DAVID R. HOUSTON, an               300 Las Vegas Boulevard South
    individual; and DAVID R. HOUSTON, LTD., a      Las Vegas, Nevada 89101
26  Nevada professional corporation, doing business
    as THE LAW OFFICE OF DAVID R.
27  HOUSTON,

28                  Defendants.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

I, Malhar S. Pagay, declare as follows:

1.     I am an attorney, duly admitted to practice before the United States Court of Appeals for the Ninth Circuit, the United States District Courts for the Central, Eastern, Northern and Southern Districts of California and this Court, and am counsel to Wynn Las Vegas, LLC d/b/a Wynn Las Vegas ("Wynn Las Vegas"), in connection with the legal disputes described herein.

2.     This Declaration is submitted regarding the *Reply in Support of the Motion for Order Approving Stipulation Regarding Resolution of Removed Action* (the "Reply"); and *Motion for Order Approving Stipulation Regarding Resolution of Removed Action [Docket No. 23]* (the "Motion"), filed by Wynn Las Vegas in the above-captioned case.  Terms not otherwise defined herein shall have the same meaning as set forth in the Motion or Reply, as applicable.

3.     Attached hereto as **Exhibit "G"** is a true copy of the Transcript of Proceedings Before the Honorable Sandra Klein, United States Bankruptcy Judge, taking place in the chapter 11 cases of the Debtors on August 7, 2013.

4.     Attached hereto as **Exhibit "H"** is a true copy of the Transcript of Proceedings Before the Honorable Sandra Klein, United States Bankruptcy Judge, taking place in the chapter 11 cases of the Debtors on April 10, 2013.

I declare under penalty of perjury that the foregoing is true and correct and that if called upon as a witness, I could and would competently testify thereto.

Executed this 21st day of August, 2013, at Los Angeles, California.

MALHAR S. PAGAY

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT G

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4  In Re:                        )  Case No. 2:13-bk-15130-SK
                                 )
5  GGW BRANDS, LLC and GGW       )  Chapter 11
   MARKETING, LLC,               )
6                                )  Los Angeles, California
            Debtors.            )  Wednesday, August 7, 2013
7  _____)  9:30 a.m.

8                                HEARING RE MOTION FOR ORDER
                                 EXTENDING THE TIME WITHIN
9                                WHICH GGW MARKETING, LLC MAY
                                 FILE NOTICES OF REMOVAL OF
10                               CIVIL PROCEEDINGS

11                               HEARING RE MOTION FOR APPROVAL
                                 OF SETTLEMENT WITH WYNN LAS
12                               VEGAS, LLC AND STEPHEN A. WYNN

13              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE SANDRA KLEIN
14             UNITED STATES BANKRUPTCY JUDGE

15  APPEARANCES:

16  For GGW Global Brands:       MICHAEL D. KOLODZI, ESQ.
                                 Kolodzi Law Firm
17                               5981 Topanga Canyon Boulevard
                                 Woodland Hills, California
18                                 91367
                                 (818) 287-7171
19
    For Wynn Las Vegas, LLC:     MALHAR S. PAGAY, ESQ.
20                               Pachulski, Stang, Ziehl &
                                   Jones
21                               10100 Santa Monica Boulevard
                                 11th Floor
22                               Los Angeles, California  90067
                                 (310) 277-6910
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

```
1  APPEARANCES:  (Cont'd.)

2  For Wynn Las Vegas, LLC:        MITCHELL J. LANGBERG, ESQ.
                                   Brownstein, Hyatt, Farber &
3                                     Schreck
                                   2029 Center Park East
4                                  Suite 2100
                                   Los Angeles, California  90067
5                                  (310) 500-4631

6  For the Trustee:                MATTHEW HEYN, ESQ.
                                   Klee, Tuchin, Bogdanoff &
7                                     Stern
                                   1999 Avenue of the Stars
8                                  39th Floor
                                   Los Angeles, California
9                                  (310) 407-4000

10 For Tamara Favazza:             JOHN MEDLER, ESQ.
                                   The Medler Law Firm, LLC
11                                 7700 Bohomme
                                   Suite 360
12                                 Clayton, Missouri  63105
                                   (311) 727-8777
13
   For Class Action Creditors:     A.J. DE BARTOLOMEO, ESQ.
14                                 Girard Gibbs, LLP
                                   601 California Street
15                                 14th Floor
                                   San Francisco, California
16                                   94108
                                   (415) 981-4000
17
   Court Recorder:                 Shemaine Carraza
18                                 United States Bankruptcy Court
                                   Edward R. Roybal Federal
19                                   Building
                                   255 East Temple Street
20                                 Los Angeles, California  90012
                                   (213) 894-5932
21
   Transcriber:                    Shonna D. Mowrer
22                                 Echo Reporting, Inc.
                                   6336 Greenwich Drive, Suite B
23                                 San Diego, California  92122
                                   (858) 453-7590
24

25
```

*Echo Reporting, Inc.*

1

1  LOS ANGELES, CALIFORNIA WEDNESDAY, AUGUST 7, 2013 9:30 A.M.

2                              --oOo--

3       (Call to order of the Court.)

4           THE COURT:  Matter Number 49, GGW.

5           MR. HEYN:  Good morning, your Honor.  Matt. Heyn

6  appearing on behalf of the Trustee and GGW Marketing, LLC.

7           THE COURT:  Good morning, Mr. Heyn.

8           MR. MEDLER:  Good morning, your Honor.  John

9  Medler appearing on behalf of creditor Tamara Favazza.

10           THE COURT:  Good morning, Mr. Medler.  Did your

11  case settle?

12           MR. MEDLER:  Yes, ma'am.  The eleventh hour.

13           THE COURT:  Wonderful.  Okay.

14           MR. PAGAY:  Good morning, your Honor.  Malhar

15  Pagay, Pachulski, Stang, Ziehl & Jones, pro counsel for Wynn

16  Las Vegas, LLC.

17           MR. KOLODZI:  Good morning, your Honor.  Michael

18  Kolodzi on behalf of GGW Global Brands, Inc., the interested

19  party.

20           THE COURT:  Pronounce your last name.

21           MR. KOLODZI:  Kolodzi.

22           THE COURT:  Kolodzi.

23           MR. KOLODZI:  Thank you.

24           THE COURT:  Thank you.

25           MS. DE BARTOLOMEO:  Good morning, your Honor.

2

1   A.J. De Bartolomeo from Girard Gibbs on behalf of the class

2   action creditors.

3            THE COURT:  And your last name again, ma'am?

4            MS. DE BARTOLOMEO:  De Bartolomeo.

5            THE COURT:  Please spell that.

6            MS. DE BARTOLOMEO:  Are you serious?

7            THE COURT:  Yes.

8            MS. DE BARTOLOMEO:  No.  I'm sorry.  I've been

9   asked that question since I was three.  I didn't know if

10  people were kidding me.

11           THE COURT:  No, no.  I'm serious.

12           MS. DE BARTOLOMEO:  Capital D, as in David, E.

13  Then there's a space.  Capital B, as in boy, A-R-T-O-L-O-M,

14  as in Michael, E-O.

15           THE COURT:  Okay.

16           MS. DE BARTOLOMEO:  Just pronounce everything you

17  see.

18           THE COURT:  Okay.  Perfect.  Okay.

19           And actually, Number 49, which I called first, was

20  the unopposed motion for order extending time to file

21  notices of removal.  And that was unopposed, and that was

22  granted.  So we're actually all here on Matter Number 50,

23  which is the motion for approval of the settlement.

24           One more.

25           MR. LANGBERG:  Good morning, your Honor.  Mitchell

3

1  Langberg, Brownstein, Hyatt, Farber, Schreck for Wynn Las

2  Vegas.

3          THE COURT:  Okay.  Great.

4          All right.  So we're here on the moving for

5  approval of settlement.  I believe each of you received a

6  short little tentative that came out yesterday via e-mail.

7          Mr. Heyn, I assume that you don't oppose the

8  tentative?

9          MR. HEYN:  We appreciate the lengthy analysis, and

10  we would submit on the tentative.

11          THE COURT:  Okay.  So then I'd like to hear from

12  each of the opposing creditors.  Mr. Medler, because you

13  signed in first, I'll hear from you first.

14          MR. MEDLER:  Thank you, your Honor.

15          Your Honor, I represent Tamara Favazza, who, if

16  Wynn Las Vegas' claim is not allowed, would be the single

17  largest creditor of the Debtor's with a claim of almost $6

18  million.  And while our judgment is against the precursor

19  companies, I believe we've submitted evidence to the Court

20  showing that the Debtors are, in essence, the successor

21  corporations by essentially a name change that occurred in

22  approximately November 2010.

23          And Ms. De Bartolomeo has also submitted some

24  deposition testimony from the former vice president of

25  Mantra Films, Inc., who said that basically we went

4

1 essentially overnight from Mantra Films, Inc. to the GGW

2 companies.  And that's essentially what happened.  They just

3 changed the name.

4         So we have a legitimate debt of -- or judgment of

5 $6 million essentially against the precursor company, which

6 we believe is a very legitimate debt against the Debtors.

7 And what is at stake here for my client, your Honor, is that

8 if the Trustee is successful in obtaining the intellectual

9 property and selling the company on the auction block for

10 what I believe should be several million dollars, my client

11 stands, as a result of this settlement, to lose, I believe,

12 between 1 and $2 million.

13         And so it is a very important motion for my

14 client.  It's something that we take very seriously and I

15 know your Honor takes it seriously.  But it's something that

16 we believe that this settlement is completely unfair to our

17 client and basically massively dilutes her claim to the

18 point where she will get perhaps a few hundred thousand

19 dollars at the end of the day on what is a $6 million claim

20 and a legitimate claim against the company.

21         I'd like to frame the issue, if we could, your

22 Honor, by something that I hope we can all agree with.  If

23 the Court were to rule that the law prohibited reverse veil

24 piercing, then there is no question that this settlement is

25 unfair.

5

1        For example, if the claim of Wynn Las Vegas, this
2   reverse veil piercing claim, was beyond the statute of
3   limitations -- and we all agreed with that -- they would
4   have a nonviable claim.  So to legitimize a nonviable claim
5   for some $27 million and thereby dilute the claims of my
6   client and other unsecured creditors, I think we would all
7   agree that that is an unfair settlement that should not be
8   approved.
9        So at the end of the day, the analysis really
10  comes down to whether this reverse veil piercing claim
11  should be allowed or not.
12       Now, with regard to this $1.8 million of money,
13  I'm not going to spend much time on that, your Honor.  I
14  believe they should have gotten a little bit more, but at
15  the end of the day, what's good about that is the Trustee
16  gets paid.  And we would like that too.  Because to date, I
17  think the Trustee, I would say has done an excellent job for
18  all the unsecured creditors.
19       I wanted to make that point for Matt and his firm.
20  I think they've done an excellent job.  And they deserve to
21  be paid, and I hope at the end of the day, when this company
22  is sold on the auction block, they will be paid for their
23  efforts because I think they've done an outstanding job so
24  far.
25       That's the only good thing about this agreement,

6

1   your Honor.  What is bad about it is it legitimizes a $27

2   million claim, which is nonviable.  And I wanted to point

3   something out to the Court that you may not be aware of is

4   that there is another claim out there in the woodworks that

5   is coming in literally three days.

6          A former attorney named Brian Raymont (phonetic)

7   for the Debtors has gotten an $8.8 million judgment against

8   Joe Francis.  Half of that, 4.4 million, is punitive

9   damages.  And I would say something like 80-percent -- you

10  can correct my math if I'm wrong, but something like 80-

11  percent of that is a claim for intentional infliction of

12  emotional distress filed against Mr. Francis for doing

13  things like telling Mr. Raymont's daughters that he was a

14  thief, things like that.  I won't go into it.

15         But essentially what's going on is, about 80-

16  percent of that $8.8 million claim is going to be a reverse

17  veil piecing claim exactly like the Wynn claim.  So it's not

18  just $27 million.  Ultimately, Mr. Raymont is going to come

19  in and try and ride the coattails of this ruling to have his

20  entire judgment of 8.8 million also recognized.  And you can

21  imagine that's going to significantly dilute the claim of my

22  client.

23         Now, your Honor, one thing I did want to talk

24  about with respect to these choices of law and the matters

25  of law, as we know, we've talked about the possibility of

7

1  Delaware, California and Nevada.  And I wanted to point

2  something out to the Court.  With respect to Delaware, I

3  think we're in agreement -- at least I am in agreement with

4  Mr. Wynn that Delaware law under no circumstances would

5  apply.

6        And when Mr. Pagay filed his reply brief, he cited

7  a case called <u>First National Bank</u>.  It's the <u>Cuban Bank</u> case

8  from the United States Supreme Court.  It's in Mr. Pagay's

9  reply brief, if your Honor wants the cite.  And I believe

10  that they're absolutely correct that that case stands for

11  the proposition that when outside third parties are

12  involved, the Internal Affairs Doctrine simply does not

13  apply.  And therefore, Delaware law under no circumstances

14  would apply.  And I think we are in agreement with that.  So

15  I think the issue boils down to California and Nevada.  At

16  least that's our position.

17        In order to determine this analysis, your Honor, I

18  believe we need to start with what is the forum state.

19  Because in most cases, that's a pretty clear thing.  But in

20  this case, there is a little bit of an issue on that.  I

21  would suggest to you that because they're bringing this

22  settlement agreement to you to decide and you essentially

23  have to rule on whether reverse veil piercing is legitimate

24  in order to determine whether the good-faith -- whether this

25  is a good-faith settlement, in essence, you are the forum.

8

1       And because you are sitting in California, the

2  forum state is California.  And there has been some

3  discussion about this transfer of venue and so on, and I

4  wanted the Court to also realize that if they want to go

5  forward and legitimize their claim for reverse veil

6  piercing, in order to do that, because of the stay in

7  bankruptcy, they're obviously going to have to come to you

8  first and get a lift of that stay.

9       And you may rule for them, you may rule against

10 them, but when you rule on that issue on lifting the stay,

11 you're going to have to be taking, of course, into account

12 the situation with regard to the other creditors and the

13 fairness of that.  And so when the Court rules at that

14 stage, this Court will be the forum state.  So it's our

15 position that this court, California is the forum state.

16      With regard to choice of law, this is -- I believe

17 this is almost like a bar exam question.  This is so

18 complicated with all these issues regarding the choice of

19 law.  And I'd like to try and delve through it a little bit

20 if I can, your Honor.

21      I think on the choice of law rules, the way I've

22 analyzed it is you have essentially five choices of choice

23 of law analysis.  And the first choice is the Ninth Circuit

24 ruled that the law of the forum governs alter ego issues.

25 This is something that Mr. Heyn cited in his reply brief

9

1  that I had not seen before.  But apparently, there's three

2  cases that Mr. Heyn has cited from the Ninth Circuit.  One

3  is <u>Schwarzkopf</u> (phonetic).  There's <u>SEC vs. Hickey</u> and <u>In Re</u>

4  <u>Turner</u>.

5          And in each of those cases, they said if the issue

6  is alter ego, we apply the law of the forum state in

7  determining whether a corporation is the alter ego of an

8  individual.  And so because we believe that California is

9  the forum state, California law should apply.  So that's

10  choice one.  And if the Court were to want to go with that

11  option for a choice of law, that would be fine with Ms.

12  Favazza.

13          The second issue would be the California

14  Government interest approach.  If the Court is sitting in

15  diversity, it normally applies the choice of law rules of

16  the state where it sits.  And again, because we believe that

17  the forum state is California, the Government interest test

18  should apply here.

19          And in that scenario, you basically take the

20  interests of California and compare them with the interests

21  of Nevada.  Let's talk about the interests of California, if

22  we could.

23          California has an interest in making sure that

24  LLCs that do business in California pay the debts of the

25  corporation.  And it will be very difficult for them to pay

10

1 the debts of their corporation if they're busy paying for

2 gambling debts and defamation cases and intentional

3 infliction of emotional distress caused by Mr. Francis

4 himself.

5        California has an interest in making sure that

6 corporate creditors in California who extend credit are

7 protected.  California has an interest in making sure that

8 LLCs operating in California pay the victims of their

9 corporate torts.

10        And I might point out, your Honor, that in our

11 case -- I don't know if you know too much of the details of

12 our case, but it was essentially a sexual assault on my

13 client that was then filmed, and without her consent

14 broadcast across the United States and internationally

15 without her consent.

16        THE COURT:  I've -- sorry to interrupt you.  I

17 have read the pleadings in that case.

18        MR. MEDLER:  Okay.  Thank you, your Honor.

19        So California would have an interest in making

20 sure that California corporations that engage in that

21 conduct pay the victims of those torts.

22        With regard to Mr. Raymont's ultimate claim, part

23 of that claim is not a corporate veil -- it's not a reverse

24 veil piercing claim.  It's, you didn't pay my legal bills.

25 And as far as that portion of Mr. Raymont's claim is going

11

1 to be concerned, California has an interest in making sure

2 that corporations in California pay their legal bills and

3 Honor their contracts.

4         Now let's talk about the interest of Nevada.  The

5 interests of Nevada is basically to make sure that a casino

6 owner which got cheated on a gambling debt by an individual

7 can attach the assets of that individual's corporation or

8 that a casino owner who is defamed can attach the corporate

9 assets of the corporation of the shareholder that defamed

10 him.

11         I would submit to your Honor that when you compare

12 those governmental interests, California's interests are far

13 superior than those of Nevada.  And under the governmental

14 interest approach, California again law should apply.

15         If the Court were to determine, however, that

16 Nevada was the forum state, then Nevada applies the most

17 significant relationship test.  And basically, again, it's

18 an analysis of the factors.  But you look to basically which

19 company -- or which state, rather, has the most significant

20 interests and closest relationship with the facts in this

21 case.

22         Now, let's remember, this is not the case for

23 defamation.  This is not the case for, you didn't pay me my

24 gambling debt.  This is alter ego and reverse piercing of

25 the corporate veil.  That's what is of interest here.  And

12

1  so that's what we have to focus on.

2          So in analyzing the most significant relationship,

3  you would look to the fact that Mr. Francis has basically

4  taken his money and put it into these corporations in

5  California.  These companies are operating in California.

6  Their employees are in California.  The Trustee is operating

7  the company in California.  The records of the company are

8  in California.  Basically, all the factors in this case are

9  in California.

10          So under the most significant relationship test, I

11  would argue again that California law applies.  And if we --

12  if we were to analyze the factors of Section 154 of the

13  restatement, again you can see that California law applies.

14  If we want to just go through a few of those.  For instance,

15  the needs of the interstate system.  Interstate commerce, I

16  believe, would be adversely affected if creditors in other

17  states can't get repaid for their credit extended in

18  California.

19          It also requires us to look at the relevant

20  policies of other states that might be affected.  My client

21  is from Missouri.  The tort occurred in Missouri, and

22  Missouri has an interest in making sure Missouri victims of

23  corporate torts get compensated.

24          And the basic policies underlying this field of

25  law are basically that there is fair, equal treatment of

13

1 corporate creditors. I think in your tentative ruling, your

2 Honor, you said that the expected -- expectations of

3 unsecured creditors are that they share pro rata with all

4 the other unsecured creditors. And I think that's

5 absolutely right.

6      This gives Mr. Wynn a $250,000 preference. This

7 allows him to walk away with a large sum of money, and this

8 allows him to legitimize what we believe is an invalid claim

9 of reverse veil piecing. We believe, then, under that most

10 significant relationship test, that California applies.

11      I've already spoken -- the fourth option is the

12 internal affairs. And I think that would point to Delaware,

13 and I don't think that that applies because of the Cuban

14 Bank case that Mr. Pagay cited.

15      And then the last opportunity as far as choice of

16 law analysis, your Honor, would be specific provisions of

17 the restatement of conflicts. And Mr. Heyn points out in

18 his brief that Nevada's law technically says that you look

19 at the most significant relationship and the 154 factors

20 unless a more specific provision applies.

21      And Mr. Heyn has pointed to this Section 150

22 involving multi-state defamation. And I would suggest to

23 your Honor that this is not the defamation case. The

24 defamation case is over and is on appeal. This is the alter

25 ego reverse veil piercing case. So we believe that Section

14

1   150 does not apply.

2          If you're going to apply a more specific section

3   of the restatement, there is one called Section 174.  And

4   that's entitled "Vicarious Liability."  And that says that

5   the law selected by application of the rule of 145

6   determines whether one person is liable for the tort of

7   another person.  That's about as close as we can get here,

8   your Honor.

9          And so if you're going to basically apply Section

10  174, that brings us right back again to the 145 factors that

11  I just pointed out.  So essentially, whichever choice of law

12  analysis that you come up with, your Honor, it's our

13  position that California law applies.

14         THE COURT:  And let me stop you there.  I'm aware

15  of the Postal case.  What about the nominee theory?

16         MR. MEDLER:  Your Honor, we believe that the

17  nominee theory is primarily used in the context of tax

18  cases.  And -- go ahead.

19         THE COURT:  I read the cases on which the recent

20  Ninth Circuit cases were based, and I disagree with you.  I

21  think those cases happen to be IRS cases, but the underlying

22  issue is a California state law issue regarding nominee

23  liability.

24         So I don't agree with your analysis of -- you

25  know, that California -- those cases only apply to tax-

15

1 related issues.  I don't think that's a correct reading of

2 the law.

3         MR. MEDLER:  Your Honor -- and of course that's

4 why reasonable minds can differ.  And so of course --

5         THE COURT:  Of course.

6         MR. MEDLER:  -- I would respectfully disagree.

7 But I will tell you that with respect to this nominee

8 theory, if you allow the nominee theory, then that

9 essentially swallows the rule.  There's no point.  I mean,

10 you might as well allow reverse veil piecing because in a

11 nominee theory, all you have to do is establish a nexus.

12         So if that's all you have to do, then what's the

13 point of the Postal case basically saying reverse veil

14 piercing?  I mean, you're swallowing the exception with the

15 rule.  And I would say, your Honor, that it keeps getting

16 pointed out by people that this Postal Instant Press case is

17 out there as if that's the only case that rules in our favor

18 under California law.  Judge, there are five cases that say

19 that California law does not recognize reverse veil

20 piercing.

21         THE COURT:  What about the older cases that were

22 cited in the tentative, including the only Supreme Court

23 case that I believe has addressed it, which is Woods?

24         MR. MEDLER:  Yeah.

25         THE COURT:  And you can get to that in a moment.

16

1 I disagree with you in terms of the nominee theory.  It's

2 not just the exception swallowing the rule.  There's a six-

3 factor test that the Ninth Circuit set forth in <u>Fourth</u>

4 <u>Investors</u>.  And the Court went through how it believed that

5 there is at least a viable theory under the <u>Fourth Investor</u>

6 test.

7            And again, the Court does disagree.  As you say,

8 reasonable minds can disagree --

9            MR. MEDLER:  Right.

10            THE COURT:  -- in terms of whether or not that

11 nominee theory is only focused on tax-related claims.

12            MR. MEDLER:  I'd like to address the point you

13 made a moment ago about some of the older cases in

14 California.

15            THE COURT:  Certainly.

16            MR. MEDLER:  The first one was <u>Taylor</u>.  And if you

17 look at the <u>Postal Instant Press</u> case, they actually cover

18 <u>Taylor</u> in that opinion.

19            THE COURT:  Uh-huh.

20            MR. MEDLER:  You probably read that.  And they

21 nevertheless believed that this was a case of first

22 impression, when <u>Postal Instant Press</u> was decided.

23            So they were of the opinion that <u>Taylor</u> was

24 certainly not -- decided in 1957, was certainly not

25 persuasive enough for them to rule that way.  I will point

17

1  out also that there is nothing in that previous <u>Taylor</u> case

2  which suggested that there were other legitimate unsecured

3  creditors of the corporation waiting in the wings to be paid

4  who had to stand behind in line for the creditors of the

5  individual shareholder.  So I think that makes that

6  different.

7           With regard to the Supreme Court case from 1977,

8  your Honor, that was a case involving trusts.  And I just

9  don't think that that is very close to the facts here.  In

10 that case, they were saying that the trust was the alter ego

11 of the shareholder -- of the individual person who was, I

12 guess, a member of the trust or whatever.  I just don't

13 think those facts are the same.  And we don't have the same

14 situation here where we have creditors of the trust lurking

15 out there that have to wait in line behind this.

16          And I just think that it's just a matter of

17 overall fairness, Judge.  This is a gentleman, Mr. Francis,

18 who I think we can all agree is a walking time bomb, who

19 goes around committing torts right and left.  For the

20 legitimate creditors of the corporation to have to wait in

21 line behind the preferences given to someone who is not a

22 legitimate corporate creditor, who is someone who is a

23 creditor of torts that are committed by Joe Francis that

24 have absolutely nothing to do with the corporation, we

25 believe is just fundamentally unfair, your Honor.

18

1          THE COURT:  Let me ask you a question.  Because I

2     assume Mr. Pagay would take issues with you calling Mr. Wynn

3     or Wynn Las Vegas not a legitimate creditor and Ms. Favazza

4     a legitimate creditor.  So I think the Court pointed out in

5     the tentative ruling, everybody is trying to hold the

6     Debtors responsible for Mr. Francis's claims or wrongs or

7     whatever it is, based upon some type of vicarious liability.

8          You're saying it's a mere name change.  The

9     Trustee takes issue with that.  And Mr. Pagay and Mr. Wynn

10    are trying to hold the Debtor liable for, you know, wrongs

11    committed by Mr. Francis.  So I think everybody, legitimate,

12    illegitimate, not legitimate, however you want to call it, I

13    think you're all standing in the same position.  You all

14    have judgments against Mr. Francis.

15          MR. MEDLER:  No, that's not true.

16          THE COURT:  Oh, I'm sorry.  You have it against

17    Mantra and MRA.

18          MR. MEDLER:  Right.

19          THE COURT:  Okay.  And Mr. Pagay is against

20    Francis, and the class action creditors, I believe, are

21    against --

22          MR. MEDLER:  Mantra.

23          THE COURT:  -- Mantra.

24          MS. DE BARTOLOMEO:  Actually, excuse me.  Just --

25    not to interrupt.

19

1          THE COURT:  That's fine.

2          MS. DE BARTOLOMEO:  They're against all three.

3 I'm sort of a hybrid.

4          THE COURT:  Okay.  Against Mantra, MRA and

5 Francis.

6          MS. DE BARTOLOMEO:  Francis, Mantra, MRA.

7          THE COURT:  Okay.

8          MR. MEDLER:  Okay.

9          THE COURT:  But everybody has them against someone

10 other than the Debtors.  Okay.

11          MR. MEDLER:  I would -- sure.  Go ahead.  Sorry.

12          THE COURT:  I hear your argument that you say it's

13 a mere name change.  That's all.  There's no big deal.  The

14 Trustee takes issue with that.  I think the Trustee's

15 arguments have weight in terms of that.

16          That being said, we're looking at your judgment.

17 If you look at the paper that your judgment is on, it's not

18 against the Debtors.  Nobody's judgment is against the

19 Debtors at this point.  So everybody is trying to get money

20 from the Debtors, and nobody actually has a judgment that

21 says it's against GGW Marketing or Direct or whatever the

22 others are.

23          So the distinction between legitimate and not

24 legitimate, I really don't see it quite the same way you do.

25          MR. MEDLER:  And I know obviously we disagree on

*Echo Reporting, Inc.*

20

1  it, but let me just make the quick point that there is not a

2  body of law in California that says my type of claim is

3  illegitimate.  The successor liability is very firmly

4  established in California law.  And even if it's not

5  successor liability, we can have traditional piercing of the

6  corporate veil, which is clearly allowed in California.

7           So I think it's different because there's not a

8  body of law out there that says this is bogus, this is an

9  illegitimate, invalid claim.  And that's why I think the two

10 are dissimilar.  I would agree -- and by the way, let me

11 just make another point that I don't know is -- I think it

12 should probably be made.

13          We agree that he's the alter ego.  We don't have

14 any debate with that, that Joe Francis is the alter ego of

15 the Debtors, is the alter ego of Mantra.  No question about

16 that.  And in a traditional veil piecing analysis, that

17 would be the end of the inquiry.  Because once he's the

18 alter ego, you get to pierce.

19          But in the reverse veil piercing, you have to go

20 the second step of having a body of law which says you can

21 reverse veil-pierce.  And that's where we disagree with

22 them, and we believe that there is not a legitimate claim.

23          So we believe, your Honor, that this settlement is

24 fundamentally unfair, will dramatically dilute my client's

25 share of what will be the ultimate recover in this case.

21

1   And so we'd ask that you reverse your position in your

2   tentative.

3           And as a last point, if the Court were to go with

4   the tentative, we would ask for the ability to be able to

5   appeal, so we'd like your Honor to stay her ruling and give

6   us the opportunity to appeal the case -- appeal the ruling.

7           THE COURT:  Thank you.

8           MR. MEDLER:  Thank you, your Honor.  I appreciate

9   your time.

10          THE COURT:  Thank you.

11          Wh don't we go with Mr. Kolodzi.

12          MR. KOLODZI:  Thank you, your Honor.

13          Your Honor, we reviewed the 24-page tentative,

14  respectfully disagree.  Just to keep it short, honestly, in

15  order to avoid being duplicative, we've asserted our

16  positions, our arguments, our authorities.  We agree with

17  counsel's positions on the reverse veil piercing and choice

18  of law doctrines.

19          I would only ask that if you do take the tentative

20  to be your final ruling, that we would also request a stay

21  pending appeal.  Thank you.

22          THE COURT:  Thank you.

23          Ms. De Bartolomeo.  Did I do that right?

24          MS. DE BARTOLOMEO:  No, your Honor, you didn't,

25  but it's fine.  I'm pretty much used to it.

*Echo Reporting, Inc.*

22

1        Just to digress for a minute, do you know anything
2  about professional football and the Forty-Niners?

3        THE COURT:  I do not.

4        MS. DE BARTOLOMEO:  Okay.  Well, usually that's my
5  question, because the former owner of the Forty-Niners is a
6  gentleman named Eddie De Bartolo.  And I have three extra
7  letters to him.  So my father always says, that's the poorer
8  side of the family.

9        Your Honor, just for a little bit of background.
10  I know that your Honor has read all the papers here.  Who I
11  am, I represent class action creditors.  And people might be
12  wondering who the heck are they, and what are they doing
13  here.  We litigated a case against Mantra, MRA and Joe
14  Francis starting in, I think, 2005 or 2004.  I can't even
15  remember, it's been so long.

16        The case -- we certified a nationwide class under
17  California law.  It went up on appeal, and it was confirmed.
18  Essentially, the litigation was like every other piece of
19  litigation with Mr. Francis and his companies, which is
20  just, you know, a circus.  But we won at every level.  The
21  case was finally settled, was granted preliminary approval.
22  Notice went out.

23        And that was sort of the beginning of the tricks
24  and tribulations of the Joe Francis show.  Because
25  essentially, even though there was a court order, they

23

1  refused to pay for things like notice, claims administration

2  and the whatnot.  So I had the luxury of basically getting

3  writs and liening bank accounts going back just to pay for

4  the settlement, essentially, which is what my claim is.

5  It's for the remainder of that judgment from September of

6  2009, which they changed banks, and we seized a couple of

7  cars, and we sold them and settled that.

8         But as Mr. Wynn's counsel I'm sure has

9  experienced, it's like chasing -- that game on the street

10 where something is always under a different shell.  And in

11 this case, it just became a different company or an offshore

12 trust account or something like that.  So you're in for a

13 good experience, I think, with this bankruptcy.

14        But back to my point.  Just to add on something

15 that esteemed counsel here has mentioned.  California does

16 have a further interest in that other creditors like my

17 client are a California judgment brought under California

18 laws before the California Superior Court.  And we do have a

19 right to have that judgment be treated fairly in the

20 Bankruptcy Court where we find ourselves now.

21        What I'd like to simply ask the Court is to -- I

22 agree with everything that both counsel to my right have

23 said regarding the reverse veil piercing and to respectfully

24 request that the Court maybe take a second look at some of

25 the cases that have been discussed and the law that applies.

24

I'd also like to ask the Court to reconsider its tentative rule as to the section regarding the allowance of the $250,000 priority administrative claim.  I have trouble with that one because it appears that the allowance runs contrary to or basically even negates the $400,000 subordination that one section of the settlement agreement -- in one breath, they say we're going to subordinate 400,000, and in the next breath -- which means we'll go to the back of the line and we'll let the other creditors move forward, and then we're going to take a $250,000 priority administrative claim, and that puts you to the front of the line.

And I'm just a little unclear as to how that could possibly fair -- be fair to the other unsecured creditors. And quite frankly, as I explained from over there, my judgment is against Mr. Francis and then the predecessor companies of the GGW entities that are before you in bankruptcy, Mantra and MRA.

So I'm kind of a hybrid, but I'm not necessarily -- I don't agree with the reverse veil piercing point.  But I do tend to think that all of the creditors out there -- even if I'm in the same position as Mr. Wynn with a judgment against Mr. Francis, why wouldn't I get a priority claim administrative claim?

And I understand that in the paper, the movants

25

1  are arguing that that has to do with the fact that there was

2  a settlement reached as to the trust money that was in with

3  a Nevada lawyer, Mr. -- I believe it's Mr. Francis's

4  criminal lawyer, although I've seen on occasion in civil

5  court with our case.

6          And I realize that there was a tracking of funds,

7  and it was from the Debtors.  It was a certain amount, and

8  that's being put back into the estate.  And I applaud them

9  for that because we would welcome money into the estate

10  because there are going to be plenty of creditors showing up

11  to file claims for this.  However, I just don't get the

12  $250,000 administrative claim and that priority and would

13  ask the Court to reconsider that.

14          The other section of my argument that I would ask

15  the Court to take another look at is the point of the bar

16  date.  And I realize that there isn't any law out there that

17  says thou must wait until the bar date in order to settle

18  cases.  I don't think that's my point.

19          It may not have been articulated that well in the

20  papers, but simply stated, I don't really see a couple of

21  TMZ reports in some minor newspapers saying that "Girls Gone

22  Wild" is going bankrupt and Joe Francis's company.  I mean,

23  as we know, there is "Girls Gone Wild" events and brands and

24  magazine and you name it.  "Girls Gone Wild" fill in the

25  blank.  It's not necessarily that other creditors out there

26

1  are going to know, oh, that's my company.  They went

2  bankruptcy.  Or they know Joe Francis, but they may not

3  connect it.

4         So I don't necessarily think it would be fair to

5  allow Mr. Wynn that $250,000 priority claim when there may

6  be other creditors out there that are even more worthy of a

7  priority claim, but they're just not before this Court yet.

8         So I would respectfully ask the Court to delay

9  that decision on the priority claim until after the bar

10  date, when you have a complete record before you and you can

11  see what creditors have shown up.  Because they do know

12  about it, and they have appeared.

13         Thank you for your time, your Honor.

14         THE COURT:  Thank you.

15         Mr. Pagay.

16         Mr. Heyn, you'll get a chance too.

17         MR. PAGAY:  I don't want to steal Mr. Heyn's

18  thunder.  I'll be very, very brief, your Honor.  I'm not

19  going to add much to the tentative.  Obviously, it was very

20  well thought out and thoroughly analyzed.

21         I think the interest of the objecting parties

22  belies really their positions to aspire to be creditors of

23  these estates.  And if they're successful, they obviously

24  have an interest.  They've been arguing all morning that

25  there be as few other claims to share with them as possible.

27

1 And I understand that interest.

2          The other objecting party appears to be the latest

3 incarnation of Joe Francis.  And obviously, the interest

4 there in opposing this settlement is that that party wants

5 the estate, the Trustee, Mr. Neilson, to have as few

6 resources as possible in the immediate sense to chase after

7 Francis and whatever entity Mr. Francis may be using.  But

8 at the end of the day, it's Mr. Neilson's business judgment

9 that should be given deference by this Court.

10          I think with respect to the three remaining

11 relevant A&C factors -- because, as the Court noted, one of

12 them doesn't have any bearing here -- difficulties of

13 collection is not at issue.  I think the fact that there is

14 so much uncertainty and so much argument over the merits of

15 the law, which law to be applied, it lends itself to the

16 conclusion that there is an issue with success in the

17 litigation.  So it's obviously a factor to be weighed.  And

18 any time two parties settle any litigation, that uncertainty

19 weighs in favor of settlement.

20          Mr. Medler admitted Factor Number 2.  He said,

21 quote, these issues are so complicated, he said.  And so he

22 concedes the second factor that this is complex litigation.

23 And obviously, as the Trustee has noted in papers, expense,

24 inconvenience and delay is inevitable.  These parties

25 obviously are going to look to appeal this.

28

1           Obviously, these issues are going to be hard
2  fought, regardless.  But I think two out of three of the A&C
3  factors are already there.

4           The paramount interest of creditors, of course,
5  your Honor, is the Trustee's number one concern.  And the
6  Trustee has an interest in resolving issues.  The Trustee
7  may be before the Court shortly with settlements with each
8  of these creditors as they try to look to this estate for
9  recovery on account of their claims, which are against
10 nondebtor entities as well.

11          Obviously, Wynn believes it will prevail.  The
12 terms of the settlement are not to be sort of cherry-picked
13 by any court.  They are the result of thorough arm's length
14 negotiations and extensive ones that have taken several
15 months.

16          As we all know, the Trustee has researched this
17 thoroughly.  As Mr. Medler points out, they have done a
18 tremendous amount in researching the estates, the claims
19 against it and the interests of the various parties.

20          So I think there's no argument whatsoever that
21 this was a rush to allow Wynn claims.  Obviously, as we
22 pointed out in our papers, Wynn believes it's entitled to
23 all this money.  Wynn believes that the 1.8 is entirely
24 Wynn's.  We have multiple liens every which way but Tuesday
25 to get after that 1.8.

29

1          So this is an integrated global settlement.  The

2   Trustee's business judgment is to be respected.  Some of the

3   counsel have -- it can't be cherry-picked apart as, we like

4   this, but we don't like that.  And so we would urge that the

5   Court's tentative become the ruling today, your Honor.

6   Thank you.

7          THE COURT:  Thank you.

8          Mr. Heyn.

9          MR. HEYN:  There is very little left after what's

10  been said and what's been written, so I will be brief.

11         First I want to reiterate what Mr. Pagay said.  He

12  said this is an integrated settlement and that we have dealt

13  with the two parts of the settlement, the return of the

14  funds and the allowance of claims as two equally fair parts

15  of this deal.  It should not mask the fact that we don't get

16  the money -- or if we don't allow the claims.  We don't

17  allow the claims if we don't get the money.

18         We're settling claims with Mr. Wynn.  And we --

19  and as part of that settlement is a $250,000 priority claim.

20  I think that it's appropriate for your Honor to address this

21  at this point.  I think that creditors have now at this

22  point been given notice.  I think that from the outset of

23  this case, it's not been just in TMZ, but in national

24  publications that have made creditors aware that the "Girls

25  Gone Wild" is in bankruptcy.

30

1          You know, your Honor has noted that are a lot of

2     other creditors.  Mostly it's just creditors that, like

3     Wynn, wish to hold the Debtor vicariously liable.  And the

4     Trustee has to balance the interests of protecting the

5     estate with the expense of -- and the prospect of ending

6     this litigation.

7          And the Trustee just cannot engage in a 20-front

8     war with every creditor that ever asserts that the "Girls

9     Gone Wild" should be liable for Joe Francis or his companies

10    or his previous companies.  We have to do what's reasonable.

11         So the Trustee spent a lot of time, as the

12    briefing reflects, looking at these issues very carefully.

13    It's difficult to talk about the weaknesses of the estate's

14    position because the litigator in me wants to fight

15    everything.  I want to defend the estate against Wynn.  I

16    want to defend the estate against Favazza and the judgment

17    creditors.

18         But there are extraordinary weaknesses in the

19    case, not the least of which is that Wynn has already had a

20    court that's found that it is substantially likely to

21    prevail.  Not the least of which is that Mr. -- that other

22    creditors have similarly had success against Mr. Francis and

23    his entities.

24         Against these realities, the Trustee had to make a

25    very tough decision, and he endeavored to do so with a great

31

1  deal of diligence.  He did do a great deal of diligence.

2  And as much as Mrs. Favazza -- or sorry -- Ms. Favazza and

3  the judgment creditors want to make this a trial about

4  whether reverse piercing is appropriate here, your Honor

5  doesn't need to make a finding about the correct state --

6  the correct law.  Your Honor doesn't even need to make a

7  correct finding about whether reverse piercing would be

8  allowed under any state's law.

9         All your Honor needs to do is determine that there

10  is no slam dunk here, that it is a very complicated issue,

11  and that the Trustee, one, negotiated in good faith, and

12  two, that the settlement is fair and equitable in light of

13  all the circumstances.

14        Favazza and the judgment creditors believe that

15  California has an interest in making sure that their claims

16  are not diluted by Wynn, but that California has no interest

17  in protecting Wynn from similar wrongdoing by Francis.  It's

18  utterly perplexing to me.

19        Wynn -- Mr. Wynn himself has a California

20  judgment.  And I think that California law is very clear

21  that formalities are disregarded in favor of creditors that

22  have been hurt.  So it's very difficult for us to argue

23  against that.  And the prospects are not great.

24        These are complicated proceedings, and the Trustee

25  wants to do right by all creditors.  And we understand that

32

1  the creditors are faced with a very large claim by Wynn.

2  They want the Trustee to throw -- to throw the end zone

3  pass, the hail Mary to try and keep Wynn out of this case

4  and keep it for a much larger recovery for them.  And we

5  understand that.  But that's not the Trustee's job.  The

6  Trustee's job is not to take extraordinary risk.  And so we

7  would request that your Honor grant the 9019 motion.

8           As to the stay issue, we would resist the stay.  I

9  think your Honor is well aware that the settlement agreement

10  potentially blows up unless approved by final order by the

11  end of this month.  We have obtained a hearing date in

12  Nevada so that we can get that final approval.

13           If this Court's ruling is stayed, I can't tell you

14  that the settlement agreement will remain in place.  So

15  there would be extraordinary prejudice to the estate.  And

16  so we would request that the stay be denied or that the

17  party seeking the stay be -- put up an appropriate bond.

18  Thank you, your Honor.

19           THE COURT:  Thank you.

20           I'm going to take a brief recess for about 10

21  minutes.  I want to review a few issues.  So we'll

22  reconvene -- it's now about 20 of 11:00.  We'll reconvene at

23  10 of 11:00.  Thank you.  Off the record.

24       (Proceedings recessed briefly.)

25           THE COURT:  Thank you.  Please be seated.  Good

33

1  morning again.

2          I've considered the argument of all sides.  And I

3  think it's important to remember the reason that we're here.

4  And we're here on the 9019 motion regarding approval of the

5  settlement.  In terms of the legal standard to approve

6  settlement, a court has great latitude in approving a

7  settlement.  That's Woodson vs. Fireman's Fund Insurance

8  Company, 839 F.2d 610, Ninth Circuit, 1988.

9          The standard that I believe all parties cited was

10  the In Re A&C Properties, 784 F.2d 1377, Ninth Circuit, 1986

11  standard, which states that a Bankruptcy Court should

12  approve a settlement if it was the result of, quote, good-

13  faith negotiation and is, quote, fair and equitable.

14          When making this determination, there's a four-

15  part test:  The probability of success on the litigation;

16  the difficulties, if any, to be encountered in the matter of

17  collection; the complexity of the litigation involved and

18  the expense, inconvenience and delay necessarily attending

19  it; and finally, the paramount interests of the creditors in

20  proper deference to their reasonable views in the premises.

21          The Trustee has the burden of demonstrating that

22  the compromise is fair and equitable and should be approved.

23  It's also important to note, although the Court should

24  consider reasonable view of creditor's objections, do not

25  rule.  That's a quote.  It is well established that

34

compromises are favored in bankruptcy.  That's <u>In Re Leeway</u>
<u>Holding Company</u> (phonetic), 120 B.R. 881, Bankruptcy
Southern District of Ohio, 1990.

In terms of the four factors, as all parties
recognize the second one, the difficulties in collection is
not relevant to the facts before the Court.

In terms of the probability of success in the
litigation and the complexity of the litigation involved,
all parties, regardless of whether they acknowledge it or
not, appear to recognize that the litigation is very
complex.  There are complex choice of law issues.  There's
complex issues in terms of whether or not reverse veil
piercing will be allowed and/or whether or not nominee
theory is appropriate.

In terms of the probability of success of the
litigation, the Trustee has engaged in extensive analysis
and has provided a very well reasoned basis why there are
questions regarding whether or not the Trustee would prevail
in the litigation, either under a reverse veil piecing
argument or a nominee theory argument.

As the Court noted, the Court didn't really think
that the choice of law issue or which state's law would
apply was really the dispositive issue.  Because based upon
the Court's analysis, the -- Mr. Wynn or Wynn Las Vegas, I
guess it is, had a viable legal theory under California law,

35

1  under Nevada law and under Delaware law.

2           So to the Court, the choice of law analysis fell

3  away because there was a viable legal theory for Wynn Las

4  Vegas to assert under any of those three jurisdictions laws.

5           In terms of the arguments the paramount views of

6  the creditors -- and I did consider and spent a significant

7  amount of time considering the arguments of Ms. Favazza, of

8  the class action creditors.  I did also consider GGW

9  Global's arguments.  However, GGW Global obviously is not a

10  creditor.  They claim to be the successor to one of the GGW

11  entities.

12          But that being said, in terms of the interests of

13  the creditors, Wynn Las Vegas's claim and Mr. Wynn's claim

14  are the largest claims if the settlement is approved.  If

15  the settlement isn't approved and if the Trustee were to

16  continue to litigate those claims and were to lose, which

17  there is a significant probability that that might occur,

18  not only would Wynn Las Vegas and Wynn's claims be allows in

19  their full amounts, but there would be significant

20  additional expenses incurred in continuing to litigate those

21  issues.

22          So although I understand and can sympathize with

23  the arguments of Ms. Favazza as well as the class action

24  creditors, I do believe that the paramount interests of all

25  creditors in this situation is to approve the settlement.

36

1         So as stated in the Court's tentative, I am

2    approving the settlement in its entirety.  One final -- one

3    final issue regarding the division of the funds and the

4    trust fund, the $1.8 million.  I believe that Wynn Las Vegas

5    has demonstrated that they have a right to the entirety of

6    those trust funds.

7         So in terms of the Debtors receiving the $800,000

8    and Wynn Las Vegas getting about a million, I think that's

9    definitely fair in terms of the $250,000 administrative

10   claim.  I think it's a fair division, given the strength of

11   Wynn Las Vegas's evidence substantiating that they have an

12   interest in all of those funds.

13        So based upon the statements in the tentative

14   ruling as well as the statements just made by the Court, I

15   am granting the Trustee's motion to approve the settlement.

16        Now let's talk about the motion for stay pending

17   appeal.  I'm normally not inclined to rule on oral motions.

18   However, I know we're under significant time deadlines at

19   this point.  So I would like to have argument on that.

20        Mr. Medler, you're the first person to address it.

21   There's a four-part standard under the Supreme Court's

22   decision -- I don't know if I'm saying it correctly -- Nken,

23   N-K-E-N, vs. Holder, 129 Supreme Court 1749, 2009 case.

24   It's whether the stay applicant has made a strong showing

25   that you are likely to succeed on the merits, whether the

37

applicant will be irreparably injured absent a stay, whether
the issuance of the stay will substantially injure the other
parties interested in the proceeding, and where the public
interest lies.

MR. MEDLER:  Yes, your Honor.  As far as the
reasonable likelihood of success on the merits, I don't
think we need to rehash that.  Obviously, you know our
position on that is that we believe that we have a
substantial likelihood of prevailing on this matter on
appeal because we believe that it is important to analyze
the choice of law because we believe that California law
clearly rejects reverse veil piecing.

And even if Nevada substantive law were to apply,
the case law is not completely clear in Nevada on reverse
veil piercing.  And in that case, you have to consider the
interests of the other creditors involved.  And in this
scenario here where the legitimate corporate creditors are
being put to the back of the line of Wynn, it is essentially
grossly unfair.  And there is the Flamingo case of course we
mentioned.  I know it's an unpublished decision, but I
believe that supports our position here.

With regard to the second issue about whether
there is irreparable harm, if the Court approves this, the
money will be distributed.  And who knows where it will go.
It will go to Wynn, and we have to just rely on Wynn to say,

38

1  oh, if things go differently, you're going to pay it back.

2        As far as the second piece of this, I -- you

3  know -- sorry.

4        THE COURT:  Let me ask you a question.  When you

5  say the money is going to be distributed to Wynn --

6        MR. MEDLER:  Right.

7        THE COURT:  -- 27 million, the estate doesn't have

8  anything near that.

9        MR. MEDLER:  Correct.

10        THE COURT:  The 1 million --

11        MR. MEDLER:  Yes.

12        THE COURT:  -- from the trust fund will be.

13        MR. MEDLER:  That's what I was referring to, yes.

14        THE COURT:  Okay.  And if there were an issue, of

15  all people, I believe Wynn and Wynn Las Vegas probably does

16  have the ability to pay that money back.

17        MR. MEDLER:  Probably true.

18        THE COURT:  Okay.

19        MR. MEDLER:  And I would say that probably the

20  fight over the IP battle is going to take a number of

21  months, and by the time we finally get the case, you know,

22  on the auction block, it's probably going to be -- I don't

23  know -- next year sometime, I would think.  I don't know how

24  long an appeal takes here, so -- but I -- if the Court were

25  of the opinion that, by going forward with the appeal, that

39

1    the money that was obtained in an auction of the company

2    would then go to them before we had an opportunity to appeal

3    them, there would be irreparable harm.

4              I'm not sure what the time deadlines you have here

5    in this jurisdiction, so if I can address that.

6              THE COURT:  I'm not sure -- I didn't understand

7    that argument in terms of if the company were -- please

8    explain that again.

9              MR. MEDLER:  Yeah.  So what would happen is -- the

10   question is, what's going to happen first, the court that's

11   ruling on this issue on appeal rendering their decision,

12   number one, or number two, there being a distribution of

13   that 27 million or whatever it is, whatever money that is

14   obtained on the auction of this company to Wynn.  And I

15   don't know which of those would happen first.

16             But in the event that -- so it's just -- that

17   depends on whatever your time deadlines here for appeals,

18   how long that takes and how long it's going to take us to

19   wind this up.  So I don't really -- I probably can't speak

20   to that because I don't know what the amount of months that

21   would be.

22             THE COURT:  Right.  Right.

23             MR. MEDLER:  The public interest, I think to --

24   when you look at the public interest, it's some of the

25   issues we talked about before about, you know, the other

40

1  creditors that are involved in this case that have to just

2  go to the back of the line for this $250,000 priority claim.

3  I think that's a public interest.

4         I think that the public interest of the employees

5  of this company is an issue.  And to the extent that this

6  Wynn claim will basically, you know, end up making it so the

7  company can't ultimately pay its debts could be an issue.

8         And the third factor I think you mentioned -- what

9  was the third factor?

10         THE COURT:  Sure.  The first one is whether the

11  stay applicant has made a strong showing of likely success

12  on the merits.  Second is whether the application --

13  applicant will be irreparably injured.  Third, whether the

14  issuance of the stay will substantially injure the other

15  parties interested in the proceeding.  And four is public

16  interest.

17         MR. MEDLER:  Right.  So that kind of -- the third

18  factor kind of goes along with what we talked about before,

19  which is that, you know -- you made the point that, you

20  know, if the money goes to Wynn, you know, I guess there

21  would be concern that it could never come back.  But I guess

22  you're probably correct that Wynn probably has enough money

23  to pay it back if that happened.  And then it sort of

24  depends on the time line of which happens first.

25         THE COURT:  Right.

41

1        MR. MEDLER:  So, you know --

2        THE COURT:  In terms of appeals, I guess it would

3  depend upon where you appeal to.  The District Court, that's

4  anybody's guess.  The BAP, nine months to a year is what

5  I've seen in terms of the time period it takes to get

6  through the process.

7        MR. MEDLER:  I haven't spoken with A.J., but my

8  thought is to go to the District Court.  I don't know what

9  your thoughts are, but that's what we would probably do.

10        THE COURT:  And that just depends upon the

11  District Court judge that gets assigned the case.

12        MR. MEDLER:  Yeah.

13        THE COURT:  Okay.

14        MR. MEDLER:  Okay.  Thank you, your Honor.

15        THE COURT:  Thank you.

16        Mr. Kolodzi.

17        MR. KOLODZI:  Just briefly, your Honor.  Actually,

18  very briefly.

19        I join in counsel's arguments as to the issuance

20  of a stay.  Irreparable injury is minuscule compared to the

21  irreparable harm to my client, to counsel's clients as well

22  as to any of the judgment creditors.

23        Public interest -- and again, we're just asking

24  for a stay.  I know the time lines -- the time period in

25  which the Appellate Court or District Court would rule on

42

1  that matter might be an issue, but again, in the broad

2  scheme of things, it's not very -- it's not a lot, to be

3  honest with you.

4          THE COURT:  Let me ask you a question.

5          MR. KOLODZI:  Yes, your Honor.

6          THE COURT:  How will your client be irreparably

7  injured?

8          MR. KOLODZI:  Well, your Honor, ours is an

9  interesting situation.  Again, we're an interested party.

10 As you referenced in your tentative ruling, we filed a

11 motion to dismiss the bankruptcy of GGW Marketing, LLC.

12         THE COURT:  Right.

13         MR. KOLODZI:  I don't have to rehash it, but the

14 reason why was because we were not given consent.  My

15 client, GGW -- Global Brands, Inc. is a sole member of the

16 Marketing, LLC brand.  The stay, in my opinion, would allow

17 us to kind of filter that position out as well, that

18 argument which I believe is going to be heard later this

19 month, if not September 5th or something.  I have to check

20 my calendar.  I apologize.

21         THE COURT:  I think that's been continued to

22 October 22nd.

23         MR. KOLODZI:  October -- you're right.  It was

24 originally scheduled December 5th.  Thank you.

25         Either way, a stay in this situation, again, for

43

1  the reasons enunciated by counsel, would allow that issue as

2  to the motion to dismiss the Marketing, LLC brands also to

3  be filtered out and adjudicated as well.

4          Again, the irreparable harm to our client and also

5  to the other judgment creditors and interested parties is

6  minuscule, de minimis to any kind of benefit that they would

7  receive.  And again, it's just a stay.  Who knows how the

8  Appellate Court, District Court is going to rule, besides

9  for some more time to filter these things out.

10         THE COURT:  What about the argument that the

11 settlement agreement is only good through the end of August,

12 I believe.  So the irreparable injury, I would think, is

13 pretty high on the other parties.

14         MR. KOLODZI:  Good point, your Honor.  I mean,

15 again, our arguments again, as proffered into the opposition

16 papers of the settlement agreement itself was unreasonable

17 and unfair and inequitable.  We would have an issue with

18 that.  We'd have to raise that issue and litigate it.  But

19 that's a good point.  I really have no answer to that.

20         THE COURT:  Okay.

21         MR. KOLODZI:  Thank you.

22         THE COURT:  Thank you.

23         And I won't even try to say your name, but please

24 come to the podium.

25         MS. DE BARTOLOMEO:  It's De Bartolomeo.  I would

44

1 just agree with counsel in terms of their points.  I think

2 the point that I made earlier in terms of irreparable harm,

3 I'm still -- you know, I'm still fighting that battle for

4 wait until the bar date.

5          And I understand that the settlement agreement has

6 sort of a blow-up term by August 30th.  I'm unclear as to

7 why that can't be extended, but I'm sure that someone who

8 studied more of the papers or the detail behind it will

9 explain it to us.

10          So my view would simply be, I'd rather the Court

11 have a complete record and all of the proper creditors

12 before her.  Thank you.

13          THE COURT:  Thank you.

14          MR. PAGAY:  Good morning again, your Honor.

15          THE COURT:  Good morning.

16          MR. PAGAY:  With respect to the factors I believe

17 in the Nken case, the first one, strong showing of

18 likelihood of success on the merits, I don't want to confuse

19 what that success is and what -- the merits that the Court

20 should be looking at.

21          This is not about the merits of the underlying

22 litigation.  This is not about arguing over choice of law.

23 It's not about arguing over the underlying issues in the

24 litigation.  That litigation is not before this Court.  The

25 Trustee's motion is.

45

1          And if we look upon the merits of the Trustee's

2   motion and what the Ninth Circuit tells this Court what and

3   how it should rule, looking to the Court's tentative, the

4   Court sites Burton vs. Allrich (phonetic).  The Court need

5   not rule upon disputed facts and questions of law, but only

6   canvas the issues.

7          This Court has done far more than that and has

8   overwhelmingly exceeded what a court needs to do to fairly

9   consider a settlement brought before it by a trustee or a

10  debtor in possession.  So this Court has overwhelmingly met

11  its requirement in that regard.

12         The standards for a settlement also require that a

13  court should not substitute its judgment for that of a

14  trustee.  The Trustee is the steward of these estates, and

15  the judgment, based certainly on the thorough analysis of

16  Mr. Neilson, is not supposed to be arbitrarily displaced by

17  a court in considering a settlement.

18         And again, as mentioned in the tentative, the

19  Court is to evaluate whether or not it's fair and equitable

20  and it falls below the lowest point of reasonableness.

21  Overwhelmingly, with the analysis done here, this is a

22  reasonable, fair and equitable settlement.

23         So as to the merits of the motion, not the

24  underlying litigation that counsel seeks to argue before

25  this Court, it is overwhelming that this motion will succeed

46

1 on its merits even on -- and there's no likelihood of

2 success on appeal on their part, and a strong showing

3 certainly on the Trustee's part that the Trustee would

4 prevail in getting this motion upheld on appeal.

5          With respect to irreparable injury to the

6 appellant absent a stay, the Court has already noted -- and

7 we were a little jocular earlier -- the money is not going

8 anywhere.  There's no evidence before this Court that there

9 is a likelihood that the trust funds that are to be

10 distributed as part of the settlement are going to go

11 anywhere with respect to Wynn.

12          As the Court noted also, claims are not being paid

13 anytime soon.  So there's not a matter of the assets, the

14 subject of the settlement disappearing anytime quickly.  So

15 there's -- there should be no irreparable injury to any of

16 these prospective claimants in this case.  They don't really

17 have allowed claims in this case as of yet, given that their

18 creditor is really of ancillary -- and people just like Wynn

19 Las Vegas is.

20          No substantial harm to the appellees.  The Court

21 has noted the settlement expires on August the 30th.  We

22 have a hearing already before the Nevada Bankruptcy Court

23 prior to that date so that the settlement can be

24 consummated.  And that is a hard deadline.

25          And lastly, your Honor, the fourth element that

47

1  the Court should consider in ruling on the motion for stay

2  pending appeal is the public interest.  I think the Court

3  already noted earlier today, compromises are favored in

4  bankruptcy.  Overwhelming public interest in making sure

5  that bankruptcy cases are administered quickly, are

6  administered expeditiously.  And a trustee in bankruptcy is

7  tasked with that role.

8          And so a trustee should be able to, as Mr. Heyn

9  has pointed out earlier, not fight 1,000 battles, but

10  carefully analyze the issues, fight the battles that he

11  must, and otherwise find settlements and compromises which

12  are favored in the bankruptcy context.  Thank you, your

13  Honor.

14          THE COURT:  Thank you.

15          Mr. Heyn.

16          MR. HEYN:  I have very little to add.

17          On the four factors, I would note that the burden

18  is on the party seeking the stay to make a showing of strong

19  probability of success on the merits.  The strong

20  probability of success is a factor met here, both because

21  your Honor decided the motion correctly and because, on

22  appeal, your Honor's decision is reviewed with extraordinary

23  deference.  I think the case for that is Woodson.  Yeah.  On

24  Woodson -- the Woodson court said that your Honor's decision

25  would be given a great deal of latitude.  And I find it very

48

1  unlikely that the appeal will be successful.

2          As far as irreparable injury, they have not shown

3  that either.  They postulate that maybe, you know, Wynn is

4  going to -- Wynn L.V. is going to do something with the

5  money, though they've just admitted that Wynn has the

6  wherewithal to return the money.

7          They postulate that, well, maybe this estate will

8  be wrapped up and the money will be distributed.  That's --

9  but there's no showing on that.  They have to make the

10 showing.  They haven't made it.

11         As far as harm to others, they haven't shown that

12 there will not be harm to the Trustee or -- well, candidly

13 to the estate by issuing a stay.  And the harm here is

14 palpable and is that the settlement blows up on August 30.

15         There's been some suggestion that there's no

16 reason that that can't be continued, and the settlement

17 agreement does provide that Wynn L.V. and the Trustee may

18 agree to continue the date, though I can tell you that from

19 our discussions with Wynn L.V., they're antsy to get back on

20 collecting the debt, and they want their Nevada action going

21 forward as soon as possible.

22         You know, candidly, it was part of our leverage in

23 getting the deal that we got, was to hold that out for them

24 and say, well, you know, you will be able to go forward

25 against -- in your alter ego case if you settle with us.

49

1        Finally, the public interest, as Mr. Pagay has

2   aptly noted, is against issuing a stay in this case because

3   settlements are so favored.  Because settlement in this case

4   is absolutely necessary.  We can't go through this process

5   for every claim against the estate, your Honor.  Just -- we

6   can't do it.  There's just not the money.

7        So for those reasons, we would request that your

8   Honor deny the stay.

9        THE COURT:  Okay.  In terms of stays pending

10  appeal, the Supreme Court in <u>Nken vs. Holder</u>, 129 Supreme

11  Court 1749, 2009, stated that the Court has discretion in

12  determining whether to issue a stay pending appeal.  A stay

13  should be sparingly employed and reserved for the

14  exceptional circumstance.  A stay is not a matter of right,

15  even if irreparable injury might otherwise result.  And the

16  party requesting a stay bears the burden of proof.

17       As I mentioned previously, the Supreme Court

18  stated four factors that courts must consider when

19  determining whether to issue a stay pending appeal.  One,

20  whether the stay applicant has made a strong showing that he

21  or she or it is likely to succeed on the merits.  Two,

22  whether the applicant will be irreparably injured, absent a

23  stay.  Three, whether issuance of the stay will

24  substantially injure the other parties interested in the

25  proceeding.  And four, where the public interest lies.

50

1        In terms of the fourth -- the first factor,
2   whether the stay applicant -- and here's it's applicants --
3   have made a strong showing that they are likely to succeed
4   on the merits, based upon my review of all of the briefs and
5   all of the evidence, I do not find that they have made a
6   strong showing that they are likely to succeed on the merits
7   on appeal.  So that factor, I find, weighs against granting
8   a stay.
9        Whether the applicant will be irreparably injured
10  absent a stay.  At this point, I don't believe that the
11  applicants have -- have made that showing either.  Although
12  there is argument that I guess the million dollars in the
13  trust fund will go away, and the $250,000 administrative
14  claim will dwarf all the other claims, and then the $27
15  million claim will substantially dwarf all other claims.
16       Those things aren't happening right now.  My
17  understanding is, the 800,000 of the trust fund is going to
18  go to the Trustee for the benefit of the Debtors.  The one
19  million plus is going to stay in the trust fund.  I didn't
20  see anything saying that it was going to be immediately
21  distributed to Mr. Wynn.
22            MR. PAGAY:  It is.
23            THE COURT:  It is.
24            MR. PAGAY:  It is, your Honor.
25            THE COURT:  Okay.  But even if it is, I'm not

*Echo Reporting, Inc.*

51

1  seeing that creating irreparable injury.

2          In terms of the $27 million claim, it would be a

3  whole lot worse if the Trustee were to litigate and lose

4  that litigation because then Wynn and Wynn Las Vegas would

5  have more than $31 million in claims, plus the estate would

6  be burdened with all of the additional administrative

7  expenses, which I can only imagine what the amount of those

8  administrative expenses would be.

9          Further, it's common for participants in a

10  bankruptcy proceeding not to be paid the entirety of what

11  they're owed.  And as has been argued extensively, each one

12  of the parties here other than GGW Global has a claim

13  against the Debtor's -- excuse me -- based upon vicarious

14  liability.  And so there is going to be additional

15  litigation regarding that.

16          So in terms of whether the applicants will be

17  irreparably injured absent a stay, I do not find that that

18  showing has been met.  But even if that showing has been

19  met, according to the Ninth Circuit in <u>Leyva-Perez vs.</u>

20  <u>Holder</u>, 640 F.3d 962, Ninth Circuit, 2011, even certainty of

21  irreparable harm has never entitled a party to a stay.

22          In terms of the third factor, whether issuance of

23  the stay will substantially injure the other parties

24  interested in the proceeding, I do find that issuance of the

25  stay will substantially injure the estate, the other

52

1 creditors as -- which -- who are involved in this case.

2           I understand that the major creditors, Mr. Wynn,

3 Wynn Las Vegas, Ms. Favazza and the class action creditors

4 are here.  But as the Trustee pointed out in his motion,

5 there are employees who are working for the Debtor, and

6 there are creditors who actually did business with the

7 Debtors and who relied on the credit-worthiness of the

8 Debtors to extend credit to them.  And those -- those

9 creditors would be substantially injured, and the estate

10 would be substantially injured if the stay were issued.

11           In terms of the public interest, generally if

12 private parties are involved, public interest is neutral.

13 But we are in the context of a bankruptcy case.  And as has

14 been noted, compromises and settlements are favored by all

15 courts, including the Supreme Court.

16           So based upon my analysis of the factors, I am

17 denying the motion for stay pending appeal.  The tentative

18 ruling will be posted on the docket, so it will be available

19 in public record.

20           Mr. Heyn, if you'll just upload an order that's

21 about two sentences, basically, for the reasons stated in

22 the Court's tentative as well as stated on the record, the

23 motion for settlement -- for approval of the settlement is

24 granted.

25           MR. HEYN:  Yes, your Honor, I will upload that

53

1  order.  Do you want to do anything with respect to your

2  decision on the stay motion?

3          THE COURT:  Normally I have the movant do it, but

4  I'll --

5          MR. HEYN:  Same order or a new order?

6          MR. PAGAY:  He can do it.

7          THE COURT:  He can do it.  Why don't you do two

8  separate orders just so the docket is clean.  Just very

9  briefly --

10          MR. HEYN:  For the reasons set forth on the

11  record.

12          THE COURT:  For the reasons set forth on the

13  record, Mr. -- Ms. Favazza's motion for stay pending appeal

14  was denied.

15          MR. HEYN:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          MR. PAGAY:  To clarify, your Honor, it was a

18  multiple motion.  I believe all three -- three applied.  So

19  it's really -- the motion of all three creditors --

20          THE COURT:  So the motion for all --

21          MS. DE BARTOLOMEO:  So we stay the motion of all

22  three combined?

23          THE COURT:  Yeah.  The combined motion of Ms.

24  Favazza --

25          MR. PAGAY:  Okay.  Just to be clear.

54

1          THE COURT:  -- GGW Global and the class action

2   creditors.  That's perfect.

3          MR. PAGAY:  Thank you, your Honor.

4          THE COURT:  Is there any other housekeeping, just

5   to make sure I didn't miss something?

6          MR. HEYN:  No, your Honor.

7          THE COURT:  Okay.  Thank you.  And I believe we're

8   back here on August 29th.

9          MR. HEYN:  That's correct, your Honor.

10          THE COURT:  Okay.  Thank you.

11          ALL:  Thank you, your Honor.

12       (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Shonna Mowrer                    8/12/13
     Transcriber                        Date

6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

# EXHIBIT H

```
 1                UNITED STATES BANKRUPTCY COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4   In Re:                      )   Case No. LA13-15130-SK
                                 )
 5   GGW BRANDS, LLC,            )   Los Angeles, California
                                 )   Wednesday, April 10, 2013
 6           Debtor.            )   10:30 a.m.
                                 )
 7   _____)
     In Re:                      )   Case No. LA13-15132-SK
 8                               )
     GGW DIRECT, LLC,            )
 9                               )
             Debtor.            )
10   _____)
                                 )
11   In Re:                      )   Case No. LA13-15134-SK
                                 )
12   GGW EVENTS, LLC,            )
                                 )
13           Debtor.            )
     _____)
14                               )
     In Re:                      )   Case No. LA13-15137-SK
15                               )
     GGW MAGAZINE, LLC,          )
16                               )
             Debtor.            )
17   _____)

18                               HRG RE MOTION FOR ORDER
                                 DIRECTING THE APPOINTMENT OF A
19                               CHAPTER 11 TRUSTEE

20

21                TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE SANDRA KLEIN
22             UNITED STATES BANKRUPTCY JUDGE

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

*Briggs Reporting Company, Inc.*

ii

```
 1  APPEARANCES:

 2  For the United States          DARE LAW, ESQ.
       Trustee:                    Office of the United States
 3                                    Trustee
                                   725 South Figueroa Street
 4                                 Suite 2600
                                   Los Angeles, California 90017
 5                                 (213) 894-4925

 6  For Wynn Las Vegas:            MALHAR S. PAGAY, ESQ.
                                   Pachulski, Stang, Ziehl &
 7                                   Jones, LLP
                                   10100 Santa Monica Boulevard
 8                                 13th Floor
                                   Los Angeles, California 90067
 9                                 (310) 277-6910

10                                 MITCHELL J. LANGBERG, ESQ.
                                   Brownstein, Hyatt, Farber
11                                   & Schreck, LLP
                                   2029 Century Park East
12                                 21st Floor
                                   Los Angeles, California 90067
13                                 (310) 500-4631

14  Proposed Counsel for           ROBERT M. YASPAN, ESQ.
       Debtor-in-Possession:       Law Offices of Robert M.
15                                   Yaspan
                                   21700 Oxnard Street
16                                 Suite 1750
                                   Woodland Hills, California
17                                   91367
                                   (818) 905-7711
18

19  Court Recorder:                Sandra Queen
                                   United States Bankruptcy Court
20                                 Edward R. Roybal Federal
                                     Building
21                                 255 East Temple Street
                                   Los Angeles, California 90012
22

23  Transcriber:                   Briggs Reporting Company, Inc.
                                   6336 Greenwich Drive, Suite B
24                                 San Diego, California 92122
                                   (310) 410-4151
25
```

1

1   LOS ANGELES, CALIFORNIA  WEDNESDAY, APRIL 10, 2013 10:30 AM

2                              --oOo--

3        (Call to order of the Court.)

4             THE COURT:  Matter number 37, GGW Brands.  It's

5   also matter numbers 38, 39 and 40.

6             MS. LAW:  Good morning, your Honor.  Dare Law on

7   behalf of the United States Trustee.

8             THE COURT:  Good morning, Ms. Law.

9             MR. PAGAY:  Good morning, your Honor.  Malhar

10  Pagay, Pachulski, Stang, Ziehl and Jones, together with

11  Mitchell Langberg of Brownstein, Hyatt, Farber and Schreck,

12  together for Wynn Las Vegas.

13            THE COURT:  Thank you.  How do you pronounce your

14  last name?

15            MR. PAGAY:  Pagay, P-A-G-A-Y.

16            THE COURT:  Pagay.  Thank you.

17            MR. PAGAY:  Thank you, your Honor.

18            MR. YASPAN:  Robert M. Yaspan, Y-A-S-P-A-N,

19  attorneys -- proposed counsel for the debtor in possession.

20            THE COURT:  Okay.  We're here on Wynn's motion for

21  order directing appointment of a Chapter 11 trustee.

22            I'd like to hear from Ms. Law first.  Even though

23  the U.S. Trustee filed a motion to dismiss yesterday, the

24  Court -- excuse me, a motion to appointment a trustee

25  yesterday, the Court did review that motion to appointment a

2

1  trustee.

2          I wanted to know from Ms. Dare, were monthly

3  operating reports filed?

4          MS. LAW:  Thank you, your Honor.

5          Your Honor, the case was filed on February 27th so

6  they would have owed a monthly operating report for the two

7  days of February and as of -- checking the docket yesterday

8  around 6:00, 6:30, I did not see a monthly operating report

9  on file.

10          I don't know if debtor has filed it since because

11 I have not looked at the docket since that time.

12          THE COURT:  Okay.  And the Court has this morning

13 and there are none reflected on the docket.

14          MR. YASPAN:  Your Honor, they were filed last

15 night at about 6:30.

16          THE COURT:  Okay.  Well, I can certainly go back

17 and check.  They weren't filed timely if that's in fact what

18 occurred, Mr. Yaspan.  Thank you.

19          MR. YASPAN:  I --

20          THE COURT:  I do take your representation that

21 they were filed, but they weren't filed timely because they

22 were due by March 15th, correct?

23          MR. YASPAN:  I understand that, your Honor.

24          THE COURT:  Thank you.

25          Anything else, Ms. Law?  I have reviewed the U.S.

3

1  Trustee's motion to appoint a trustee.

2          Again, that's not on for hearing today.  That's

3  not on for a hearing at the beginning of May, but I have

4  reviewed that, as well as the declaration of the NLS to

5  perform the 341(a) meeting or was present at it.

6          You actually performed it.  I saw some of the

7  testimony and also information about the site visit.

8          MS. LAW:  Yes, your Honor.  With respect to the

9  motion that is on calendar for today, the United States

10  Trustee does not do joinders to any such motion or replies

11  to any such opposition.

12          The U.S. Trustee does independent investigation.

13  If there is grounds for a motion, we do file a motion.  As

14  the Court has taken judicial notice, we did file a motion

15  for the appointment of a Chapter 11 trustee or in the

16  alternative for an examiner.

17          If the Court wants me to discuss that motion, I'm

18  happy to do that.  But at this point, I think it might be

19  preferable to allow the movant to argue his motion, and then

20  if the Court needs comments or requests information from the

21  U.S. Trustee, I'd be happy to provide it at this time.

22          THE COURT:  Thank you, Ms. Law.

23          MR. YASPAN:  Your Honor, might I speak just for

24  moment?

25          THE COURT:  Yes, Mr. Yaspan.

4

1        MR. YASPAN:  And if I just interrupted the Court,
2   I apologize.
3        I have not seen any motion from the U.S. Trustee.
4   If I have been served with it, it could easily be that it's
5   at my server, but I was in a deposition in this matter until
6   5:00 o'clock yesterday at the offices of the Wynn attorneys,
7   and I did not go back to my office.  And I have not seen
8   anything from the U.S. Trustee.
9        So I would object to the Court's consideration of
10  the documents unless we have had some due process and some
11  notice with respect to the documents.
12       Now, the same thing is true with respect to --
13  apparently to some items filed by the Wynn lawyers
14  yesterday.  Even though I was in their offices, they chose
15  not to serve me with those documents.  And, again, I have no
16  idea what they say, although I have heard rumors that things
17  have been filed.
18       THE COURT:  Well, I can certainly tell you what
19  they say, Mr. Yaspan.  It was an ex parte emergency
20  application to file, actually, a request for judicial
21  notice, which was a copy of the U.S. Trustee's motion to
22  appoint a trustee as well as the 341(a) transcript.
23       And from my review of the transcript, it was quite
24  lengthy, over 300 pages, but you represented debtor and Mr.
25  Dale was the person testifying on behalf of debtor but you

5

1    represented debtor during that 341(a).  So you should be

2    familiar with everything that occurred during that hearing.

3              MR. YASPAN:  Still, documents should be served

4    upon the debtors in order for them to be considered at

5    hearings.  And even though, yes, I did attend it, I haven't

6    had the chance to review a transcript of it.

7              THE COURT:  I understand that.  The transcript was

8    by a court reporter at Barcley.  But that being said, that's

9    not going to be the determinative factor in this hearing.

10             But I appreciate your position, Mr. Yaspan.

11             MR. YASPAN:  Thank you.

12             THE COURT:  I'm very familiar with the facts of

13   the case, the evidence submitted, and the allegations made

14   by both sides.

15             I considered but am not going to hold an

16   evidentiary hearing.  It's not necessary in this case based

17   upon all of the evidence that's before the Court.  That's

18   according to Ninth Circuit law.  In re Bibo, 76 F.3d 256,

19   Ninth Circuit, 1996.

20             I believe there's more than sufficient evidence

21   upon which I can rule.  Both sides are welcome to argue

22   their position.  Please don't reiterate what is in your

23   papers.  As I mentioned, I am very, very familiar with the

24   papers, with the evidence submitted and with the arguments.

25             Mr. Pagay, it's your motion.

6

1          MR. PAGAY:  Thank you, your Honor.

2          As the Court just stated, the Court is very, very

3  familiar with the evidence before it.  We believe that Wynn

4  Las Vegas over the course of litigation has amassed quite a

5  record in addressing the interactions between Joe Francis

6  and these debtors, and I won't repeat that record here.

7          All I will say briefly is that the integrity of

8  our process that the Court is a part of, and all of us are a

9  part of, requires the presence of a fiduciary for creditors

10  in every case.

11          In the Chapter 11 process, that fiduciary status

12  is granted immediately upon the filing of a Chapter 11

13  petition to the debtors' management.

14          And I think the evidence here begs the question of

15  who is the fiduciary in these cases.  And I think the

16  evidence before the Court has shown, and it's actually

17  admitted by the debtors, that the debtors' management has

18  allowed for a period of years a massive amount of money to

19  flow unrestricted to the debtors' insider, Mr. Francis.  And

20  I will not go into the evidence that the Court has already

21  reviewed in connection with that allegation.

22          We also know that the debtors' manager, Mr. Dale,

23  who testified two days ago at the 341(a) hearing was, until

24  about four and a half months ago, a human resources

25  coordinator for the debtor and spends only about two hours a

7

1 week managing this process.

2          What that means for the Court is that the

3 fiduciary of these estates, the person in charge of these

4 reorganizations is a part-time HR director that is working

5 for these debtors a couple hours a week and then spends most

6 of his time working human resources elsewhere.

7          So that does not, I think, bode well for the

8 fiduciary status of these debtors when their leader is in

9 fact in absentia.

10          We know also, your Honor -- I think this is

11 critical -- that the debtors' management is in a way

12 horribly conflicted by what they've allowed to occur over a

13 period of years.

14          We know that they've allowed unrestricted funds to

15 flow to Mr. Francis and third parties and it puts them in a

16 direct conflict of interest with these estates because the

17 estates may have breach of fiduciary duty claims.  The

18 estates may have gross negligence claims.

19          The estates may have fraudulent transfer liability

20 that it has to investigate, and it's highly unlikely that

21 the debtors' management will investigate its own conduct

22 over the past couple of years.

23          In sum, your Honor, we know that the debtors'

24 fiduciaries are not fiduciaries.  The debtors' management

25 does not qualify to steward these estates through Chapter

8

1  11.

2          Now, the Bankruptcy Code, as the Court is aware,

3  removes -- the Code removes discretion from the Court as to

4  whether or not to appoint a trustee when cause is shown

5  under 1104(a)(1).

6          We believe, your Honor, that Wynn Las Vegas has

7  amassed that record such that cause is ample in these

8  circumstances where there has been an entirely -- no aspect

9  of fiduciary status has been maintained by the debtors'

10 management.  Again, a part-time HR employee.

11         Your Honor, I have a feeling that if the Court is

12 to review the items that the Court did authorize us to file

13 and to add to this record this morning, I don't know if the

14 Court has had a chance to do that.

15         THE COURT:  It was over 300 pages.  I definitely

16 looked at some parts of it but not in great detail.

17         MR. PAGAY:  Understood, your Honor.  And, again, I

18 don't know if Ms. Law will have an opportunity to highlight

19 some of those, since she's obviously the one that took the

20 most examination at that 341(a) hearing.

21         But one image that I sort of want to leave the

22 Court with is, I asked the manager of the debtors -- I asked

23 "Well, how did you get the job?  How did you get the job

24 managing all these entities, the CEO, the top dog?  How did

25 you get that job?  Did you apply for it?"

9

1          He said, "No."  I asked him "Well, did you

2    interview to be the corporate leader of these entities?  Did

3    you interview for it?"  He said, "No."  So I asked him how

4    he got the job.

5          And he said, "I was told by Mr. Tim," who is an

6    attorney both for Mr. Francis and a voluntary non-

7    compensated attorney for these estates, "He just told me

8    that I was appointed, I was now the manager of the debtors."

9          Your Honor, it sort of speaks volumes that an

10   attorney for both Joe Francis and these estates is the one

11   that's telling and appointing effectively the CEO in these

12   cases.  It shows that despite the efforts to try and

13   distance themselves from Mr. Francis, his presence is really

14   and his mark is really all over these cases.

15         So, your Honor, Wynn Las Vegas, the largest

16   creditor by far of these estates, requests that the Court

17   immediately appoint a Chapter 11 trustee.

18              THE COURT:  Thank you.

19              MR. PAGAY:  Thank you, your Honor.

20              THE COURT:  Mr. Yaspan?

21              MR. YASPAN:  Thank you.

22         Let me get my folder here first.

23         Your Honor, in every Chapter 11 at the beginning

24   of the case where there is a motion for a trustee, the Court

25   is faced with arguments that the debtor in its pre-filing

10

1   capacity violated one rule or another, committed fiduciary

2   fraud or broke contacts, didn't pay creditors, any one of a

3   number of litany of things -- number or litany of things

4   that are bad items in the pre-filing light.

5           In determining whether or not to appoint a

6   trustee, a creditor or a moving party needs to show more

7   than pre-filing bad acts.  There needs to be bad acts or

8   questionable acts in the Chapter 11 itself.

9           Here, there is no evidence before the Court that

10  this DIP has acted in any inconsistent with its duties.  The

11  Court pointed out that the MOR was filed late, but it was

12  filed.

13          The MOR -- I disagree.  I think it only should

14  file evidence and information for one day because the case

15  was filed in the evening of the 27th, so we're talking about

16  February 28th and that would have been the time period for

17  the documents that were filed.

18          Very little happened on the one day.  The Court

19  can look at it and see it.

20          Now, with respect to the allegations that are in

21  the moving party's motion, all of the evidence seems to

22  reveal a frustrated creditor of Joe Francis.  That is what

23  this record shows.  And there have been disputes between Mr.

24  Francis and Mr. Wynn of a personal nature that have gone on

25  for many, many years.

11

1        Let's assume all that is true.  That would be then

2   a fight as to whether or not a judgment creditor of Mr.

3   Francis can execute on a supposed interest in these debtors

4   or their parents in an effort to control GGW.

5        In other words, that claims creditor -- and it's a

6   creditor only because of the wider definition in Bankruptcy

7   Code section 101.  It's not a creditor of this case in the

8   normal sense of the word.  It doesn't have any claim against

9   these debtors directly but only through the interest of the

10  shareholder or the member or the grandfather of the member,

11  allegedly.

12       Now, to the extent that it has a claim, it takes

13  the position of being a creditor subordinate to other

14  creditors.

15       The real fight in this case is whether or not they

16  can promote themselves from a subordinated creditor which

17  comes in through a claim against an alleged member, or are

18  they a trade creditor equal in priority with the telephone

19  company.

20       There are no secured creditors in this case.

21       So really, it's a question of a fight between

22  unsecured creditors.

23       Now, to the extent that this creditor is claiming

24  to be able to promote itself, this Court can make that

25  decision.  It's a legal decision, maybe mixed with some

12

1  facts.  But that is one that should be addressed in the full

2  course of the case.

3         Now, the other part of the argument is, "Well,

4  even though we haven't shown that they've done anything bad

5  during the case, there's a potential for them to do

6  something bad in the future."  But that's true for every

7  debtor in possession.

8         It is a policy decision that Congress made when

9  they created a presumption for debtor in possessions.

10         Here, those presumptions have not been met.  I

11  would have wanted, if I were the creditors' lawyer, to see

12  evidence of payments to Mr. Francis or to anyone not

13  entitled to money.  Those payments are not in front of the

14  Court.

15         I would have wanted, if I were the creditors'

16  attorney, to see evidence of influence on the debtors'

17  management so that they could then parade their horribles in

18  front of this Court.  No evidence of that is before this

19  Court.

20         What is before this Court is a frustrated creditor

21  of Mr. Francis that is trying to exercise its control by

22  filing a motion to get a trustee.

23         Now, one of the reasons why these Chapter 11's

24  were filed was so that they could be protected while these

25  alleged owners were fighting among themselves.  It was --

13

1  there is money that allegedly belongs to one of these

2  debtors direct that is sitting in an attorney trust account

3  that they have a claim against for $1.8 million.

4        There is money that the debtor earns every day of

5  the year that are used to pay its bills.  The schedules show

6  the but for the claim of the litigation parties, this

7  company is solvent and is paying its bills as they mature.

8        But they can't pay the bills and protect the 35

9  people that work for this debtor if Mr. Francis is entitled

10  to interrupt -- not Mr. Francis, I apologize -- Mr. Wynn and

11  his company are allowed to interrupt the cash flow of the

12  debtors.

13        The people whose jobs are at risk are being

14  protected by the 11 while the fight of the mega-titans can

15  go on.  And let it go on.  I have no dog in that show -- or

16  maybe in that race.  I have no dog in that race.

17        The only thing that I want and that my

18  representation is directed to is the protection of the

19  companies pending this fight, which can go on off-stage

20  between the mega-titans.

21        Now, I don't know what the U.S. Trustee has said

22  in its motion.  I don't know what parts of the transcript

23  need to be highlighted by me, because I haven't reviewed it.

24  For that, I have no ability to respond properly on behalf of

25  these debtors.

14

1         However, I'm not saying that the motion should be

2    denied with prejudice.  I'm just saying that the record

3    before this Court is such that there is no evidence of

4    defalcation that exists in the Chapter 11.

5         With respect to the second operating report, the

6    debtor has obtained the services of a professional who will

7    make sure that it gets filed on that.  And that one, your

8    Honor, is more meaningful because it concerns the activities

9    of the first month of operations.

10        Now -- does the Court have any particular

11   questions of me?

12        THE COURT:  Well, Mr. Yaspan, you mentioned that

13   there were 35 people who work for the debtors.  Are those 35

14   employees or -- I thought that there were certain employees

15   and certain independent contractors.

16        MR. YASPAN:  Well, there are both.  There are some

17   employees, there are some independent contractors.  And the

18   debtor utilizes a leasing service so --

19        THE COURT:  And -- I'm sorry.

20        MR. YASPAN:  I'm sorry.

21        THE COURT:  I didn't mean to interrupt you.  And

22   the leasing service is with which company?

23        MR. YASPAN:  Perfect Science Labs, PSL.

24        THE COURT:  Okay.  Thank you.

25        MR. YASPAN:  And we have disclosed that to the

15

1 remember.  We've given the employee leasing agreements to

2 the U.S. Trustee and we have been open as to the reason for

3 that.  That has to do with some problems with the workers'

4 compensation and problems with obtaining coverage during the

5 Chapter 11.  We know it to be necessary so this is the

6 method by which the workers are protected.

7                THE COURT:  I see.  Okay.

8                MR. YASPAN:  And the estate is protected.

9                THE COURT:  How many actual employees are there,

10 and how many are independent contractors out of that 35?

11                MR. YASPAN:  If I could have a moment?

12                THE COURT:  That's fine.

13                And in the meantime, I'll ask Ms. Law, I didn't

14 bring the U.S. Trustee motion out on the bench.

15                Ms. Law, can you please put on the record whether

16 or not Mr. Yaspan was served, and if he was, where he was

17 served.

18                MS. LAW:  Your Honor, Mr. Yaspan is served by ECF,

19 so as soon as the motion is filed, he should have gotten an

20 ECF notice.

21                The only people that actually got paper notice,

22 which was prepared by my clerk, was the debtor, because

23 that's what's required under the local rules.  They get

24 paper service.

25                But counsel for the debtor received ECF service as

16

1  well as counsel for the Wynn and any other attorney who

2  asked for ECF service.

3          THE COURT:  And I believe the motion was filed

4  somewhere around 3:00 o'clock yesterday, between 3:00 and

5  4:00 maybe?

6          MS. LAW:  Yes, your Honor.  I personally do my own

7  filing for ECF, so it was around that time.

8          THE COURT:  Thank you.

9          Okay.  Mr. Yaspan?

10         That was the only question I had, Ms. Law.

11         Mr. Yaspan?

12         MR. YASPAN:  The answer is 13.

13         THE COURT:  Thirteen full-time employees or

14  employees and then the remaining 22 are independent

15  contractors?

16         MR. YASPAN:  They're not employees of any of the

17  debtors.  Of the 13 -- just a minute -- two are two-thirds

18  allocated to Direct.  The remaining one-third is allocated

19  to another company.

20         THE COURT:  Which company is that?

21         MR. YASPAN:  I don't know but my guess would be

22  Perfect Science Labs.

23         THE COURT:  Okay.  Thank you.

24         Mr. Yaspan, I don't have any questions of you.  Is

25  there anything further you'd like to put on the record?

17

1        MR. YASPAN:  Yes, and that is that service of

2 process of the motion to appoint a trustee, based on what

3 was served upon us, appears not to have been made upon all

4 of the creditor body.

5        THE COURT:  Thank you.

6        Mr. Pagay?

7        MR. PAGAY:  Just a couple of things, your Honor.

8        Debtors' counsel makes much of the fact that we

9 are a disputed creditor.  That's how the debtors in all the

10 cases scheduled us.

11        I also note, your Honor, that just about every

12 single creditor in the cases, all of them, is scheduled as

13 disputed in some way, except for a couple including Mr.

14 Francis's attorney and the entity that allegedly licenses

15 intellectual property to the debtor and is owed some

16 unspecified amount, 1.5 million or excess.

17        So Francis-related remembers are undisputed, it

18 appears, but all the rest of us are disputed, so a lot of us

19 are in the same boat.

20        Another thing that debtors' counsel said, which I

21 believe is actually an incorrect statement of the law, is

22 that the Court is not to look to pre-petition conduct.

23        I think section 1104(a)(1) of the Bankruptcy Code

24 is quite clear that the Court, upon finding cause, including

25 fraud, dishonesty, incompetence or gross mismanagement

18

1  either before or after the case is allowed to consider that,

2  and in some cases discretion is taken away from the Court

3  and the Court must appoint a trustee if that cause is found.

4           Thank you, your Honor.

5           THE COURT:  Thank you.

6           Ms. Law.

7           MS. LAW:  Your Honor, I'd like to reply to some of

8  the argument made by counsel for the debtor.

9           In his argument, counsel for the debtor basically

10 states that if the Court were to grant a motion, that the

11 trustee would act in the interest for Wynn, basically being

12 Wynn's trustee.  That's not a correct statement.

13          When the U.S. Trustee, who is not a creditor in

14 this case and is given standing by the Code to appear and to

15 make argument before the Court, appoints a Chapter 11

16 trustee, that is an independent fiduciary on behalf of all

17 creditors.

18          That trustee does not represent one creditor to

19 the detriment or benefit of any other creditor.  That

20 remember is an independent fiduciary for all the creditor

21 bodies, particularly the unsecured creditors but all

22 creditors.

23          So that is not a correct statement to say that if

24 the Court were to grant the motion, that the trustee would

25 be a Wynn trustee.

19

1          With respect to the statement that the companies

2     are solvent and that they were paying their debts as they

3     become due, I would note that there is, on the debtors'

4     schedule, a $1.5 million royalty payment to Path Media.

5          The 341(a) testimony will show that that agreement

6     was terminated.  The representative who testified, Mr. Dale,

7     did not know why it was terminated.  He was not manager at

8     the time of the termination.

9          But eventually the debtor had to renegotiate a new

10    agreement with Path Media to be allowed the use of the Girls

11    Going Wild licensed name.  Mr. Dale did not know the terms

12    of that agreement.  And that agreement only goes until May

13    2013.

14          So it is unclear whether the debtor in fact was

15    able to pay their debts as they became due, because

16    obviously, this 1.5 royalty payment does not appear to be a

17    payment that was due right before the filing but had in fact

18    accumulated over time.

19          Also, in reviewing the debtors' opposition, the

20    opposition indicated that the debtor needed to have Mr.

21    Francis as the face of Girls Gone Wild.  The testimony at

22    the 341(a) indicates and it will show that they have not

23    allowed him use of the credit card after the March

24    statement.

25          There is a March American Express statement that

20

1 shows use by Mr. Francis and others.

2          And the testimony will show that Mr. Dale stated

3 that his credit card has in fact been terminated and that

4 they're only paying for use of his vehicle.

5          But the opposition makes much of the fact that

6 they need him as the face of Girls Gone Wild, so that begs

7 the question of how are they going to continue to be allowed

8 to have him be the informal face of the company if they have

9 now ceased paying his expenses and allowed him unfettered

10 use of that American Express card.

11          THE COURT:  Thank you.

12          Mr. Pagay, is there anything further?

13          MR. PAGAY:  No, your Honor.

14          THE COURT:  I'll deal with a couple of preliminary

15 matters first and then get to the ruling.

16          There's -- and just so the record is clear, we're

17 here on the motions for order directing the appointment of a

18 Chapter 11 trustee that were filed by Wynn Las Vegas LLC on

19 March 21st in all GGW cases.

20          And I'll refer to the cases collectively, and

21 those cases were filed by GGW Brands, GGW Direct, GGW

22 Events, and GGW Magazine.  And those cases were all filed on

23 February 27, 2013.

24          On the same day as filing the motions, Wynn also

25 filed an application for order shortening time for notice of

21

1  hearing.  And on 3/22 the Court granted the application, set

2  a briefing schedule, and set the motion for hearing today at

3  10:30.

4           On March 29th each debtor filed an opposition, and

5  on April 4th Wynn filed a reply.

6           On 3/21, on the same date that Wynn filed the

7  motion, Wynn also filed a request for judicial notice and

8  attached a number of documents.  Debtors and Wynn also filed

9  numerous evidentiary objections.

10          Although not currently before the Court, the U.S.

11 Trustee filed a motion to appoint a trustee yesterday

12 between 3:00 and 4:00 in the afternoon.  That motion is

13 scheduled for hearing May 9th.

14          Although Mr. Yaspan claims that he has not seen

15 that motion, I note that he is an ECF filer, and as

16 represented by Ms. Law, he was served with that motion at

17 the time that it was filed.

18          Late yesterday, Wynn filed an ex parte emergency

19 application for order authorizing Wynn to file a

20 supplemental request for judicial notice and notice of

21 lodgment of transcript of 341(a) meeting of creditors.  I

22 granted that ex parte application earlier today.

23          In terms of due process claims, due process is

24 what's necessary under the circumstances.  I'm not

25 adjudicating the U.S. Trustee's motion; however, I am

22

1  considering some of the statements in the 341(a) and I don't

2  believe there can be any due process claim considering that

3  Mr. Yaspan was present throughout the 341(a) hearing and

4  represented debtors during that hearing.

5          In terms of preliminary matters, Wynn filed a

6  request for judicial notice.  Wynn requested that the Court

7  take judicial notice of six documents that were filed in

8  various state court actions.

9          Debtors did not file an opposition to the request

10  for judicial notice.  Pursuant to Federal Rule of Evidence

11  201(b), the Court can judicial notice of a fact that is not

12  subject to reasonable dispute because it is generally known

13  within the trial court's territorial jurisdiction or can be

14  accurately and readily determined from sources whose

15  accuracy cannot reasonably be questioned.

16          Here, all of the documents attached to the request

17  for judicial notice were publicly filed.  The Court can take

18  judicial notice of the fact that these documents were filed,

19  which is undisputed and a matter of public record.  And

20  that's pursuant to Lee vs. City of Los Angeles, 250 F.3d

21  668, Ninth Circuit, 2001.

22          The Court, however, cannot take judicial notice of

23  the facts stated in those publicly filed documents.  And

24  there's a slew of case law that says you can take judicial

25  notice of the fact that a document has been filed but the

23

1  internal facts, the Court cannot take judicial notice of

2  because they're hearsay and they also -- the doctrine of

3  collateral estoppel would be superfluous if the Court could

4  take judicial notice of the actual facts contained in those

5  pleadings.

6        Evidentiary objections.  On 3/29, debtors filed

7  evidentiary objections to the declaration of Mitchell

8  Langberg that was filed in support of the motion.

9        On April 4th, Wynn filed a response to the

10 evidentiary objections.  The Court has considered and

11 overrules each of the three evidentiary objections asserted

12 by the debtor.

13       The Court notes that the basis for many of those

14 objections is hearsay.

15       Many of the statements to which debtors object

16 were made by Robert Kluger, an individual who was designated

17 by debtors pursuant to Federal Rule of Civil Procedure

18 30(b)(6) and Nevada Rule of Civil Procedure 30.  And other

19 statements were made during depositions of debtors' lawyers

20 or employees.

21       Statements made by these individuals are

22 admissible pursuant to FRCP 32(a) and FRE 801(d)(2).

23       Debtors also claim that some of the evidence did

24 not comply with local bankruptcy rule 7031-1(b).  The Court

25 notes there was no such LBR.

24

1    It appears the debtors meant to cite LBR

2  7030-1(b), which requires a party who seeks to offer

3  deposition testimony pursuant to FRCP 32 and FRE 803 or 804

4  to lodge the original deposition transcript and a copy

5  pursuant to this rule with the clerk at least seven days

6  before the hearing or trial at which it is to be offered.

7    On April 4th, which was seven days before the

8  hearing, Wynn filed two notices of lodgment pursuant to LBR

9  7030-1.  Therefore, Wynn complied with the LBRs.

10    Finally, the basis for a significant number of

11  debtors' evidentiary objections is attorney-client

12  privilege.

13    Courts utilize an eight-part test to determine

14  whether the attorney-client privilege applies.  That is U.S.

15  vs. Richey, 632 F.3d 559, 566, Ninth Circuit, 2011.

16    As the movant GGW has the burden of establishing

17  the relationship and privileged nature of the communication,

18  the attorney-client privilege exists where legal advice of

19  any kind is sought from a professional legal advisor in his

20  capacity.

21    As such, the communication relating to that

22  purpose made in confidence by the client are at his

23  insistence permanently protected from disclosure by himself

24  or by the legal advisor unless the protection is waived.

25  That's U.S. vs. Graf, 610 F.3d 1148, Ninth Circuit, 2010.

25

1        The fact that a person is a lawyer does not make

2  all communications with that person privileged.  Because it

3  impedes the full and free discovery of the truth, the

4  attorney-client privilege is strictly construed.

5        Here, debtors have failed to demonstrate that the

6  objected-to statements were legal advice or were made in

7  confidence.

8        Additionally, most of the statements to which

9  debtors object relate to communications that Joseph Francis

10  had with various counsel.  In response to Wynn's motion,

11  debtors argued repeatedly that Francis is not an employee,

12  manager, owner or officer of the GGW entities and they

13  assert that Francis has absolutely no control over debtors.

14        Debtors cannot take inconsistent positions in this

15  case.  Debtors cannot claim that communications between

16  Francis and counsel should be protected by debtors'

17  attorney-client privilege when their position is that

18  Francis is merely a consultant.

19        Now there is case law that if a consultant is the

20  functional equivalent of an employee, that consultants'

21  communications with a corporate lawyer would be privileged.

22  However, based on debtors' characterization of Francis's

23  role, there would be no basis for the Court to find that he

24  was the, quote, functional equivalent an employee.

25        And further there is a dearth of evidence

26

1  regarding the purpose of the communications or that the

2  communications were made in confidence.

3          Wynn made numerous evidentiary objections to the

4  declaration of Joe Francis, to the declaration of

5  Christopher Gale, and to the Evidence Code of Ron Tim.

6          Wynn objects to seven statements contained in

7  Francis's declaration.  The objections are based on lack of

8  foundation, improper opinion, apparent hearsay, and

9  relevancy.

10         Federal Rule of Evidence 602 provides that a

11 witness may testify to a matter only if evidence is

12 introduced sufficient to support a finding that the witness

13 has personal knowledge of the matter.

14         Further, pursuant to FRE 701, if a witness is not

15 an expert, testimony in the form of an opinion is limited to

16 one that is rationally based on the witness's perception,

17 helpful to clearly understanding the witness's testimony or

18 to determining a fact in issue, and not based on scientific,

19 technical or other specialized knowledge.

20         The Court finds that none of the objected-to

21 portions of Francis's declaration run afoul of either

22 Federal Rule of Evidence 602 or 701.  Francis's statements

23 are based on his personal knowledge and none appear to be

24 opinions.  Even if they could characterized as opinions,

25 they are based on his own perception and are not based on

27

1  scientific, technical or other specialized knowledge.

2         Additionally, the Court has reviewed the portion

3  of Francis's declaration to which Wynn objects on hearsay

4  grounds and overrules those objections.

5         Finally, Wynn's fourth and fifth objections relate

6  to certain portions of Francis's declaration.  Those relate

7  to that he was incarcerated for 11 months in 2007 and 2008.

8  During that period, he had no involvement with his business.

9  After he was released, he discovered that the business was

10  looted by other officers of Mantra.

11        He then states in late 2009, only hours after

12  criminal tax charges had been settled, the IRS took

13  virtually all of his assets and also took Mantra's operating

14  cash.  That left the company unable to operate and it

15  effectively ceased to exist.

16        Pursuant to FRE 401, evidence is relevant if it

17  has any tendency to make a fact more or less probable than

18  it would be without the evidence, and (b) the fact is of

19  consequence in determining the action.

20        Further, according to FRE 402, relevant evidence

21  is generally admissible and irrelevant evidence is not

22  admissible.  As the Supreme Court has noted, relevance is

23  determined, quote, "in the context of the facts and

24  arguments in a particular case and relevancy is not an

25  inherent characteristic of any item of evidence but exists

28

 1  only as a relation between an item of evidence and a matter

 2  properly provable in the case."  That's Sprint/United

 3  Management Company vs. Mendelsohn, 552 U.S. 379, 2008.

 4           Initially, it might appear that what occurred

 5  between 2007 and 2010, as well as issues related to Mantra,

 6  are not relevant to whether a Chapter 11 trustee should be

 7  appointed in these cases.

 8           The Court, however, finds that these statements

 9  are relevant based on Wynn's contention that Francis has a

10  history of forming business entities in order to frustrate

11  creditors.

12           The information in Francis's declaration is

13  relevant to his motivation in forming new business entities

14  after he was released from prison.

15           Wynn objects to 19 statements contained in Dale's

16  declaration.  The vast majority of the objections are based

17  on lack of foundation or improper opinion and legal

18  conclusion of a lay witness or improper opinion without

19  foundation.

20           Wynn's objections on these bases are overruled for

21  the same reason its objections under FRE 602 and FRE 701,

22  702 and 704 were overruled regarding Francis's declaration.

23           Wynn's second and fifth objections also claim that

24  the statements may represent inadmissible hearsay or

25  potentially contain inadmissible hearsay.  Wynn's second

29

1  objection relates to the following statement:

2          "Debtor is maintaining proper books

3          and records and is paying its bills and

4          meeting its obligations."

5          Wynn's fifth objection relates to this portion of

6  Dale's declaration:

7          "If a Chapter 11 trustee is

8          appointed, Francis would likely no

9          longer permit his image to be used with

10         the GGW entities and the licenses likely

11         would not be renewed and the Chapter 11

12         trustee would simply be presiding over

13         the end of the debtors' business and

14         liquidation of a few remaining assets."

15         These objections are overruled.  The objected-to

16 statements are not hearsay.

17         Wynn's fourth and 18th objections also indicate

18 that the statements violate the best evidence rule.  Wynn's

19 fourth objection relates to this portion of Dale's

20 declaration:

21         "The lifeline of GGW entities are

22         the licenses from a third party to use

23         the Girls Gone Wild and GGW name on

24         services and products and those licenses

25         are based on a short-term agreement that

30

1          expires in a matter of months."

2          The 18th objection is to the following statements

3    made by Dale:

4               "These intellectual property rights

5               acquired by the GGW entities to operate

6               their business are licensed to the GGW

7               entities by an unaffiliated company,

8               Path Media pursuant to a license

9               agreement that expires on May 31st,

10              unless affirmatively renewed monthly by

11              both Path Media and the GGW entities."

12         Although the Court does find that these statements

13   do violate the best evidence rule -- and I'll describe how

14   the Fourth Circuit describes it -- I note that the actual

15   license between GGW Direct and Path Media is part of the

16   record, and that was actually submitted in a filing that was

17   attached to Mr. Tim's declaration.

18         So, in essence, the objection is irrelevant, but I

19   will cite from the Fourth Circuit which talks about the

20   misconception of the best evidence rule.

21         According to the Fourth Circuit, the rule applies

22   to the circumstance where the proponent seeks to prove the

23   content of a document.  The rule exists to avoid guarantees

24   against inaccuracies and fraud by requiring that the

25   original of the document be offered.

31

1            Thus, it is more accurate to refer to Rule 1002 as

2    the, quote, original document rule, not the best evidence

3    rule.

4            This objection, although it's being sustained, is

5    actually irrelevant, because again, the actual license

6    between Path Media and GGW Direct I believe is part of the

7    record.

8            Wynn objects to seven statements contained in

9    Tim's declaration.  Objections 1 through 5 relate to rulings

10   that were issued by a Nevada state court in litigation

11   involving Wynn's efforts to collect against the GGW entities

12   and miscellaneous other companies on an alter ego theory.

13           These objections are sustained because Tim was not

14   debtors' counsel in that case, and he has not presented

15   evidence, quote, sufficient to support a finding that he has

16   personal knowledge to testify on these subjects.

17           Statements 1, 2 and 5 also violate the best

18   evidence rule.

19           Wynn's sixth and seventh objections are to Exhibit

20   A and B attached to Tim's declaration which has certain

21   pages from Robert Kluger's June 22nd and August 28th

22   depositions.  Wynn's bases for these objections are lack of

23   foundation, hearsay and best evidence rule.

24           These objections are overruled.  It does not

25   appear that Tim was involved in either deposition, and

32

1  therefore, FRE 602 might be an issue.

2          However, due to the fact that Wynn introduced and

3  utilized portions of these depositions in support of its

4  motions, the Court notes that pursuant to FRCP 32(a)(6),

5  debtors, quote, could require Wynn to introduce other parts

6  of these depositions that in fairness should be considered

7  with the part introduced.

8          Similarly, FRE 106 provides, quote:

9              "If a party introduces or part of a

10             writing or recorded statement, an

11             adverse party may require the

12             introduction at that time of any part

13             that in fairness ought to be considered

14             at the same time."

15         So those are the preliminary rulings on the

16 request for judicial notice as well as the evidentiary

17 objections.

18         The substantive ruling will be read into the

19 record now.

20         The pre-petition legal proceedings that predated

21 the bankruptcy filing, I will just summarize those.

22         On June 18, '09, Wynn obtained a judgment against

23 Joseph Francis in Nevada state court paid upon unpaid

24 gambling debts.  The parties, I believe, refer to this as

25 the Nevada marker judgment.

33

1          As of 2/13/13, Francis owed Wynn more than $3.9

2 million on account of this Nevada marker judgment.

3          On September 30, '09, Wynn filed an action in

4 California state court seeking to collect on the Nevada

5 marker judgment.  The parties call this the California

6 judgment litigation.

7          Wynn filed a, quote, judgment creditors notice of

8 motion and motion for appointment of limited receiver in

9 that matter on November 16th.

10          The court entered an order appointing limited

11 receiver in aid of execution to enforcement of judgment.

12          On April 9, 2012, a Nevada state court entered a

13 judgment in favor of Wynn and Steven Wynn as an individual

14 against Francis.

15          The Nevada defamation judgment, which is how the

16 parties refer to this matter, consisted of $5,000,000 in

17 compensatory damages and $2.5 million in punitive damages.

18 As of February 13th of this year, Francis owed Wynn and

19 Steven Wynn a total of more than 8.1 million on account of

20 the Nevada defamation judgment.

21          On 4/18/2012, Wynn filed a case in the Nevada

22 state court against, among others, Francis and GGW Brands,

23 Direct and Events.  That's been referred to by the parties

24 as the alter ego litigation.

25          In the alter ego litigation, the court issued a

34

1  temporary restraining order that froze nearly $2,000,000 of

2  funds claimed to belong to GGW Brands and/or Direct that

3  were held in a client trust account by an attorney David

4  Houston.

5          On July 20, 2012, the court in that matter issued

6  a preliminary injunction which continued to freeze those

7  funds.

8          Wynn has filed a motion for summary judgment in

9  the alter ego litigation.

10          Debtors' organizational structure.  The evidence

11  demonstrates that as of 6/22/12, the organizational

12  structure of the debtors was as follows.

13          GGW Brands is a holding company that owns GGW

14  Direct, Events, and Magazine.

15          GGW Brands is the sole member of Direct, Events,

16  and Magazine.

17          GGW Direct, Events, and Magazine are member

18  managed companies, meaning that they have no separate

19  managers.

20          GGW Brands is also a member managed company.  Its

21  sole member manager is Pablo Holdings LLC.  Pablo Holdings

22  is a manager managed company.

23          Pablo Holdings' sole manager was Francis until

24  Dale was appointed.  And although there doesn't appear to be

25  a specific date in the record when Dale was appointed,

35

1   according to his testimony during the 341, I believe it was

2   sometime late October, early November.

3          Dale claims that he was elevated by Asia Trust

4   Limited as trustee of Ridgewood Global Trust to be the

5   manager of Pablo Holdings.  And that came from Dale's

6   declaration that was signed on 12/21/12.  It was attached to

7   the Langberg declaration.  It's Exhibit 11.

8          The sole member of Pablo Holdings is the Ridgewood

9   Global Trust.  The settlor-trustor of Ridgewood Global Trust

10  is Francis and the trustee is a quote, trust company in the

11  Cook Islands Asia Trust Limited, end quote.

12          Although there's no definitive evidence regarding

13  the beneficiaries of the Ridgewood Global Trust, Kluger who

14  was designated by GGW Brands and Direct as their 30(b)(6)

15  deponent in the alter ego litigation, testified he, quote,

16  assumed that Mr. Francis is at least one beneficiary of the

17  trust.

18          Summary of the parties' positions.  In the motion

19  Wynn argues that the Court should appoint a Chapter 11

20  trustee because of the diversion of debtors' assets to

21  satisfy Francis's personal obligations and the debtors' use

22  of puppet management to ensure that debtors' funds will

23  continue to be funneled to Francis to support his lifestyle.

24          According to Wynn, the evidence demonstrates the

25  complete abandonment of the debtors' fiduciary

36

1 responsibilities to creditors.

2        Essentially, Wynn alleges that Francis, despite

3 having no formal position with debtors, controls debtors and

4 that debtors improperly transfer funds to him.

5        Wynn also alleges that since Wynn has taken steps

6 to attempt to collect from the GGW entities, debtors'

7 management structure was changed to avoid impending court

8 orders.

9        In the opposition, debtors claims that Francis has

10 no actual power, control or authority over the GGW entities.

11 They contend that he is a consultant and that the GGW

12 entities continue to use his face for the brands.

13        Debtors acknowledge that Francis facsimile

14 signature was used on company checks which simply, according

15 to debtors, provided an appearance of continuity with third

16 party suppliers.

17        According to debtors, they voluntarily chose to

18 pay Francis's personal expenses to support his lifestyle,

19 but the GGW entities do not intend to and have not continued

20 to pay any of Francis's expenses post-petition other than

21 allowing Francis to use company vehicles to help maintain

22 the brand.

23        Debtors repeatedly assert that the trustee of the

24 trust, not Francis, has the ultimate say regarding the

25 management of the GGW entities.

37

 1          Debtors, when they say that the trustee of the

 2  trust had the ultimate say, don't specify to which trust

 3  they are referring.  In light of the context of the

 4  organizational structure of the various entities, it is most

 5  likely Asia Trust Limited, which is the trustee of Ridgewood

 6  Global Trust.

 7          The Court notes that a trust cannot act on its own

 8  and debtors have not identified who on behalf of Asia Trust

 9  Limited actually had the ultimate say, according to debtors,

10  regarding management of the GGW entities.

11          Debtors question whether Wynn has standing to file

12  the motion because it is, quote, merely pursuing a reverse

13  alter ego claim against debtors.  Debtors assert that under

14  Delaware law, Wynn's alter ego claim against debtors are not

15  viable.

16          Debtors also argue that Wynn has not met its

17  burden of showing by clear and convincing evidence that

18  appointment of a trustee is warranted under 1104(a)(1) or

19  1104(a)(2).

20          Wynn replies and contends that the Pablo Holdings

21  operating agreement, which is dated October 10, 2011,

22  demonstrate that the manager of Pablo, who it's undisputed

23  was Francis until Dale took over sometime late October,

24  early November, has authority over Pablo.

25          As a result, Wynn argues Francis controlled at

38

least until October, early November debtors.  According to

Wynn, emails between Francis and Direct TV along with other

correspondence show that Francis has control over debtors

that goes beyond mere consulting.

Wynn argues that Dale misrepresented facts to the

Court when he asserted that Path Media is not affiliated

with debtors.  Wynn claims that Path Media is structured as

part of the same asset protection scheme as the debtors

themselves and that Path Media's owner is the same as

debtors, Ridgewood.

Wynn asserts that debtors reformed as a result of

Francis's previous attempts to thwart creditors' collection

attempts.  Wynn claims that Francis has de facto control

over debtors because he can terminate debtors' right to use

valuable IP.

Wynn highlights that certain expenses reflected on

Francis's personal American Express bill which debtors paid

on behalf of Francis were largely pedestrian expenditures,

such as groceries, medical expenses and utilities.

Therefore, Wynn asserts that these expenses were

not, as debtors contend, necessary to maintain an image of

Francis's bad boy lifestyle.

Wynn also claims it has standing to file the

motion and the burden of proof applicable to the motion is

one of a preponderance of the evidence rather than clear and

39

1   convincing.

2           Facts relating to Wynn's allegation in terms of

3   Francis's control over and authority within debtor.  Wynn

4   contends that Francis, as manager of Pablo, was the ultimate

5   manager of debtors.

6           To support this contention, Wynn presented the

7   following evidence.  Francis was the person who first

8   approached Kluger, a former attorney for debtors, about

9   providing legal representation to debtors.

10          The Pablo operating agreement states explicitly

11  that the manager who was Francis through late October, early

12  November and then Dale and not the member, Ridgewood Global

13  Trust, has exclusive control over the company.

14          Illustrating this exclusive control are the

15  following provisions, quote:

16              "All management powers over the

17              business and affairs of the company

18              which is Pablo Holdings are and shall be

19              exclusively invested in the manager and

20              the member, who is Ridgewood Global

21              Trust, shall not have any right to

22              participate in or exercise control over

23              management power over the business of

24              the company."

25          According to the Pablo operating agreement, the

40

1  manager has exclusive power to do many, many different

2  things, including opening bank accounts, acquire, dispose or

3  encumber property, use assets and file for insolvency.

4          Conversely, the member does, quote:

5                  "not have any right or power to

6              take part in the management or control

7              of the company or its business and

8              affairs or to act for or bind the

9              company in any way."

10          Brian Rayment, another former attorney for

11  debtors, testified that Francis was the individual with whom

12  he dealt with respect to Rayment's representation of

13  debtors.

14          Francis had authority to choose the banks that

15  debtors would do business with.  On at least one occasion,

16  Francis terminated an employee and hired a replacement.

17  Francis was the only person with in the GGW entities who had

18  the authority to terminate the employees.

19          The paychecks from the GGW entities bore Francis's

20  signature.  Francis determined his own level of compensation

21  and there is no one who could have vetoed any item of

22  compensation.

23          Francis attempted to amend an agreement with

24  Direct TV so that Argyle Media Sales and not GGW Direct

25  would be the party to that agreement with Direct TV.

41

1  Francis through Path Media owns IP that debtors use in their

2  business and therefore he has the ability to harm debtors or

3  shut debtors down if he chooses to withhold from debtors the

4  right to use that IP.

5          Francis on behalf of the GGW entities terminated a

6  contract with Molten Logistics Management which, from the

7  emails submitted by Wynn, appeared to be a calling center.

8          On December 23, 2010, Francis sent an email to

9  Molten stating that:  We are pulling out of Molten now.

10 This is official notice of termination of all contracts with

11 Perfect Science Labs and Mantra/Girls Gone Wild.  This

12 termination is for fraud, overbilling and other material

13 breaches.

14         It was unclear from the record what type of

15 products Perfect Science Labs sells or what its relationship

16 to the GGW entities is.  I believe that Mr. Yaspan mentioned

17 that they lease employees from Perfect Science, that GGW

18 does, or there's some type of relationship.

19         What is clear is that Francis had authority, or at

20 least represented that he had the authority, to terminate

21 contracts on behalf of the debtors as well as Perfect

22 Science.

23         Debtors argue that Francis is not an officer or

24 owner of any of the GGW entities.  Debtors represent that

25 Francis has provided informal consultation services

42

1  regarding the operation of the debtors.  They also contend

2  that Francis's name and face are forever associated with the

3  brand in the minds of the public and the association of the

4  GGW and Francis sells products.

5           The GGW entities are able to distinguish their

6  products by their association with Francis.

7           Debtors downplay Francis's role with the GGW

8  entities that characterize him as a, quote, figurehead who

9  often loudly voices opinions or recommends to staff and

10 others regarding whether someone should be hired or fired or

11 on other aspects of the business.

12          Debtors represent that Francis has no actual power

13 or control over the GGW entities.  To support their

14 position, debtors submit portions of the Kluger deposition

15 dated 8/28/12 in which Kluger stated that the owner of Pablo

16 Holdings is the trust which is controlled by the trustee and

17 not Francis and that the trustee, therefore, is in control

18 of the GGW entities.

19          Kluger also testified that he did not remember

20 ever seeing a contract executed by Francis on behalf of the

21 GGW entities.

22          Turning to transfer of funds from debtors to

23 Francis.  Wynn alleges that there were numerous improper

24 transfers of funds either directly to Francis or to third

25 parties on behalf of Francis.

43

1          Evidence of these transfers include the following:

2          Debtors would pay Francis compensation not with a

3 set salary but rather through a system whereby debtors would

4 pay Francis's personal expenses and Francis would pay taxes

5 on those reimbursed expenses at the end of the year.

6          Francis's compensation was a set amount but he

7 regularly exceeded this amount meaning the set amount became

8 irrelevant.

9          His compensation was what they paid him.  And that

10 was from Kluger's deposition in August.  And Mr. Kluger also

11 stated as long as Francis did not spend more than the

12 companies had after he paid his other expenses, there was

13 really no limit to the expenses that he could personally

14 make and take as his compensation.

15          Instead of net income being distributed to the

16 members of the debtors, debtors' net profits were allocated

17 to Francis and were reported on his taxes.

18          A September through October 2011 American Express

19 bill which was issued in the name of Francis personally

20 reflects exclusively nonbusiness-related expenses such as

21 clothing, dry cleaning, pharmacy, medical, and grocery store

22 charges.  This AmEx bill had a balance due of a little more

23 than $38,000 on October 1, 2011.

24          Exhibit F of the Langberg declaration is a

25 document produced by debtors in response to Wynn Las Vegas's

44

1  request for production.  That document is titled, quote,

2  "GGW Direct transactions by account of Blue Horse

3  transactions," which reflects a total of almost three-

4  quarters of a million dollars in payments made from 3/25/10

5  to 9/10/12.

6          It is undisputed that Blue Horse Trading is an

7  entity that holds Francis's personal assets.  That's from

8  Kluger's depo, 6/20/2012.

9          Exhibit F to the Langberg declaration demonstrates

10 that on November 3, 2011, GGW Direct made a $38,441.59

11 payment to American Express.  The Court has also reviewed

12 the U.S. Trustee's motion to dismiss.

13         The Court notes that GGW Direct, based upon their

14 records, continued to make payments on behalf of Blue Horse

15 through at least November 16th for a net total of almost

16 $45,000.  This is reflected in GGW Direct's general ledger

17 that identifies these payments as accounts receivables from

18 an affiliate company.

19         Debtors also paid Francis's personal legal

20 expenses.  For example, Liner Grode -- and it has a very

21 long name -- begin representing Francis in 2010 and did not

22 begin representing GGW Direct until the summer or fall of

23 2011, yet GGW Direct began making payments to that firm in

24 the December of 2010.

25         Debtors also paid legal fees to Attorney

45

Aftergood, who represented Francis personally in the Nevada

defamation action brought by Wynn and Steven Wynn,

litigation in California regarding a defamation claim

brought by Steven Wynn, as well as the California judgment

litigation.

Finally, debtors paid legal fees to Attorney David

Houston who has represented Francis personally on a number

of matters including those related to Francis's indictment

by the IRS as well as working on the appeal of the Nevada

marker judgment.

Debtors acknowledge that they paid Francis's

expenses before the GGW entities filed bankruptcy.

According to Dale, the GGW entities' business records reveal

that, quote, certain personal expenses of Joe Francis had

been voluntarily paid by the GGW entities prior to his

becoming manager.

This was done with the consent of Ridgewood

Global's trustee, that is Asia Trust Limited.

When such expenses were paid, Mr. Dale continued,

"It was not pursuant to any contract but rather done by the

GGW entities to try to maintain the public perception of the

lifestyle of Joseph Francis."

Dale notes, however, that there are no contracts

requiring any of the GGW entities to pay any expenses on

behalf of Francis and there were no other contracts of any

46

1 kind with Francis, quote:

2         "... other than an indemnity agreement

3         between GGW Direct and Francis in which

4         GGW Direct agreed to indemnify Francis

5         for attorneys' fees and other costs he

6         may incur in connection with litigation

7         arising due to the public's perception

8         of him as the public persona of Girls

9         Gone Wild."

10         In August 2012, Dale, who at that time was the GGW

11 entities' human resource manager, testified that he

12 maintained employment agreements with employees and

13 independent contractors and had never seen a contract

14 between debtors and Francis that contained an indemnity

15 agreement.

16         More recently, Dale, who is now the manager of

17 Pablo and claims to be the manager of GGW Brands, claims

18 that debtors have not continued to pay Francis's expenses

19 post-petition but that Francis is still allowed use of

20 company vehicles to maintain the brand.

21         To support their position that it was appropriate

22 for the GGW entities to pay Francis's legal personal bills,

23 Kluger testified that when he was first engaged by debtors,

24 there was an issue of whether the legal fees that were paid

25 were properly deductible by the GGW entities as ordinary and

47

1  necessary business expenses.

2        Kluger stated that he got a file of attorneys'
3  engagements letters, reviewed the letters, and called some
4  of these attorneys to determine the nature of the engagement
5  and to determine whether the legal fees that had been paid
6  were properly deductible by the debtors as business
7  expenses.

8        Kluger testified that most of the legal expenses
9  incurred were legitimate business expenses because the
10  assets of the company in most cases were being protected in
11  the litigation.

12        Turning to changes in debtors' management
13  structure.  The evidence submitted by Wynn demonstrates that
14  sometime in late October, early November, Dale was, quote,
15  elevated by Asia Trust Limited as trustee of the Ridgewood
16  Global Trust to be the manager of Pablo.  And that comes
17  from Dale's declaration dated December 21, 2021.

18        The Court notes that Dale is the person who signed
19  all of the bankruptcy petition schedules and statement of
20  financial affairs and he signed those documents as the
21  debtors' manager.

22        On 8/29, when Dale's deposition was taken in the
23  alter ego litigation, he was a human resources manager for
24  GGW Brands and he claimed that at that time his knowledge of
25  the organizations was limited.

48

1    On October 3, 2012, Dale identified himself as the

2 legal affairs manager of GGW Brands in those entities'

3 responses to request for production of documents in the

4 alter ego litigation.

5    Dale claims that since he became manager of Pablo

6 Holdings and GGW Brands, Francis has not been an employee of

7 the GGW entities, is not paid any salary or other

8 compensation, does not have authority to make any decision

9 for the GGW entities, and does not have any authority over

10 Dale.

11    In Dale's 3/28/2013 declaration, he states that

12 Francis is not an owner or manager of debtor and he is not

13 an officer or owner of any GGW entity.

14    According to Dale, debtors' continued existence

15 relies on Francis's informal involvement with the company

16 through him allowing his image to be used to sell

17 memberships and other goods and services and consulting

18 services provided by Francis.

19    Dale alleges that the lifeline of the GGW entities

20 are third party licenses to use the GGW and Girls Gone Wild

21 name and those licenses expire in a few months.

22    Dale claims that if a Chapter 11 trustee is

23 appointed, Francis would likely no longer permit his image

24 to be used with the GGW entities and the licenses likely

25 would not be renewed and the Chapter 11 trustee would simply

49

1  be presiding over the end of debtors' business and

2  liquidation of a few remaining assets.

3       In Francis's 328 declaration, he asserts that he

4  started the GGW brand many years ago but no longer has any

5  official role with respect to the brand.  He claims, "I am

6  not and have never been an owner or manager of the GGW

7  entities."

8       He states that:

9            "In the past, debtors have paid

10           certain related to my lifestyle.

11           Because my image helps debtors sell

12           products and services because of my past

13           association with the GGW brand, I have

14           provided informal consultation to the

15           GGW entities."

16       During the 341(a) meeting, Dale appeared and

17  testified on behalf of the debtors.  As I mentioned, I got

18  to briefly review Mr. Dale's testimony this morning.  There

19  was more than 300 pages filed, but a few key points.

20       Mr. Dale mentioned that he works approximately

21  four to five hours a week on behalf of all of the GGW

22  entities.  He's actually employed with an unrelated entity,

23  Music Clips, as an HR manager.

24       Mr. Dale testified that he didn't apply for the

25  job.  He was actually contacted and told that he was going

50

1  to be the manager.

2          So those are just a few of the statements that Mr.
3  Dale made in the 341(a).

4          On 4/2 the court issued an order re evidence to be
5  submitted by debtor by 4/5 at noon in the GGW Direct case.
6  In the order, the court indicated it had reviewed GGW
7  Direct's statement of financial affairs including a multi-
8  page document titled "GGW Direct finds report November 30,
9  2012 through February 27, 2013."

10          In the order the court indicated it sought copies
11 of certain documents including complete copies of all bills,
12 invoices or other evidence substantiating the payments
13 listed on Exhibit A which was attached to the order, as well
14 as copies of checks, wire transfers, et cetera, or any other
15 evidence demonstrating that the payments were made within 90
16 days before filing of the bankruptcy.

17          As I mentioned, attached was Exhibit A which
18 listed a number of payments for which the court sought
19 information.  The total of those payments were more than
20 $281,000 that were paid in the three months before filing to
21 American Express, more than $274,000 paid to Argyle Online,
22 $232,000 paid to J.G. Marzan (phonetic), and $65,000 paid to
23 Kiki Entertainment.

24          On 4/5, GGW Direct filed a declaration of Ronald
25 Tim regarding order of court dated April 2, 2013.  Tim

51

1   states he is an attorney for GGW Direct and that when he

2   received the order, he contacted Mandy Isaac, GGW Direct's

3   controller, and asked her to research the books and records

4   of the debtor and to locate documents responsive to the

5   order.

6           She did such investigation under his supervision

7   and transmitted to him the documents that were attached to

8   Mr. Tim's declaration.

9           In terms of the American Express bill, he states

10  that the payments made by GGW Direct are documented and

11  supported by the bills sent by American Express to GGW

12  Brands.

13          Exhibits 1 through 4 attached to Mr. Tim's

14  declaration are AmEx bills for an account ending in 6-54007

15  for a business Centurion card issued in the name of GGW

16  Brands, Joseph R. Francis, for the periods ending November

17  23, 2012; December 24, 2012; January 24, 2012; and February

18  21, 2013, respectively.

19          According to Tim, the payments designated by the

20  debtor are marked with checkmarks.  A review of Exhibits 1

21  through 4 attached to the Tim declaration reveals that the

22  following payments were made on those bills:  a $40,000

23  payment, a 923,787 payment, 82,000 payment, and $59,000

24  payment, for a total of about $275,000.

25          The charges for each month are varied and were

52

1  incurred by various individuals in addition to Mr. Francis.

2  The charges include expenses for hotels, plane tickets,

3  food, and purchases at Home Depot in Mexico.

4          Some of what appear to be nonbusiness-related

5  expenses include charges at Petco and Lucky Strike Bowling

6  Alley.

7          Each of the payments listed above indicate that

8  they were made by Mr. Francis on the applicable date.

9          Mr. Tim also indicated that Exhibit 5 to his

10 declaration was a copy of an American Express bill for the

11 period ending February 15, 2013.  A review of Exhibit 5

12 reveals that the American Express bill is for an account

13 ending in 6-21000 for a business Green rewards card issued

14 in the name of Perfect Science Labs, Joseph R. Francis.

15         That payment was made on January 22, 2013 in the

16 amount of $6300.  Mr. Tim did not address why approximately

17 a month before debtors filed for bankruptcy, they were

18 paying a bill for Perfect Science Labs.

19         The total amount reflected as paid on Exhibits 1

20 through 5 is $281,000 and change, which is the same amount

21 that GGW Direct listed on the statement of financial

22 affairs.

23         Tim states that the payments to Argyle Online in

24 the amount of $274,250 are related to a contract entitled

25 "Trademark license agreement by and between GGW Direct LLC

53

1   as the licensee and Path Media Holdings LLC as the

2   licensor," and that a copy of that agreement is attached as

3   Exhibit 6.

4          Tim directs the Court's attention to paragraph

5   1(d) which sets out the initial term of the license

6   agreement.  Exhibit 6 is a trademark license agreement dated

7   2/25/13, two days before debtors filed, that was entered

8   into between Path Media and GGW Direct.

9          The agreement reveals that the licensor, who is

10  Path Media, and the licensee, GGW Direct, agree to an

11  exclusive non-transferrable and limited license to use

12  certain trademarks related to Girls Gone Wild, which are

13  identified in Exhibit A to the agreement.

14          The agreement also provides that, quote:

15              "In consideration for such a

16          license, GGW Direct has paid Argyle

17          Online, LLC licensor's U.S.

18          representative a license fee in the

19          amount of $274,250, the initial term

20          license fee for the initial term which

21          is defined below."

22          The agreement also provides that:

23              "The term of this agreement and the

24          license granted herein is for a period

25          commencing on the effective date and

54

1     expiring on May 31st."

2         The agreement also provides that it may be renewed

3   for an additional one-month period if agreed to in writing

4   by both parties.

5         On the last page of the agreement, it indicates

6   that the licensor is Path Media Holding LLC by Asia Trust

7   Limited, as trustee of the Hammersmith Trust Manager by ATP

8   Directors Limited.

9         The signatures of the persons who signed on behalf

10  of these entities are illegible and the names which were

11  handwritten above "Authorized signatories" are difficult to

12  read, although the first names appear to be Angela and Lisa.

13        Chris Dale, manager, signed on behalf of GGW

14  Direct.

15        There were certain payments to J.G. Marzan that

16  the court asked for further information for in the 4/2

17  order.  Tim claimed that the payments to J.G. Marzan relate

18  to pre-filing legal services rendered to the debtor by Mr.

19  Marzan in Mexico in connection with, among other things, a

20  labor dispute.

21        Mr. Tim states that the smaller payments are

22  supported by Mr. Marzan's written billings for legal

23  services that were attached as Exhibit 7.

24        The larger payments, Mr. Tim stated, he was

25  informed related to a settlement agreement.  He was

55

1  attempting to get a copy of the agreement from counsel.  He

2  indicated that he would submit the document to bankruptcy

3  counsel when it was received.

4          Exhibit 7 consists of the following three heavily

5  redacted bills for $1300, $3,000 and $3100, as well as a

6  1/23 invoice for $23,000, which indicates it's for payment

7  for legal settlement, GGW.

8          On 4/8, Mr. Tim filed a first supplemental

9  declaration.  In the Tim declaration, he states that an

10  invoice received for 146,277.28 paid to the law firm of J.

11  Luis Garcia Marzan by GGW Direct were attached hereto as

12  Exhibit 9 and evidences that such payments were settlement

13  payments for a labor dispute.

14          He was still awaiting an invoice receipt for the

15  $53,000 that was remaining that was paid to Mr. Marzan

16  during the 90 days before debtors filed for bankruptcy.  He

17  indicated he would submit that to the Court as soon as it

18  was received.

19          In the Tim 4/5 declaration, the first one, he

20  stated that the payment to Kiki Entertainment was made on

21  February 27th from debtors' pre-filing bank account at Wells

22  Fargo.

23          According to the Tim declaration, and the Wells

24  Fargo bank account which is heavily redacted, there were

25  only four legible entries, one of which is a 2/27 WT --

56

which the Court assumes is a wire transfer -- for $65,000 to

Kiki Entertainment.

     Tim concludes by stating that Mandy Isaac, the

controller, has not yet located any support for making this

transaction.

     In the first supplemental declaration submitted by

Mr. Tim on 4/8, he explains that the $65,000 payment from

GGW Direct to Kiki Entertainment was as follows, and I'm

quoting:

          "Such amount was actually first

          deposited in trust with debtor by

          Perfect Science Labs for forwarding to

          Kiki Entertainment on behalf of Perfect

          Science Labs.  Perfect Science Labs did

          not have the ability to wire funds from

          its account online.  GGW Direct did have

          the ability to wire funds from its

          account online.  Perfect Science Labs

          asked, and GGW Direct agreed, in

          February 2013 to forward monies from

          Perfect Science Labs to Kiki

          Entertainment, so Perfect Science Labs

          caused $65,000 of its funds on deposit

          at Wells Fargo to be transferred by

          Wells Fargo internally to debtor in

57

1          trust and debtor in turn online wired

2          those funds to Kiki Entertainment.

3          Attached hereto as Exhibit 10 is a

4          redacted copy of the bank statement of

5          GGW Direct evidencing the transfer of

6          $65,000 into debtor's account from

7          Perfect Science Labs on February 26th

8          and then such amount being wired on

9          February 27th to Kiki Entertainment."

10          That's the end of the quote.

11          A review of Exhibit 10 reveals that on 2/26

12  $65,000 was actually transferred from Argyle Online into GGW

13  Direct's Wells Fargo's account ending in the number 5232.

14  And the next day and the date that the GGW entities' cases

15  were filed, GGW Direct wired $65,000 to Kiki Entertainment.

16          Perfect Science Labs, the Court notes, is not

17  mentioned anywhere on Exhibit 10.

18          The legal standard for a section 1104 motion

19  provides that:

20          "At any time after commencement of

21          a case but before confirmation of a

22          plan, on request of a party in interest

23          or the U.S. Trustee after notice and a

24          hearing, the court shall order the

25          appointment of a trustee --

58

1          "(1) for cause, including fraud,

2        dishonesty, incompetence, or gross

3        mismanagement of the affairs of the

4        debtor by current management, either

5        before or after the commencement of the

6        case ... or

7          (2)  if such appointment is in the

8        interests of creditors."

9        If the moving party has met its burden under

10 either of the two subsections the court must appoint a

11 trustee.

12        The appointment of a trustee is an extraordinary

13 remedy, and there's a strong presumption that the debtor

14 should be permitted to remain in possession absent a showing

15 of need for the appointment of a trustee.

16        This presumption is based, at least in part, on

17 the debtor in possession's usual familiarity with the

18 business it has already been managing at the time of the

19 bankruptcy filing, often making it the best party to conduct

20 operations during the reorganization.

21        A Chapter 11 debtor, as representative of the

22 estate, occupies a trust relationship subject to fiduciary

23 obligations which include a prohibition against self-

24 dealing.

25        A debtor in possession's job is to get the

59

1  creditors paid.  And its fiduciary obligations to its

2  creditors include refraining from acting in a manner which

3  could damage the estate or hinder a successful

4  reorganization.

5          In terms of the burden of proof, the parties

6  dispute what that burden should be on a motion to appoint a

7  trustee.  Debtor, as one would expect, argues that it should

8  be clear and convincing evidence.  Wynn argues that it's

9  only by a preponderance of the evidence.

10          The Court notes there's a split of authority

11  regarding the burden of proof and the Ninth Circuit has not

12  yet addressed that issue.

13          The Court doesn't believe it's necessary to decide

14  today whether or not the burden is preponderance or clear

15  and convincing evidence because, based upon the evidence

16  before me, there is clear and convincing evidence that a

17  trustee should be appointed.

18          I find there is clear and convincing evidence that

19  a trustee should be appointed under both 1104(a)(1) for

20  cause and 1104(a)(2) in the best interests of the creditors.

21          Again, a few preliminary issues.

22          As I mentioned, an evidentiary hearing is not

23  required and there was more than sufficient evidence in the

24  record on which the Court is basing its ruling.

25          Section 1104(a)(1) contains four non-exclusive

60

1 bases for finding there is cause to appoint a Chapter 11

2 trustee:  fraud, dishonesty, incompetence, and gross

3 mismanagement of the affairs of the debtor by current

4 management.

5         While a certain amount of mismanagement of the

6 debtors' affairs prior to the filing date may not be

7 sufficient grounds for the appointment of a trustee,

8 continuing mismanagement of the affairs of the debtors after

9 the filing date is evidence of the need for appointment of a

10 trustee.

11         As one court noted:

12             "If a debtor had not filed

13             bankruptcy, its management might not

14             have been subject to such critical

15             scrutiny.  Things are different,

16             however, now that debtor seeks

17             protection in this court, and the

18             interests of its creditors are to be

19             accorded a higher priority."

20         A court may consider both pre-petition as well as

21 post-petition conduct in determining the necessity of a

22 trustee.

23         Although diversion of funds and misuse of

24 corporate assets constitute fraud or dishonesty sufficient

25 to warrant appointment of a trustee under section

61

1  1104(a)(1), the fact that a debtor's prior management might

2  be guilty of fraud, dishonesty, incompetence, or gross

3  mismanagement does not necessarily provide grounds for

4  appointment of a trustee as long as the court is satisfied

5  that current management is free from the taint of prior

6  management.

7       Under 1104(a)(2), appointment of a trustee is

8  allowed even when there is no cause.  When determining

9  whether it is, quote, in the interests of creditors to

10 appoint a trustee under 1104(a)(2), courts look to practical

11 realities and necessities.  The standard is a flexible one

12 and courts have considered the following factors:

13      One, the trustworthiness of the debtor.

14      Two, the debtor in possession's past and present

15 performance and prospects for rehabilitation.

16      Three, the competence or lack thereof of the

17 business community and of creditors in present management.

18      And, four, the benefits derived from the

19 appointment of a trustee balanced against the cost of

20 appointment.

21      Section 1104(a)(2) may be used to justify the

22 appointment of a trustee when current management that has

23 been recently appointed is competent and honest but does not

24 have the expertise that an exceptional trustee would have in

25 reorganizing the debtor.

62

1          The first argument that debtors made was -- they

2    questioned whether Wynn had standing.

3          Debtors claim that the GGW entities are Delaware

4    corporations.  To support their position, debtors cite the

5    petition docket number 1 and rely heavily on a quote from In

6    re ALT Hotel, 479 B.R. 781, Bankruptcy, Northern District of

7    Illinois, 2012, where the court determined that Delaware law

8    would not permit a claim for inside reverse piercing of the

9    corporate veil.

10          Debtors' assertion that Wynn lacks standing is not

11    persuasive.  As an initial matter, the petitions do not

12    contain any information from which the Court could determine

13    in which state they were purportedly incorporated.  And

14    debtors are limited liability companies, not corporations.

15          Although debtors have not presented any evidence

16    substantiating their claim that the GGW entities are

17    Delaware limited liability companies, Wynn concedes this

18    fact and the evidence demonstrates that the GGW entities are

19    in fact Delaware LLCs.

20          Nevertheless, from In re ALT Hotel is legally and

21    factually distinguishable from this case and is not

22    controlling precedent.

23          To have standing in a bankruptcy case, a party

24    must meet three requirements:

25          One, qualify as a party in interest under 1109(b).

63

1          Two, meet Article Three constitutional

2  requirements.

3          And, three, federal prudential standing

4  requirements.

5          And that's from In re Thorpe Insulation Company,

6  677 F.3d 869, Ninth Circuit, 2012.

7          Although section 1104(a) provides that a party in

8  interest may request that the court order the appointment of

9  a Chapter 11 trustee, it does not define "party in

10  interest."

11          Section 1109(a) states that:

12               "A party in interest, including the

13          debtor, the trustee, a creditors

14          committee, an equity security holders

15          committee ... may raise and may appear

16          and be heard on any issues in a case

17          under this chapter," which is Chapter

18          11."

19          The party in interest standard has generally been

20  construed broadly.  Section 1109(b) was not intended to

21  provide standing exclusively to the listed examples but

22  rather was meant to give standing to anyone who has a

23  legally protected interest that could be affected by a

24  bankruptcy proceeding.

25          The standard has also been articulated as whether

64

1 a party has a sufficient stake in the proceedings and that

2 is <u>In re Thorpe</u>.

3        Wynn satisfies the 1109(a) party in interest

4 requirement.  The evidence demonstrates that he has a,

5 quote, legally protected interest that could be affected by

6 this case.

7        In fact, debtors each listed a disputed claim of

8 over $10,000,000 owed to Wynn on this list of creditors

9 holding 20 of the largest unsecured claims as well on

10 Schedule F, creditors holding unsecured non-priority claims.

11        Additionally, in support of the opposition,

12 debtors submitted portions of Kluger's two depositions which

13 were attached to Ron Tim's declaration that was filed on

14 3/29/13.

15        Kluger was being deposed as the designee of GGW

16 Direct and Brands in the alter ego litigation.  This

17 demonstrates that Wynn, who is the plaintiff in the alter

18 ego litigation, has an interest in this case.

19        Further, as the plaintiff in the alter ego

20 litigation, Wynn also is sufficiently affected by this case

21 to be a real party in interest because the automatic stay

22 has put that litigation on hold, which has delayed Wynn's

23 attempt to collect against debtors.

24        Additionally, Wynn contends that the GGW cases are

25 being used to impermissibly hide assets, which is another

65

1    basis for the Court to find that the GGW cases affect Wynn.

2           In terms of Article Three standing, a party has

3    Article Three standing if the party can demonstrate an

4    injury that in fact that is traceable to the challenged

5    action and that is likely to be redressed by a favorable

6    decision.

7           In the context of a Chapter 11 case, Article Three

8    standing exists where the participant holds a financial

9    stake in the outcome of the proceeding such that the

10   participant has an appropriate incentive to participate in

11   an adversarial forum to protect his or her interests.

12          Wynn has Article Three standing because it has

13   disputed claims against debtors for millions of dollars and

14   it has an incentive to protect its interests.

15          And, as noted above, when the GGW cases were

16   filed, Wynn's alter ego litigation was stayed which

17   necessarily delayed Wynn from collecting.

18          Further, Wynn alleges that debtors are using

19   bankruptcy to shield Francis's assets from Wynn which would

20   be redressed if the Court grants the motion.

21          In terms of prudential standing, that is a

22   judicially self-imposed limit on the exercise of federal

23   court jurisdiction.  It's founded in concerns about the

24   proper and properly limited role of the courts in a

25   democratic society.

66

1        One requirement of prudential standing is that a

2  party's grievance must fall within the zone of interests to

3  be protected or regulated by the statute or constitutional

4  guarantee in question.

5        Another requirement of prudential standing is that

6  a litigant must assert his or her own rights or interests

7  and not those of a third party.

8        The Court finds that Wynn has prudential standing.

9  Wynn's grievance falls within the zone of interests

10 protected by 1104(a) because the purpose of the statute is

11 to protect creditors.

12       That's In re Savino Oil and Heating Company, 99

13 B.R. 518, Bankruptcy, Eastern District of New York, 1989,

14 stating that 1104(a) is an important protection to

15 creditors, that courts should not lightly disregard or

16 encumber with overly protective attitudes towards debtors in

17 possession.

18       Turning to the substance of the motion.

19       Wynn seeks appointment of a Chapter 11 trustee

20 pursuant to both subsection (a)(1) and (a)(2) of 1104.

21       Under 1104(a)(1) Wynn asserts this cause to

22 appoint a trustee based upon the pre-petition conduct of

23 Francis and the debtors.

24       To support his position, Wynn cites a number of

25 cases.  In re Bibo, which is a Ninth Circuit; In re PRS; In

67

1  re -- I can't pronounce it -- it's B-O-I-N-E-A-U; and In re

2  Microwave Products America.

3         Using these cases as support, Wynn contends there

4  is cause to appoint a trustee in this case because Francis

5  has, quote:  total control over debtors for his own benefit

6  and historically has used debtors as his personal piggy-bank

7  as part of a scheme to hide his assets and he continues to

8  do so irrespective of the recent appointment of Dale as,

9  quote, manager.

10         In Wynn's view, Dale's appointment as manager was

11  simply a smokescreen that in reality perpetrated Francis's

12  unbridled control over and access to debtors' assets.  Wynn

13  asserts that debtors' current management is a sham and

14  constitutes more than ample cause for appointment of the

15  trustee.

16         Wynn also asserts there is cause based upon what

17  it characterizes as Francis's scheme to transfer debtors'

18  rights related to a Direct TV deal to Francis's other

19  companies.  Wynn argues that Francis attempted to transfer a

20  revenue stream from Direct TV to a Francis-related entity

21  when faced with Wynn exercising its remedy through the alter

22  ego litigation.

23         To support this contention, Wynn email

24  correspondence between Francis and a Direct TV

25  representative.

68

1          Wynn also filed an ex parte application for order

2     authorizing Wynn Las Vegas to file under seal Argyle Media

3     license agreement related to motion for order directing the

4     appointment of trustee.

5          On April 8th, the Court granted the ex parte

6     application.  A review of the email exchange highlighted by

7     Wynn as well as the document that was filed under seal

8     substantiates Wynn's contention that Francis attempted to

9     change the licensor with Direct TV from GGW Direct to Argyle

10    Media Sales, LLC.

11         Wynn asserts that Francis's intent was to transfer

12    these rights from GGW Direct, an entity subject to the alter

13    ego litigation to Argyle, an entity that was not.  Debtors

14    do not explain why Francis sought to transfer the rights

15    from GGW to Argyle.

16         Instead, debtors contend that courts will only

17    appoint trustees in cases where the debtor will continue

18    misconduct.  Debtors state that there is no evidence

19    presented of any misconduct pre-petition or post-petition

20    and even if there were pre-petition conduct, in the past,

21    debtors have a new management team since the time of the

22    alleged mismanagement.

23         For this proposition and for the fact that debtors

24    claim a trustee should not be appointed, they rely on In re

25    General Oil Distributors and In re Sundial Limited.

69

1          Here, the Court finds there is sufficient cause to

2    appoint a Chapter 11 trustee pursuant to 1104(a)(1).  This

3    finding is based on evidence of Francis's control over

4    debtors while he was the manager of Pablo Holdings which was

5    through late October, early November of 2012, as well as

6    what the Court perceives as Francis's continued control over

7    debtors since that time when Dale was purportedly promoted

8    to manager of Pablo Holdings.

9          The evidence is clear that despite debtors'

10   protestations to the contrary, that the trustee of the trust

11   controlled debtors, Francis was in complete control of

12   debtors through at least early November of 2012.

13         Pablo Holdings' operating agreement demonstrates

14   that the manager of Pablo -- who was Francis, not the member

15   as asserted repeatedly by debtors -- had absolute unfettered

16   discretion and complete control over Pablo Holdings, which

17   in turn controlled GGW Brands, the holding company of the

18   other GGW entities.

19         Further, although debtors seek to distance

20   themselves from Francis and claim that he often loudly

21   voices opinions or recommends to stamp on others regarding

22   whether someone should be hired or fired, the truth is that

23   at least through early November Francis had the ultimate say

24   in hiring and firing.

25         Francis alone determined how much he would be

70

1 paid, which was limited only by debtors' income.

2        From a review of his personal AmEx bills, it is

3 beyond dispute that GGW funds were used to pay Francis's

4 personal expenses.  He also used GGW assets to pay for

5 lawyers who represented him personally.

6        Although Kluger testified that when he was first

7 engaged by debtors, he researched whether Francis's personal

8 legal fees were properly deducted and he concluded that most

9 of the legal expenses incurred were legitimate business

10 expenses.  Because in most cases the assets of the companies

11 were being protected, that does not alter the analysis.

12       The implication is that some of the expenses might

13 not have been considered legitimate expenses or that Kluger

14 did not research all of the expenses.

15       Further, debtors' assertion that Francis did not

16 have any control over the GGW entities is belied by the fact

17 that he negotiated with and terminated vendors on behalf of

18 the GGW entities and that is evidence related to the Direct

19 TV emails and the Molten emails.

20       Further, the timing of Francis's attempt to change

21 the Direct TV licensor from GGW Direct to Argyle Media Sales

22 further supports the Court's belief that a trustee is

23 warranted.

24       On 7/20/2012, the Nevada state court issued a

25 preliminary injunction in the alter ego litigation which

71

continued to freeze 2,000,000 in funds claimed to belong to GGW Brands and/or Direct which were held in David Houston's client trust account.  Five days later, Francis attempted to change the Direct TV licensor from GGW to Argyle Media Sales, LLC.

Wynn also alleges that the attempted transfer to Argyle should arouse suspicion about the nature and purpose of any payments or transfers of assets from any of the debtors to Argyle.

Wynn asserts that Argyle is a cancelled California LLC that was registered with the Secretary of State under Tim's name.  Wynn does not present any evidence supporting this assertion and none is in the record.

Wynn also highlights that Aftergood signed the agreement purportedly between Direct TV and the GGW Brands where Mr. Francis was trying to change the licensor to Argyle which Wynn asserts is reason to believe that Francis controls everything and everyone related to debtors in an attempt to manage the assets of his company.

Undercutting Wynn's arguments, only slightly though, on this point, is Francis's seeming nonchalance in response to Direct TV's reluctance to accept the amended license agreement.

If Francis were determined to divert assets at that time, it seems likely he would have made more of an

72

1  effort to persuade Direct TV on this point.

2      Although debtors argue that Dale is now the

3  manager of the debtors and Francis purportedly has no actual

4  power or control over the GGW entities, the Court finds that

5  such an assertion is not credible.

6      It is true that Dale now claims to be the manager

7  of Pablo Holdings.  However, the timing of Dale's promotion

8  and his independence are questionable.  The Court notes that

9  Dale was purportedly promoted to manager of Pablo Holdings

10  in late October, early November, which was approximately the

11  same time as the Wynn -- as Wynn filed its motion for

12  appointment of a limited receiver in the California judgment

13  litigation.

14      Further, the Court has serious concerns regarding

15  Dale's ability to manage the GGW entities.  It's undisputed

16  that Dale was debtors' human resources manager at least

17  until August 29, 2012 and he concedes that at that time, his

18  knowledge of and authority over debtors was extremely

19  limited.

20      By late October, early November, Dale had been

21  elevated by Asia Trust Limited as trustee of the Ridgewood

22  Trust to purportedly manage Pablo Holdings and therefore

23  debtors.

24      He at that point was then responsible for what Mr.

25  Yaspan claims were 13 employees and at least 22 independent

73

1   contractors and a multimillion-dollar brand.

2         Debtors submitted Dale's declaration in support of

3   their opposition and they certainly could have provided

4   information regarding Dale's education, background and

5   experience that could have substantiated that he has the

6   knowledge, ability and background to manage debtors.

7         Debtors did not provide this information or about

8   the controller, the letter of whom debtors claim has years

9   of experience as a controller.  The lack of information

10  submitted by debtors on the important issue of the

11  experience of their management team is significant.

12        Additionally, as the Court noted during the 341(a)

13  meeting of creditors, Dale appeared and testified on behalf

14  of debtors.  Dale testified that he works approximately four

15  to five hours per week for the GGW entities and he is

16  currently working for an unrelated entity called Movie Clips

17  as an HR manager.

18        Although Dale testified he is the decision maker

19  for the GGW entities, he admitted relying on the department

20  heads to make day-to-day operating decisions.

21        Although Dale claims that Francis no longer has

22  any control over debtors, the Court does not believe this to

23  be true.  Debtors' explanation of GGW Direct's $65,000

24  payment to Kiki Entertainment that was made on 2/7/13, which

25  coincided with the date that the GGW entities filed for

74

bankruptcy, demonstrates that Francis still controls debtors.

According to Tim, the $65,000 payment from GGW Direct to Kiki Entertainment occurred because Perfect Science Labs needed to wire funds from its account but did not have the ability to do so; therefore, GGW Direct agreed that Perfect Science Labs could transfer money from its account and then GGW Direct would forward the money to Kiki Entertainment.

What Tim did not state is that Francis is the manager of Perfect Science Labs and that evidence is contained in the Langberg declaration, Exhibit 6 and Exhibit D, the second Langberg declaration.

And even though Mr. Tim claims that the payment to Kiki Entertainment was on behalf of Perfect Science Labs, the evidence submitted to support this contention demonstrates that Argyle Online, rather than Perfect Science Labs, transferred $65,000 into GGW Direct's account.

Additionally, the evidence related to the $274,250.52 payments made to Argyle Online within a week of the GGW cases being filed also raises significant concerns with the Court.

On February 19, 2013, GGW Direct reported paying Argyle a total of $214,250.52.  Approximately a week later, on 2/25 Argyle Online as the, quote, U.S. representative of

75

Path Media was paid an additional $60,000 and then executed a 95-day lease agreement for a total of 274,250.52 for the use of the GGW trademarks.

The Tim 4/5 declaration and the 2/25 agreement between Path Media and GGW Direct that purportedly demonstrates the basis for the almost $275,000 payment appears strange to the Court for a number of reasons.

First, the agreement just happened to be dated two days before debtors filed for bankruptcy, and it was for a 90-day period. There was no explanation why the agreement is for such an odd number of days.

Second, even if it were a valid agreement, which the Court is not convinced it is, the 274,250.52 amount of the agreement is odd and it is exactly the same amount as the total of the three payments that GGW Direct made within a week of filing bankruptcy.

Finally, the agreement states explicitly that the effective date was 2/25/13, which was the date of the last $60,000 payment to Argyle. GGW Direct, however, had paid Argyle a total of more than $214,000 a week before, on February 19, 2013.

Therefore, the payments made on February 19th raise issues regarding whether debtors as fiduciaries should pursue a possible fraudulent conveyance or preference action against Path Media and/or Argyle Online to recover these

76

1 payments.

2          It is undisputed that Path Media is owned by

3 Ridgewood Trust, the sole member of Pablo Holdings and <u>In re</u>

4 <u>Pitt Penn Holding Company</u>, 484 B.R. 25, Bankruptcy, the

5 District of Delaware, 2012, stated that a close relationship

6 between the transferor and transferee is one of the badges

7 of fraud for purposes of determining whether a transfer is

8 fraudulent under section 540(a).

9          Finally, debtors' repeated assertions that the

10 trustee of the trust, and not Francis, controls debtors is

11 not true.  The Pablo operating agreement reveals that the

12 manager of Pablo Holdings, Francis and then Dale late

13 October, early November, and not its member Asia Trust

14 Limited, the trustee of Ridgewood Global Trust, is vested

15 with expansive control and power over Pablo and therefore

16 over debtors.

17          Section 9 of the Pablo operating agreement again

18 states that all management powers over Pablo are and shall

19 be exclusively vested in the manager and the member shall

20 not have any right to participate in any exercise, control

21 of management power or over the business and affairs of the

22 company.

23          As noted above, the Pablo agreement then lists

24 numerous functions of the manager demonstrating that the

25 manager, and definitely not the member, has unlimited

77

1 discretion regarding the management of Pablo.

2          In light of this unambiguous language in the Pablo

3 operating agreement, it's clear that the debtors continued

4 statement that the trustee of the trust, and not Francis,

5 has control over debtors is absolutely not true, despite

6 debtors' claim, Ridgewood Trust, as a member of Pablo has no

7 power over that entity.

8          As a result, Ridgewood Trust has no power over

9 debtors which are controlled by Pablo.  Control over Pablo,

10 and therefore control over debtors was vested exclusively in

11 the manager of Pablo.

12          According to Dale, he was elevated -- and that's a

13 direct quote from his declaration -- by Asia Trust Limited,

14 as trustee of the Ridgewood Global Trust, to be manager of

15 Pablo.  Again, Dale doesn't state exactly when that

16 occurred.

17          And, as I mentioned previously during the 341(a)

18 meeting, he had mentioned that he had not applied for the

19 manager position and that he learned about his appointment

20 during a telephone call from Robert Tim, who is representing

21 debtors and who has filed a number of declarations before

22 this Court.

23          On January 28, 2013, Dale signed a declaration in

24 which he stated that he was custodian of records of Pablo

25 Holdings and the GGW entities.  And that declaration was

78

1  Exhibit C to the second Langberg declaration that was filed

2  with the reply.

3          Attached to the declaration were copies of

4  operating agreements for the GGW entities as well as the

5  Pablo operating agreement.

6          Exhibit D-1 to Dale's January 28, 2013 declaration

7  is an amended and restated operating agreement of GGW

8  Brands, a Delaware limited liability company.

9          That operating agreement indicates that it was

10 amended and restated on February 19th and that the business

11 affairs of GGW Brands shall be managed by a board of

12 managers consisting of one manager appointed by the sole

13 member.  The initial manager shall be Christopher Dale and

14 the manager may be replaced at any time by the member, which

15 is defined as Pablo later in the agreement.

16         On the last page under the word "Member," which is

17 listed as Pablo Holdings, there is a stamp that states "ATP

18 Directors Limited by its duly authorized officer," and there

19 are signatures of Angela Pope and Lynette -- and her last

20 name is illegible.

21         The problem with the GGW amended operating

22 agreement is that pursuant to the Pablo operating agreement,

23 the manager of Pablo was in exclusive, complete control over

24 Pablo.  Therefore, it appears that the GGW operating

25 agreement might not be a valid effected document because it

79

1   was signed on behalf of Pablo Holdings by non-manager

2   parties.

3          The Court recognizes that even if Francis was

4   guilty of fraud, dishonesty, incompetence or gross

5   mismanagement, that does not necessarily mean that there is

6   cause and that a trustee must be appointed -- and that a

7   trustee doesn't have to be appointed if the Court is

8   satisfied that current management is free from the taint of

9   prior management.

10          As noted above, the evidence is not sufficient for

11   the Court to be satisfied that debtors' current management

12   is competent to be managing the debtors or that they are

13   acting independently.

14          Although the evidence is insufficient for this

15   Court to untangle the intricate web of interrelated

16   companies in this case, it's abundantly clear that all of

17   the interrelated companies are somehow related to Francis

18   and are controlled by him or someone acting on his behalf.

19          Therefore, the Court finds there is cause to

20   appoint a trustee under 1104(a).

21          Turning to -- that was 1104(a)(1).

22          Turning to 1104(a)(2), Wynn contends that

23   appointment of a trustee is warranted under (a)(2) because,

24   quote, "A trustee is essential to remedy the vacuum created

25   by debtors' abdication of control to Francis and the

80

1 resulting self-dealing."

2          The debtors do not exist independently from

3 Francis and cannot be trusted to do anything other than what

4 is in the best interest of Francis.

5          No rehabilitation is in prospect for which any

6 management expertise would be required, and in light of the

7 puppet managers installed by Francis, it appears that the

8 debtors' management would lack the knowledge and expertise

9 to lead to any such rehabilitation.

10          Wynn cites several cases to support its view that

11 under 1104(a)(2) the court employs a flexible standard and

12 courts consider several factors when determining whether to

13 appoint a trustee.

14          Debtors counter that appointment of a trustee

15 would be contrary to the interests of creditors because

16 debtors intend to pay all legitimate claims in full, debtors

17 are being professionally managed with an accounting staff

18 and experienced controller, and appointment of a trustee

19 would quickly cause the economic collapse of the GGW

20 entities since they will lose their right to use the Girls

21 Gone Wild brand.

22          And a trustee would not have the same motivation

23 as the debtors' management to reorganize the business and

24 preserve its enterprise value.

25          Debtors cite two cases for the proposition that

81

1  deciding whether to appoint a trustee pursuant to section

2  1104(a) is essentially a cost benefit analysis.  And debtors

3  assert that the factors listed above illustrate that the

4  cost of appointing a trustee outweigh the benefits.

5       Both Wynn and debtors frame the same legal

6  standard in slightly different terms.  As noted above, when

7  determining whether to appoint a trustee under 1104(a)(2),

8  the standard is flexible and courts examine the four factors

9  that I previously mentioned.

10       Further, as noted above, even if current

11  management is competent and honest, appointment of a trustee

12  may be warranted if management was recently appointed but

13  does not have the expertise that an exceptional trustee

14  would have in reorganizing the debtor.

15       In terms of trustworthiness of debtors.  The

16  essence of Wynn's argument is that debtors cannot be

17  trusted.  In Wynn's view, current management is merely a

18  puppet who is controlled by Francis and after Wynn took

19  steps to collect from the GGW entities, debtors' management

20  structure was changed to avoid impending court orders.

21       Wynn argues that debtors do not exist

22  independently from Francis and cannot be trusted to do

23  anything other than what is in the best interest of Francis.

24       Debtors acknowledge that Francis still has a role

25  with debtors as a consultant but maintain he has no actual

82

1 power or control over the GGW entities.  That assertion is

2 belied by Francis's relationship with Path Media.

3         Debtors assert that if a trustee were appointed,

4 the GGW entities would face, quote, economic death, end

5 quote, because Path Media, an allegedly unaffiliated

6 company, would purportedly not renew an intellectual

7 property license that exists between Path Media and debtors.

8         Contrary to debtors' assertion, the evidence

9 demonstrates that Path is owned by Ridgewood Trust which was

10 settled by Francis and therefore is not an unaffiliated

11 company.

12        Path Media obtained the IP rights which debtor

13 believes to be incredibly valuable because Path Media's

14 failure to renew those rights would result in debtors'

15 economic death for no consideration.  That was from Kluger's

16 deposition.

17        Through his control over Path Media and its

18 exceedingly valuable IP rights, Francis exercises complete

19 control over debtors.  Debtors' assertion that Francis

20 exercises no power or control over debtors therefore rests

21 on shaky ground, undermining debtors' credibility.

22        Further, the fact that debtors chose to

23 characterize Path Media as an unaffiliated company also

24 seriously undercuts debtors' trustworthiness.

25        Debtors' trustworthiness is also called into

83

1 question by their representations and filings before this

2 Court regarding who controls debtors.

3        The GGW entities' assertion that the trustee of

4 the trust and not Francis purportedly had ultimate say

5 regarding the management of the companies is not true, as

6 analyzed above.

7        Control over Pablo Holdings, and therefore control

8 over debtors, was and continues to be vested in the manager

9 of Pablo Holdings.

10        Although debtors claim that Dale is now in charge,

11 the Pablo operating agreement and the evidence related to

12 transfers, both into and out of the GGW entities' bank

13 accounts a few days before filing, support Wynn's contention

14 that Dale is a figurehead.

15        Further supporting that contention is the fact

16 that Dale only works four to five hours a week for debtors,

17 has outside employment and he leaves day-to-day management

18 decisions to managers who were not named and identified and

19 their credentials are not known to the Court.

20        Further, the fact that Dale is now purportedly

21 Pablo Holdings' manager does not engender an increase in the

22 debtors' trustworthiness.  It is difficult for the Court to

23 believe that Dale, who in August of 2012 was a human

24 resources manager and who knew little about debtors, is now

25 running a multimillion-dollar brand.

84

1        As mentioned Dale admitted working only four to
2   five hours a week and he leaves others to make the day-to-
3   day decisions.
4        Debtors' misrepresentation to this Court about
5   Pablo Holdings' true organizational structure as well as
6   significant questionable payments debtors made a few days
7   before filing for bankruptcy and the fact that debtors were
8   not able to produce a large, over 50,000 bill that was
9   purportedly for legal services, calls into question the
10  trustworthiness of debtors and weighs heavily in favor of
11  appointing a trustee.
12       In terms of debtors' past and present performance
13  and their prospects for rehabilitation, the Court has very
14  little information about debtors' past and present
15  performance.
16       The Court notes that even thought the cases were
17  filed and debtors claim that they have continued to operate
18  their business during the administrative period and have
19  even noticed an uptake in sales due to the publicity
20  surrounding the filing of the cases, the Court doesn't have
21  any information regarding the specifics of the debtors'
22  business.
23       I did review the initial status report that was
24  filed by debtors' counsel.  It does not provide any level of
25  detail regarding the debtors' business.

1          Further, the Court notes that debtors did not file

2   the typical, quote, first day, end quote, motions that are

3   filed in most corporate Chapter 11 cases.

4          For example, debtors did not seek authority to pay

5   pre-petition payroll even though they claim they employ --

6   now, they claim 13 employees.  I believe in one pleading it

7   said they had 17 employees and numerous independent

8   contractors.

9          Additionally, debtors did not file a motion

10  deeming the utilities to be adequately assured of future

11  performance pursuant to 11 U.S.C. section 366.  Therefore,

12  debtors' electricity, water or other utilities could be

13  terminated without warning at this point if debtors were

14  behind on their payments.

15         Debtors have also, as noted, not timely filed

16  monthly operating reports, although Mr. Yaspan mentioned

17  that there was a monthly operating report filed last

18  evening.

19         Therefore, the Court does not have any information

20  regarding the debtors' performance.  The fact that

21  $2,000,000 in funds belonging to GGW Brands and/or Direct

22  were frozen by court injunction sometime in 2012 is not

23  encouraging.

24         Although Dale, the person who claims to currently

25  be in charge of debtor, states that debtor is currently a

86

1  profitable business that is paying its bills and meeting its

2  obligations, it is difficult to believe this given that Dale

3  only works four to five hours a week.

4          Further, GGW Direct allowed Perfect Science Labs

5  and/or Argyle Online to use their account to transfer funds

6  the day that the bankruptcy was filed.

7          And little more than a month before debtors filed

8  for bankruptcy, GGW Direct paid Perfect Science Labs'

9  American Express bill that was issued in the name of Perfect

10  Science Labs and Joe Francis.  It is undisputed that Francis

11  is the manager of Perfect Science Labs.

12          As I mentioned, debtors were not able to provide a

13  copy of a 53,000 invoice or bill for a payment made to the

14  attorney who Mr. Tim claims is an attorney representing

15  debtors in a Mexico litigation.  Although the reason for

16  allowing these transfer of payments is unknown and maybe

17  questionable, it does demonstrate that debtors do not have

18  appropriate internal controls in place.

19          Therefore, this factor weighs in favor of

20  appointing a trustee.

21          In terms of the level of confidence of the

22  business community and creditors in current management, it

23  is clear that Wynn obviously does not have any confidence in

24  debtors' current management.  And also debtors dispute

25  Wynn's claim, Wynn is by far debtors' largest creditor.

87

1        Debtors allege the current management consists of

2    Dale as lead executive and that debtors are being

3    professionally managed with an accounting staff and

4    experienced controller.  Debtors acknowledge that Francis

5    still has a role as a consultant.

6        Regarding Dale, the Court, as mentioned, has no

7    information about his background, expertise or any other

8    information that would give the Court confidence that he

9    would be able to manage debtors.

10        Likewise, there's no evidence demonstrating how

11    the business community as a whole is likely to view Dale.

12    He was an HR manager until sometime at the end of October,

13    early November.  He is also now an HR manager for an

14    unrelated company.

15        Dale appears to have risen in the ranks quite

16    quickly and there's no evidence demonstrating his education,

17    business skills or acumen and/or managerial skills.  In

18    fact, Dale's testimony during the 341(a) meeting supports

19    Wynn's and the Court's lack of confidence in Dale to manage

20    debtors.

21        The Court also has no information about any other

22    managers of debtors other than Dale's conclusory statement

23    that the controller has years of experience as controller of

24    companies.

25        On balance, the Court finds that this factor

*Briggs Reporting Company, Inc.*

88

1  weighs in favor of appointing a trustee.

2          Finally, benefits of appointment balanced against

3  costs.

4          If the Court appoints a Chapter 11 trustee, many

5  of the concerns regarding transparency and Francis's level

6  of control would be alleviated.  A trustee would not have

7  any conflicts of interest that would prevent him or her from

8  pursuing possible claims for fraudulent transfers and/or

9  preferences.

10          Debtors' current management, on the other hand,

11  would be less likely to pursue such claims because of their

12  previous personal and professional relationships with

13  transferees.

14          A similar concern was before the court in In re

15  Microwave Products of America, Inc., 102 B.R. 666.  There,

16  the court found that appointment of a trustee would be in

17  the best interests of the creditors, in part because of the

18  existence of several transactions that the court saw as

19  questionable, including questionable accountings regarding a

20  $5,000,000 promissory note.

21          A director claimed to have sold the note at a

22  discounted price to a company owned by the director.

23  However, after the date of the supposed sale, the note was

24  still on debtor's books as a $5,000,000 asset.

25          The CFO sought direction from the board of

89

1  directors regarding this transaction, but the board did not

2  advise him on how to reflect the transaction on the debtor's

3  books.

4         The court noted that because the debtor is not in

5  a strong posture to pursue possible claims that may have

6  resulted from conflicts of interest and fraudulent

7  transfers, a trustee would likely be able to investigate

8  claims that could result in additional sums of money coming

9  into the estate.

10        The court also stated that because of the erosion

11  of confidence in the debtor, there is likely to be increased

12  litigation which will result in escalating legal costs to

13  the estate.

14        Many of the same concerns are present here.

15  Debtors have engaged in questionable transactions with

16  insiders, and current management would not have an incentive

17  to attempt to pursue possible fraudulent transfer or

18  preference claims.

19        Debtors here are also embroiled in litigation

20  which is likely to lead to more litigation costs to the

21  estate.

22        Debtors contend that if a trustee is appointed,

23  Path Media would not renew IP licenses with debtors that are

24  crucial to their business.  This assertion is questionable,

25  and even if it were true, there is no explanation why a

90

1  trustee would not be able to secure use of such rights.

2          Although a trustee will need time to familiarize

3  him or herself with the debtors' business, as noted Dale,

4  who is purportedly in charge of debtors, only assumed his

5  current position, at the latest, early November.

6          He has outside employment at an unrelated company

7  and he only works four to five hours per week for debtors.

8  He also leaves day-to-day operations to unnamed department

9  heads.

10          There was also no evidence demonstrating that

11  Dale, even if he worked full-time for debtors, would have

12  the knowledge, experience or expertise to manage debtors

13  successfully.

14          As analyzed above, on balance, the Court finds

15  that appointment of a Chapter 11 trustee would be in the

16  best interests of the creditors pursuant to 1104(a)(2).

17          So that concludes the hearing.

18          Ms. Law, in terms --

19          I guess it's -- Wynn needs to upload an order and

20  the order -- it's not going to be, oh, my goodness a two-

21  hour order.  It's going to be about three lines, which will

22  be for the reasons stated on the record.

23          And can you get that uploaded today?

24          MR. PAGAY:  Yes, your Honor, I can.  I was hoping

25  you'd say that I could just refer to the record.

*Briggs Reporting Company, Inc.*

91

1          THE COURT:  Yeah.  Just for the reasons stated on

2  the record.

3          MR. PAGAY:  Yes, your Honor.

4          THE COURT:  You can refer to (a)(1) and (a)(2) --

5          MR. PAGAY:  Will do so.

6          THE COURT:  -- and that's it.

7          And then after that is on the docket, Ms. Law, I

8  believe that the U.S. Trustee needs to determine who would

9  be a good possible trustee in this case.  And what's the

10 timing on that?

11         MS. LAW:  Your Honor, with respect to appointment

12 of a trustee, the U.S. Trustee needs to confer with the

13 parties in interest in this case first, speak to them about

14 qualifications of trustees and that sort of thing.  It

15 depends on how fast I can talk to debtors' attorneys and

16 movant.

17         Once that is done, I will speak to the U.S.

18 Trustee.  He is aware of the matter.  And then we will

19 interview likely candidates.

20         And then once that is done, we will get the

21 statement of disinterestedness from the candidate and then

22 we will do the notice of appointment as well as the proposed

23 order approving that notice of appointment.

24         If parties can talk to me within today or

25 tomorrow, then I believe that by -- within two or three

92

1  days, I'll be able to finish the process.

2        THE COURT:  Okay.  Well, you have them all here.

3  You have a captive audience, so I suggest you all go outside

4  and try to come to some agreement in terms of the criteria

5  for a trustee in this case.

6        MR. YASPAN:  Might I ask a question?

7        THE COURT:  Yes, Mr. Yaspan.

8        MR. YASPAN:  Is the Court inclined to appoint the

9  same trustee for all four cases?  Now, the Court doesn't

10 appoint, but let me -- maybe I should ask it to the trustee.

11        Are we going to have one trustee or four trustees?

12        THE COURT:  I think that's something that the U.S.

13 Trustee probably needs to consider after speaking with the

14 parties and finding out more information; is that correct,

15 Ms. Law?

16        MS. LAW:  Yes, your Honor.  There's been no pre-

17 determination of whether it's going to be one or four in

18 anticipation of whether the Court would or would not grant

19 the motion.

20        So the U.S. Trustee has not made a determination

21 of whether we should appoint one or whether we should

22 appoint four.

23        I believe -- and I'm speculating -- that Mr.

24 Yaspan's concern is regarding cost of trustees.

25        MR. YASPAN:  Yes.

93

1          MS. LAW:  So --

2          MR. YASPAN:  As well as we don't need to have

3  trustees suing each other, perhaps.

4          MS. LAW:  Well, your Honor, you know, I can't

5  determine at this point whether in fact there will be

6  conflicts, whether there will be issues or not issues.

7          The testimony at the 341(a) suggests that the

8  debtors ran this as one large enterprise rather than

9  respecting the separate legal entities, but I need to confer

10  with the U.S. Trustee, and he will make a determination

11  whether there will be one or four or one to start and

12  possibly more later.  I just don't know at this time.

13          THE COURT:  Understood.  And that's what I

14  expected.

15          Is there anything further, Mr. Yaspan?

16          MR. YASPAN:  Yes, I do have another question.

17          In the approximate -- it wasn't two hours, but in

18  the hour and 45 minutes that we have been listening to the

19  Court's reasoned order, there was no mention made of

20  anything bad or good or even at all of GGW Magazine or GGW

21  Events.

22          Is the Court appointing a trustee for those as

23  well?

24          THE COURT:  The order relates to all of them.  As

25  Ms. Law stated and as the testimony in the 341(a) appears to

94

1  be that they were all treated as one entity and the Court is

2  appointing a trustee in all four cases.

3          MR. YASPAN:  Thank you.

4          THE COURT:  Thank you.

5          Is there anything further?

6          Okay.  That concludes the hearing.  Off the

7  record.

8      (Proceedings concluded.)

9

10

11         I certify that the foregoing is a correct

12 transcript from the electronic sound recording of the

13 proceedings in the above-entitled matter.

14

15 /s/ Holly Martens                4-15-13
   Transcriber                      Date
16

17

18

19

20

21

22

23

24

25