# EXHIBIT C

1 | David M. Stern (State Bar No. 67697)
Michael L. Tuchin (State Bar No. 150375)
2 | Matthew C. Heyn (State Bar No. 227474)
Jonathan M. Weiss (State Bar No. 281217)
3 | KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, Thirty-Ninth Floor
4 | Los Angeles, California 90067
Telephone:    310-407-4000
5 | Facsimile:    310-407-9090
Email:        dstern@ktbslaw.com
6 |             mtuchin@ktbslaw.com
             mheyn@ktbslaw.com
7 |             jweiss@ktbslaw.com

8 | *Counsel for R. Todd Neilson, Chapter 11 Trustee,*
*and GGW Marketing, LLC*

9

10 | **UNITED STATES BANKRUPTCY COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA**

12 | **LOS ANGELES DIVISION**

| | |
|---|---|
| 13 | In re | Case No. 2:13-bk-15130-SK |
| | | Jointly Administered |
| 14 | GGW BRANDS, LLC, | |
| | GGW DIRECT, LLC, | Chapter 11 |
| 15 | GGW EVENTS, LLC, | |
| | GGW MAGAZINE, LLC, and | **REPLY IN SUPPORT OF MOTION TO** |
| 16 | GGW MARKETING, LLC, | **APPROVE PROPOSED SETTLEMENT** |
| | | **WITH WYNN LAS VEGAS, LLC AND** |
| 17 | Debtors. | **STEPHEN A. WYNN; SUPPLEMENTAL** |
| | | **DECLARATION OF MATTHEW C.** |
| 18 | | **HEYN** |

This pleading affects:

| | | |
|---|---|---|
| 19 | All Debtors | ☒ |
| | GGW Brands, LLC | ☐ |
| 20 | GGW Direct, LLC | ☐ |
| | GGW Events, LLC | ☐ |
| 21 | GGW Magazine, LLC | ☐ |
| | GGW Marketing, LLC | ☐ |
| 22 | | |

**Hearing**:
Date:     August 7, 2013
Time:     9:30 a.m.
Judge:    Hon. Sandra R. Klein
Place:    U.S. Bankruptcy Court
          255 E. Temple St., Ctrm. 1575
          Los Angeles, CA 90012

23

24

25

26

27

28

*(left margin, vertical)* KLEE, TUCHIN, BOGDANOFF & STERN LLP / 1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR / LOS ANGELES, CALIFORNIA 90067 / TELEPHONE: 310-407-4000

## **TABLE OF CONTENTS**

**Page(s)**

I.     INTRODUCTION ............................................................................................. 1

II.    THE SETTLEMENT OF THE WYNN CLAIMS REFLECTS THE
       CHALLENGES INHERENT IN THE ALTER EGO LITIGATION ................................... 3

       A.    Nevada Law Likely Will Be Applied to Determine the Alter Ego Action. .............. 5

       B.    Under Nevada Law, It Is Clear That Reverse Piercing Is Allowed. ........................ 9

       C.    The Delaware Courts Have Not Yet Spoken, but There Is a Strong
             Argument that the Delaware Courts Would Also Allow Reverse Piercing. ........... 10

       D.    The Law Is Not Settled Whether a California Court Would Allow Reverse
             Piercing in Circumstances Such as These. ........................................................ 12

       E.    The Nominee Theory of Ownership Has Been Applied Outside the Context
             of IRS Enforcement Actions ............................................................................. 13

III.   THE SETTLEMENT OF THE TRUST FUNDS IS FAIR AND APPROPRIATE ........... 15

IV.    THE COURT SHOULD NOT DELAY THE SETTLEMENT UNTIL AFTER THE
       BAR DATE .................................................................................................... 17

V.     CONCLUSION ............................................................................................... 19

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

145946.4                                                    i

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*ASARCO LLC v. Americas Mining Corp.*,
   382 B.R. 49 (S.D. Tex. 2007)................................................................................ 11

*Cech v. Crescent Hills Coal Co. (In re Sannonpin Mining Co.)*,
   2002 U.S. Dist. LEXIS 15731 (W.D. Pa. 2002) ............................................ 17, 18

*Communist Party v. 522 Valencia, Inc.*,
   41 Cal. Rptr. 2d 618 (Ct. App. 1995)................................................................. 13

*Ehrenberg v. Southern California Permanente Medical Group (In re Moses)*,
   167 F.3d 470 (9th Cir. 1999)................................................................................. 8

*Feeley v. NHAOCG, LLC*,
   62 A.3d 649 ......................................................................................................... 11

*General Motors Corp. v. District Court*,
   134 P.3d 111 (Nev. 2006) ................................................................................. 6, 9

*Gravquick A/S v. Trimble Navigation International, Ltd.*,
   323 F.3d 1219 (9th Cir. 2003)............................................................................. 13

*In re ALT Hotel LLC*,
   479 B.R. 781 (Bankr. N.D. Ill. 2012) ............................................................. 4, 10

*In re Coudert Bros. LLP*,
   673 F.3d 180 (2d Cir. 2012) ................................................................................. 6

*In re Schwarzkopf*,
   626 F.3d 1032 (9th Cir. 2010)............................................................................... 5

*In re Spirtos*,
   2006 WL 681102 (9th Cir. B.A.P. 2006), *aff'd*, 270 Fed. Appx. 540 (9th Cir. 2008)............ 19

*In re Turner*,
   2007 WL 7238117 (B.A.P. 9th Cir. Sept. 18, 2007)........................................ 6, 14

*Lewis v. Hankins*,
   262 Cal. Rptr. 532 (Ct. App. 1989).................................................................. 13, 14

*LFC Marketing Group, Inc. v. Loomis*,
   8 P.3d 841 (Nev. 2000) ........................................................................................ 9

*Postal Instant Press, Inc. v. Kaswa Corp.*,
   77 Cal. Rptr. 3d 96 (Cal. App. 2008) .............................................................. 4, 12

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

*S.E.C. v. Hickey*, opinion amended on denial of reh'g 335 F.3d 834 (9th Cir. 2003)
322 F.3d 1123 ...................................................................................................... 5

*Spinell v. JP Morgan Chase Bank, N.A.*,
873 N.Y.S.2d 626 (App. Div. 2009) .................................................................. 11

*Taylor v. Newton*,
257 P.2d 68 (Cal. Ct. App. 1953) ...................................................................... 12

*Van Dusen v. Barrack*,
376 U.S. 612 (1964) ............................................................................................ 6

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ............................................................................ 18

*Wood v. Elling Corp.*,
572 P.2d 755 (Cal. 1977) ................................................................................... 12

**OTHER AUTHORITIES**

Cal. Civ. Code § 3528 ............................................................................................ 13

Mont. Code Ann. § 35-8-906(2) ............................................................................. 16

Nev. State Rules of Civil Pro. Rule 4(d)(2) ........................................................... 16

Restatement (Second) of Conflicts of Laws § 6 ....................................................... 8

Restatement (Second) of Conflict of Laws § 99 .................................................... 5-6

Restatement (Second) of Conflicts of Laws § 150 .................................................... 7

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

R. Todd Neilson, solely as chapter 11 trustee ("Trustee"), and GGW Marketing, LLC, as debtor in possession ("GGW Marketing"), hereby submit this reply in support of their *Motion for Approval of Settlement With Wynn Las Vegas, LLC and Stephen A. Wynn* [Docket No. 228] (the "9019 Motion"),[1] and in response to the *Opposition [of GGW Global Brands, Inc.] to Motion for Approval of Settlement etc.* [Docket No. 258] ("Brands Opp."), *Creditor Tamara Favazza's Opposition to the Trustee's Proposed Settlement etc.* [Docket No. 259] ("Favazza Opp."), *Creditor Tamara Favazza's Supplemental Opposition etc.* [Docket No. 266] ("Favazza Supp. Opp."), and the *Objection of [Class Action] Judgment Creditors etc.* [Docket No. 276] ("CAC Opp.").[2]

## I. INTRODUCTION

It is ironic, if predictable, that the only objectors to the Trustee's proposed settlement of alter ego claims with Mr. Wynn and Wynn LV are two creditors who have similar alter ego claims and GGW Global Brands, Inc. ("Global Brands"), which is controlled by the ultimate alter ego, Mr. Francis.  Although it is understandable that each of the alter ego claimants would prefer to be the favored child, the Trustee cannot be an indulgent parent to any constituency.  Simply put, he has evaluated the claims of Mr. Wynn and Wynn LV dispassionately and will do likewise (possibly to the displeasure of the Wynn interests) when the time comes to deal with the claims asserted by Tamara Favazza ("Ms. Favazza") and the judgment creditors who brought a class action in the L.A. Superior Court (the "Class Action Creditors").  As to Mr. Francis and his various entities, including the newly revived and renamed GGW Global Brands, the Trustee will deal fairly, although likely adversarially, with him/them as well.

As discussed at length in the 9019 Motion, the Wynn interests' Alter Ego Litigation poses significant challenges to the estates.  Mr. Wynn and Wynn LV have over $31 million in judgments against Mr. Francis, and the Clark County District Court has already ruled that there is a

---

[1]  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the 9019 Motion.

[2]  The Favazza Supp. Opp. and CAC Opp. were late filed, but we respond to them nonetheless.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    "substantial probability" that at least some of the Debtors are Mr. Francis's alter egos.  If the Alter

2    Ego Lawsuit is successful, Mr. Wynn's and Wynn LV's claims have the potential to overwhelm

3    the claims of other unsecured creditors (including employees and trade creditors who provided

4    goods and services directly to the Debtors and relied on their credit).  Even if the Alter Ego

5    Litigation did not face significant legal and factual hurdles, it constitutes costly litigation in a

6    foreign forum.  Although the Debtors' venue transfer motion may succeed, it must first be fought

7    in the Nevada Bankruptcy Court.  Due to actions by Mr. Francis and others to denude the Debtors

8    prior to filing for bankruptcy, the Trustee and GGW Marketing have limited resources to engage

9    in such a fight against a well-funded adversary who has been very successful to date.

10          The Settlement Agreement attempts to obviate the significant fees associated with a fight

11   against Wynn LV and Mr. Wynn, obtain substantial reductions in the Wynn claims, and (via

12   subordination) drastically increase the likelihood that general unsecured creditors will receive

13   meaningful distributions.  Ms. Favazza and the Class Action Creditors oppose the Settlement

14   because they would prefer the Trustee roll the dice in an expensive fight against Mr. Wynn and

15   Wynn LV (and presumably Mr. Francis as well), and presumably acknowledge the correctness of

16   their legal positions (although each would be equally outraged if the Trustee did that with respect

17   to the other objector).  Each (and Global Brands, as well) would understandably prefer to spend

18   nothing on the fight with Mr. Wynn and Wynn LV, and then obtain all of the upside if the fight

19   were successful.[3]

20          The estates cannot afford to engage in endless litigation with all adversaries.  At the end of

21   the day, each of Mr. Wynn, Wynn LV, Ms. Favazza, and the Class Action Creditors share a

22   common position: as a result of the actions of Mr. Francis (either as an individual or through a

23   non-Debtor entity), they were hurt and are seeking compensation from the most obvious assets he

24   controlled.  Each of Mr. Wynn, Wynn LV, Ms. Favazza, and the Class Action Creditors also share

25   a common objective: to get as large a percentage of the Debtors' distributions as possible.  There

26   _____

    [3]    We hesitate to lump Global Brands with Ms. Favazza and the Class Action Creditors, as they
27         are morally and legally situated very differently, but in this instance, they do share the
           common trait of wanting to reap benefits based on the efforts of others.
28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1 is also a third commonality: each of the claims of Mr. Wynn, Wynn LV, Ms. Favazza, and the

2 Class Action Creditors have weaknesses in that they all seek to hold the Debtors liable for the

3 obligations of some other person or entity, where all of the elements for successor liability are less

4 than clear.[4]

5   The Settlement Agreement takes into account the weaknesses of the claims of Mr. Wynn

6 and Wynn LV in that it (i) embodies significant concessions in terms of the size of the claim that

7 they will be allowed, (ii) requires a partial subordination to certain unsecured creditors of the

8 estates, and (iii) divides the Trust Funds.  The Settlement Agreement was negotiated in good faith

9 and at arms' length.  The Settlement Agreement constitutes a reasonable compromise of disputed

10 claims and should be approved.

11 **II. THE SETTLEMENT OF THE WYNN CLAIMS REFLECTS THE CHALLENGES**
**INHERENT IN THE ALTER EGO LITIGATION**

12

13   Although Ms. Favazza and Global Brands concede that (1) the Clark County District Court

14 has already found a "substantial likelihood" that Wynn LV will prevail in the Alter Ego Litigation

15 and (2) the Tulsa District Court has entered a judgment holding the Debtors liable as alter egos of

16

17

---

18 [4] Neither Ms. Favazza's nor the Class Action Claimants' claims is based on judgments against

19 the Debtors.  Ms. Favazza has a judgment against Mantra Films, Inc. and MRA Holdings, LLC
(collectively, "Mantra"), and is seeking one against Mr. Francis.  Favazza Opp. 6:18-8:20.

20 The Class Action Claimants have a judgment against Mantra and Mr. Francis.  Complaint
[Docket No. 1 in Adv. No. 13-01746] ("CAC Complaint") 1:3-9.

21 Ms. Favazza treats the transition of the Girls Gone Wild business from Mantra to the Debtors

22 as merely "a name change," Favazza Opp.at  4:11-6:11, contending that "there can be no
question, that the GGW Debtors are the successors-in-interest via a name change to the

23 original companies Mantra Films, Inc. and its holding company MRA Holdings, LLC."
Favazza Opp., at 6:14-16.    However, this is a mischaracterization.   The Debtors are

24 indisputably separate entities from Mantra, not merely new names for the same entities.
Mantra Films, Inc. and MRA Holding, LLC are each debtors in separate chapter 7 proceedings

25 before this Court.  *See* Case Nos. 2:13-bk-19216-RN & 2:13-bk-19224-RK.  In essence, Ms.

26 Favazza seeks to hold the Debtors liable for an alleged fraudulent transfer of the "Girls Gone
Wild" business from Mantra to the Debtors.  The Class Action Creditors appear to be pursuing

27 a similar tack.  CAC Opp. 2:1-4; CAC Complaint 8:15-10:13.  Whether the claim can be
established remains to be seen.

28

1  Mr. Francis,[5] they both argue that the Settlement Agreement is unreasonable because Wynn LV's

2  alter ego claim is supposedly invalid as a matter of law, though they do not agree on the reasons.

3        Global Brands argues that the relevant court would apply either California law or Delaware

4  law under either the "Diversity Approach," the "Uniform Federal Common Law Approach," or the

5  "Hybrid Approach."  It argues that, under the diversity approach or the hybrid approach, Delaware

6  substantive law applies because the internal affairs doctrine allegedly requires the trial court to

7  apply the law of the state in which the Debtors were organized – Delaware.  Under a Federal

8  uniform common law approach, California law applies because, allegedly, it has the strongest

9  interest in resolving the alter ego litigation.   Although Global Brands admits that the California

10  Supreme Court has not spoken on the issue of reverse piercing the corporate veil and that no

11  Delaware court has done so, Global Brands points to one California intermediate-court decision

12  that held that reverse piercing is not allowed under California law and one decision from a

13  bankruptcy court in Illinois predicting that reverse piercing would not be allowed under Delaware

14  law.[6]   Brands Opp. 2:9-12, 4:6, 5:13-15, 6:25, 9:24-25.   On this thin basis, Global Brands

15  concludes that Wynn LV and Mr. Wynn have no valid claims against the Debtors' bankruptcy

16  estates.

17  _____

18  [5]  Global Brands says that the Tulsa County Action judgment was "based solely on 'deemed
     admissions....'"  Brands Opp. 10 n.5.  This is inaccurate.  Attached hereto as <u>Exhibit X</u>, is the
19   declaration of Brian Rayment, former counsel for the Debtors, that Mr. Rayment submitted in
     support of the Tulsa judgment.  Heyn Decl. ¶ 4.  In the declaration Mr. Rayment testifies
20   that certain of the Debtors (and other entities) are "are so closely linked and inextricably
     intertwined with the assets and affairs of Defendant Joseph R. Francis and each other as to be
21   effectively one person/entity."  Rayment Decl. ¶ 8.

22   Global Brands also says that in making the determination that Wynn LV had a substantial
     probability of success "the Court was never presented with … the fact that neither California
23   nor Delaware recognize reverse piercing."  Brands Opp 9:3-4.  This is **also** inaccurate.
     Attached hereto as <u>Exhibit W</u> is a pleading the Debtors submitted in the Alter Ego Litigation,
24   which cites (at page 6) California and Delaware law to argue that reverse piercing cannot be
     allowed.  Heyn Decl. ¶ 3.

25
26  [6]  The California decision is *Postal Instant Press, Inc. v. Kaswa Corp.*, 77 Cal. Rptr. 3d 96 (Cal.
     App. 2008).  The decision from the Illinois bankruptcy court is *In re ALT Hotel LLC*, 479 B.R.
27   781 (Bankr. N.D. Ill. 2012).  Both of these decisions were considered by the Trustee and are
     cited in the 9019 Motion.  *See* 9019 Motion 16:11-13.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    Ms. Favazza is less equivocal.  She rejects the notion that the internal affairs doctrine has

2  any application, instead, "the applicable law in this case is clearly California, and California does

3  NOT allow reverse veil-piercing."  Favazza Opp. 11:16-17.  According to Ms. Favazza, California

4  law applies under the "most significant relationship test" or the "governmental interests test"

5  because the Trustee is in California, the bankruptcy estate is in California, and the Debtors'

6  headquarters and employees are in California.[7]  Notwithstanding her recent allegations that the

7  Debtors are liable as Mr. Francis's alter egos (see Heyn Decl. ¶ 5, <u>Exhibit Y</u>), she points to the

8  same two cases that Global Brands does, to argue that reverse piercing is impossible under

9  Delaware and California law.

10    As discussed below, Ms. Favazza's and Global Brands' choice of law and alter ego

11  analyses are not only inconsistent with each other, they are inconsistent with the relevant

12  authorities.  The most likely substantive law to be applied in the Alter Ego Litigation is the law of

13  the original forum: Nevada.  Nevada courts allow reverse piercing except where it would upset

14  expectations of creditors and shareholders, which will not happen in this instance and certainly

15  will not happen as to the objecting creditors here, neither of which had any direct dealings with the

16  Debtors.

17  **A.    Nevada Law Likely Will Be Applied to Determine the Alter Ego Action.**

18    As presented in the 9019 Motion, the Trustee's choice of law is basic.  The Alter Ego

19  Litigation was first brought in the Clark County District Court, in Nevada.  Even if the litigation is

20  not remanded to the Clark County District Court, it is most likely that Nevada law will apply.

21  "The local law of the forum determines the methods by which a judgment of another state is

22  enforced."  Restatement (Second) of Conflict of Laws § 99.  *Accord*, *In re Schwarzkopf*, 626 F.3d

23  1032, 1037 (9th Cir. 2010) ("In determining whether alter ego liability applies, we apply the law

24  of the forum state."); *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 opinion amended on denial of reh'g

---

[7]   Ms. Favazza also says that Francis's house, cars, and many other alleged assets are in
California and the relevant documents are in California.  This probably assumes too much.
The Trustee's preliminary investigation indicates that Francis has significant assets overseas
and may well have moved most of the Debtors' documents outside the U.S. as well.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  335 F.3d 834 (9th Cir. 2003) ("We apply the law of the forum state in determining whether a

2  corporation is an alter ego of an individual."); *In re Turner*, 2007 WL 7238117 (B.A.P. 9th Cir.

3  Sept. 18, 2007) ("The law of the forum state is used to determine whether an entity is an alter ego

4  of an individual.").  It is telling that, notwithstanding their lengthy choice-of-law analyses, neither

5  Ms. Favazza nor Global Brands have cited a single case in which a state court applied the laws of

6  a different state's court to determine alter ego liability.

7           This rule does not mean that if the Trustee is successful in his venue transfer motion in the

8  Nevada Bankruptcy Court and the Alter Ego Litigation is transferred to this court, that California

9  law will apply.  That an action is removed to Federal court or transferred between federal courts is

10 an irrelevancy, as federal courts apply the law of the ***initial*** trial court.  *Van Dusen v. Barrack*, 376

11 U.S. 612, 639 (1964) ("[T]he transferee district court must be obligated to apply the state law that

12 would have been applied if there had been no change of venue. A change of venue under

13 § 1404(a) generally should be, with respect to state law, but a change of courtrooms."); *In re*

14 *Coudert Bros. LLP*, 673 F.3d 180, 191 (2d Cir. 2012) ("[B]ankruptcy courts should follow *Van*

15 *Dusen* and look to the choice of law rules of the state where the underlying prepetition complaint

16 was filed."); *see also* 9019 Motion 17:6-9 & n.11 (citing authorities).

17          Ms. Favazza seeks to escape this black letter principle by finding ambiguity in Nevada

18 law.  She says "In *General Motors Corp. v. Dist. Ct.*, 122 Nev. 466, 134 P.3d 111 (2006), the

19 court rejected prior tests and concluded that Nevada would follow the rule found in the

20 Restatement (Second) of Conflicts of Laws called the 'most significant relationship' test," and

21 would then apply California law.  Favazza Opp. 15:27-16:3.  Ms. Favazza is wrong both in her

22 conclusion and in her analysis of the *General Motors* case.  What the Nevada Supreme Court

23 actually said was that "the Second Restatement's most significant relationship test governs choice-

24 of-law issues in tort actions ***unless another, more specific section of the Second Restatement***

25 ***applies to the particular tort***."  134 P.2d at 116 (emphasis added).  *General Motors* is not helpful

26 in defeating the Wynn claims because, even assuming the Alter Ego Litigation is a tort action,

27 there is "another, more specific section" of the Restatement that applies.

28

1    Most of Wynn LV and Mr. Wynn's judgments are for defamation.[8]   The Restatement has a

2    specific section (150) addressing multi-state defamation:

3         (1) The rights and liabilities that arise from defamatory matter in any one

4         edition of a book or newspaper, or any one broadcast over radio or television,

5         exhibition of a motion picture, or similar aggregate communication are

6         determined by the local law of the state which, with respect to the particular issue,

7         has the most significant relationship to the occurrence and the parties under the

8         principles stated in § 6.

9         (2) When a natural person claims that he has been defamed by an

10        aggregate communication, ***the state of most significant relationship will usually***

11        ***be the state where the person was domiciled at the time,*** if the matter complained

12        of was published in that state.

13        (3) When a corporation, or other legal person, claims that it has been

14        defamed by an aggregate communication, ***the state of most significant***

15        ***relationship will usually be the state where the corporation, or other legal***

16        ***person, had its principal place of business at the time***, if the matter complained

17        of was published in that state.

18   Restatement (Second) of Conflicts of Laws § 150 (emphasis added).

19        Although the factors in Section 6 of the Restatement (referred to in § 150(1)) might

20   overturn the presumption that Nevada law should apply (because §§ 150(2) & 150(3) only say that

21   the state of most significant relationship is "usually" the domicile of the victim), examination and

22   application of those factors here does indicate there ought be a variance from the Section 150

23   presumption as none of the (Section 6) factors obviously cuts one way or the other.

24        Going to the source, Section 6 of the Restatement provides that "the factors relevant to the

25   choice of the applicable rule of law include

26   _____

27   [8]   The remaining claims are for gambling debts.  It is hard to imagine Nevada deferring to any
          other state on that issue.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  "(a) the needs of the interstate and international systems,

2  "(b) the relevant policies of the forum,

3  "(c) the relevant policies of other interested states and the relative interests of
those states in the determination of the particular issue,

4

5  "(d) the protection of justified expectations,

6  "(e) the basic policies underlying the particular field of law,

7  "(f) certainty, predictability and uniformity of result, and

8  "(g) ease in the determination and application of the law to be applied."

Restatement (Second) of Conflicts of Laws § 6.

9

10  Ms. Favazza argues that these factors weigh in favor of California law because the

11  bankruptcy estate, the Trustee, the Debtors' employees, and Mr. Francis are in California.

12  Favazza Opp. 17:1-11. However, Mr. Wynn and Wynn LV might reasonably argue that these

13  factors point to Nevada law as that is where the harm from the defamation took place and four of

14  the five judgments were issued. Applying Nevada law is consistent with at least factors (b) and

15  (e) and quite possibly (d), and does no violence to any other factors. Specifically, permitting Mr.

16  Wynn and Wynn LV to reverse pierce serves to protect Nevada judgment creditors and Nevada

17  businesses from the abuse of the corporate form, is consistent with justified expectations that

18  Delaware law will not have an impact on a debt collection action between Nevada citizens and a

19  business and person in California, and advances the policy of all jurisdictions that disregard form

20  over substance to enable victims to recover and that reject use of the corporate form to perpetrate

fraud.

21

22  Mr. Wynn and Wynn LV would argue that California does not have a policy of allowing

23  judgment debtors to avoid paying their debts by hiding assets or playing shell games with

24  corporations and limited liability vehicles.[9] On the other hand, the Nevada Supreme Court has

25  determined that a judgment creditor can collect a shareholders' debt directly from the corporation

26  in circumstances such as these. While California may have an interest in preventing Mr. Wynn's

27

28  ---

[9]  *Ehrenberg v. So. Cal. Permanente Med. Group (In re Moses)*, 167 F.3d 470, 473 (9th Cir.
1999) (noting California's disapproval of self-settled trusts).

1  and Wynn LV's asset collection from crippling the Debtors, there is no real threat of that here.

2  The Debtors are already in bankruptcy.  The only claim Mr. Wynn and Wynn LV may have is

3  against the Debtors' bankruptcy estates (*i.e.*, not the Debtors themselves).  In short, there is a

4  considerable probability that the default rules of section 150 will prevail, if *General Motors*

5  applies at all.

6  **B.    Under Nevada Law, It Is Clear That Reverse Piercing Is Allowed.**

7      As Ms. Favazza admits, Nevada courts allow outside reverse veil piercing in certain

8  circumstances.  *See* Favazza Opp. 11:22-23.  The leading case in Nevada is *LFC Marketing*

9  *Group, Inc. v. Loomis*, 8 P.3d 841 (Nev. 2000).  In that case, the Loomises attempted to recover a

10  $25,000 judgment against William Lange by obtaining a writ of attachment on commissions

11  payable to LFC Marketing Group.  *Id.* at 842.  LFC Marketing – whose sole shareholder was

12  William Lange's brother, Robert Lange – disputed that William was entitled to any of the

13  commissions and requested a hearing on the writ.  The trial court held that LFC Marketing could

14  be liable and the Nevada Supreme Court agreed.  *Id.* at 846 ("[W]e conclude that reverse piercing

15  is appropriate in those limited instances where the particular facts and equities show the existence

16  of an alter ego relationship and require that the corporate fiction be ignored so that justice may be

17  promoted").  The Wynn interests can likely pass this test.  As Ms. Favazza and the Class Action

18  Creditors passionately argue, there is substantial evidence of an alter ego relationship between

19  Mr. Francis and the Debtors (and other entities) and substantial evidence that Mr. Francis used the

20  Debtors to avoid paying his debts.

21      Citing *In re Flamingo 55, Inc.*, 242 Fed. Appx. 456 (9th Cir. 2007), Ms. Favazza argues

22  that *LFC Marketing* is not applicable to the claims of Wynn LV and Mr. Wynn because "the

23  doctrine only applies where 'the particular facts and equities' require that the fiction be ignored to

24  promote justice."   Ms Favazza claims that "ignoring the corporate form would 'disturb and

25  destroy' the reasonable and legitimate expectations of the other creditors to be paid first from [the

26  Debtors'] assets." Favazza Opp. 12:15-17.

27      Ms. Favazza's position ignores two critical facts.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

145946.4

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- First, the actual terms of the Settlement Agreement subordinate Mr. Wynn's and Wynn LV's claims to $400,000 of non-insider and non-Francis-related party claims. Based on the Debtors' schedules, the Trustee believes that this will be adequate to satisfy those creditors who were relying on the credit worthiness of the Debtors and had reasonable and legitimate expectations that they would not have to share the assets of the Debtors with other creditors.

- Second, Ms. Favazza and the Judgment Creditors (*i.e.*, the only creditor objectors) do not fall into this category. They have claims directly against Mantra, Inc. and MRA Holdings, LLC, and only can assert claims against the Debtors based on the same equitable factors that support the claims advanced by the Wynn interests.

In short, the settlement is entirely consistent with Nevada law, and indeed advances its basic goals.

**C.    The Delaware Courts Have Not Yet Spoken, but There Is a Strong Argument that the Delaware Courts Would Also Allow Reverse Piercing.**

Global Brands argues that Delaware law is more likely to apply to the Alter Ego Litigation because the Debtors are Delaware limited liability companies. Brands Opp. 5-7. Ms. Favazza disagrees. Favazza Opp. 18:8-9 ("Delaware has very little connection to the issue at all. The only connection is that is the state where the debtors were incorporated, so the Delaware issue is kind of a red herring."). Ms. Favazza and Global Brands both admit that there are no cases in Delaware deciding whether reverse piercing is appropriate, but instead rely on *In re ALT Hotel LLC*, 479 B.R. 781 (Bankr. C.D. Ill. 2012) to argue that, if Delaware law applies, reverse alter-ego would be prohibited. Favazza Opp. 12:24-25; Brands Opp. 3:27-4:6.

However, *ALT Hotel LLC* is a thin reed on which to lean. To be sure, it does support the estate's position against Mr. Wynn and Wynn LV, but it does so in equivocal terms, relying on the prudential rule that "it would be inappropriate for this court, an Illinois bankruptcy court, to find that Delaware would recognize inside reverse piercing, moving Delaware law in a direction that Delaware's own courts have not yet gone." 479 B.R. at 801. No reported decision follows *ALT*

*Hotel*'s holding that Delaware does not allow reverse piercing of the corporate veil. Indeed, one federal and one state court have held just the opposite.

In *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 66 (S.D. Tex. 2007), "Plaintiffs [ASARCO] pled that they could have pierced their own veil because SPH was a 'mere instrumentality, agent and alter ego of ASARCO.' … Plaintiffs have also pled facts supporting a conclusion that ASARCO was stripped of assets and that its creditors were injured." When the defendant argued that there was no Delaware case allowing ASARCO to piece its own corporate veil, the court flipped the analysis the defendant, holding "[t]he Defendant has not offered any case law excluding the availability of a reverse veil piercing claim under Delaware law" and, therefore, predicted that reverse piercing would be permissible. *Id.* at 68.

In *Spinell v. JP Morgan Chase Bank, N.A.*, 873 N.Y.S.2d 626 (App. Div. 2009), the New York Supreme Court, Appellate Division found that the corporate veil of Birddog Associates could be pierced and its assets used to satisfy the debts against defendant. Although the court was applying New York law, its reasons for doing so are relevant: "The court properly applied New York law because there is no conflict with Delaware law with respect to 'reverse veil-piercing.'" *Id.* at 626.

The analyses in *ASARCO* and *Spinell* is the analysis that the Trustee is assuming is likely. Either the court determining the Alter Ego Litigation will decide that Delaware law allows reverse veil piercing, or it will decide that the issue is unclear and implement Nevada law. In terms of general policy, there are many decision from Delaware courts that form will give way to substance to promote justice. *See, e.g., Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012) ("Numerous legal rules and doctrines circumvent the general principles of corporate separateness and legal liability."). For the Trustee – especially in this case where there is significant evidence that Francis abused the corporate form – to roll the dice on an appeal to the corporate form is unwarranted.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**D.      The Law Is Not Settled Whether a California Court Would Allow Reverse Piercing in Circumstances Such as These.**

Favazza and Global Brands assume that reverse piercing of the corporate veil is strictly prohibited under California law, both citing an intermediate appellate court decision, *Postal Instant Press, Inc. v. Kaswa Corp.*  However, that reverse piercing is prohibited under California law is hardly settled.

In a different California intermediate court decision, *Taylor v. Newton*, 257 P.2d 68 (Cal. Ct. App. 1953), Taylor loaned money to Newton, but then Newton transferred substantially all his assets to N.H. Development Co., a company of which Newton was president and general manager. After Newton failed to pay the loan, Taylor sought and obtained a declaratory judgment that N.H. Development Co. was liable for the debts of Newton.  The court of appeal affirmed:

> A corporation may be but the mere instrumentality through which, for their convenience, the individuals who own all the capital stock transact their business. Looking to substance rather than to form[,] the law and equity will hold the corporation obligated for the acts of the sole owners of its stock.

*Id.* at 73 (quoting *Hillman v. Hillman Land Co.*, 183 P.2d 730, 736 (Cal. App. 1947)).

In *Wood v. Elling Corp.*, 572 P.2d 755, 761 (Cal. 1977), the plaintiff filed an action against Walter and Cathryn Wencke, several corporate entities alleged to be the Wenckes's alter egos, and two trusts alleged to be the Wenckes's alter egos.  Although the court found that alter ego lawsuits could not go forward against the corporations because there was no allegation that the Wenckes had an ownership interest in them, it reversed the dismissal of the alter ego claims against the trusts:

> If it were alleged and proven that the two trusts in question were themselves alter egos of the Wenckes, those trusts would essentially drop out as independent legal entities. … Our review of the record in this case leads us to believe that plaintiff may be able to make and support such further allegations; he should be given the opportunity to do so.

*Id.* at 762.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    In short, the basic assumption that a California court is any less capable of preventing an

2  abuse of the corporate form when it is a corporation that is being found liable for the debt of its

3  principal than when a principal is held liable for a debt of an undercapitalized corporation is

4  dubious.    By both statute, *see* Cal. Civ. Code § 3528 ("The law respects form less than

5  substance."), and decision, *Communist Party v. 522 Valencia, Inc.*, 41 Cal. Rptr. 2d 618, 625 (Ct.

6  App. 1995) (lengthy alter ego analysis), California has rejected the application of formalities in

7  favor of getting to substance.    Assuming, as the objectors do, that the California Supreme Court

8  would allow form to prevail over substance is not a risk the Trustee can reasonably take.[10]

9  **E.    The Nominee Theory of Ownership Has Been Applied Outside the Context of IRS
          Enforcement Actions**

10

11    Ms. Favazza and Global Brands also discount that Wynn may have a claim against the

12  Debtors based on the nominee theory.    Ms. Favazza accuses the Trustee of being "disingenuous"

13  and says that "such a theory would only work if Wynn was the I.R.S. and the Debtors were

14  taxpayers seeking to avoid a tax lien."    Favazza Opp. 18:23-25; *see also* Favazza Supp. Opp. 2:7-

15  24.    Global Brands says "the 'nominee theory' of liability is solely a federal tax lien theory and

16  has ***never*** been used in a non-tax setting by state or federal courts to circumvent the normal alter-

17  ego/veil piercing requirements to hold an entity and its assets generally liable for the obligations of

18  another."    Brands Opp. at 10:16-18 (emphasis added).

19    Ms. Favazza and Global Brands are mistaken.    State and federal courts have recognized the

20  nominee theory of liability (or something like it) outside the context of tax liens.    For example, in

21  *Lewis v. Hankins*, 262 Cal. Rptr. 532, 536 (Ct. App. 1989), Hankins was ordered to repay

22  $424,560, but did not do so.    The court held that the judgment creditors had a lien against two

23  pieces of real property held by corporations that Hankins controlled:    "The judgment recited that

24  while record title to two parcels of real property in issue was held in the names of Taletta

25  Enterprises,    Inc.    (Taletta),    and    Mount    Washington    Development    Corporation    (Mount

---

[10]    "In a case requiring a federal court to apply California law, the court must apply the law as it
believes the California Supreme Court would apply it."    *Gravquick A/S v. Trimble Navigation
Int'l, Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   Washington), respectively, the parcels were beneficially owned by defendant because such ***entities***

2   ***were mere agents or nominees of defendant***.  Accordingly, the judgment continued, the parcels

3   are subject to levy and sale in satisfaction of defendant's obligations under the decree." *Id.* at 536

4   (emphasis added).  The court of appeal affirmed.  *Id.* at 537.

5       In *In re Turner*, 2007 WL 7238117 (B.A.P. 9th Cir. 2007), Stephen and Susanna Turner

6   engaged in an asset protection scheme.   In mid-1995, they created Real Investment Capital

7   Holdings LLC ("RICH") and Proset Enterprises, Inc.  *Id.* at *1.  CG Trust, an irrevocable offshore

8   trust that the Turners settled, was the 99% owner of RICH.  *Id.*  In early 1998, after a civil

9   complaint had been filed against Mr. Turner, but before a judgment was entered, the Turners

10  transferred their home to RICH.  In December 2001, RICH executed a deed transferring title of the

11  home to Susana Turner and, in 2002, Stephen Turner filed for bankruptcy.  *Id.* at *2.  Although the

12  Trustee could not establish that the transfer of the home from RICH to Susana was a fraudulent

13  transfer (because, in the Court's view, RICH could not be Stephen Turner's alter ego under

14  California law), the BAP allowed the Trustee to reach the home under an equitable ownership

15  theory:

16          Under California law, "[a] resulting trust arises from a transfer of property under

17          circumstances showing that the transferee was not intended to take the beneficial

18          interest." *Siegel v. Boston (In re Sale Guar. Corp.)*, 220 B.R. 660, 664 (9th Cir.

19          BAP 1998) (citing *Am. Motorists Ins. Co. v. Cowman*, 179 Cal. Rptr. 747, 752 (Ct.

20          App. 1982)).   When a transfer is recognized to be fraudulent as to a debtor's

21          creditors, the creditors can seek to impose a resulting trust upon the debtor's

22          equitable interests in the transferred property for their benefit.  *See In re Torrez*, 63

23          B.R. 751, 753-54 (9th Cir. BAP 1986) (applying California law).

24  *Id.* at *11.  Thus, in *In re Turner*, the BAP rejected the alter ego theory, but still found that assets

25  beneficially owned by a judgment debtor could be attached by a creditor.

26      *Lewis v. Hankins* and *In re Turner* create the risk that, even if the court that resolves the

27  Alter Ego Litigation permits the Debtors to escape liability as alter egos, Wynn LV and Mr. Wynn

28  may still have a sizable claims against the estate under a nominee theory.

### III.  THE SETTLEMENT OF THE TRUST FUNDS IS FAIR AND APPROPRIATE

Ms. Favazza and Global Brands also criticize the settlement of the Debtors' interest in the Trust Funds.  Ms. Favazza seems to agree that only a portion (less than $700,000) of the Trust Funds originated from the Debtors, was paid to Francis's accountant and then was paid to Houston, with the balance being paid primarily by Mr. Francis or Pepe Bus.  However, Ms. Favazza believes that the Debtors should get a greater portion of the Trust Funds because: (i) "$295,000 came from Pepe Bus, LLC. …  Those buses were used for the Girls Gone Wild business.  That is obviously money which belongs more rightly to the Debtors than to Francis personally" (Favazza Opp. 20:11-14.); (ii) "With regard to the $1,413,000 that is allegedly 'Francis'[s money] from unknown sources, the Trustee's Exhibit T shows clearly that Francis syphoned over $7.655 M from the Debtors from 2011-2013.  That money is owed from Francis to the Debtors as a fraudulent transfer.  Why shouldn't the Trustee have just as legitimate a claim to that money as Wynn?"  (Favazza Opp. 20:22-21:25).

Ms. Favazza's disappointment is understandable (the Trustee shares it), but her position is not strong.

- The Trustee's investigation has revealed that the approximately $295,000 that originated from Pepe Bus, LLC is likely Mr. Francis's money.  At the time of the payment to Houston, Pepe Bus, LLC was a defunct Montana limited liability company, whose manager was Mr. Francis and whose sole owner (*i.e.*, member) was Mr. Francis.  *See* Heyn Decl. ¶ 6, Exhibit Z (Montana Secretary of State Certificate of Fact for Pepe Bus, LLC).  While the Debtors did use a bus owned by Pepe Bus, LLC as part of their business, the use of the bus does not mean that all of Pepe Bus, LLC's property can be considered the Debtors' property.[11]

- Mr. Wynn and Wynn LV have judgments against Mr. Francis.  From the Trustee's investigation, it appears that on or about April 18, 2012, Wynn LV served a notice

---

[11]  There is an argument that the estates have equitable liens on the physical bus by virtue of having paid its expenses, but that is a far cry from owning everything which the bus owner may have once owned.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

of garnishment upon Houston, requiring Houston to pay to Wynn LV any amounts that were Mr. Francis's property. If the Trust Funds belonged to Mr. Francis, they should have been paid to Wynn LV. While there is substantial evidence that the Debtors' estates have sizable fraudulent transfer claims against Mr. Francis, those potential (as yet unliquidated) claims probably do not give the Trustee or GGW Marketing a stronger (or even equal) right to the Trust Funds than Wynn LV, a creditor of Mr. Francis which garnished the Trust Funds ten months before the Debtors filed bankruptcy. It is likely that the Trust Funds will be property of the estate only if they originated from the Debtors. Because less than $700,000 of the Trust Funds originated from the Debtors, receiving $800,000 of the Trust Funds is a reasonable settlement of the Trust Funds.

Global Brands asserts the opposite objection to Ms. Favazza. It contends the settlement cannot be approved because "Pepe Bus, LLC is also a party to that litigation and was never served with a Summons or Complaint. The $1.1 million that the Settlement Agreement agrees to give Wynn actually belonged to Pepe Bus, LLC [which assigned its right to Global Brands]." Brands Opp. 15:8-11.

Global Brands' position is flawed and deceptive. According to the records of the Montana Secretary of State, Pepe Bus, LLC was voluntarily terminated on March 12, 2012, before the Alter Ego Litigation began. So there was no reason to serve it. Even if not terminated, Pepe Bus's manager was Mr. Francis, who *was* served.[12] Pepe Bus could not assign to Global Brands any interest in the Trust Funds, as Global Brands now contends. A voluntarily terminated limited liability company ceases to exist and therefore loses the ability to enter into contracts. Mont. Code Ann. § 35-8-906(2) ("The existence of a limited liability company is terminated upon the filing of the articles of termination….").

---

[12] A limited liability company is served through it manager. *See* Nev. State Rules of Civil Pro. Rule 4(d)(2) ("If the suit is against an unregistered foreign entity or association that has an officer, general partner, member, manager, trustee or director within this state, [service may be made upon] such officer, general partner, member, manager, trustee or director").

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

## IV.  THE COURT SHOULD NOT DELAY THE SETTLEMENT UNTIL AFTER THE BAR DATE

The Class Action Creditors assert an additional objection to the 9019 Motion.  In addition to joining in Ms. Favazza's position concerning the Debtors' reverse-piercing liability, the Class Action Creditors raise essentially two arguments:  (i) it is premature to consider the Settlement until the bar date has passed (CAC Opp. 2:25-3:18); and (ii) the Settlement seeks "immediate disbursement of all currently available cash to divvy between [Wynn's] entities."  CAC Opp. 5:9-10. Both of these arguments are baseless.

*First,* there is no relationship between the bar date to assert claims and the standards under which a settlement is approved or disapproved.  Neither *A&C Properties* nor any other case or authority of which the Trustee is aware indicates that the bar date needs to occur before the Trustee may settle claims against the estate.  The case cited by the Class Action Creditors, *Cech v. Crescent Hills Coal Co. (In re Sannonpin Mining Co.)*, 2002 U.S. Dist. LEXIS 15731 (W.D. Pa. 2002) (cited at CAC Opp. 3:17-18) certainly does not support that proposition.  In *Cech*, the bankruptcy court had previously determined that the Crescent Black Lung Fund was property of the debtors' estate and did not belong to Crescent Hills Coal Co.  *Id.* at *20-21.  After Crescent appealed, the trustee of the Debtors' estates entered into a settlement with Crescent that was manifestly objectionable:

> What the settlement actually did was much different from declaring or settling ownership of the one fund … at issue.  In addition to relinquishing the Crescent Black Lung Fund, the Chapter 7 Trustee also released the Shannopin Black Lung Fund to Crescent.  The 1997 settlement failed to pay pro rata all creditors similarly situated.  It paid professionals who had not filed fee applications.  It paid professionals who had fees approved in the chapter 11 an amount greater than what had been approved by the Bankruptcy Court. It failed to pay all professionals. In direct conflict with § 726(b)(7) of the Bankruptcy Code, it paid some chapter 11 administrative expenses before it paid the chapter 7 administrative expenses. It

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    failed to pay the U.S. Trustee's and Clerk's fees.   It failed to pay LTV's

2    superpriority claim.

3  *Id.* at *47-48.

4       Nothing like that is happening here.  Under the Settlement Agreement, no estate funds are

5  being distributed to Mr. Wynn or Wynn LV.  Instead, Mr. Wynn and Wynn LV are compromising

6  claims against the estate and agreeing that $800,000 (of a total of approximately $1,800,000), of

7  amounts that they have garnished – and arguably should have been paid – will be contributed to

8  the estate.

9       Although the Class Action Creditors raise the possibility that serving notice of the bar date

10 might alert creditors to these bankruptcy cases (CAC Opp. 3:9-4:3), this does not give the Court

11 any reason to disapprove the settlement.  These bankruptcy cases were initially filed in February.

12 At the time they were filed, they received nationwide media attention.[13]  The day after the Debtors

13 filed for bankruptcy, newspapers from Alaska to Florida publicized the Debtors' bankruptcy.[14]

14 While it is possible that sending out notice of the bar date will alert additional creditors to the fact

15 of the Debtors' bankruptcy cases, it is unlikely.  Failure of creditors to participate in the case at

16 this point is due to lack of motivation, not a lack of notice.

---

18 [13]  *See, e.g.*, ABC News, *'Girls Gone Wild' Files for Bankruptcy*, available at
19 http://abcnews.go.com/Nightline/ video/girls-wild-files-bankruptcy-18653495;  Michael
20 Winter, *'Girls Gone Wild' goes bankrupt to dodge legal awards*, USA TODAY; Feb. 28, 2013;
   Steven Church & Sophia Pearson, *'Girls Gone Wild' Files Bankruptcy to Fight Vegas Debt*,
   Feb. 28, 2013, available at http://www.bloomberg.com/news/2013-02-28/-girls-gone-wild-
21 files-bankruptcy-to-fight-vegas-debt.html.  Several of these printouts are attached hereto as
22 Exhibit ZZ.  The Trustee request that the Court take judicial notice of these articles, not for the
   facts contained therein, but only to show that major media outlets have provided interested
23 parties notice that the Debtors have been in bankruptcy since February.  *See, e.g.*, *Von Saher v.*
   *Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may
24 take judicial notice of publications introduced to 'indicate what was in the public realm at the
   time, not whether the contents of those articles were in fact true'").

25 [14]  *'Girls Gone Wild' goes bankrupt to dodge legal awards*, FLORIDA TODAY, February 28, 2013,
26 available at http://www.floridatoday.com/usatoday/article/ 1954419; *'Girls Gone Wild' files*
   *for bankruptcy, founder fights gambling debt case*, ALASKA DISPATCH, February 28, 2013,
27 available  at  http://www.alaskadispatch.com/article/20130228/girls-gone-wild-files-
   bankruptcy-founder-fights-gambling-debt-case (Exhibit ZZ).

28

1 The Class Action Creditors' second argument – that "Wynn seeks immediate disbursement

2 of all currently available cash to divvy between his own entities" (CAC 5:9-10) – is a

3 misinterpretation of the Settlement Agreement. Nothing in the Settlement Agreement allows

4 immediate distribution of the Debtors' cash to Mr. Wynn or Wynn LV. Although the Class

5 Action Creditors say that "Wynn's Settlement Agreement seeks approximately 30% of the estate's

6 cash value, $250,000[,] as a Priority Claim, to be paid prior to all other Creditors" (CAC Opp.

7 5:20-22), this too is factually wrong because it assumes that the Debtors' only value is the cash on

8 hand on May 30 and the accounts receivable. Such a calculation excludes the Debtors' hard

9 assets, its claims to the IP, and even the $800,000 that would come into the estate as a result of the

10 Settlement Agreement.

11 The Class Action Creditors' opposition is based on a confused understanding of

12 bankruptcy law, the relevant facts, and the terms of the Settlement Agreement. The Class Action

13 Creditors provide no reason that the Court should reject the Settlement.

14 <center>**V.  CONCLUSION**</center>

15 Although the Trustee believes he struck a good deal for the estates, he need not so

16 demonstrate for the Court to approve the compromise. "Rather than an exhaustive investigation or

17 a mini-trial on the merits, the bankruptcy court need only find that the settlement was negotiated in

18 good faith and is reasonable, fair and equitable…. [T]he bankruptcy court's proper role is to

19 canvas the issues and see whether the settlement falls below the lowest point in the range of

20 reasonableness." *In re Spirtos*, 2006 WL 681102, *10 (9th Cir. B.A.P. 2006) (internal cites,

21 brackets and quotation marks omitted), *aff'd*, 270 Fed. Appx. 540 (9th Cir. 2008). That much, at a

22 minimum, should be clear. As such, the Trustee respectfully submits that the Court should grant

23 the 9019 Motion.

24

25

26

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

145946.4

DATED: July 31, 2013                    Respectfully submitted,

                                        KLEE, TUCHIN, BOGDANOFF & STERN LLP


                                        _____
                                        Matthew C. Heyn
                                        Attorneys for R. Todd Neilson, Chapter 11 Trustee,
                                        and GGW Marketing, LLC

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

145946.4                                        20

**<u>SUPPLEMENTAL DECLARATION OF MATTHEW C. HEYN</u>**

I, Matthew C. Heyn, declare as follows:

1.      I am over the age of 18.  All statements made in this declaration are based on my personal knowledge.  If called to testify as a witness in this matter, I could and would testify under oath to the truth of the statements set forth herein.

2.      I am a partner in Klee, Tuchin, Bogdanoff & Stern, LLP, which is counsel to GGW Marketing, LLC ("GGW Marketing") and R. Todd Neilson, the chapter 11 trustee (the "Trustee") in the jointly administered bankruptcy cases of GGW Brands, LLC, GGW Direct, LLC, GGW Magazine, LLC and GGW Events, LLC.

3.      Attached hereto as <u>Exhibit W</u> is a true and correct copy of a pleading the Debtors submitted in the Alter Ego Litigation, which cites (at page 6) California and Delaware law to argue that reverse piercing cannot be allowed.

4.      Attached hereto as <u>Exhibit X</u> is a true and correct copy of the declaration of Brian Rayment, former counsel for the Debtors, that Mr. Rayment submitted in in support of the Tulsa judgment.  In the declaration Mr. Rayment testifies that certain of the Debtors are Mr. Francis's alter egos.  Rayment Decl. ¶ 8.

5.      Attached hereto as <u>Exhibit Y</u> is a true and correct copy of the complaint filed by Ms. Favazza against, among others, the Debtors, in the United States District Court for the Eastern District of Missouri, Case No. 4:12-CV-01561-TCM.

6.      Attached hereto as <u>Exhibit Z</u> is a true and correct copy of the State of Montana's Secretary of State Certificate of Fact for an entity called Pepe Bus, LLC.  The Certificate indicates that at the time of an approximately $295,000 payment to David Houston that originated from Pepe Bus, LLC, Pepe Bus, LLC was a defunct Montana limited liability company, whose manager was Mr. Francis and whose sole owner (i.e., member) was Mr. Francis.

7.      Attached hereto as <u>Exhibit ZZ</u> are true and correct copies of several news articles discussing the Debtors' cases at the time the cases were filed.  These articles indicate that major media outlets have provided interested parties notice that the Debtors have been in bankruptcy since February.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

145946.4

21

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct and that this was executed this 31st day of July 2013, at Los Angeles, California.

3

4    _____

5    Matthew C. Heyn

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067

A true and correct copy of the foregoing document entitled **REPLY IN SUPPORT OF MOTION TO APPROVE PROPOSED SETTLEMENT WITH WYNN LAS VEGAS, LLC AND STEPHEN A. WYNN; SUPPLEMENTAL DECLARATION OF MATTHEW C. HEYN**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 31, 2013 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**See attached**

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 31, 2013, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**See attached**

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 31, 2013 | Jonathan M. Weiss | /s/ Jonathan M. Weiss |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Martin R Barash**    mbarash@ktbslaw.com, lbogdanoff@ktbslaw.com
- **Brendt C Butler**    brendt.butler@gmail.com
- **Anne-Marie J DeBartolomeo**    ajd@girardgibbs.com, jiv@girardgibbs.com
- **Richard K Diamond**    rdiamond@dgdk.com, DanningGill@gmail.com
- **Matthew Heyn**    mheyn@ktbslaw.com
- **Lance N Jurich**    ljurich@loeb.com, kpresson@loeb.com
- **Samuel M Kidder**    skidder@ktbslaw.com
- **Michael D Kolodzi**    mdk@mdklawfirm.com
- **Dare Law**    dare.law@usdoj.gov
- **Dare Law**    dare.law@usdoj.gov
- **John F Medler**    JOHN@MEDLERLAWFIRM.COM, JMEDLER@MEDLERROITHER.COM
- **Kelly L Morrison**    kelly.l.morrison@usdoj.gov
- **R. Todd Neilson (TR)**    tneilson@brg-expert.com, sgreenan@brg-expert.com;tneilson@ecf.epiqsystems.com;ntroszak@brg-expert.com
- **Malhar S Pagay**    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- **Robert J Pfister**    rpfister@ktbslaw.com
- **Ronald N Richards**    ron@ronaldrichards.com, nick@ronaldrichards.com
- **Ronald N Richards**    ron@ronaldrichards.com, nick@ronaldrichards.com
- **Steven J Schwartz**    sschwartz@dgdk.com, DanningGill@gmail.com
- **David M Stern**    dstern@ktbslaw.com
- **Ronald D Tym**    RTym@Tymfirm.com
- **Ronald D Tym**    RTym@Tymfirm.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Andy C Warshaw**    awarshaw@lawcenter.com, mstevens@lawcenter.com
- **Jonathan M Weiss**    jweiss@ktbslaw.com
- **Jonathan M Weiss**    jweiss@ktbslaw.com
- **Robert M Yaspan**    court@yaspanlaw.com, tmenachian@yaspanlaw.com

**VIA PERSONAL DELIVERY:**

Hon. Sandra R. Klein
U.S. Bankruptcy Court
255 E. Temple St., Ctrm 1575
Los Angeles, CA 90012

**VIA FEDERAL EXPRESS:**

United States Trustee
c/o Dare Law, Esq.
725 S. Figueroa St., Ste. 2600
Los Angeles, CA 90017

# EXHIBIT W

1  OPP
   Elliot S. Blut, Esq.
2  Nevada Bar No. 6570
   ECOFF BLUT, LLP
3  300 South Fourth Street, Suite 701
   Las Vegas, NV 89101
4  Telephone (702) 384-1050
   Facsimile (702) 384-8565
5
   Attorneys for Defendants,
6  GGW DIRECT, LLC, GGW BRANDS, LLC,
   GGW EVENTS, LLC and BLUE HORSE TRADING, LLC
7

8                             DISTRICT COURT
9                          CLARK COUNTY, NEVADA
10

| | | |
|---|---|---|
| WYNN LAS VEGAS, LLC d/b/a WYNN LAS VEGAS, a Nevada Limited Liability Company | ) ) ) | CASE NO.:  A-12-660288-B DEPT. NO.:  XI |
| Plaintiff | ) ) ) | GGW DIRECT, LLC AND GGW BRANDS, LLC'S OPPOSITION TO PRELIMINARY INJUNCTION |
| v. | ) ) ) | |
| GGW DIRECT, LLC, a Delaware limited liability company; GGW BRANDS, LLC, a Delaware limited liability company; GGW EVENTS, LLC, a Delaware limited liability company; MANTRA FILMS, INC., an Oklahoma corporation; BLUE HORSE TRADING, LLC, a California limited liability company; PEPE BUS, LLC, a Montana limited liability company; SANDS MEDIA, INC., a Nevada domestic coroporation; JOSEPH R. FRANCIS, an individual; DAVID R. HOUSTON, an individual; and DAVID R. HOUSTON, LTD., a Nevada professional corporation, doing business as THE LAW OFFICE OF DAVID R. HOUSTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FILED UNDER SEAL<br><br>Date of Hearing:  July 6, 2012<br>Time of Hearing:  9:00 a.m. |
| Defendants. | ) ) ) | |

25       Defendants GGW Direct, LLC, GGW Brands, LLC, GGW Events, LLC and Blue Horse

26  Trading, LLC by and through their attorney of record, Elliot S. Blut, Ecoff Blut, LLP hereby

27  submit this Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary

28  Injunction.

1     A preliminary injunction is an extraordinary and drastic remedy.  It is axiomatic that

2  courts do not issue preliminary injunctions lightly and should exercise restraint and caution.  All

3  presumptions are taken against the moving party who bears the burden of showing by competent

4  evidence all elements necessary to support the issuance of a preliminary injunction.  As

5  demonstrated by an examination of Plaintiff's moving papers, Plaintiff has failed to carry its

6  burden for the issuance of  an extraordinary remedy.

7     First, Plaintiff has failed to demonstrate a reasonable probability of success on the merits.

8  By this action, Plaintiff attempts to apply the alter ego doctrine in 'reverse' to reach corporate

9  assets for the debts of Joseph Francis.  Reverse piercing is not appropriate in this case because

10  the moving papers fail to establish that Mr. Francis abused the corporate form to avoid personal

11  liability.  Second, Plaintiff cannot show irreparable harm because any losses it has incurred can

12  be remedied by compensatory damages.

13     This Opposition shall be based upon the following Memorandum of Points and

14  Authorities, the Declarations of Joseph Francis, David Houston, Esq., Robert Kleuger, Esq.,

15  Chris Dale and Elliot S. Blut, Esq. with exhibits attached thereto, all matters which Defendants

16  request that this Court take Judicial Notice of, as well as oral testimony and argument to be

17  presented at the hearing on this matter.

18  DATED this 25th day of June, 2012                    ECOFF BLUT, LLP

19

20

21                                                   By: _____
                                                        Elliot S. Blut, Esq.
22                                                      NEVADA BAR No. 6570
                                                       300 South Fourth Street, Suite 701
23                                                      Las Vegas, Nevada 89101
                                                       Attorneys for Defendants
24                                                      GGW DIRECT, LLC, GGW BRANDS,
                                                       LLC, GGW EVENTS, LLC and BLUE
25                                                      HORSE TRADING, LLC

26

27

28

1 | ## MEMORANDUM OF POINTS AND AUTHORITIES

2 | ## I.

3 | ## INTRODUCTION

4 | This is an action filed by Wynn Las Vegas, LLC ("Wynn") seeking to amend a judgment

5 | entered in 2009 against Joseph Francis ("Francis") and apply the 'reverse' alter ego doctrine to

6 | hold the defendant entities liable for Francis' personal obligations.  The underlying action arose

7 | out of a gambling marker debt incurred by Francis (the "Underlying Action").  During the

8 | Underlying Action, Francis asserted his Fifth Amendment rights because criminal charges were

9 | then pending.  Consequently, Wynn moved for, and was granted, summary judgment in the

10 | Underlying Action.  The criminal charges were eventually dismissed.  The judgment in the

11 | Underlying Action remains solely against Francis.  Unable to collect the judgment against

12 | Francis, Wynn now moves to have the entity defendants held liable.

13 | As will be fully set forth below, while it appears as though Wynn has been performing

14 | exhaustive collection efforts, the fact remains that Wynn has not sought a charging order in

15 | Nevada, California or any other state for that matter, as to any of the named defendants and never

16 | served a wage garnishment upon GGW Brands, LLC, the entity which has been providing

17 | compensation to a Francis entity since its inception in October 2010.

18 | The Declaration of Mitch Langberg contains hyperbole, argument, interpretation of

19 | testimony and in one instance mischaracterizes the testimony of witnesses deposed in the debt

20 | collection matters.  One of the entities, Blue Horse Trading, LLC, has been in existence since

21 | 2002, has always paid its own expenses and can not by any stretch be seen as being created and

22 | used to frustrate Wynn.  As to the other named defendants and their payments of expenses that

23 | Wynn has determined to be personal in nature to Francis and supporting their claim for alter ego,

24 | there are simple explanations as to how the current entities are operating and how expenses are

25 | handled.  For example, a ledger is maintained at GGW Brands, LLC and GGW Direct, LLC

26 | evidencing payments for the personal benefit of Francis.  Francis is compensated much like an

27 | entertainer's loan out company, which is common in the entertainment industry.  This is how

28 | matters have been handled even prior to the Wynn Judgment, which defeats the claim that this

system was somehow concocted to dodge Wynn's collection efforts.  At bottom, the totality of the circumstances does not support Wynn's claims, no matter how counsel has characterized the evidence.

## II.

## LEGAL ARGUMENT

### A.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction to preserve the status quo is only available upon a showing that the party seeking it enjoys a reasonable probability of success on the merits and that the conduct of the party sought to be enjoined, if allowed to continue, will result in irreparable harm for which compensatory damage is an inadequate remedy.  *See*, *Pickett v. Comanche Construction Co.*, 108 Nev. 422, 836 P.2d 42 (1992); *See also*, *Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029 (1987).  It is designed to protect the applicant from irreparable injury and to preserve the status quo pending final judgment. *See*, *Otternheimer v. Real Estate Division*, 91 Nev. 338, 535 P.2d 1284 (1975); *see also*, *Memory Gardens of Las Vegas, Inc. v. Pet Ponderosa Memorial Gardens, Inc.*, 88 Nev. 1, 492 P.2d 123 (1972); *Berryman v. International Brotherhood of Electrical Workers*, 82 Nev. 277, 416 P.2d 387 (1966).  Because such injunctive relief is not available in the absence of actual or threatened injury, loss or damage, the party seeking the preliminary injunction must prove the "reasonable probability" that real injury will occur before a trial on the merits can be held. *See*, *Berryman*, *supra*; *see also*, *Sherman  v. Clark*, 4 Nev. 138 (1868).

A preliminary injunction is an extraordinary and drastic remedy which should be granted only upon a clear showing by the applicant of his right thereto.  In establishing that clear right, all presumptions and ambiguities are to be taken against the moving party who carries the burden of persuasion. *See*, *Canale Authority of the State of Florida v. Callaway*, 49 F.2d 567 (6th Cir., 1974).  Further, a court should exercise restraint and caution in providing this type of equitable remedy. *See*, *Leonard v. Stoebling*, 102 Nev. 543, 728 P.2d 1358 (1986).

As discussed above, a preliminary injunction to preserve the status quo is available only

1 upon a showing that the parties seeking it enjoy a "reasonable probability" of success on the

2 merits. *See*, *Christensen v. Chromalloy American Corp*, 99 Nev. 34, 656 P.2d 844 (1983); *see*

3 *also*, *Republic Entertainment, Inc. v. Clark County Liquor & Gaming Licensing Board*, 99 Nev.

4 811, 672 P.2d 634 (1983); *Number One Rent-A-Car v. Ramada Inns, Inc.*, 94 Nev. 779, 587 P.2d

5 1329 (1978); *Dixon v. Thatcher*, *supra*.

6       **B.**    **THE PRELIMINARY INJUNCTION IS IMPROPER BECAUSE WYNN**

7            **WILL NOT PREVAIL ON THE MERITS**

8           **1.**    **Elements Of Reverse Piercing**

9       The alter ego doctrine can be applied in "reverse" to reach the assets of a corporation to

10 answer for the debts of a controlling party. "Reverse veil-piercing is a process by which a

11 subsidiary can be made to bear the obligations of its parent; here, that would mean that the owner

12 of the equity interest in the various corporations would be co-liable with the corporations

13 themselves." *In re National Audit Defense Network* (Bankr. D. Nev. 2007) 367 B.R. 207, 230.

14           The elements for finding an alter ego, which must be established

15           by a preponderance of the evidence, are: (1) the corporation must

16           be influenced and governed by the person asserted to be the alter

17           ego; (2) there must be such unity of interest and ownership that one

18           is inseparable from the other; and (3) the facts must be such that

19           adherence to the corporate fiction of a separate entity would, under

20           the circumstances, sanction [a] fraud or promote injustice.

21 *Id.* at 230, citing *LFC Mktg. Group, Inc. v. Loomis* (2000) 116 Nev. 896, 8 P.3d 841.

22           It is particularly appropriate to apply the alter ego doctrine in

23           "reverse" when the controlling party uses the controlled entity to

24           hide assets or secretly to conduct business **to avoid the**

25           **pre-existing liability of the controlling party...**Where a creditor

26           proves that controlling shareholders organized or used the

27           corporation to deceive or defraud personal creditors, the separate

28           existence will be disregarded and the corporation and the

1              shareholders will be treated as one and the same.

2   *Select Creations, Inc. v. Paliafito America, Inc.* (E.D. Wis. 1994) 852 F.Supp. 740, 774 (emphasis

3   added).

4        The instant action is the reverse of the usual claim of alter ego where a corporation is the

5   debtor and the creditor is seeking to reach the assets of the shareholder.  As will be more fully set

6   forth below, Wynn cannot establish that Francis has abused the corporate form in an attempt to

7   avoid personal liability:

8              The same abuse of the corporate form does not exist when the

9              judgment debtor is the shareholder. In that situation, the corporate

10             form is not being used to evade a shareholder's personal liability,

11             because the shareholder did not incur the debt through the corporate

12             guise and misuse that guise to escape personal liability for the debt.

13   *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1522, 77 Cal.Rptr.3d 96,

14   104-05.  This is the situation in this matter as there is no allegation that Wynn relied whatsoever

15   on any entities when entering into the underlying transaction which led to the 2009 judgment.

16        The law requires that fraud or injustice be found in the defendants' use of the corporate

17   form...Unless done deliberately, with specific intent to escape liability for a specific tort or class

18   of torts, the cause of justice does not require disregarding the corporate entity. The corporate form

19   itself works no fraud on a [tort victim] who has never elected to deal with the corporation.

20   *Mobil Oil Corp. v. Linear Films, Inc.* (D. Del. 1989) 718 F.Supp. 260, 268-69.

21        Further, the injustice/inequity alleged by Wynn is insufficient to justify reverse piercing

22   the corporate veil because adequate legal remedies exist, of which Wynn has failed to take

23   advantage.

24             Any breach of contract and any tort-such as patent infringement-is,

25             in some sense, an injustice.  Obviously this type of "injustice" is not

26             what is contemplated by the common law rule that piercing the

27             corporate veil is appropriate only upon a showing of fraud or

28             something like fraud. The underlying cause of action does not

1          supply the necessary fraud or injustice. To hold otherwise would

2          render the fraud or injustice element meaningless, and would

3          sanction bootstrapping.

4 *Id.* at 268-69.

5       "'[T]raditional theories of conversion, fraudulent conveyance of assets, respondeat

6 superior and agency law are adequate to deal with situations [in which] one seeks to recover from

7 a corporation for the wrongful conduct committed by a controlling stockholder without the [need]

8 to invent a new theory of liability.'" *Commissioner of Environmental Protection v. State Five*

9 *Indus. Park, Inc.* (2012) 304 Conn. 128, 156, citing *Cascade Energy & Metals Corp. v. Banks,*

10 *supra,* at 1577.

11            **2.**    **Reverse piercing is not appropriate in this case**

12       For reasons which are applicable to the facts of this matter, California has explicitly

13 rejected outside reverse piercing. *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162

14 Cal.App.4th 1510, 1519-20, 77 Cal.Rptr.3d 96, 102-03. The abuse of the corporate form does not

15 exist when judgment debtor is shareholder; the corporate form is not being used to evade a

16 shareholder's personal liability, because shareholder did not incur debt through the corporate

17 guise and misuse guise to escape corporate debt. *Id.*

18       The true issue outside piercing seeks to address is not misuse of corporate form. Rather, it

19 is the shareholder's transfer of personal assets to the corporation to shield the assets from

20 collection from a creditor of the shareholder. In other words, seeks to protect from shareholder

21 fraudulent transfer of assets. Conversion and fraudulent conveyance afford judgment creditors

22 protection when shareholders have transferred their assets into an entity. Judgment creditors

23 cannot use reverse piercing as shortcut to pursue those remedies. *Id.*

24       Courts have recognized that there are three problems with reverse piercing:

25       1.      It bypasses normal judgment collection procedures;

26       2.      Non-culpable shareholders may be prejudiced;

27       3.      Legal remedies adequately protect creditors from fraud

28 *Cascade Energy and Metals Corp. v. Banks* (10th Cir.1990) 896 F.2d 1557, 1576-1577. Further,

1    disregard of corporate form should only be granted when legal remedies are inadequate. *Floyd v.*

2    *I.R.S.* (10th Cir.1998) 151 F.3d 1295.

3        Wynn heavily relies on *LFC Marketing Group, Inc. v. Loomis, supra,* 116 Nev. 89, 8 P.3d

4    841 to support its allegations.  In *LFC*, the underlying case involved a judgment in favor of the

5    judgment creditors, the Loomises, and against William Lange ("Lange") for $25,000.00 in

6    attorneys' fees.  In an attempt to collect on their judgment, the Loomises obtained an *ex parte* writ

7    of attachment from assets held in escrow for a corporation Lange allegedly controlled, LFC

8    Marketing ("LFC") a Nevada corporation performing services in Nevada whose sole shareholder

9    was Lange's brother, Robert Lange.  The Loomises became aware that the Nevada Land and

10   Resources Company ("NLRC") hired LFC and deposited funds in an escrow in Nevada for

11   payment to LFC.

12       LFC filed a third-party claim asserting sole ownership of the assets. The District Court

13   determined that LFC was alter ego of Lange and allowed satisfaction of judgment out of the

14   attached assets.  LFC appealed.  The Nevada Supreme Court held that under the specific facts

15   presented, the alter ego doctrine may be applied in reverse to reach corporation's assets to satisfy

16   controlling individual's debt.

17       In *LFC*, evidence elicited at the hearing included the fact that in dealing with the NLRC,

18   Lange held himself out to be the "president and CEO" of LFC, that Lange personally negotiated

19   the contract, that the NLRC accountant identified Lange as the "ultimate authority" for all of

20   LFC's dealings and significantly, that Lange determined how proceeds from a settlement were to

21   be divided and how payment of invoices due to LFC were to be paid from the transaction.

22       The Court in *LFC Marketing* was concerned with the fact that absent a finding of reverse

23   piercing, there would be no opportunity to reach the judgment debtor where "the controlling party

24   uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing

25   liability of the controlled party." *LFC Marketing Group,* 116 Nev. at 903 (internal citation

26   omitted).

27       The case at hand is factually distinguishable from *LFC Marketing Group* for many

28   reasons, discussed in detail below. First, Francis is not the ultimate authority in all defendant

1   entity dealings. (Klueger Decl., ¶ 8 and Deutsch Deposition, Exhibit "J" to Motion.) Second, all

2   defendant entities are or were separate functioning entities with their own books and records.

3   (Klueger Declaration). Last, Francis does not negotiate all contracts, such as distribution

4   agreements which would include a determine how much each defendant entity receives in

5   payments. (Klueger Decl., ¶8.) The reasons the Court was inclined to find alter ego in *LFC*

6   *Marketing* was due to the fact that the judgment debtor had complete control over the entity, and

7   especially the funds in issue. Here, there is no evidence that Francis is profiting from the

8   defendant entities to the frustration of Wynn. In *LFC Marketing* there was no means by which the

9   creditors could reach Lange. Here, Wynn has determined which collection efforts it would

10  entertain, however, an exhaustive campaign would have led to more fruitful efforts. Alter ego

11  should not be found to extend the judgment to operating entities (and in some cases dissolved

12  entities) as legal remedies that were not available to the creditor in *LFC Marketing* are available

13  here. As is set forth below, the indicia required to find alter ego do not exist and the preliminary

14  injunction is improper.

15          a.    **Joe Francis Is Not The Ultimate Decision Maker Over**

16                **Employees Or Vendors**

17          The funds at issue with regard to the Temporary Restraining Order are funds belonging to

18  GGW Direct, LLC. The first element Wynn must establish is that GGW Direct, LLC is

19  influenced and governed by Francis, the person asserted to be its alter ego. *Polaris Indus. Corp. v.*

20  *Kaplan, supra*, 103 Nev. 598 at 601.

21          "While mere single ownership may indeed tend to generate some suspicion regarding

22  interrelated activities involving third parties, it cannot, in and of itself, support a finding of fraud

23  or collusion as a basis for disregarding the corporate entity." *Robertson v. Roy L. Morgan*

24  *Production Co.* (10th Cir. 1969) 411 F.2d 1041, 1043. "It is necessary to establish something

25  more than ownership of virtually all of the subsidiary stock by the parent or identity of directors in

26  order to treat the parent and subsidiary as one." [Citations.] *Luckett v. Bethlehem Steel Corp.* (10th

27  Cir. 1980) 618 F.2d 1373, 1379.

28          Alter ego can be proved where one entity is the alter-ego, or mere instrumentality, of

1  another entity. Instrumentality requires that a plaintiff show "(1) Control, not mere majority or

2  complete stock control, but **complete domination**, not only of finances, but **of policy and**

3  **business practice in respect to the transaction attacked** so that the corporate entity as to this

4  transaction had at the time no separate mind, will or existence of its own; and (2) **Such control**

5  **must have been used by the defendant to commit fraud or wrong**, to perpetrate the violation

6  of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of

7  plaintiff's legal rights; and (3) The aforesaid control and breach of duty must **proximately cause**

8  **the injury or unjust loss complained** of." *Fischer Inv. Capital, Inc. v. Catawba Development*

9  *Corp.* (N.C. Ct. App. 2009) 200 N.C.App. 644, 650, 689 S.E.2d 143, 147. (Emphasis added.)

10       "Pursuant to the **instrumentality rule**, to justify any veil pierce, it is not enough for the

11  plaintiff merely to prove that the insider debtor exercised complete control over the subject

12  corporation. It further must be shown that the debtor used that control 'to commit fraud or wrong,

13  to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in

14  contravention of [the plaintiffs'] legal rights; *and* ... that the aforesaid control and breach of duty

15  ... **proximately cause[d] the injury or unjust loss complained** of.'" (Emphasis in original;

16  internal quotation marks omitted.) *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*,

17  *supra*, 187 Conn. at 553, 447 A.2d 406. *Commissioner of Environmental Protection v. State Five*

18  *Indus. Park, Inc.* (2012) 304 Conn. 128, 146.

19       Wynn has failed to show Francis' complete dominion over finances, business, and policy

20  in connection with the transaction complained of, specifically, the debt incurred in the marker

21  case, and more importantly, that such control over GGW Direct, LLC *proximately caused the*

22  *debt incurred*.  As evidenced by the Declaration of Robert Klueger, decisions are made at GGW

23  Brands, LLC and GGW Direct, LLC by persons other than Francis.  While there is some evidence

24  that Francis was involved in certain areas of GGW Brands, LLC and GGW Direct, LLC there are

25  separate and distinct departments at these entities in which Francis is not in the chain of

26  command, such as the accounting or human resources arms of the companies.  (Klueger Decl.,

27  ¶8.)  In addition, there was a distribution agreement negotiated by former counsel Robert Klueger

28  with no involvement with Francis and in fact Mr. Klueger believed that Francis was not involved

1 in the decision making.  (Klueger Decl., ¶8.)

2       The lack of total control is confirmed by Eric Deutsch, as evidenced by deposition

3 excerpts attached as Exhibit "J" to the Motion.  (The excerpts are attached to the Blut Declaration

4 as Exhibit "K.")  The Motion itself mischaracterizes and misquotes Deutsche's testimony.  As

5 opposed to confirming that Francis was everyone's "boss", Deutsche actually testified, "Each of

6 those people (the various vice presidents) reports to different people..." (Exhibit "J," 6:12) and

7 that David Goldberg, the Vice President of Marketing and Operations, was responsible for finance

8 issues, and that three workers reported to Goldberg.  (Exhibit "J," 6:23-25 - 7:1-8.)  Deutsche

9 went on to testify that there were two different Human Resource Managers at the entity.  (Exhibit

10 "J," 16:9-10.)  The Motion itself confirms that a finding of alter ego is not the appropriate result

11 here.

12          **b.**    **Payment Of Joe Francis' Personal Expenses Does Not Establish**

13                  **Alter Ego**

14       Wynn claims that Francis is the alter ego of the defendant entities because Blue Horse

15 pays for the mortgage and entities pay for Francis' personal attorney's fees and American Express

16 bill.  First, and most important, Blue Horse Trading, LLC is a pass through entity for tax purposes.

17 Income attributed to Francis is subject to a wage garnishment Order.  As will be set forth below,

18 Wynn has failed to exhaust its legal rights available to it by statute and could have been able to

19 have more fruitful collection efforts had it acted differently.  To date, no garnishment order has

20 been served upon Blue Horse Trading, LLC.

21           **i.**    **Blue Horse Trading, LLC**

22       Plaintiff complains that Blue Horse Trading, LLC pays the mortgage on "Francis'

23 residence."  Blue Horse Trading, LLC was formed in 2002.  (Klueger Declaration, Exhibit "A".

24 The operating agreement was amended in 2003.  (Klueger Decl., ¶5, Exhibit "B.")  This

25 amendment was recently located.  The amendment was signed by Michael Barrett, its manager,

26 not Francis.

27       By way of history, Blue Horse Trading, LLC purchased the real property located at 1111

28 Bel Air Place, Los Angeles, California (the "Property") in 2002.  (Klueger Decl., ¶6, Exhibit "C.")

1  Since the purchase, the expenses for the Property have been paid by Blue Horse Trading, LLC.

2  (Klueger Decl., ¶6, Exhibit "D.") The bank account statements from Blue Horse Trading, LLC's

3  account at Morgan Stanley evidence the payment of the expenses dating back to 2002, 7 years

4  before the judgment was entered. Simply because this residence is paid for by Blue Horse does

5  not establish Francis as an alter ego of Blue Horse Trading, LLC, or GGW Direct, LLC for that

6  matter. Blue Horse Trading, LLC had a rental agreement with Mantra Films at the time of the

7  purchase of the property. (Declaration of Joseph Francis.)

8         With respect to said mortgage payments, Wynn cites to *NEC Electronics Inc. v. Hurt*

9  (1989) 208 Cal.App.3d 772, 776, 256 Cal.Rptr. 441, 442-43 in support of its position. In *NEC*, the

10  subject corporation, Ph Components, paid its sole shareholder and chief executive officer, Porter

11  Hurt's insurance, berthing fees, maintenance and fuel expenses for Hurt's boat, leased an

12  automobile for Hurt's wife, who was not a corporate employee, and made over 30 monthly

13  mortgage payments on Hurt's personal residence. *Id.* at 776. However, in that case, among other

14  factors, the court found that Hurt **used his personal funds to pay corporate obligations**,

15  including property taxes, building rent, payroll and legal expenses. These facts led the court to

16  conclude that Hurt was the alter ego of the corporation. These facts are distinguishable from the

17  instant action. Here, there is no "back-and-forth" payment of monies between Francis and any of

18  the defendant entities. Further, Blue Horse pays the mortgage and the same expenses for the Bel

19  Air residence as it is the owner of the property and has been since 2002.

20         There are several factors which demonstrate that Blue Horse Trading, LLC does not bear

21  the indicia required for a finding of alter ego. In fact, the amended operating agreement and

22  mortgage documents on the Bel Air residence actually show the lack of ultimate control or

23  authority by Francis. First, the amended agreement was signed by Michael Barrett. In this regard,

24  Wynn alleges that Francis took out a five million dollar loan in February 2008. (See Exhibit "Q")

25  to Moving papers). However, Francis was actually incarcerated in Washoe County, Nevada from

26  June 4, 2007 until March 10, 2008. (See Declaration of David Houston and Exhibit "A" to

27  Declaration of Blut.) It is impossible that he would be able to execute the documents and

28  complete such a transaction. Further, the five million dollar mortgage documents on Francis' Bel

1   Air residence were forged.  The documents were executed in February, 2008 and notarized as

2   being executed in Los Angeles, Los Angeles County.  Moreover, the signature on the forged

3   documents do not even remotely resemble Francis' signature.  This was during a period of time

4   described by Francis during a judgment debtor exam whereby there was internal fraud and

5   embezzlement at Mantra Films, Inc., the original member of Blue Horse Trading, LLC.  (Blut

6   Decl., ¶6, Exhibit "J.")  This was confirmed by Mr. Francis at last week's deposition.

7       Blue Horse Trading, LLC as the owner of the property has an interest in protecting its only

8   asset.  This is the entity that receives compensation earned by Francis from GGW Brands, LLC.  It

9   is clear that Francis was not involved in the amended operating agreement which changed the

10  ownership interest.  This document was recently located and gives credence to Francis' testimony

11  that he was unaware of the owner of Blue Horse Trading, LLC as he truly was ignorant since he

12  did not create or sign the document transferring title to Francis from Mantra Films, LLC.

13      Therefore it is not possible that Blue Horse Trading, LLC was formed in order to defraud

14  creditors, much less Wynn, a creditor who came along many years after its formation. This is just

15  one example of the overreaching by Wynn as Wynn attempts to persuade this Court to look at the

16  "totality of circumstances" as opposed to individually looking at each entity and evidence

17  supporting Wynn's claims.

18      Wynn also cites to *Olen v. Phelps* (Wis. Ct. App. 1996) 200 Wis.2d 155, 546 N.W.2d 176

19  in support of its position. In *Olen*, an investor sued an accounting firm and its sole shareholder,

20  and director, Phelps, to recover funds placed with director, recovered default judgment, and

21  subsequently filed fraudulent conveyance action and sought to garnish the debtor's office building

22  and future profits. The appellate court affirmed that reverse piercing of corporate veil was justified

23  because Phelps transferred the office building and condo to his daughter as a gift, but she was

24  unaware of transaction, and did not give consideration. Further, the company continued to pay

25  mortgage as if it were the owner, and the transaction was made only 2 months after debt incurred.

26  Here, Blue Horse Trading, LLC has paid all expenses at the property since 2002 and mortgage

27  payments after the loan was obtained and there was no transfer of property by Francis to avoid

28  Wynn's collection efforts.

        **ii.**    **Payment Of Joe Francis' Attorneys' Fees Does Not**

                **Establish Alter Ego**

Francis is the founder of the Girls Gone Wild "brand". As such, any litigation against Francis will result in essentially litigation against a Girls Gone Wild entity. Defending Francis in litigation whereby the "brand" is implicated is defending the brand. For example, when this case was filed, the headline of vegasinc.com was "Wynn moves to garnish assets of 'Girls Gone Wild' founder". (Blut Decl., ¶3, Exhibit "H.")

This issue was reviewed by Robert Klueger in connection with his evaluation of tax issues facing GGW Brands, LLC, GGW Events, LLC and GGW Direct, LLC. Mr. Klueger formed the opinion that as Mr. Francis is associated with Girls Gone Wild, publicity surrounding Mr. Francis has led to negative publicity for Girls Gone Wild. In order to protect the "brand" it is appropriate for GGW Direct, LLC to pay for the representation where appropriate. This included representation in criminal matters in which Francis was a defendant. This included attorneys fees charged by David Houston, who has performed legal services for Mr. Francis. The defense of actions arising out of Mr. Francis' work for the various entities would constitute expenses of the various entities inasmuch as entities have an obligation to defend their agents, officers, employees with regard to actions arising out of their work performed for the entities.

The funds at issue in this motion for Preliminary Injunction are in the attorney client trust account of David R. Houston, a long time attorney for Mr. Francis. (See Declaration of David R. Houston., ¶1.) Contrary to the arguments of counsel, these funds were deposited for future litigation against GGW Direct, LLC. Most significant for the purposes of this Opposition, and omitted from the Motion, is the fact that the funds held in the David R. Houston attorney client trust account that are the subject of the Temporary Restraining Order have **not** been used to pay any of Francis' personal legal fees. (Blut Decl., ¶4, Exhibit "I.")

Further, in California where the defendant entities operate or operated, it is well settled that an employer indemnifies employees, agents, officers and directors for acts performed during the course of employment. California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the

1   employees' acts within the course and scope of their employment.' [Citation.] ... [S]ection 2802

2   codifies this policy and gives an employee a right to indemnification from his or her employer.'"

3   *Nicholas Laboratories, LLC v. Chen* (2011) 199 Cal.App.4th 1240, 1247, 132 Cal.Rptr.3d 223,

4   228, citing, *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 952, 81 Cal.Rptr.3d 282,

5   189 P.3d 285; see, California *Labor Code* § 2802. "'Section 2802 ... requires an employer to

6   indemnify an employee who is sued by third persons for conduct in the course and scope of his or

7   her employment, including paying any judgment entered and attorney's fees and costs incurred in

8   defending the action. [Citations.] As long as the employee is acting within the scope of his or her

9   employment, the right to indemnity is not dependent upon a finding that the underlying action was

10   unfounded.'" Id. at 1247, citing, *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145

11   Cal.App.4th 220, 230, 51 Cal.Rptr.3d 527. Therefore, the conclusion that payment of attorney's

12   fees for the defense of Joe Francis in criminal matters was consistent with case law. While

13   Plaintiff may argue that the payment of such fees establishes its claim for alter ego, this appears

14   on its face to be a bona fide business judgment decision, i.e., to indemnify an agent for work

15   performed in the course and scope of the entity business.

16                 iii.   **LLC's can pay personal expenses without losing its form**

17         The other area raised in the Motion is the payment of Francis' personal American Express

18   bills. As shown in the Declaration of Joe Francis, Mr. Francis sent his personal funds to

19   Boulevard Management for the payment of the American Express bills referenced in the motion.

20   (Declaration of Joseph Francis.) Also, Blue Horse Trading has paid Mr. Francis' personal

21   American Express bills. (*See*, Exhibit "D.") Robert Klueger, these are funds that are paid in

22   connection with the compensation due to Francis for his work for GGW Brands, LLC.

23         Further, an internal ledger is kept which delineates what's personal and what's in

24   connection with the defendant entities. (Klueger Decl., ¶7.) Counsel sent a draft Protective

25   Order to counsel on June 22, 2012 and is waiting for signature in order to produce the ledger.

26   Francis recently testified that he has a personal and corporate credit card and keeps expenses

27   separate. The Opposition will be supplement when the transcript is available which should be

28   prior to the hearing on this Motion.

### C.    THE PRELIMINARY INJUNCTION IS IMPROPER BECAUSE WYNN HAS NOT AND WILL NOT SUFFER IRREPARABLE INJURY

A preliminary injunction may be issued to preserve the status quo if the party seeking it shows: (1) that the party enjoys a reasonable "likelihood of success" on the merits; and (2) the party will be subjected to "irreparable harm." *Dixon v. Thatcher*, 103 Nev. 414, 415, 742 P.2d 1029, 1029 (1987).   NRS 33.010(2) authorizes an injunction when the commission of an act would produce irreparable injury to the plaintiff. Before the district court may issue a preliminary injunction, the moving party must show: (1) that there is a likelihood that he or she will be successful on the merits, (2) that there is a reasonable probability that the nonmoving party's conduct will cause irreparable harm for which damages will not be an adequate remedy, and (3) that the moving party's potential hardships outweigh any hardships to the nonmoving party caused by implementing the injunction. *University Sys. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721 (2004)

The United States Supreme Court declared the "key word" in the injunction analysis "is irreparable.  Mere injuries, however substantial, in terms of money, time and energy ..., are not enough. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (quoting *Va. Petroleum Jobbers Ass'n. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)) (emphasis in original) (internal quotation marks omitted).  In *Sampson v. Murray, supra*, 415 U.S. at 90, the Supreme Court held that:

> temporary loss of income, ultimately to be recovered, does not usually
> constitute irreparable injury.... "The possibility that adequate
> compensatory or other corrective relief will be available at a later date,
> in the ordinary course of litigation, weighs heavily against a claim of
> irreparable harm."

Hence, "monetary injury is not normally considered irreparable" for purposes of injunctive relief. *Nelson v. National Aeronautics & Space Admin.*, 530 F.3d 865, 881 (9th Cir.2008) (citation and internal quotation marks omitted)

Plaintiff's motion for a preliminary injunction summarizes its position with regards to the