Although courts should consider the reasonable views of creditors, "objections do not
rule. It is well established that compromises are favored in bankruptcy." *In re Lee Way
Holding, Co.,* 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990). As noted by the Supreme
Court: "In administering reorganization proceedings in an economical and practical
manner, it will often be wise to arrange the settlement of claims to which there are
substantial and reasonable doubts." *TMT Trailer Ferry, Inc.,* 390 U.S. at 424.

## III. Analysis

### A. Compromise of Wynn and Wynn LV's Claims

#### 1. The Probability of Success in the Litigation

The Trustee contends that he has determined there is "a substantial risk that he will lose
the Alter Ego Litigation" and that each Debtor "eventually will be determined to be"
Francis's alter ego. Motion at 14. According to the Trustee, before his appointment
each Debtor was wholly owned and controlled by Francis. The Trustee notes that
Francis and the Debtors appear to have operated as a "single economic unit," so that
one was inseparable from the other. *Id.* at 15. The Debtors paid Francis's personal
expenses, including business expenses for his property in Mexico and insurance on
cars that were owned by one of the Debtors, but driven by Francis. Declaration of
Mandy Isaac in support of the Motion (Issac Decl.) ¶¶ 4-6.

The Trustee also contends that the Debtors paid Francis's attorneys' fees as if they
were the Debtors' business expenses, and caused the Debtors to make payments to his
personal accountant, who then used the funds to pay for "everything from Francis's
landscaping to his mortgage." Motion at 15. Francis used the Debtors' cars for his
personal use and their credit cards for his ordinary personal expenses. Francis
managed the Debtors without taking any salary. Debtors' primary intellectual property
and several other assets were transferred between Francis and other entities that he
controlled. The Debtors' office space was subleased from another entity controlled by
Francis. The Trustee contends that Francis initially disguised his ownership interest in
the Debtors. Then, Francis transferred that interest and the intellectual property that the
Debtors use to offshore entities, which are owned by a trust that Francis settled and of
which he is the beneficiary.

The Trustee asserts that the Debtors have previously focused on arguing against being
liable under the alter ego doctrine on the basis that it usually only applies to insiders
being held liable for the debts of a business entity, and that the opposite—a corporation
being liable for an insider's debts—is impermissible or rare. The Trustee notes that
several courts have rejected such "reverse corporate veil piercing." Motion at 16. The
Trustee acknowledges, however, that a number of courts have recognized reverse veil
piercing as a viable theory and that there is a significant possibility that Wynn and Wynn
LV would prevail on such a claim.

Not surprisingly, Favazza and GGW Global view the situation differently. According to Favazza, Wynn and Wynn LV's claims could be "easily challenged by the Trustee" and if the Trustee challenged the "reverse veil-piercing and nominee claims, the Trustee would surely prevail." Favazza Opposition at 31. Similarly, GGW Global contends that "[g]iven the likelihood that [Wynn and Wynn LV's claims], if contested, would be found to be invalid . . . and the minimal cost of any litigation contesting the claims, the proposed settlement is not reasonable." GGW Global Opposition at 1. It is paradoxical that both Favazza and GGW Global believe that the Debtors' case against Wynn and Wynn LV would be such an easy victory given the fact that they both engage in extensive argument regarding which choice of law analysis applies, and which state's law applies to determining whether outsider reverse veil piercing would be applicable.

Although the parties do not agree on many issues in this case, they do appear to agree that the laws of three states—California, Delaware, and Nevada—could be implicated. The Trustee argues that the laws of Nevada apply, with a small chance that Delaware law applies. GGW Global asserts that the laws of either Delaware or California apply. Finally, Favazza contends that California law applies.

Ultimately, as discussed below, the Court believes that for the purposes of this Motion it does not matter which jurisdiction's choice of law analysis applies or which state's law would apply to the facts before the Court.

### a. Delaware

No Delaware court has explicitly addressed the issue of whether a claim for outside reverse veil piercing would be allowed. At least two federal courts applying Delaware law, however, have attempted to predict how the Delaware courts would resolve the issue.

In *In re Alt Hotel, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012), the court determined that Delaware law would not permit a claim for inside reverse-piercing of the corporate veil. The court in *In re Alt Hotel* defined reverse piercing as where a "corporate insider, the shareholder or subsidiary, wants to be considered the alter ego of the corporation to assert a corporate claim against a third party." *Id.* at 801. According to the court in *In re Alt Hotel*, "courts are overwhelmingly hostile to insider reverse piercing" because "insiders who benefit from incorporation should not be able to deny corporate existence later on when the corporate form 'works to their detriment or disadvantage.'" *Id.* at 802. The instant case is not on point with *In re Alt Hotel* because here, Wynn and Wynn LV, "outsiders," are seeking to hold the GGW Entities liable for the acts of their insider, Francis.

In contrast, in *ASARCO LLC v. Ams Mining Corp.*, 396 B.R. 278, 317 (S.D. Tex. 2008) the court predicted that the Delaware courts would adopt the doctrine of reverse veil-piercing "if presented with a similar factual scenario" as that before the court. The facts of *ASARCO* were legally and factually complex, but at its core, Grupo Mexico, S.A.B. de C.V. (Grupo) wholly owned American Mining Corporation (AMC), which wholly owned ASARCO, LLC (ASARCO), which wholly owned Southern Peru Holdings, LLC (SPHC),

14

which owned the majority of stock of Southern Peru Cooper Company (SPCC). *Id.* at
302. Grupo dictated the creation of SPHC to avoid the potentially adverse impact of
pledging SPCC's stock as collateral. *Id.* at 324. ASARCO asked "the Court to find that
SPHC was its alter ego so that it [could] claim an interest in the SPCC stock that was
transferred from SPHC to AMC." *Id.* at 317. In other words, ASARCO sought to pursue
a claim on behalf of SPHC for the benefit of ASCARO's creditors. *Id.* at 315. *ASARCO*
resists easy classification as either an inside or outside reverse piercing case. Even
though ASARCO initially appears to involve insider reverse veil piercing (because a
parent wanted to be considered the alter ego of a subsidiary) a closer analysis
demonstrates that the court was deciding an outsider reverse veil piercing case
(because the claim was brought on behalf of outside creditors). *See In re Alt Hotel,
LLC,* 479 B.R. at 801 (noting that outside piercing is when a third party such as "a
creditor or bankruptcy trustee" makes an alter ego claim "either to hold the corporation
liable for the acts of its shareholder or subsidiary, or to bring an action in the name of
the corporation against the shareholder or subsidiary.").

### b. California

#### i. Outsider Reverse Veil Piercing

In *Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 1523 (2008), the
California Court of Appeals surveyed the reverse veil piercing law and concluded that it
was not a viable theory in California. The crux of the court's reasoning was that
"conversion and fraudulent conveyance already afford judgment creditors protection"
from situations where a judgment debtor attempts to use corporate forms as a shield
against collection. *Id.* at 1523.

The court in *Postal* also stated that even if it accepted the theory as viable, it would not
apply to the facts at issue in that case. *Id.* at 1524. On this point, the court stated that
the judgment creditor "failed to show that innocent creditors would be adequately
protected" if reverse piercing was applied. *Id.* The court also noted that adding an alter
ego to a judgment was an equitable remedy, and as a result, the availability of
alternative legal remedies had to be considered before such remedy could be applied.
*Id.* The court concluded that the party seeking to utilize the alter ego theory "failed to
establish that its legal remedies were inadequate, and the record [did] not show whether
the trial court considered the adequacy of [its] legal remedies." *Id.*

In *Postal*, the issue before the court was whether a corporation should be liable for the
debt of a shareholder, and the party seeking to hold the company liable for the
shareholder's debt was a corporate outsider. *Postal* at 1517. Therefore, the court in
*Postal* was addressing outside reverse piercing. *Id.* at 1518 ("The California Supreme
Court has not spoken on the issue of outside reverse piercing of the corporate veil.
Whether to accept or reject the doctrine is an issue of first impression in this state.").

The Trustee acknowledges *Postal* but contends that the prohibition against reverse
piercing under California law "is hardly settled." Trustee Reply at 12. To support this
assertion, the Trustee cites *Taylor v. Newton*, 117 Cal.App.2d 752 (1952) (affirming trial
court's decision that a corporation could be liable for the debts of its shareholder on an

alter ego theory) and *Wood v. Elling Corp.*, 572 P.2d 755, 762 (1977) ("If it were alleged and proven that the two trusts in question were themselves alter egos of the Wenckes, those trusts would essentially drop out as independent legal entities . . . .").

Although the cases cited by the Trustee do not refer to reverse piercing by its modern name, they do approve the application of some version of the reverse piercing concept. The courts' ultimate conclusions in these cases are therefore in conflict with *Postal*. The only conclusion that can be drawn from viewing these cases in the aggregate is that the law regarding the issue of reverse veil piercing is fairly muddled in California.

### ii. Nominee Theory

The Trustee contends that Wynn and Wynn LV have indicated they might attempt to hold the Debtors liable for Francis's debts on the theory that the Debtors hold Francis's assets as nominees. Motion at 17-18. The Trustee notes that this theory has recently been endorsed by the Ninth Circuit in *Rothwell, Ltc. v. United States*, 2013 WL 2997188 (9th Cir. 2013) (unpublished decision) (a case that also involved Francis) and *Fourth Inv. LP v. United States*, 2013 WL 2631514 (9th Cir. 2013).

GGW Global and Favazza contend that a nominee theory "would only work if Wynn was the I.R.S. and the Debtors were taxpayers seeking to avoid a tax levy." Favazza Oppo. at 18. While the court in *Fourth Inv.* was analyzing the nominee theory for the purpose of determining tax liability, the nominee theory is a product of California law and is therefore applicable outside of tax cases. *Fourth Inv.* 2013 WL 2631514, at *8 ("The federal tax lien statute itself 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'") (*quoting Drye v. United States*, 528 U.S. 49, 58 (1999)); *see also Morgan v. Commissioner*, 309 U.S. 78, 80 (1940) ("State law creates legal interest and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed."); *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 903 (9th Cir. 2000) (stating that interpretations of state law from the Ninth Circuit Court of Appeals are binding within the circuit absent a subsequent contrary interpretation from the state courts).

The court in *Fourth Inv.* stated that if the California Supreme Court were to evaluate factors "relevant to determining nominee ownership under California law, it would adopt the uniform set of factors generally recognized by federal courts," which are as follows:

> (1) whether inadequate or no consideration was paid by the nominees;
> (2) whether the properties were placed in the nominees' names in anticipation of a lawsuit or other liability while the transferor remains in control of the property;
> (3) whether there is a close relationship between the nominees and the transferor;
> (4) failure to record the conveyances;
> (5) whether the transferor retained possession; and
> (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Id.* at 9; *see also Lewis v. Hankins*, 214 Cal.App.3d 195, 201 (1989) (affirming a judgment providing that while record title to two parcels of real property were held in the name of two corporations, the parcels were beneficially owned by defendant because such entities were "mere agents or nominees of defendant" and the parcels were subject to levy and sale in satisfaction of defendant's obligations); *In re Turner*, 2007 WL 7238117, at *11 (9th Cir. BAP 2007) (finding that, under California law, property fraudulently transferred to an entity by an individual could be reached by the individual's creditors under a resulting trust theory).

Here many, if not all, of the *Fourth Inv.* factors appear to be met. For example, until the Trustee was appointed, Francis used, enjoyed, and/or possessed the Debtors' money and property as if it was his own. Although Francis contends otherwise, the evidence demonstrates that he exercised complete control over the Debtors. *See, e.g.*, Issac Decl. ¶¶3-5. It is beyond dispute that Francis has also been subjected to many lawsuits and collection activities over the years. Therefore, based on the record in this case, Wynn and Wynn LV appear to have a viable claim of nominee liability under California law against the Debtors.

### c. Nevada

The Nevada Supreme Court has explicitly held that "reverse piercing is appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted." *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (2000).

Favazza notes that the Ninth Circuit recently affirmed a decision of a bankruptcy court rejecting a reverse veil piercing claim under Nevada law. Favazza Oppo. at 12 (*citing In re Flamingo 55, Inc.*, 242 Fed.Appx. 456 (9th Cir. 2007) (unpublished decision))). As an initial matter, *Flamingo* is an unpublished decision, and therefore is not binding precedent. The court in *Flamingo* determined that Nevada law "requires an analysis of the expectation and reasonable reliance of the individuals and entities that would be affected by the court's decision to pierce the corporate veil." *Flamingo*, 242 Fed.Appx at 458. In particular, the court noted that the parties seeking application of the reverse piercing doctrine did not carry their burden "because their expectation as a judgment creditor of the parent corporation should be to recover the equity interests that remain of the subsidiary corporation after its creditors are paid." *Id.*

The facts in *Flamingo* are distinguishable from the facts at issue here. In *Flamingo*, Gregory Grantham (Grantham) and John Saba (Saba) obtained a default judgment against Senior Care Industries, Inc. (SCI) and its principals. *Id.* at 457. Granthan and Saba then sought to enforce the default judgment against Flamingo 55, Inc. (Flamingo), SCI's wholly owned subsidiary. *Id.* The court stated that "the reasonable expectation of Grantham and Saba in obtaining their judgment 'lie in the availability of the assets' of [SCI] and that Grantham and Saba have already realized that expectation, because, '[b]y diverse means they are now holders of all of [SCI's] equity interest in Flamingo." *Id.* at 457-58. Gratham and Saba also wanted to be Flamingo's "most senior creditor,"

which would "disturb and destroy" the reasonable and legitimate expectation of other creditors." *Id.* at 458.

Favazza's argument that if "Wynn gets a $27M claim against the Debtors, it will take the lion's share of the entire corpus of the Debtors, leaving legitimate corporate creditors like Favazza with a massively diluted share" is not persuasive. Favazza Oppo. at 12. The Court does not believe that Favazza's proffered distinction between "legitimate corporate creditors" (a class in which Favazza apparently believes she belongs) and Wynn and Wynn LV's claims, which she classifies as "having absolutely nothing to do with the operation of the companies" is relevant. *Id.* at 2, 12. If Wynn LV were to prevail in the Alter Ego Litigation—either on a reverse veil piercing or nominee liability theory—it would have a judgment enforceable against the Debtors. The fact that Wynn LV's judgment would be based on an alter ego theory would not make it inferior to Favazza's judgment. In fact, Favazza's judgment is not against the Debtors, but rather, it is against Mantra and MFA. Therefore, Favazza, like Wynn and Wynn LV, would have to advance some vicarious liability theory to hold the Debtors liable for her judgment. Assuming she could do so, she would have unsecured claims against the Debtors. The reasonable expectation of all creditors who have unsecured claims is to be paid pro rata with all other unsecured creditors. Therefore, to the extent that Favazza relies on *Flamingo* and contends that her expectations differ from Wynn and Wynn LV's, such an argument is meritless.

### d. Summary of State Laws

To summarize the state laws that could apply in this case: Delaware courts have not yet determined whether reverse corporate veil piercing is a viable cause of action. And, the two federal courts that have addressed the issue have come to contrary conclusions. In California, the most recent case addressing the issue (*Postal*) concluded that reverse veil piercing is not a viable theory, but older cases (*Wood* and *Taylor*) approved its application. It is also notable that *Wood* is the only case that was decided by the California Supreme Court. Thus, the state of the law on this issue in California is subject to reasonable dispute. On the subject of nominee liability, the Ninth Circuit concluded that California has long recognized the nominee theory of liability and it is clear that it applies outside of the tax context. Finally, reverse veil piercing is a viable legal theory in Nevada.

Therefore, the Court believes that the issue of which states' choice of law rules apply and ultimately, which state's law would apply to determining whether reverse veil piercing and/or nominee theory would be viable legal theories is irrelevant. From the Court's analysis, Wynn and Wynn LV would have a viable legal claim under Delaware, Nevada, or California law. And, given the significant amount of effort that Favazza and GGW Global expend trying to explain why the Alter Ego Litigation is such a slam dunk for the Trustee, it is clear that it is no such thing.

18

   2. The Difficulties, if any, to be Encountered in the Matter of
      Collection

The settlement relates to Wynn and Wynn LV's claims against the Debtors, not
collection of amounts from Wynn or Wynn LV.  Therefore, this factor is not
relevant.

   3. The Complexity of the Litigation and the Expense, Inconvenience and
      Delay Necessarily Attending it

The Alter Ego Litigation involves several contested legal issues as well as an
extensive and complex factual record.  Among the contested issues are which
jurisdictions' choice of law rules apply, which state's laws apply, and whether the
matter should be remanded to the Nevada State Court or transferred to this
Court.  These preliminary matters will increase the expense of the litigation
before a court can even reach the merits of the dispute.  The fact that the case is
currently pending in Nevada creates added expense and inconvenience because
the Debtors' cases are pending in Los Angeles, which necessitates travel for the
Trustee's counsel and raises issues regarding eligibility to practice law in
Nevada.  In addition to the choice of law issues, which are complex, some of the
legal issues have under-developed appellate authority (for example reverse veil-
piercing under Delaware and California law).  This invites the possibility of
appeals, which would add to the delay and expense in resolving the litigation.

The Alter Ego Litigation was initiated by Wynn LV on 4/18/12.  Settlement
Agreement, Ex. 3.  According to the Trustee, Wynn LV has indicated that the
"Alter Ego Litigation is nearly trial ready" and if the parties do not enter into the
Settlement Agreement, Wynn LV will seek relief from the automatic stay to
proceed with that case.  Motion at 20.  If the Settlement Agreement is not
approved, continuing the Alter Ego Litigation in any forum will result in the
Debtors' estates incurring substantial additional costs, inconvenience, and
delay.[12]

The Class Action creditors argue that the Settlement Agreement should not be
approved because the proof of claim bar date—9/12/13—has not yet passed.
Class Action Oppo. at 3.[13]  Although they contend that "any additional potential
creditors would be greatly prejudiced by approval of the Settlement Agreement"
before the bar date, *id.* at 3, they do not explain the basis for this assertion.  They

---

[12]  If the Alter Ego Litigation were ultimately transferred to this Court, much of the work that had been
done in Nevada may have to be duplicated which would be wasteful and would significantly increase
costs to the Debtors' estates and further delay resolution of the issues.

[13] The Class Action Creditors incorrectly refer to Wynn and/or Wynn LV as the parties who have filed the
Motion. *See, e.g.,* Class Action Oppo. at 4 ("Wynn's stated motive is to avoid 'costly, multi-jurisdictional
litigation'"); ("Wynn's Proposed Settlement Agreement is unfair and inequitable . . . .").  The Trustee filed
the Motion under Federal Rule of Bankruptcy Procedure 9019(a).  Wynn and Wynn LV are parties to the
Settlement Agreement and do have an interest in the Motion being granted.

also lament that the settlement "ignores all other GGW Brands creditors" because it only resolves Wynn and Wynn LV's claims. *Id.* at 4.

The Court believes that it is appropriate to decide this Motion now even if there are creditors who have not yet been identified or made an appearance in this case. The standard for approving the Settlement Agreement requires this Court to take into account the interests of all the estates' creditors. It is not necessary to know the identity of every single creditor for those interests to be protected. Here, the Settlement Agreement will conserve resources and resolve disputed claims in a reasonable way. This furthers the interests of all creditors of the estate, whether they are presently known or not. The Court has also considered the arguments of three diverse parties in interest who have opposed the Motion: GGW Global, Favazza, and the Class Action Creditors. It is difficult to imagine that an unknown creditor would assert any additional arguments that would compel the Court to change its mind. Also, as the Trustee notes, the filing of these cases generated nationwide media coverage which makes the existence of unknown creditors unlikely. Finally, the Class Action Creditors do not cite any precedent for their contention that the Motion cannot be approved until the bar date passes.

The argument that the Settlement Agreement is somehow deficient and ignores the other creditors because it only resolves Wynn and Wynn LV's claims is not compelling. The Settlement Agreement was negotiated between the Trustee, Wynn, and Wynn LV in good faith. It is unreasonable to suggest the Trustee should attempt to resolve all disputed claims against the Debtors' estates with one agreement. The claims of the other creditors can be addressed by consensual resolution or litigation during the Debtors' cases.

### 4. The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premises

In the Motion, the Trustee argues that the Settlement Agreement is in the interest of the creditors and in deference to their views because it provides for limited subordination of Wynn and Wynn LV's claims and will keep administrative costs down by avoiding costly litigation. Motion at 21. GGW Global argues that the creditors' interests are not being served because Wynn and Wynn LV will have large claims on the basis of what GGW Global contends are invalid legal theories. GGW Global Oppo. at 14. Favazza does not specifically address this element but does generally argue that the allowed claims of Wynn and Wynn LV are too high and that this will prejudice the other creditors.

Wynn and Wynn LV's claims will be the largest claims if the Settlement Agreement is approved. If the Trustee continued to litigate these claims and lost, however, the Debtors' estates would be saddled with larger administrative expenses along with the full, unsubordinated amount of Wynn and Wynn LV's claims.

A reasonable view of creditors is to be paid their pro rata share with the rest of the creditors in their class. Here, the unsecured creditors will be treated better than this by virtue of the subordination provisions of the Settlement Agreement. It is not reasonable for a creditor to think that the Trustee will prevail, against the odds, in complex multi-jurisdictional litigation. Also, as the Trustee persuasively argues, the Class Action Creditors and Favazza do not have judgments against any of the Debtors, weakening any argument that they reasonably believe they would be paid by the Debtors.

The $400,000 limited subordination also protects the reasonable expectations of creditors because it will improve the distribution to creditors who actually dealt with the Debtors, including trade creditors and employees. As of 8/1/13, the proofs of claims filed by such creditors does not exceed $400,000.[14]

### B. Division of Trust Funds

#### 1. The Probability of Success in the Litigation

The Trustee contends that the proposed allocation of the approximately $1.8 million dollars in Trust Fund assets—$800,000 immediately to be distributed to the Trustee for the benefit of the Debtors' estates and the remainder to be paid to Wynn LV—is fair, reasonable and equitable. According to the Trustee, he has traced $710,967.99 from GGW Direct LLC to Boulevard, who served as Francis's personal accountant. According to the Trustee, the balance of the funds transferred to Boulevard, $2,337,383.16, came from Francis or non-Debtor entities. Although the Trustee has attempted to trace these additional funds to the Debtors, he has had "limited success." Heyn Decl. ¶ 17. Therefore, the Trustee asserts that he is unlikely to succeed in obtaining a significantly larger

---

[14] The Debtors' cases are being jointly administered but each case has its own claims register. *See* docket #98 in case no. 13-bk-15130. Favazza filed proofs of claim in all five of the Debtors cases. Aside from her proofs of claim, the following proofs of claim have been filed: A. *GGW Marketing, LLC* 2:13-bk-23452: 1) IRS, $700. B. *GGW Direct, LLC*, 2:13-bk-15132: 1) Moulton Logistics Management Inc., $5,709.48 (goods and services); 2) Bryan Lord, $5,000 (services); 3) SF Global Sourcing, LLC, $8,695 (goods); 4) Media Distributors, $673.40 (goods); 5) IRS, $10,640,636.73. C. *GGW Events, LLC* 2:13-bk-15134: 1) IRS, $310,020.38. D. *GGW Magazine, LLC* 2:13-bk-15137: 1) IRS, $97,036.15. E. *GGW Brands, LLC* 13-bk-15130: 1) Chelsea Heath, $67,926.36 (judgment against GGW Brands, Inc. for unpaid wages and wrongful termination); 2) Google Inc., $16,450.18 (services); 3) Yahoo! Inc., $2,506.13 (basis not clear from proof of claim); 4) Larry Hancock, $5,000 (services); 5) IRS, $700.00; 6) Transcontinental Interweb Montreal, $40,244.82 (goods); 6) 2nd Watch, Inc. $928.06 (services); 7) Cogent Communications, Inc., $7,082.91 (services). The total amount of claims filed against the Debtors by persons and entities other than the IRS and Favazza equals $160,216.37.

The Trustee asserts that his initial assessment of the IRS's claims is that they will not be allowed because the Debtors are single-member LLCs and are therefore disregarded as a separate entity from their owner for federal tax purposes. As a result, the Debtors' "activities are treated in the same manner as sole proprietorship, branch, or division of the owner," and the owner is considered the employer for purposes of payroll taxes. *See* Motion at 21-22 n.13 (*citing* Treas. Reg. §§ 301.7701-2(a); 301.7701-3(b)(1)(ii); *Kandi v. United States*, 2006 WL 83463 (W.D. Wash. 2006), *aff'd*, 295 Fed. App'x. 873 (9th Cir. 2008).

portion of the Trust Fund than is allocated to the Debtors under the Settlement
Agreement.

GGW Global takes issue with the $800,000 that the Debtors will receive from the
Trust Fund because it opines that most of those funds will be used to pay the
fees of the Trustee and his professionals. Favazza engages in her own tracing
of the funds in the Trust Fund and concludes that $655,741.06 of the
approximately $3 million that was transferred to Boulevard from GGW Direct
Mantra and Pepe Bus, LLC (21.5% of the total), "should easily come back to the
Debtors' estate [sic] without too much of a fight." Favazza Oppo. at 20. She
then contends that applying the 21.5% to the approximately $1.8 million in the
Trust Fund demonstrates that $387,000 is "clearly the Debtors' money." Id.

Favazza argues that Francis siphoned more than $7.6 million from the Debtors.
Therefore, she asserts that the Trustee has an equally valid claim to the funds
belonging to Francis as Wynn and Wynn LV, and the Debtors should therefore
get a higher percentage of the Trust Fund. Id. at 20-21. Favazza acknowledges
that the Debtors are receiving more than they are "clearly" entitled to. She still
contends, however, that the Trustee should have bargained for more.

Wynn LV presents persuasive evidence demonstrating that all of the money in
the Trust Fund belonged to Francis—as opposed to the Debtors. For example,
the money in the Trust Fund was transferred from Boulevard, which managed
Francis's personal finances. Langberg Decl. Ex. S. Wynn LV acknowledges that
GGW Direct LLC transferred approximately $710,000 to Boulevard. Wynn Reply
at 5; Langberg Decl. Ex. I. Wynn LV offers deposition testimony to demonstrate
that the GGW Entities paid Francis a salary during the first half of 2011, and as a
result the funds that were transferred from GGW Direct, LLC to Boulevard were
distributions from the GGW Entities to Francis and most likely not fraudulent
transfers. Wynn Reply at 5; Langberg Decl. Ex's N, 80:5-25 and I. This
testimony and documentary evidence tends to show that the $710,000 originating
from GGW Direct, LLC was a legitimate payment to Francis from one of the
Debtors for services provided by Francis. Therefore, any claim that the Debtors
have to that money would be tenuous.

Wynn LV also submitted evidence that it has a priority lien on all of the monies in
the Trust Fund, which would make the Trustee's claim to those funds, difficult, at
best.[15] In light of the source of the money in the Trust Fund, Wynn LV's liens on

---

[15] Wynn LV served Francis with a Notice to Appear at a Judgment Debtor Examination which
created a lien on all of Francis' personal property pursuant to California Code of Civil Procedure
Section 708.110(d). Langberg Decl. Ex's. O and P. Wynn LV subsequently renewed that lien by
serving an additional Notice to Appear at a Judgment Debtor Examination. Id. Ex. P. Wynn LV
also recorded abstract of judgments in two Nevada counties (Washoe and Clark), which created
a lien on all of Francis's property pursuant to Nevada Revised Statute section 353C.170. Id. Ex.'s
Q and R. These liens would only be valid to the extent that Wynn LV's underlying claims to the
money were valid. See Gostin v. State Farm Ins. Co., 224 Cal. App. 2d 319, 325 (1964) ("An
enforceable lien is dependent upon an existing obligation the performance of which is secured by
the property upon which the lien is a charge."); In re Thomas, 102 B.R. 199, 201 (Bankr. E.D. Cal.

the Trust Fund and the fact that the Debtors will receive more than the $710,000, which was transferred from GGW Direct, LLC without having to incur any additional litigation costs, the division of the Trust Fund is reasonable.

The Class Action creditors take issue with the proposed $250,000 priority claim for Wynn LV because "there is no equitable outcome for the remaining creditors as the Settlement Agreement is silent" regarding how all other creditors will be treated if Wynn and Wynn LV receive their Admin. Claim. Class Action Oppo. at 6. The Settlement Agreement does not need to define how all the other creditors will be treated. The other creditors will receive the treatment they are entitled to receive under the Bankruptcy Code, except that unsecured creditors will benefit from the limited subordination of Wynn and Wynn LV's unsecured claims, as provided in the Settlement Agreement.

2. The Difficulties, if any, to be Encountered in the Matter of Collection

The settlement relates to Wynn and Wynn LV's claims against the Debtors, not collection of amounts from Wynn or Wynn LV. Therefore, this factor is not relevant.

3. The Complexity of the Litigation and the Expense, Inconvenience and Delay Necessarily Attending it

The rightful owner of the Trust Fund is a less legally complex issue than the issues relating to reverse veil piercing. The facts involved, however, are complex because they involve tracing money through convoluted channels. And, the Trustee's counsel has already consulted with the Debtors' employees and former attorneys and attempted to "trace the balance of Funds transferred to Boulevard Management to show that other funds it transferred to Houston originated from the Debtors." Heyn Decl. ¶ 16. He has, however, had "limited success" in finding additional amounts that the Debtors transferred indirectly to Boulevard. *Id.*

The same concerns with litigating in Nevada that were addressed above apply to the Trust Fund. Because the Trustee can only trace $710,967.99 of the Trust Fund to the Debtors, continuing to litigate with Wynn LV instead of accepting the $800,000 and avoiding additional legal fees would not be in the best interests of the creditors.

4. The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premises

The Settlement Agreement benefits all unsecured creditors because the estate will receive $800,000 immediately, which will help the Trustee move the Debtors' cases forward and hopefully ultimately realize more value for the creditors. The alternative

---

1995) ("The California courts have long recognized the maxim that a lien cannot survive (much less be created in the first place) absent the existence of an enforceable underlying obligation.").

would be to take a chance and litigate over the Trust Fund, which most likely will result in recovery of less than $800,000 and will unquestionably lead to more administrative costs in the form of legal fees and a delay of the Debtors' cases. The Settlement Agreement as it relates to the Trust Fund is in the best interests of the creditors and comports with a reasonable creditors views of the situation.

## IV. Conclusion

Many, if not most, of the arguments in the GGW Global, Favazza and Class Action Creditors' oppositions are directed at discrete legal and factual issues. Essentially, the objectors believe that the Trustee either: 1) could have obtained a more favorable settlement, or 2) would ultimately prevail on the merits if he continued litigating with Wynn and Wynn LV. When ruling on a 9019 motion, a bankruptcy court does not need to determine whether a consensual resolution is the best one possible, or conduct an in depth analysis into complicated legal issues. *In re Pac. Gas & Elec. Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) (*citing In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("Rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable.")).

In this case, the Settlement Agreement was the result of good faith arm's-length negotiations that spanned several weeks. It provides a sensible and fair resolution of Wynn and Wynn LV's claims when the alternative would be contentious, complex, and expensive multi-state litigation in which the Trustee's likelihood of success is questionable. The Settlement Agreement is reasonable, fair, and equitable when comparing the claims being compromised against the likely rewards of litigating those claims. *In re HyLoft, Inc.,* 451 B.R. 104, 109 (Bankr. D. Nev. 2011). Finally, the Settlement Agreement, without question, is above "the lowest point in the range of reasonableness." *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983);

For all of the reasons stated above, the Motion is GRANTED. Pursuant to LBR 9021-1(b)(1)(B), movant must serve and lodge a proposed order via LOU within 7 days of the hearing. Appearances required.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled COURT'S TENTATIVE RULING ON THE TRUSTEE'S MOTION FOR APPROVAL OF SETTLEMENT WITH WYNN LAS VEGAS, LLC AND STEPHEN WYNN WHICH WAS ADOPTED AS THE COURT'S FINAL RULING AT THE HEARING was entered on the date indicated as Entered on the first page of this judgment or order and will be served in the manner stated below:

**1.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** B Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of August 7, 2013, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

Martin R Barash    mbarash@ktbslaw.com, lbogdanoff@ktbslaw.com
Brendt C Butler    brendt.butler@gmail.com
Anne-Marie J DeBartolomeo    ajd@girardgibbs.com, jiv@girardgibbs.com
Richard K Diamond    rdiamond@dgdk.com, DanningGill@gmail.com
Matthew Heyn    mheyn@ktbslaw.com
Lance N Jurich    ljurich@loeb.com, kpresson@loeb.com
Samuel M Kidder    skidder@ktbslaw.com
Michael D Kolodzi    mdk@mdklawfirm.com
Dare Law    dare.law@usdoj.gov
Dare Law    dare.law@usdoj.gov
John F Medler    JOHN@MEDLERLAWFIRM.COM, JMEDLER@MEDLERROITHER.COM
Kelly L Morrison    kelly.l.morrison@usdoj.gov
R.    Todd    Neilson    (TR)                 tneilson@brg-expert.com,    sgreenan@brg-expert.com;tneilson@ecf.epiqsystems.com;ntroszak@brg-expert.com
Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
Robert J Pfister    rpfister@ktbslaw.com
Ronald N Richards    ron@ronaldrichards.com, nick@ronaldrichards.com
Ronald N Richards    ron@ronaldrichards.com, nick@ronaldrichards.com
Steven J Schwartz    sschwartz@dgdk.com, DanningGill@gmail.com
David M Stern    dstern@ktbslaw.com
Ronald D Tym    RTym@Tymfirm.com
Ronald D Tym    RTym@Tymfirm.com
United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
Andy C Warshaw    awarshaw@lawcenter.com, mstevens@lawcenter.com
Jonathan M Weiss    jweiss@ktbslaw.com
Jonathan M Weiss    jweiss@ktbslaw.com
Robert M Yaspan    court@yaspanlaw.com, tmenachian@yaspanlaw.com

**2.   SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:


Argyle Online, LLC
7120 Carlson Circle, #263
Canoga Park, CA 91311